ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-3038, 22-3039 & 22-3041

---

# In the United States Court of Appeals for the District of Columbia Circuit

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*

v.

JOSEPH FISCHER, EDWARD LANG, AND GARRET MILLER,

*Defendants-Appellees*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NOS. 1:21-CR-53, 1:21-CR-119, 1:21-CR-234 (NICHOLS, J.)

———————

APPELLANT'S APPENDIX

———————

MATTHEW M. GRAVES
    United States Attorney
    District of Columbia

JOHN CRABB JR.
    Chief, Capitol Siege Section
    District of Columbia

KENNETH A. POLITE
    Assistant Attorney General

LISA H. MILLER
    Deputy Assistant Attorney General

JAMES I. PEARCE
    Appellate Counsel, Capitol Siege Section
    Criminal Division
    U.S. Department of Justice
    950 Pennsylvania Ave., N.W.
    Washington, DC 20530
    (202) 532-4991
    James.Pearce@usdoj.gov

# TABLE OF CONTENTS

<u>1:21-cr-53 (Lang)</u>

Docket ................................................................................................. 1

9/7/21      Government's Opposition to Defendant's Motion for
            Release (ECF 31) .................................................................. 14

9/15/21     Superseding Indictment (ECF 36) ...................................... 51

6/22/22     Notice of Appeal (ECF 65) .................................................. 58


<u>1:21-cr-119 (Miller)</u>

Docket ............................................................................................. 59

1/19/21     Amended Criminal Complaint (ECF 5) .............................. 73

11/10/21    Second Superseding Indictment (ECF 61) .......................... 84

3/7/22      Memorandum Opinion (ECF 72) ......................................... 90

4/1/22      Government's Motion for Reconsideration of the
            Court's Ruling Dismissing Count Three of the
            Indictment (ECF 75) ........................................................ 119

4/28/22     Defendant's Opposition to Government's Motion for
            Reconsideration (ECF 80) ................................................ 371

5/27/22     Memorandum Opinion (ECF 86) ....................................... 397

6/22/22     Notice of Appeal (ECF 88) ................................................ 409


<u>1:21-cr-234 (Fischer)</u>

Docket ........................................................................................... 410

2/17/21     Criminal Complaint (ECF 1) ..............................................422

11/5/21     Government's Opposition to Defendant's Motion to
            Clarify and Modify Conditions of Release (ECF 49) ..........433

11/10/21    Superseding Indictment (ECF 52).....................................443

2/4/22      Government's Opposition to Defendant's Motion to
            Dismiss Counts One, Three, Four, and Five of the
            Superseding Indictment (ECF 57).....................................447

3/15/22     Memorandum Opinion (ECF 64) .......................................502

6/22/22     Notice of Appeal (ECF 84)................................................512

# 1:21cr53, USA v. LANG

US District Court Criminal Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 08/02/2022**

## Header

| | |
|---|---|
| **Date Filed:** 01/29/2021 | **Class Code:** Open |
| **Other Docket:** Magistratejudgecasenumber: 1:21mj00061 | **Closed:** |

## Participants

### Defendant

**Name**
EDWARD JACOB LANG
Appeals court case numbers: 21-3066, 22-3039

**Attorneys**
Steven Alan Metcalf , II
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
METCALF & METCALF, P.C.
99 Park Avenue 6th Floor
New York, NY 10016
USA
fedcases@metcalflawnyc.com
646-253-0514
Fax: 646-219-2012
Designation: Retained

Martin Harold Tankleff
06/10/2022
BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP
666 Old Country Road Suite 700
Garden City, NY 11530
USA
mtankleff@barketepstein.com
516-745-1500   Fax: 646-619-4807   Designation: Retained

## Charges                                Disposition

**Complaints:** COMPLAINT in VIOLATION of 18 U.S.C.
111(b), 18 U.S.C. 231(a)(3), 18 U.S.C. 1752(a), and 40
U.S.C. 5104(e)(2)
**Pending:** 18 U.S.C. 231(a)(3); CIVIL DISORDER; Civil
Disorder(1)
18:111(a)(1) and 2; ASSAULTING/RESISTING/IMPEDING
OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding
Certain Officers and Aiding and Abetting(1s-2s)
18 U.S.C. 111(a)(1); ASSAULTING/RESISTING/IMPEDING
OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding

App.1

Certain  Officers(2)

18 U.S.C. 231(a)(3); CIVIL DISORDER; Civil Disorder(3)

18:111(a)(1); ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain Officers(3s-4s)

18 U.S.C. 111(a)(1) and (b); ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain  Officers Using a Dangerous Weapon(4)

18 U.S.C. 231(a)(3); CIVIL DISORDER; Civil Disorder(5)

18:111(a)(1) and (b); ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon(5s-6s)

18 U.S.C. 111(a)(1) and (b); ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain  Officers Using a Dangerous Weapon(6)

18 U.S.C. 1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting(7)

18:111(a)(1) and (b); ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury(7s)

18 U.S.C. 1752(a)(2) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon(8)

18:231(a)(3); CIVIL DISORDER; Civil Disorder(8s)

18 U.S.C. 1752(a)(4) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Engaging in Physical Violence in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon(9)

40 U.S.C. 5104(e)(2)(D); FEDERAL STATUTES, OTHER; Disorderly Conduct in a Capitol Building(10)

18:1752(a)(2) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon(10s)

40 U.S.C. 5104(e)(2)(F); FEDERAL STATUTES, OTHER; Act of Physical Violence in a Capitol Building(11)

18:1752(a)(4) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon(11s)

40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building(12s)

40:5104(e)(2)(F); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Act of Physical Violence in the Capitol Grounds or Buildings(13s)

**Offense Level (Opening):** Felony

**Terminated:** 18:1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting(9s)          Dismissed on Granted Motion by the Defendant.

**Offense Level (Terminated):** Felony

**Case Assigned To:** Judge Carl J. Nichols

App.2

## U.S. Attorneys

Elizabeth Harper Danello

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA

Appellate Division 555 4th Street, NW

Washington, DC 20530

USA

elizabeth.danello@usdoj.gov

(202) 252-6768
Designation: Assistant U.S. Attorney

Melissa Joy Jackson

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA

555 4th Street, NW

Washington, DC 20530

USA

melissa.jackson@usdoj.gov

202-252-7786
Designation: Assistant U.S. Attorney

James Pearce

ATTORNEY TO BE NOTICED

U.S. DEPARTMENT OF JUSTICE CRIMINAL DIVISION APPELLATE SECTION

Department of Justice, Criminal Division 950 Pennsylvania Ave NW Suite 1250

Washington, DC 20530

USA

james.pearce@usdoj.gov

(202) 532-4991
Fax: (202) 305-2121
Designation: Assistant U.S. Attorney

Karen E. Rochlin

ATTORNEY TO BE NOTICED

DOJ-USAO

99 Northeast 4th Street

Miami, FL 33132

USA

karen.rochlin@usdoj.gov

App.3

1:21cr53, USA v. LANG

305-961-9234
Designation: Assistant U.S. Attorney

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 01/15/2021 | SEALED COMPLAINT as to EDWARD JACOB LANG (1). (Attachments: # 1 Affidavit in Support) (zltp) [1:21-mj-00061-GMH] (Entered: 01/15/2021) | |
| 3 | 01/15/2021 | MOTION to Seal Case by USA as to EDWARD JACOB LANG. (Attachments: # 1 Text of Proposed Order)(zltp) [1:21-mj-00061-GMH] (Entered: 01/15/2021) | |
| 4 | 01/15/2021 | ORDER granting 3 Motion to Seal Case as to EDWARD JACOB LANG (1). Signed by Magistrate Judge G. Michael Harvey on 1/15/2021. (zltp) [1:21-mj-00061-GMH] (Entered: 01/15/2021) | |
| | 01/16/2021 | Case unsealed as to EDWARD JACOB LANG (bb) [1:21-mj-00061-GMH] (Entered: 01/21/2021) | |
| | 01/16/2021 | Arrest of EDWARD JACOB LANG in New York. (bb) (Entered: 08/10/2021) | |
| 27 | 01/22/2021 | Rule 5(c)(3) Documents Received as to EDWARD JACOB LANG from US District Court Southern District of New York Case Number 21-mj-626 (bb) (Entered: 08/10/2021) | |
| 5 | 01/29/2021 | INDICTMENT as to EDWARD JACOB LANG (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11. (zltp) (Entered: 02/02/2021) | |
| 7 | 02/04/2021 | Joint MOTION to Continue Initial Appearance and Detention Hearing by USA as to EDWARD JACOB LANG. (Jackson, Melissa) (Entered: 02/04/2021) | |
| | 02/04/2021 | MINUTE ORDER: Upon consideration of the parties 7 Joint Motion to Continue the Initial Appearance and Detention Hearing to February 9, 2021, the Court finds good cause to GRANT this motion. The Initial Appearance and Detention Hearing will take place in this matter on February 9, 2021 at 1:00 p.m. by videoconference before Judge Meriweather. Call-in instructions will be provided to counsel prior to the hearing. Signed by Magistrate Judge Robin M. Meriweather on 2/4/2021. (ztl) (Entered: 02/04/2021) | |
| 8 | 02/08/2021 | MEMORANDUM in Support of Pretrial Detention by USA as to EDWARD JACOB LANG (Jackson, Melissa) (Entered: 02/08/2021) | |
| | 02/09/2021 | ORAL MOTION to Appoint Counsel by EDWARD JACOB LANG. (ztl) (Entered: 03/04/2021) | |
| | 02/09/2021 | ORAL MOTION to Commit Defendant to Custody of Attorney General by USA as to EDWARD JACOB LANG. (ztl) (Entered: 03/04/2021) | |
| | 02/09/2021 | ORAL MOTION for Speedy Trial by USA as to EDWARD JACOB LANG. (ztl) (Entered: 03/04/2021) | |
| | 02/09/2021 | Minute Entry for proceedings held before Magistrate Judge Zia M. Faruqui: Initial Appearance/Arraignment held on 2/9/2021 as to Counts 1,2,3,4,5,6,7,8,9,10,11. Plea of Not Guilty entered as to all counts. Oral Motion to Appoint Counsel by EDWARD JACOB LANG (1); heard and granted. Oral Motion by the Government to Commit Defendant to Custody of Attorney General as to EDWARD JACOB LANG (1); heard and granted. No objection from defense. Oral Motion by the Government for Speedy Trial as to EDWARD JACOB LANG (1); heard and granted. Speedy Trial Excluded from 2/9/2021 to 3/30/2021 in the Interest of Justice (XT). Status Hearing set for 3/30/2021 at 10:00 AM by Telephonic/VTC before Judge Carl J. Nichols. Bond Status of | |

App.4

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Defendant: Defendant Committed/Commitment Issued; Court Reporter: Sara Wick; Defense Attorney:Steven Metcalf and Marty Tankleff; US Attorney: Melissa Jackson; Pretrial Officer: John Copes. (ztl) (Entered: 03/04/2021) | |
| 10 | 03/15/2021 | Unopposed MOTION for Protective Order  by USA as to EDWARD JACOB LANG. (Attachments: # 1 Text of Proposed Order)(Jackson, Melissa) (Entered: 03/15/2021) | |
| 11 | 03/29/2021 | NOTICE of Filing by USA as to EDWARD JACOB LANG (Attachments: # 1 Exhibit Discovery Letter to Defense Counsel dated March 26, 2021(Jackson, Melissa) (Entered: 03/29/2021) | |
| 12 | 03/29/2021 | MOTION for Protective Order  by USA as to EDWARD JACOB LANG. (Attachments: # 1 Text of Proposed Order)(Jackson, Melissa) (Entered: 03/29/2021) | |
| 13 | 03/29/2021 | MOTION for Disclosure  ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS  by USA as to EDWARD JACOB LANG. (Attachments: # 1 Text of Proposed Order)(Jackson, Melissa) Modified relief on 3/30/2021 (znmw). (Entered: 03/29/2021) | |
| 14 | 03/29/2021 | MOTION to Continue AND TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT by USA as to EDWARD JACOB LANG. (Attachments: # 1 Text of Proposed Order)(Jackson, Melissa) (Entered: 03/29/2021) | |
| 15 | 03/29/2021 | MOTION to Exclude Time by USA as to EDWARD JACOB LANG. (See docket entry 14 to view document.) (zstd) (Entered: 03/30/2021) | |
| | 03/30/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to EDWARD JACOB LANG held on 3/30/2021. Further Order to be issued by the Court. Status Conference set for 4/29/2021 at 03:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Steven Metcalf and Marty Tankleff; US Attorney: Melissa Jackson. (zcal) (Entered: 03/30/2021) | |
| 16 | 04/13/2021 | NOTICE OF ATTORNEY APPEARANCE: Martin Harold Tankleff appearing for EDWARD JACOB LANG  from Metcalf & Metcalf (Tankleff, Martin) (Entered: 04/13/2021) | |
| 17 | 04/27/2021 | NOTICE of Filing by USA as to EDWARD JACOB LANG (Attachments: # 1 Exhibit Discovery Letter to Defense Counsel dated April 27, 2021)(Jackson, Melissa) (Entered: 04/27/2021) | |
| 18 | 04/29/2021 | PROTECTIVE ORDER. Signed by Judge Carl J. Nichols on April 29, 2021. (lccjn1) (Entered: 04/29/2021) | |
| 19 | 04/29/2021 | NOTICE of Filing by USA as to EDWARD JACOB LANG (Jackson, Melissa) (Entered: 04/29/2021) | |
| | 04/29/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to EDWARD JACOB LANG held on 4/29/2021. Further Order to be issued by the Court. Speedy Trial as to EDWARD JACOB LANG is Excluded from 4/29/2021 to 6/15/2021, in the Interest of Justice, XT. Status Conference set for 6/15/2021 at 03:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Martin Tankleff and Steven Metcalf; US Attorney: Melissa Jackson. (zcal) (Entered: 04/30/2021) | |
| 20 | 05/18/2021 | NOTICE of Filing by USA as to EDWARD JACOB LANG (Attachments: # 1 Exhibit Discovery Letter to Defense Counsel dated May 18, 2021)(Jackson, Melissa) (Entered: 05/18/2021) | |
| 21 | 06/09/2021 | ENTERED IN ERROR..... MOTION for Leave to Appear Notice of | |

App.5

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Appearance of Steven Metcalf Attorney: Steven Metcalf. by EDWARD JACOB LANG. (Metcalf, Steven) Modified on 6/9/2021 (zstd). (Entered: 06/09/2021) | |
| 22 | 06/09/2021 | NOTICE OF ATTORNEY APPEARANCE: Steven Alan Metcalf, II appearing for EDWARD JACOB LANG  (Metcalf, Steven) (Entered: 06/09/2021) | |
| | 06/09/2021 | NOTICE OF CORRECTED DOCKET ENTRY: as to EDWARD JACOB LANG re 21 MOTION for Leave to Appear Notice of Appearance of Steven Metcalf Attorney: Steven Metcalf. was entered in error and counsel refiled said pleading using correct event. (zstd) (Entered: 06/09/2021) | |
| 23 | 06/14/2021 | NOTICE of Filing by USA as to EDWARD JACOB LANG (Attachments: # 1 Exhibit Discovery Letter to Defense Counsel dated June 14, 2021, # 2 Exhibit Discovery Letter to Defense Counsel dated June 14, 2021)(Jackson, Melissa) (Entered: 06/14/2021) | |
| | 06/15/2021 | MINUTE ORDER. As discussed at the March 30, 2021 status conference, the government's 13 Motion for an Order to Disclose Items Protected by Federal Rule of Criminal Procedure 6(e) and Sealed Materials is GRANTED. It is further ORDERED that the United States may provide in discovery sealed materials and materials protected by Federal Rule of Criminal Procedure 6(e). Signed by Judge Carl J. Nichols on June 15, 2021. (lccjn1) (Entered: 06/15/2021) | |
| | 06/15/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to EDWARD JACOB LANG held on 6/15/2021. Speedy Trial as to EDWARD JACOB LANG is Excluded from 6/15/2021 to 7/15/2021, in the Interest of Justice, XT. Status Conference set for 7/15/2021 at 11:00 AM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Martin Tankleff and Steven Metcalf, II; US Attorney: Melissa Jackson. (zcal) (Entered: 06/15/2021) | |
| | 06/16/2021 | Set/Reset Hearings as to EDWARD JACOB LANG:Status Conference RESET for 7/16/2021 at 11:00 AM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 06/16/2021) | |
| 24 | 06/30/2021 | ENTERED IN ERROR.....NOTICE of Filing by USA as to EDWARD JACOB LANG (Attachments: # 1 Exhibit)(Jackson, Melissa) Modified on 6/30/2021 (zstd). (Entered: 06/30/2021) | |
| | 06/30/2021 | NOTICE OF CORRECTED DOCKET ENTRY: as to EDWARD JACOB LANG re 24 Notice (Other) was entered in error and counsel was instructed to refile said pleading. The exhibit cannot be filed by itself, a notice of filing needs to be filed as the main document and the exhibit will be the attachment. (zstd) (Entered: 06/30/2021) | |
| 25 | 07/01/2021 | NOTICE of Filing by USA as to EDWARD JACOB LANG (Attachments: # 1 Exhibit)(Jackson, Melissa) (Entered: 07/01/2021) | |
| 26 | 07/08/2021 | NOTICE of Filing Viewing Letter by USA as to EDWARD JACOB LANG (Attachments: # 1 Notice to Counsel/Party)(Jackson, Melissa) (Entered: 07/08/2021) | |
| | 07/16/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to EDWARD JACOB LANG held on 7/16/2021. Speedy Trial as to EDWARD JACOB LANG is Excluded from 7/16/2021 to 9/15/2021, in the Interest of Justice, XT. Status Conference set for 9/15/2021 at 11:00 AM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: | |

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Lorraine Herman; Defense Attorney: Martin Tankleff and Steven Metcalf, II; US Attorney: Melissa Jackson. (zcal) (Entered: 07/16/2021) | |
| 28 | 08/12/2021 | NOTICE of Filing of Discovery Letter by USA as to EDWARD JACOB LANG (Attachments: # 1 Exhibit Discovery Letter- 8-11-2021)(Jackson, Melissa) (Entered: 08/12/2021) | |
| 29 | 08/23/2021 | First MOTION for Bond by Edward Jacob Lang, First MOTION for Release from Custody by Edward Jacob Lang by EDWARD JACOB LANG. (Attachments: # 1 Exhibit Exhibits A-J in Support of Bond Application)(Tankleff, Martin) (Entered: 08/23/2021) | |
| 30 | 08/24/2021 | STATUS REPORT Regarding Status of Discovery by USA as to EDWARD JACOB LANG (Jackson, Melissa) (Entered: 08/24/2021) | |
| | 08/30/2021 | MINUTE ORDER. After review of Defendant's 29 Motion for Bond, it is hereby ORDERED that the government shall file a response to the Motion by September 7, 2021. Signed by Judge Carl J. Nichols on August 30, 2021. (lccjn1) (Entered: 08/30/2021) | |
| | 08/30/2021 | Set/Reset Deadlines as to EDWARD JACOB LANG: Response due by 9/7/2021. (zcal) (Entered: 09/01/2021) | |
| 31 | 09/07/2021 | RESPONSE by USA as to EDWARD JACOB LANG re 29 First MOTION for Bond by Edward Jacob LangFirst MOTION for Release from Custody by Edward Jacob Lang  (Attachments: # 1 Certificate of Service)(Jackson, Melissa) (Entered: 09/07/2021) | |
| | 09/08/2021 | MINUTE ORDER. After review of USA's Response 31 to Defendant's Motion for Bond 29 , it is hereby ORDERED that Defendant shall file a Reply by September 14, 2021. It is further ORDERED that the Status Conference on September 15th at 11:00 A.M. shall include a hearing on Defendant's Motion for Bond, and Parties should be prepared to discuss the Motion. Signed by Judge Carl J. Nichols on September 8, 2021. (lccjn1) (Entered: 09/08/2021) | |
| | 09/08/2021 | Set/Reset Deadlines as to EDWARD JACOB LANG: Reply due by 9/14/2021. (zcal) (Entered: 09/09/2021) | |
| 32 | 09/09/2021 | LEAVE TO FILE DENIED- Motion to Proceed as Poor Person, Petition for a writ of Habeas Corpus, Memorandum of Law as to EDWARD JACOB LANG. This document is unavailable as the Court denied its filing. Signed by Judge Carl J. Nichols on 9/9/2021. (zltp) (Entered: 09/10/2021) | |
| | 09/13/2021 | Set/Reset Hearings as to EDWARD JACOB LANG: Motion Hearing / Status Conference RESET for 9/20/2021 at 03:15 PM in Courtroom 17- In Person before Judge Carl J. Nichols. (zcal) (Entered: 09/13/2021) | |
| | 09/13/2021 | MINUTE ORDER. The Court finds that, in light of the COVID-19 pandemic, the interest of justice is best served and outweighs the interests of the public and Mr. Lang in a speedy trial and that the time between September 15, 2021 and the next hearing, presently scheduled for September 20, 2021, shall be excluded in computing time within which the trial must commence in this case under the Speedy Trial Act, 18 U.S.C.  3161. Signed by Judge Carl J. Nichols on September 13, 2021. (lccjn1) (Entered: 09/13/2021) | |
| 33 | 09/14/2021 | Unopposed MOTION for Extension of Time to File Response Reply by EDWARD JACOB LANG. (Tankleff, Martin) Modified text on 9/14/2021 (zstd). (Entered: 09/14/2021) | |
| 34 | 09/14/2021 | RESPONSE by USA as to EDWARD JACOB LANG re 29 First MOTION for Bond by Edward Jacob LangFirst MOTION for Release from Custody by Edward Jacob Lang  (Attachments: # 1 Certificate of Service)(Jackson, Melissa) (Entered: 09/14/2021) | |

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | 09/14/2021 | MINUTE ORDER. Upon consideration of Defendant's 33 Unopposed Motion for Extension of Time, that Motion is GRANTED. It is thus ORDERED that Defendant shall file a Reply to 31 USA's Response to Defendants Motion for Bond by September 17, 2021. Signed by Judge Carl J. Nichols on September 14, 2021. (lccjn1) (Entered: 09/14/2021) | |
| | 09/14/2021 | Set/Reset Deadlines as to EDWARD JACOB LANG: Defendants Reply due 9/17/2021. (zcal) (Entered: 09/15/2021) | |
| 36 | 09/15/2021 | Superseding INDICTMENT as to EDWARD JACOB LANG (1) count(s) 1s-2s, 3s-4s, 5s-6s, 7s, 8s, 9s, 10s, 11s, 12s, 13s. (zstd) (Main Document 36 replaced on 9/16/2021) (zstd). (Entered: 09/16/2021) | |
| 35 | 09/16/2021 | Second STATUS REPORT Regarding Status of Discovery by USA as to EDWARD JACOB LANG (Jackson, Melissa) (Entered: 09/16/2021) | |
| 38 | 09/17/2021 | REPLY TO OPPOSITION to Motion by EDWARD JACOB LANG re 29 First MOTION for Bond by Edward Jacob LangFirst MOTION for Release from Custody by Edward Jacob Lang Opposition to Government (Tankleff, Martin) (Entered: 09/18/2021) | |
| | 09/20/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing/Arraignment as to EDWARD JACOB LANG (1) Count 1s-2s,3s-4s,5s-6s,7s,8s,9s,10s,11s,12s,13s held on 9/20/2021. Not Guilty as to all counts. 29 Motion for Release from Custody as to EDWARD JACOB LANG (1); DENIED for reasons set forth on the record. Motion to modify Conditions; DENIED without prejudice. Further Order to be issued by the Court. Speedy Trial as to EDWARD JACOB LANG is Excluded from 9/20/2021 to 10/20/2021, in the Interest of Justice, XT. Status Conference set for 10/20/2021 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant Committed/ Commitment Issued; Court Reporter: Lorraine Herman; Defense Attorney: Martin Tankleff and Steven Metcalf; US Attorney: Melissa Jackson; Pretrial Services Officer: Andre Sidbury. (zcal) (Entered: 09/20/2021) | |
| 39 | 09/22/2021 | NOTICE OF FILING by USA as to EDWARD JACOB LANG (Attachments: # 1 Notice to Counsel/Party UNITED STATES MEMORANDUM REGARDING STATUS OF DISCOVERY)(Jackson, Melissa) (Entered: 09/22/2021) | |
| 40 | 09/23/2021 | NOTICE OF FILING by USA as to EDWARD JACOB LANG (Attachments: # 1 Notice to Counsel/Party)(Jackson, Melissa) (Entered: 09/23/2021) | |
| 41 | 09/27/2021 | NOTICE OF FILING OF DISCOVERY LETTER by USA as to EDWARD JACOB LANG (Attachments: # 1 Notice to Counsel/Party)(Jackson, Melissa) (Entered: 09/27/2021) | |
| 42 | 10/04/2021 | NOTICE OF APPEAL (Interlocutory) by EDWARD JACOB LANG Filing fee $ 505, receipt number ADCDC-8779418. Fee Status: Fee Paid. Parties have been notified. (Metcalf, Steven) (Entered: 10/04/2021) | |
| 43 | 10/05/2021 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to EDWARD JACOB LANG re 42 Notice of Appeal - Interlocutory. (zstd) (Entered: 10/05/2021) | |
| | 10/05/2021 | USCA Case Number as to EDWARD JACOB LANG 21-3066 for 42 Notice of Appeal - Interlocutory filed by EDWARD JACOB LANG. (zstd) (Entered: 10/05/2021) | |
| | 10/15/2021 | Set/Reset Hearings as to EDWARD JACOB LANG: Due to unavailability of DC Jail, Status Conference RESET for 11/4/2021 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. | |

App.8

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | (zcal) (Entered: 10/15/2021) | |
| 44 | 10/27/2021 | STATUS REPORT Regarding Status of Discovery by USA as to EDWARD JACOB LANG (Jackson, Melissa) (Entered: 10/27/2021) | |
| | 11/04/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to EDWARD JACOB LANG held on 11/4/2021. Speedy Trial as to EDWARD JACOB LANG is Excluded from 10/20/2021 to 12/9/2021, in the Interest of Justice, XT. Status Conference set for 12/9/2021 at 10:00 AM by Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Martin Tankleff; US Attorney: Melissa Jackson. (ztl) (Entered: 11/04/2021) | |
| 45 | 11/05/2021 | STATUS REPORT Regarding Status of Discovery by USA as to EDWARD JACOB LANG (Jackson, Melissa) (Entered: 11/05/2021) | |
| 46 | 11/17/2021 | NOTICE OF ATTORNEY APPEARANCE Karen E. Rochlin appearing for USA.  (Rochlin, Karen) (Entered: 11/17/2021) | |
| | 12/09/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to EDWARD JACOB LANG held on 12/9/2021. Speedy Trial as to EDWARD JACOB LANG is Excluded from 12/9/2021 to 1/18/2022, in the Interest of Justice, XT. Status Conference set for 1/18/2022 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Martin Tankleff and Steven Metcalf, II; US Attorney: Melissa Jackson and Karen Rochlin. (zcal) (Entered: 12/09/2021) | |
| 47 | 01/18/2022 | MOTION for Extension of Time to Adjournment Request by EDWARD JACOB LANG. (Metcalf, Steven) (Entered: 01/18/2022) | |
| | 01/18/2022 | MINUTE ORDER as to EDWARD LANG. Upon review of Defendant's 47 Motion for Extension of Time and Exclusion Under the Speedy Trial Act, it is ORDERED the Motion is GRANTED. It is further ORDERED that the status conference scheduled for January 18, 2022 is CONTINUED until January 27, 2022 at 10:00 A.M. It is further ORDERED that, for the reasons stated in the Motion, in particular the injuries to the Defendant's lawyers and the Defendant's quarantine, it is in the interest of justice for the time between today and the next status conference, currently scheduled for January 27, 2022, to be excluded from the time by which the trial must commence under the Speedy Trial Act. Signed by Judge Carl J. Nichols on January 18, 2022. (lccjn1) (Entered: 01/18/2022) | |
| | 01/27/2022 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video/Telephone Status Conference as to EDWARD JACOB LANG held on 1/27/2022. Speedy Trial as to EDWARD JACOB LANG is Excluded from 1/27/2022 to 2/23/2022, in the Interest of Justice, XT. Defendant's position due by 2/4/2022. Status Conference set for 2/23/2022 at 03:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Martin Tankleff and Steven Metcalf, II; US Attorney: Karen Rochlin and Melissa Jackson. (zcal) (Entered: 01/27/2022) | |
| 48 | 02/04/2022 | ENTERED IN ERROR....First STATUS REPORT Regarding Defendant's Position on Protective Order by EDWARD JACOB LANG (Tankleff, Martin) Modified on 2/7/2022 (zstd). (Entered: 02/04/2022) | |
| | 02/04/2022 | NOTICE OF CORRECTED DOCKET ENTRY: as to EDWARD | |

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | JACOB LANG re 48 Status Report was entered in error and counsel was instructed to refile said pleading. The document is a letter and needs to be filed along with a Notice of Filing and the letter as an attachment. (zstd) (Entered: 02/07/2022) | |
| | 02/07/2022 | MINUTE ORDER as to EDWARD JACOB LANG. Upon consideration of Defendant's 48 First Status Report Regarding Defendant's Position on Protective Order, it is ORDERED that the Defendant shall file, by February 11, 2022, an additional statement with respect to Defendant's position on the Protective Order. Signed by Judge Carl J. Nichols on February 7, 2022. (lccjn1) (Entered: 02/07/2022) | |
| | 02/07/2022 | Set/Reset Deadlines as to EDWARD JACOB LANG: Defendant Additional Statement on Protective Order due by 2/11/2022. (zcal) (Entered: 02/08/2022) | |
| 49 | 02/10/2022 | STATUS REPORT Regarding Status of Discovery As Of February 9, 2022 by USA as to EDWARD JACOB LANG (Rochlin, Karen) (Entered: 02/10/2022) | |
| 50 | 02/11/2022 | ENTERED IN ERROR.....NOTICE of Filing of Letter of Updated Status Report Regarding Protective Order and Court Appearances by EDWARD JACOB LANG (Tankleff, Martin) Modified on 2/14/2022 (zstd). (Entered: 02/11/2022) | |
| | 02/11/2022 | NOTICE OF CORRECTED DOCKET ENTRY: as to EDWARD JACOB LANG re 50 Notice (Other) was entered in error and counsel was instructed to refile said pleading. The notice of filing needs to have the court caption, case number and will be filed at the main document and the letter as the attachment. (zstd) (Entered: 02/14/2022) | |
| | 02/14/2022 | MINUTE ORDER as to EDWARD JACOB LANG. Upon review of Defendant's 50 Updated Status Report, it is ORDERED that the Status Conference on February 23, 2022 at 3:00 P.M. shall be held in-person in Courtroom 19. Signed by Judge Carl J. Nichols on February 14, 2022. (lccjn1) (Entered: 02/14/2022) | |
| | 02/14/2022 | MINUTE ORDER as to EDWARD JACOB LANG. It is ORDERED that the Status Conference on February 23, 2022 is rescheduled to 11:00 A.M. and shall be held in-person in Courtroom 19. Signed by Judge Carl J. Nichols on February 14, 2022. (lccjn1) (Entered: 02/14/2022) | |
| | 02/14/2022 | Set/Reset Hearings as to EDWARD JACOB LANG: Status Conference RESET for 2/23/2022 at 11:00 AM in Courtroom 19-In Person before Judge Carl J. Nichols. Note time and location change. (zcal) (Entered: 02/14/2022) | |
| | 02/22/2022 | MINUTE ORDER as to EDWARD JACOB LANG. It is ORDERED that the Status Conference on February 23, 2022 at 11:00 A.M. shall be held by videoconference. Signed by Judge Carl J. Nichols on February 22, 2022. (lccjn1) (Entered: 02/22/2022) | |
| | 02/22/2022 | Set/Reset Hearings as to EDWARD JACOB LANG: Status Conference RESET for 2/23/2022 at 11:00 AM in Courtroom 19-In Person before Judge Carl J. Nichols. Note Location Change. (zcal) (Entered: 02/22/2022) | |
| | 02/23/2022 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to EDWARD JACOB LANG held on 2/23/2022. Defendant not present. Speedy Trial as to EDWARD JACOB LANG is Excluded from 2/23/2022 to 4/5/2022, in the Interest of Justice, XT. Further instruction to follow from the Court. Status Conference set for 4/5/2022 at 04:00 PM in Courtroom 19-In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Steven Metcalf; US Attorney: Karen Rochlin and Melissa Jackson. (zcal) (Entered: 02/23/2022) | |

App.10

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 52 | 03/08/2022 | MANDATE of USCA as to EDWARD JACOB LANG re 42 Notice of Appeal - Interlocutory. In accordance with the judgment of January 12, 2022, it is Ordered and Adjudged that the district court's September 20, 2021 oral order denying appellant's motion for pretrial release be affirmed. USCA Case Number 21-3066. (Attachments: # 1 USCA Judgment of January 12, 2022)(zstd) (Entered: 03/09/2022) | |
| 53 | 04/01/2022 | NOTICE of Proposed Order  by USA as to EDWARD JACOB LANG (Attachments: # 1 Text of Proposed Order)(Rochlin, Karen) (Entered: 04/01/2022) | |
| 54 | 04/05/2022 | First MOTION to Dismiss Count  by EDWARD JACOB LANG. (Metcalf, Steven) (Entered: 04/05/2022) | |
| | 04/05/2022 | Minute Entry for proceedings held before Judge Carl J. Nichols: Status Conference as to EDWARD JACOB LANG held on 4/5/2022. Government Response due by 4/19/2022. Defense Reply due by 4/26/2022. Joint Status Report/Proposed Scheduling Order due by 4/29/2022. Motion Hearing / Status Conference set for 5/4/2022 at 02:00 PM in Courtroom 19- In Person before Judge Carl J. Nichols. Jury Selection / Jury Trial set for 1/9/2023 at 09:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant Committed/ Commitment Issued; Court Reporter: Lorraine Herman; Defense Attorney: Steven Metcalf, II; US Attorney: Karen Rochlin. (zcal) (Entered: 04/05/2022) | |
| 55 | 04/19/2022 | Memorandum in Opposition by USA as to EDWARD JACOB LANG re 54 First MOTION to Dismiss Count   (Attachments: # 1 Exhibit Exhibit 1_3-4 Reffitt Transcript, # 2 Exhibit Exhibit 2_3-8 Reffitt Transcript)(Rochlin, Karen) (Entered: 04/19/2022) | |
| 56 | 04/26/2022 | First MOTION for Extension of Time to File Response/Reply as to 54 First MOTION to Dismiss Count   by EDWARD JACOB LANG. (Metcalf, Steven) (Entered: 04/26/2022) | |
| | 04/26/2022 | MINUTE ORDER as to EDWARD JACOB LANG (1). Upon consideration of the Defendant's 56 First Motion for Extension of Time to File Reply, it is ORDERED that the Motion is GRANTED. It is further ORDERED that the Defendant's deadline to file a reply regarding the 54 First Motion to Dismiss is EXTENDED through April 29, 2022. Signed by Judge Carl J. Nichols on April 26, 2022. (lccjn1) (Entered: 04/26/2022) | |
| | 04/26/2022 | Set/Reset Deadlines as to EDWARD JACOB LANG: Reply due by 4/29/2022. (zcal) (Entered: 04/27/2022) | |
| 57 | 04/29/2022 | REPLY TO OPPOSITION to Motion by EDWARD JACOB LANG re 54 First MOTION to Dismiss Count   (Metcalf, Steven) (Entered: 04/29/2022) | |
| 58 | 04/29/2022 | Joint STATUS REPORT  by USA as to EDWARD JACOB LANG (Attachments: # 1 Text of Proposed Order)(Rochlin, Karen) (Entered: 04/29/2022) | |
| 59 | 04/29/2022 | NOTICE OF ATTORNEY APPEARANCE James Pearce appearing for USA.  (Pearce, James) (Entered: 04/29/2022) | |
| 60 | 05/02/2022 | SCHEDULING ORDER as to EDWARD JACOB LANG. Signed by Judge Carl J. Nichols on May 2, 2022. (lccjn1) (Entered: 05/02/2022) | |
| | 05/02/2022 | Set/Reset Deadlines/Hearings as to EDWARD JACOB LANG: Exhibit List due by 11/23/2022. Motions due by 9/30/2022. Proposed Voir Dire due by 11/23/2022. Proposed Jury Instructions due by 11/23/2022. Pretrial Statement due by 11/23/2022. Responses due by 10/14/2022 Replies due by 10/24/2022. Witness List due by 11/23/2022. Pretrial Conference set for 12/19/2022 at 10:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 05/02/2022) | |

App.11

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 61 | 05/02/2022 | NOTICE Of Supplemental Authority by USA as to EDWARD JACOB LANG (Attachments: # 1 Supplement)(Rochlin, Karen) (Entered: 05/02/2022) | |
| | 05/04/2022 | Minute Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing as to EDWARD JACOB LANG held on 5/4/2022 re 54 . 54 Motion to Dismiss Count(s): Taken Under Advisement. Bond Status of Defendant: Defendant Committed/ Commitment Issued; Court Reporter: Lorraine Herman; Defense Attorney: Steven Metcalf, II; US Attorney: James Pearce and Karen Rochlin. (zcal) (Entered: 05/04/2022) | |
| 62 | 05/05/2022 | NOTICE of Filing Supplemental Authority by USA as to EDWARD JACOB LANG (Attachments: # 1 Supplement)(Rochlin, Karen) (Entered: 05/05/2022) | |
| 63 | 05/25/2022 | NOTICE Third Notice of Supplemental Authority by USA as to EDWARD JACOB LANG (Attachments: # 1 Supplement)(Rochlin, Karen) (Entered: 05/25/2022) | |
| | 06/07/2022 | MINUTE ORDER as to EDWARD JACOB LANG: Upon review of the Defendant's 54 Motion to Dismiss Count Nine, and for the reasons discussed in the Court's 72 Memorandum Opinion and 86 Memorandum Opinion in United States v. Miller (21-cr-119), it is ORDERED that the Motion is GRANTED. It is further ORDERED that Count Nine is DISMISSED WITHOUT PREJUDICE from the 36 Superseding Indictment.So Ordered by Judge Carl J. Nichols on 6/7/2022. (zcal) (Entered: 06/07/2022) | |
| | 06/07/2022 | MINUTE ORDER as to EDWARD JACOB LANG (1). Upon consideration of the 60 Scheduling Order, 59 Joint Status Report, and the entire record of this case, it is ORDERED that for the facilitation of continued discovery and the various pre-trial motions, and the Defendant's consent, the ends of justice served by the schedule outweigh the interest of the public and the defendant in a speedy trial and the time between June 7, 2022, and January 9, 2022, shall be excluded from the time by which the trial must commence under the Speedy Trial Act. Signed by Judge Carl J. Nichols on June 7, 2022. (lccjn1) (Entered: 06/07/2022) | |
| 64 | 06/10/2022 | NOTICE of Withdrawal by EDWARD JACOB LANG (Tankleff, Martin) (Entered: 06/10/2022) | |
| | 06/21/2022 | MINUTE ORDER as to EDWARD JACOB LANG. Upon consideration of the 64 Notice to Withdraw, the Court construes the filing as a Motion to withdraw as counsel under LCrR 44.5(d). It is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on June 21, 2022. (lccjn1) (Entered: 06/21/2022) | |
| 65 | 06/22/2022 | NOTICE OF APPEAL (Interlocutory) by USA as to EDWARD JACOB LANG Fee Status: No Fee Paid. Parties have been notified. (Danello, Elizabeth) (Entered: 06/22/2022) | |
| 66 | 06/22/2022 | NOTICE OF ATTORNEY APPEARANCE Elizabeth Harper Danello appearing for USA.  (Danello, Elizabeth) (Entered: 06/22/2022) | |
| 67 | 06/22/2022 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government as to EDWARD JACOB LANG re 65 Notice of Appeal - Interlocutory. (zstd) (Entered: 06/22/2022) | |
| | 06/27/2022 | USCA Case Number as to EDWARD JACOB LANG 22-3039 for 65 Notice of Appeal - Interlocutory filed by USA. (zstd) (Entered: 06/27/2022) | |
| 68 | 06/29/2022 | First MOTION for Extension of Time to the Scheduling Order by EDWARD JACOB LANG. (Metcalf, Steven) (Entered: 06/29/2022) | |
| | 07/05/2022 | MINUTE ORDER as to EDWARD JACOB LANG. Upon | |

1:21cr53, USA v. LANG

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | consideration of the Defendant's 68 Unopposed Motion for Extension of Time to the Scheduling Order, it is ORDERED that the Motion is GRANTED. It is further ORDERED that Defendant shall make discovery requests of the government by July 19, 2022 and the government shall have until August 10, 2022 to respond. It is further ORDERED that any motions to compel discovery and any pretrial proffer supporting a claim of self-defense shall be filed by August 17, 2022; any oppositions shall be filed by September 7, 2022; and any replies shall be filed by September 14, 2022. It is further ORDERED that Defendant shall file any motions raising constitutional challenges by July 15, 2022; any oppositions shall be filed by August 24, 2022; and any replies shall be filed by September 7, 2022. Signed by Judge Carl J. Nichols on July 5, 2022. (lccjn1) (Entered: 07/05/2022) | |
| | 07/13/2022 | MINUTE ORDER as to EDWARD JACOB LANG. After communication with the Parties, it is ORDERED that Defendant shall file his motion regarding constitutional due process issues by July 15, 2022; any oppositions shall be filed by August 24, 2022; and any replies shall be filed by September 7, 2022. It is further ORDERED that Defendant is not foreclosed from later filing other motions raising constitutional issues that are otherwise in accordance with the Court's scheduling order, or that arise and/or come to light after that date. Signed by Judge Carl J. Nichols on July 13, 2022. (lccjn1) (Entered: 07/13/2022) | |
| | 07/13/2022 | Set/Reset Deadlines as to EDWARD JACOB LANG: Motion due by 7/15/2022. Response due by 8/24/2022. Reply due by 9/7/2022. (zcal) (Entered: 07/14/2022) | |
| 69 | 07/15/2022 | MOTION to Dismiss Case for Lack of Jurisdiction and Due Process Violations by EDWARD JACOB LANG. (Attachments: # 1 Memorandum in Support)(Metcalf, Steven) (Entered: 07/15/2022) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

App.13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-53 (CJN)** |
| | : | |
| | : | |
| **EDWARD JACOB LANG,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the Defendant's bond motion.  The government contends that the Defendant, Edward Jacob Lang should continue to be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) [Crime of Violence]. There are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community, pursuant to 18 U.S.C. § 3142(e).

The government respectfully requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

## Procedural History

On January 15, 2021, an arrest warrant was issued for the Defendant, who was then arrested in New York on January 16, 2021.

1

App.14

On January 19, 2021, at the Defendant's initial appearance in the arresting jurisdiction, the government orally moved for the Defendant's detention pending trial pursuant to § 3142(f)(1)(A) [Crime of Violence] of the federal bail statute. The defense consented to detention but indicated it might file a future bail application.

On January 29, 2021, the Defendant was indicted on eleven charges, including two counts of Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 111(a) and (b), one count of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a), three counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), one count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2, one count of Disorderly and Disruptive Conduct in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon, in violation of Title 18 U.S.C. § 1752(a)(2) and (b)(1)(A), one count of Engaging in Physical Violence in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon, in violation of Title 18 U.S.C. § 1752(a)(4) and (b)(1)(A), one count of Disorderly Conduct in a Capitol Building, in violation of Title 40 U.S.C. § 5104(e)(2)(D), and one count of Act of Physical Violence in the Capitol Grounds or Buildings, in violation of Title 40 U.S.C. § 5104(e)(2)(F).  The Defendant was transferred to D.C. and the Court set this matter for an initial appearance and detention hearing on Tuesday, February 9, 2021, at 1 p.m.

At the detention hearing, defense again conceded detention, while requesting the right to re-open the hearing at a later date.  On August 23, 2021, the Defendant filed a motion seeking the Defendant's release for a variety of reasons. Dkt 29.  In sum, the Defendant asks for release for the following general reasons: (1) Defendant claims detention is not necessary to ensure the

App.15

safety of the community in this case; (2) Defendant claims that the conditions at the jail require

his release because he claims he is being mistreated at the jail and claims he cannot participate in

his own defense or review discovery; and (3) the Defendant claims that discovery delays entitle

him to release.  Each of these arguments is without merit and his request for release should be

denied.

## FACTUAL BACKGROUND

### *The Attack on the United States Capitol on January 6, 2021*

On January 6, 2021, a joint session of the United States Congress convened at the United

States Capitol, located at First Street Southeast, Washington, District of Columbia. During the

joint session, elected members of the United States House of Representatives and Senate met in

the United States Capitol to certify the vote count of the Electoral College for the 2020

Presidential Election, which took place on November 3, 2020.

The United States Capitol is secured 24 hours a day by security barriers and United States

Capitol Police ("USCP") occupy various posts throughout the grounds. Restrictions around the

United States Capitol include permanent and temporary security barriers and posts manned by

USCP.  USCP officers wore uniforms with clearly marked police patches, insignia, badges, and

other law enforcement equipment. Only authorized people with appropriate identification are

allowed access inside the United States Capitol. On January 6, 2021, the exterior plaza of the

United States Capitol was also closed to members of the public.

The January 6, 2021 joint session began at approximately 1:00 p.m. Shortly thereafter, by

approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a

App.16

particular objection.  Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building and USCP were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside. As the certification proceedings were underway, the exterior doors and windows of the Capitol were locked or otherwise secured.

At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and past officers of the USCP, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by the USCP or other authorized security officials.

A short time later, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. As such, all proceedings of the United States Congress, including the joint session, was effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the United States Capitol, including the danger posed by individuals who had entered the United States Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the United States Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm

App.17

after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

After the Capitol was breached, USCP requested assistance from the Metropolitan Police Department ("MPD") and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol.  Multiple MPD officers and other law enforcement officers came to assist.

By 2:30 p.m. on January 6, 2021, rioters had engulfed the west side of the Capitol and officers had begun retreating from the first landing of the Lower West Terrace, as shown in the still from USCP surveillance below.



Around the same time, rioters were climbing on the scaffolding in front of building as well as various features of the building.  Although the Capitol Building had already been breached and protesters had flooded in through several entrances, a group of MPD officers and members

5

App.18

of the USCP and other agencies called to assist gathered to protect the Capitol at the very

prominent entrance on the second landing of the Lower West Terrace.  (This is the exit through

which the President typically comes through during inauguration, as pictured below in a photo

from later that night.)  To enter the Capitol through the Lower West Terrace doors on January 6,

one had to walk, climb, or scale up to the second landing, go up a set of stairs, walk through an

arch and a short tunnel, and then walk through a series of glass doorways that the officers had

locked.  The tunnel and doorways are very narrow, with the entryway through the doors

measuring only around 10 feet across.



   Around 2:40 PM, a group of law enforcement officers were maintaining a line at the

second set of glass doors inside the tunnel.  Officers reporting to the scene rushed to the tunnel

from within the building while rioters outside of the tunnel continued to summon more men to push their way through the tunnel.  A growing number of protesters made their way into the tunnel with a variety of tools and weapons and the tunnel became the point of one of the more intense and prolonged clashes between protesters and law enforcement at the Capitol on that day. Many of the protesters in the tunnel were recording video and many of the videos continue to circulate Internet channels, social media, and the news.  Much of the fighting over the next two and a half hours was also captured on surveillance footage from a camera above the Lower West Terrace doorway and Body Worn Camera ("BWC") footage.

### *Edward Jacob Lang's Criminal Conduct*

The Defendant is prominently featured in many of those videos and photos and can be seen on surveillance footage repeatedly fighting against the law enforcement officers guarding the Lower West Terrace doors from nearly the beginning of the fighting at 2:40 p.m. to nearly the end around 5 p.m., shortly before the rioters were finally expelled from the second landing of the Lower West Terrace.

Specifically, as shown in Exhibit A, which is a still from USCP surveillance footage, LANG first entered the tunnel around 2:41 p.m. with some of the very first rioters to enter the tunnel and approach the Lower West Terrace doors.

As captured by USCP surveillance footage, other videos recorded during this time period, and on a video that appears to be filmed by LANG and that was recovered from his phone (Exhibit B), LANG was with this group as they broke the glass of the locked doors separating the officers from the rioters, as shown in the still below from Exhibit B.

*Still from Exhibit B*

7

App.20



      LANG then joined the group of rioters as they push forward towards the line of officers

guarding the interior of the Capitol.   As captured in Exhibit B, which covers around 2:41 p.m. to

App.21

2:48 p.m., he remained at the forefront of that group as they try to get through the doors and can

be heard yelling a variety of things at the officers, including: "This is our house" (Ex. B at 5

mins 46 seconds) and "You are enemies of the state" (Ex. B at 6 mins 40 secs).  (LANG later

posted this video to his Instagram account, as shown in Exhibit B-1, a still from that post.)[1]

LANG remained at the forefront near the line of officers guarding the doors and filmed

another video (Exhibit D covering around 2:51 to 2:57 p.m.).  In Exhibit D, LANG can be seen

up against the line of officers and continuing to yell a variety of things, such as: "We are getting

squished to death, the cops are squishing us to death." (Ex. D at 10 secs); "This is socialism, we

are the last free country in the world." (Ex. D at 59 secs); "Back up, this is our house." (Ex. D at

3 mins 26 secs); "Lock your shields and push." (Ex. D at 4 mins 16 secs); "Get the women out of

the way." (Ex. D at 5 mins 5 secs); "If you are not going to fight, move" (Ex. D at 5 mins 10

secs); and "Let us in. This is our house. We paid for this fucking building." (Ex. D. at 5 mins 46

secs); and "This is our country." (Ex. D. at 6 mins 10 secs).

Around 2:57 p.m., LANG and another rioter violently pushed a door against an officer's

head and LANG simultaneously kicked at that officer.  Specifically, as captured in Exhibit E,

which is a clip from YouTube Video 1, a publicly available video filmed by a photojournalist,

that corresponds to around 2:57 p.m. with an added a white box around LANG, LANG and

another rioter repeatedly shove the door against Sgt. J.M., who is in a bent forward position and

---

[1] At the beginning of this video, LANG appears to state, "We are in the motherfucking White House."  His posted
something similar about being at the White House at least once more in a Facebook post and made a similar
comment to his mother during a text exchange, as shown in Exhibit C. At the same time, in later posts and in that
same text exchange, LANG also appeared to acknowledge that he was at the Capitol.  Indeed, as discussed in detail
further on in this motion, in an extensive interview streamed on Instagram the following day, LANG explicitly
stated that he and the other rioters were not a mob, but rather "patriots on a goal, on a mission to have the Capitol
building. To stop this presidential election from being stolen so that we at least have one presidential veto left from
all of these bullshit laws and restrictions."

has his head pressed up against the door.  (LANG can be seen with the red arrow above him and

Sgt. J.M.'s head can be seen below the yellow arrow in the still below from Exhibit E.)

*Still from Exhibit E*



As shown in Exhibit F, the BWC footage from Sgt. J.M. from the same time of around

2:57 p.m., LANG can be seen repeatedly kicking at the officer as he is stuck up against the door.

As Sgt. J.M. is bent forward trying to hold onto his shield at the time, his BWC faces downward.

The first kick is visible at 2:57.17; the second kick at 2:57.32; the third kick at 2:57.38; the

fourth kick at 2:57.40; and the fifth kick at 2:57.52.  (Although the top half of the person kicking

is not visible in the BWC footage, the pants and shoes match those worn by LANG, as shown in

Exhibit G, a photo of LANG on January 6 recovered from his phone (with an added red box

around LANG). Moreover, the position of the kicker corresponds with where LANG can be seen

standing, as shown in EXHIBIT B.)

App.23

Shortly thereafter, as shown in Exhibit H-1-4, stills from USCP footage, around 3:02

p.m., LANG left the tunnel, only to come back again around 3:03 p.m., scream and push his way

to the front, and then exit once more.  This roughly corresponds with Exhibit I, a clip from

YouTube Video 1, where LANG can be heard screaming "Come on, what the fuck are we doing?

I can't even see."  Then leaving the tunnel, only to return shortly afterwards while making

guttural screams.  (A red box has been added around LANG.)

Around 3:05 p.m., LANG appears to have filmed a "selfie" style video, as shown in

Exhibit J which was recovered from his phone.  He can be seen outside the arch entrance to the

tunnel yelling "we are the real men, we are the real men, get in there."  (LANG later posted a

photo from this video to his Facebook account with the words "I was the leader of Liberty today.

Arrest me. You are on the wrong side of history." Exhibit J-1.)

Around 3:08 p.m., LANG re-entered the tunnel and joined a group effort by the rioters

trying to push past the officers guarding the doors.  Specifically, as shown in Exhibit K-1, USCP

footage from 3:08 – 3:10 p.m. with an added red box around LANG, LANG walked toward the

front of the tunnel bracing both arms on the back of the person directly in front of him and began

pushing forward on the rioter directly in front of him. LANG then pushed with the crowd

together as they pushed in unison attempting to break past the officers guarding the Lower West

Terrace doors, who were located below the camera recording this footage.   LANG then stopped

pushing and went to the side to wipe his eyes.  He then once again walked forward, braced both

arms and joined the group effort to push past the officers guarding the doors, until he and others

got pushed back out by the rioters leaving the tunnel. He then re-entered the tunnel and once

11

App.24

again joined the group pushing effort, as shown in Exhibit K-2, USCP footage from 3:12 – 3:13 p.m. with an added red box around LANG.

As captured in Exhibit L, a clip from YouTube Video 1 that corresponds to around 3:08 p.m. to 3:13 p.m., during this time frame as LANG and other rioters are violently pushing up against officers guarding the doors, the group of rioters all yelled "heave ho" as they pushed in unison.   As captured in Exhibit L, it was during this time that an MPD officer was being violently crushed against the first set of doors with a shield held by another rioter.

After being pushed out of the tunnel shortly after 3:13 p.m., LANG once again re-entered the tunnel around 3:15 p.m.  As shown in Exhibits M-1 through M-5, he pushed his way forward into the tunnel once again, grabbed an abandoned gas mask from the ground and put it on, and then rushed forward with other rioters towards the line of law enforcement guarding the doors. As captured in YouTube Video 1 and other videos, the rioters once again engaged in a joint heave-ho effort, pushing against the officers trying to guard the doors.  However, because LANG's position by the far wall and below the USCP camera obstructs view of him, it is unclear whether he participated in this additional joint-pushing effort.  As shown in Exhibits M-6 through M-7, from 3:18 p.m. to 3:19 p.m., LANG and all the remaining rioters in the tunnel are finally pushed out of the tunnel by law enforcement officers.

After law enforcement pushed rioters out of the tunnel around 3:20 p.m., and after those officers that had been violently dragged into the crowd and assaulted during this effort finally reached safety, the rioters near the arch entrance to the tunnel remained relatively calm and the violence subsided for a time.  During this time, LANG can be seen taking another selfie-style video near the edge of the second terrace.  Specifically, around 3:30 p.m., as captured in Exhibit

App.25

N, another video recovered from his phone that he appears to have filmed, LANG can be seen smiling widely and saying: "a little pepper spray in the morning!"  (LANG later posted this video to his Instagram account, as shown in Exhibit N-1, a still from that post.)

Around 3:50 p.m., rioters once again began to engage in violence, including another group pushing effort and more extreme violence.  LANG was one of the leaders in this effort and repeatedly escalated his violent attacks over the following hour.

Around 4:01 p.m., LANG can be seen crowd-surfing over the heads of rioters standing in front of the police line at the arch and then grabbing and hitting one of the officers repeatedly. Specifically, as captured in Exhibit O, a clip from YouTube Video 2, a video posted to YouTube by another Defendant, right before this happened, another rioter instructed the rioters to pull the police out.  Then rioters directly pressed up against the officers under the arch and those rioters on the steps behind them started to collectively heave against the officers to try to break past them once again.  At this point, LANG climbed on top of the heads and shoulders of the other rioters towards the line of law enforcement officers under the arch and attacked them. Essentially, he crowd-surfed to commit violence.  Once he reached the officers at the arch, as captured in USCP footage stills Exhibits P-1 through P-4, LANG hit an officer in the face.

Then, around 4:11 p.m., as captured in Exhibit Q (BWC footage from an officer on the side of the arch), after Detective P.N. fell to the ground, LANG repeatedly kicked the detective as he was down, as shown in Exhibit Q with a red box around LANG.

Around 4:20 p.m., LANG took a break from the violence to film another selfie-style video, as shown in Exhibit R, another video recovered from his phone. (LANG later posted this video to his Instagram account, as shown in Exhibit R-1, a still from that post.)

13

App.26

Around 4:26 p.m., as visible on USCP footage, LANG tried to get the attention of law enforcement to get assistance for a woman that was unconscious in the crowd of rioters being pushed out of the tunnel.  He also appears to have helped drag another individual out from underneath other rioters that had been pushed out of the tunnel.  (Unfortunately, as officers tried to help the woman and bring her inside the building to try to resuscitate her, other rioters, not including LANG, began violently attacking the officers with a variety of sticks and weapons.)

Around 4:37 p.m. LANG again took time to film another selfie-style video, this time filming himself up against the line of officers in the arch and pointing at them, as shown in Exhibit S, another video recovered from his phone.  (LANG later posted this video to his Instagram account, as shown in Exhibit S-1, a still from that post.)

Around 4:43 p.m., a woman in the crowd appeared to try to get LANG and the others committing violence to stop, only to be shut down and ignored by LANG.  Specifically, as shown in Exhibit T (BWC from Officer T.C., whom LANG then repeatedly hit with a stolen shield), around 4:43 p.m. a woman told LANG and other rioters: "you guys are better than that." LANG then appeared to state: "This is how our country was founded woman!"  She replied by stating: "First of all I am a fucking veteran, let me talk to them."  LANG responded by hitting Officer T.C. with the stolen shield, first at 4:43.36 p.m., then again at 4:43.29 p.m., then again at 4:43.51 p.m., then again at 4:43.53 p.m., and then again at 4:43.56 p.m.  LANG then came at the officer with the shield at an angle at 4:44.31 p.m., then hitting him again at 4:44.33 p.m., then again at 4:44.51 p.m., and then again at 4:44.57 p.m.  At 4:45.07 p.m., LANG told the officer: "You work for us," then hit him again at 4:45.42 p.m., and then hit the officer beside him at

App.27

4:46.37 p.m. (Exhibit U, which is a clip of BWC from the same timeframe from an officer up on the ledge in the arch, captures much of the same, with an added red marking to show LANG.)

The rioters, and LANG in particular, then escalated things even further. As shown in Exhibit V, an additional BWC clip from the officer on the ledge, around 4:48 p.m., another individual tried to get the violent rioters to stop, putting up both hands and screaming "we have to stop," only to be pulled to the side by another rioter. After that individual was pulled aside, at 4:49.22 p.m., a rioter screamed "You are going to die tonight!" at the officers. Then at 4:50 p.m., a series of violent assaults began by those standing near LANG, including a rioter attacking with a bat and a rioter attacking with a helmet. (These assaults are captured from the perspective of the officers in Exhibit V and from the perspective of the crowd in Exhibit W, a video filmed by another individual in the crowd, but found on LANG's phone, that corresponds to approximately 4:50-4:56 p.m.) These two attacks lasted around 30 seconds.

Around 4:50.42 p.m., after these attacks are done, LANG reached forward to take one of the fallen shields, which he passed back to rioters behind him. At 4:50.57 p.m., LANG then reached forward to grab the MPD helmet that had just been used to bludgeon the officers by another rioter. (This is captured more clearly on Exhibit X, another clip from BWC of an officer on the front line.) LANG then placed the helmet on his head and waved his stolen shield triumphantly in the air, as captured in Exhibit W. (LANG later posted a clip from what appears to be this same video with the words "this is me" and "Look at the patriots inspired by me chanting!!" above himself as he hoisted the shield up in the air triumphantly, as shown in the still from that posting in Exhibit W-1.)

15

At 4:51.31 p.m., as seen on Exhibit V, LANG taunted the officers (or perhaps simply tried to rile up the crowd) by slamming the stolen shield down in front of the officers.  Shortly thereafter, at 4:52 p.m., someone close to the same area where LANG was standing (unclear whom) yelled "Are you motherfuckers ready to die? Are you motherfuckers ready to die?" at the officers.  At the same time, rioters threw a variety of objects – poles, plastic cones, desk drawers, and sticks at the officers.  Around the same time, the crowd yelled "traitors" at the officers.  At 4:53 p.m., a different rioter came forward with the same bat used previously and attacked the officers for a few seconds.  At 4:54 p.m., LANG once again taunted the officers (and/or riled up the crowd) by slamming the stolen shield down in front of the officers repeatedly.  He then waived other rioters forward (although none joined him) and once again slammed the shield on the ground.

As captured best on Exhibit W, around 4:55 p.m., another rioter handed LANG the bat that had been used by other rioters at least twice before to attack the officers.

Over the next five minutes, from 4:55 p.m. to 5 p.m., LANG repeatedly, and strategically, attacked the officers guarding the Capitol with that bat.  Specifically, he can be seen striking the officers with the bat at the following times: 4:54.58 p.m.; 4:56.30 p.m.; 4:56.44 p.m.; 4:57.13 p.m.; 4:57.15 p.m.; 4:57.21 p.m.; 4:57.26 p.m.; 4:57.32 p.m.; 4:58.06 p.m.; 4:58.29 p.m.; 4:59.10 p.m.; 4:59.32 p.m.; 4:59.49 p.m.; 4:59.51 p.m.; 4:59.54 p.m.; and 4:59.58 p.m.  These are captured on Exhibit V and Exhibit Y (BWC footage from one of the officers repeatedly hit with the bat).  LANG only stopped after he was shot with a rubber bullet that hit him in the foot.

His attack with the bat is also captured by videos and photos taken by news media in the area on January 6, 2021, including for example the two photos below showing him attacking law

16

App.29

enforcement with the black and red bat (a red arrow has been added above the Defendant's head in each photo).





While attacking the officers with the bat, LANG was strategic about his approach, switching from simple swings to a more complex approach where he varied between low swings, overhead swings, and thrusts. (These low swings towards the officers' legs can best be seen in Exhibit Z, a clip from the BWC of an officer behind the frontline officers.) As one of his

17

victims, Officer H.S., noted when interviewed, these varying strikes were more effective. Indeed, Officer H.S. was injured by LANG's hits to his leg and had trouble standing after he finally got off the front line that night. Officer H.S. limped for days after and the swelling took a month to subside.

### *Defendant's Additional Postings and Interviews on Social Media After January 6*

In addition to the social media posts described above, the Defendant participated in a nearly 45-minute-long public live video interview posted on Instagram on January 7, 2021, where he described his actions on January 6, 2021, noting, among other things:

- "It was war. This was no protest.";

- After describing how he was shot in the foot with a rubber bullet, stating that this "was after already three hours face to face with them. We gave them not an inch. We tried getting in through the front, but we couldn't. Other people got access through a couple of windows, stuff like that and slowly funneled in but we were trying to get through the main gates.";

- "You know I had a gas mask on for the first two, three hours. I was fighting them face to face but eventually they started using the stuff that goes right through the gas mask.";

- "Six, seven times at least I got hit. Kept getting whatever the eyewash spray out, waiting 5 or 10 minutes, get back in there. You know and I even had a gas mask on. I got a gas mask with me, it is full of blood from the top, my head just leaked down into it."; and

- "A lot of people were thinking it was a game, for like their snapchat or to be a part of history, then they started getting hit with batons, and people started coming out with blood and people were getting trampled. And I am like straight up get the women and children out of this little corridor right here. We are talking war. We need men up there, men who are going to pull cops down and out of there. Men who are going to take a bullet if need be, you know. This was tyrants versus freedom fighters. At the end of the day painting us as insurrectionists, a mob. This was no mob. A mob is a bunch of people like attacking each other. This was an organized unit of patriots trying to take on tyrants. You know what I mean. A mob

18

has no goal.  A mob is just, uh, just screaming and shit. This was patriots on a goal, on a mission to have the Capitol building. To stop this presidential election from being stolen so that we at least have one presidential veto left from all of these bullshit laws and restrictions."

LANG made many of the same type of statements – particularly statements bragging about his violent actions on January 6, 2021, during texts with his mother, as shown in Exhibit C. After his mother extorted him to take his Facebook posts down because "they are arresting people for breaching the capital."  LANG refused, explaining that he would "gladly" get arrested and would "take the consequences of [his] actions."  LANG went on to say, "you should have seen me momma…You would be so proud," followed by details of his "three hours" of wrestling, dragging, and taking "metal" to the heads of law enforcement officers.

On January 7, 2021, LANG posted: "The tree of liberty is thirsty for the blood of tyrants. God give us strength in the battle ahead." On January 13, 2021, he posted: "Redcoats this will be the last thing you see before your maker."

In addition, an open-source search of social media depictions from January 6, 2021, also uncovered additional videos and photographs of the Defendant discussing his thoughts about what would follow the attack on the Capitol.  In a video posted by a Twitter account holder, the Defendant had a conversation with an unidentified female ("UF"), which was streamed on Instagram. The following was an excerpt of the conversation posted online:

- UF: "So what do you think happens next?"
- The Defendant: "Guns…That's it. One word. The First Amendment didn't work, we pull out the Second. We're all civilized people and we love going to work and praying to God on Sundays and having nice family barbeques…and that was every single person there. No one wants to take this and and die for our rights, but dying for our rights is the only option that any person with a logical brain sees right now. This is it."

January 14, 2021, just two days before he was arrested, the defendant posted a story to his Instagram.  Among other things, he stated: "I want to use this time to say thank you for all the people that have been reaching out, calling me a patriot… Been really amazing to have this impact on the community, going to keep on fighting for you guys, we got some big things planned.  We are not going to let them take our Constitutional Liberties.  Our God-given rights are safe within the hearts of the patriots.  So we won't give up.  You guys should not give up. Contact me if you want to be a part of the patriot movement."

### *Defendant's Efforts to Organize State Militias Online and Stop President Biden's Inauguration*

A search of LANG's phone revealed that after January 6, LANG became enthralled with the idea of fighting the government and what he saw as defending his freedoms. LANG organized group chats and invited like-minded members to join conversations where participants expressed interest in forming militias and pursuing further violence in Washington D.C. and elsewhere, including efforts to impede the inauguration of President Biden on January 20, 2021.  LANG used Instagram and the application Telegram to conduct these group discussions. As captured on his phone, LANG then attempted to use the Telegram group chats to organize a militia with factions or "regiments" in different parts of the country.  LANG assigned regional leaders, instructed participants on ways to anonymize their identities in the application, and encouraged them to recruit family and friends to join, as shown in Exhibit AA, an example of a common message LANG sent out to the Telegram militia group chats he created.

App.33

As shown in Exhibit BB, a sample chat exchange from some of the militia group chat members, some of these new Telegram group members then used the conversation threads to discuss whether and how to disrupt the government.

As shown in the examples included below, which are all included in Exhibit CC, in various chats both with the larger Telegram group chats of those interested in the militias and in discussions one on one with others via Telegram, LANG also repeatedly indicated that he was planning further efforts to disrupt the government, particularly either on January 17th or on the date of the inauguration on January 20, 2021.

- *EXHIBIT CC.1 - January 8, 2021 chat with Another Person about January 20th* - LANG notes he would have "died" with the person "on Capitol Hill" and later says "Can't wait for the 20th. I'm getting a fucking arsenal together."

- *EXHIBIT CC.2 January 9, 2021 post to group chat by LANG* – LANG notes that "This group is with ZERO fear of the feds…. They know this is war.  This is war. You obviously weren't at the capitol this week.  Let me show you what war is."

- *EXHIBIT CC.3 January 9, 2021 post to group chat by LANG-* LANG explains the regional regiments per state that he places everyone in and notes "if anything goes down where we need to mobilize and show up like the minute men the Regional Leader messages everyone and we come armed…"  Then after one of the Telegram group members warns him that the group is not vetted, LANG replies: "respectfully my name and face is all over national news and I'm not scared about these alphabet boys…" He later adds: "They know what I'm up to. I'm bringing the patriots together and theirs nothing they can do but kill me."

21

App.34

- *EXHIBIT CC.4 January 14, 2021 post to group chat by LANG* – LANG notes that "We will March armed on state capitols, and DC."

- *EXHIBIT CC.5 January 14, 2021 post to group chat by LANG* – LANG asks people to message him privately regarding "suggestions on what we should do on the 17th and 20th" and notes "I'm having discussions privately and posting what I believe this Militia should do nationally."

- *EXHIBIT CC.6 January 14, 2021 post to group by LANG* – LANG notes "Caution is out the window.  When Joe Biden gets into office he will label us domestic terrorists… I say making a stand on the 17th and 20th is our DUTY as Americans!..."

- *EXHIBIT CC.7 January 14, 2021 post to group by LANG* – LANG notes: "Our best and honestly easiest option right now is to make sure Joe Biden never gets in that office."

LANG further used videos of his violence on January 6, 2021 to inspire and convince others in this Telegram militia group chat.  For example, as shown in Exhibit DD (a portion of one of the group chat threads), on January 9, 2021, LANG asked for others to help him "scout" for additional members, to which another member responded that he had a bunch of people and "tons of ammo to load."  LANG then stated: "Can't wait to take back our country with you patriots. It's their turn to hide and run. Wednesday was the Shot heard around the world - The Second American Revolution and now the redcoats get to hide and wonder if they are safe at night."  LANG then shared some more "savage" videos of his actions on January 6, 2021 to the group to inspire them, including the video of him hoisting the stolen shield up in front of the

22

App.35

crowd shortly before he beat officers with a bat.  LANG explained "got the redcoats full gear, gas mask, shield, helmet" and added: "The patriots loved it listen to them. My people!!!!!!!! The Tree of Liberty is Thirsty for the Blood of Tyrants."

## ARGUMENT

**I.    There Is Clear and Convincing Evidence That No Conditions or Combinations Can Effectively Ensure the Safety of Any Other Person and the Community.**

There are four factors under § 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. §3142(g).  In consideration of these factors, the government respectfully submits that there are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community.

### *Nature and Circumstances of the Offenses Charged*

During the course of the violent siege of the Capitol on January 6, 2021, over 100 law enforcement officers reported being assaulted or injured by the violent mob while attempting to protect the U.S. Capitol and the individuals inside of the building. These assaults occurred both inside of the Capitol, as well as on the steps outside of the Capitol and the grounds of the Capitol, where the enormous mob included numerous individuals with weapons, bulletproof vests, and pepper spray who were targeting the officers protecting the Capitol.  Additionally, the violent crowd encouraged others in the crowd to work together to overwhelm law enforcement and gain unlawful entry into the U.S. Capitol.

App.36

What is extremely troubling about the Defendant's role in this attack is the severity of his actions, the length of time he was engaged in fighting law enforcement, the de facto leadership role he took, and the escalation of his violent assaults. As noted above, around 2:40 p.m., on January 6, 2021, the Defendant joined a large mob that substantially outnumbered law enforcement guarding the Lower West Terrace doors to the Capitol. The Defendant was part of a group that pushed forward inside of a small tunnel to reach the Lower West Terrace doors and attacked law enforcement in an effort to gain entry. The law enforcement officers were all in full uniform with the word "police" clearly visible. Over the next two and a half hours, the rioters continued to fight with law enforcement guarding these doors. The Defendant played a leading role in that effort, continually re-engaging with law enforcement on the front lines from 2:40 p.m. to around 5 p.m., when according to his own account, he was shot in the foot with a rubber bullet.

The Defendant has now been indicted for three of his violent acts during that nearly two and a half hours of fighting with law enforcement and the government intends to supersede with additional charges in the near future to encompass his many additional violent acts against law enforcement officers -- which the Defendant himself described as a "war." His actions clearly represent violent criminal behavior that involved a further dangerous escalation aimed at allowing other violent rioters to unlawfully enter the Capitol. He directly injured at least one officer and additional officers could have easily been seriously injured, if not killed, by his attacks first with his body, then with a shield, and finally with repeated blows with a baseball bat over a five-minute period. (To be sure, many other officers, including officers whom the Defendant victimized were also injured that day. However, unfortunately, due to the number of violent rioters on January 6, 2021 and the fact that officers were assaulted many times by many

App.37

people over multiple hours, it is often difficult to attribute specific injuries to the actions of one specific rioter.)   Throughout the day, but particularly towards the end when the violence was at its worst, the Defendant took on a *de facto* leadership role – encouraging and exhorting others to commit violence.   For example, early on as rioters were first trying to get past the officers guarding the Lower West Terrace doors, he told others "if you are not going to fight, move" and encouraged the group to push.   Later, after the violence had subsided and things had been peaceful for some time, he is one of those who ratcheted up the violence -- literally crowd surfing so he could attack officers by climbing on top of the rioters standing closer to the officers.   As others in the crowd tried to repeatedly stop the violence – he and those around him shut them down and got them out of the way.   Then, as the violence continued to escalate, he took a role right at the front using the officer's own tools (a helmet and shield) to both taunt them and encourage the crowd behind him.   Indeed, he himself determined that he had "inspired" those around him, as he noted in an Instagram story about the topic.

The D.C. Circuit has instructed that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   Here, the Defendant "actually assaulted" *multiple* police officers in *multiple* ways for *hours*.   As a result, LANG certainly falls within the "different category" of January 6 defendants identified in *Munchel*.   If anything, his extreme and repeated violence that day puts him in a category all his own – as very few (if any) other defendants

25

App.38

committed as much violence against law enforcement officers on January 6, 2021 as the Defendant did.

Moreover, he repeatedly demonstrated both on January 6 and the days after that he was ready and willing to go it alone in his violent attacks on law enforcement.  Indeed, he was most violent on January 6 when he mostly stood in front of the officers by himself and without assistance -- attacking them with a bat for nearly five minutes.  This is not a case in which "the presence of the group was critical to [his] ability to obstruct the vote and to cause danger to the community." *Id.*  The Defendant had no issue leading the violence all on his own.  The Defendant demonstrated that he remains a danger to the community (and any law enforcement officers standing in the way of his ideological beliefs) by his repeated choice on January 6 to engage in violence.

As a result, the nature and circumstances of these offenses overwhelmingly weigh in favor of detention.

### *Weight of the Evidence Against the Defendant*

The second factor to be considered, the weight of the evidence, also heavily weighs in favor of detention.  The evidence against the Defendant is also quite strong and compelling.  As noted above, the Defendant was observed on USCP surveillance cameras, social media videos and photos (much posted by himself), BWC videos, and media footage attacking law enforcement officers and attempting to unlawfully enter the Capitol.  A witness that has known him since childhood identified him in some of those photos and videos.  Additionally, a social media video captures the Defendant admitting that he wore a gas mask and fought law enforcement for hours on January 6, 2021 and he made similar admissions many times in chats,

App.39

texts, and online forums.  Lastly, law enforcement recovered some of the distinct clothing he wore that day, including a blue and white floral shirt and a black jacket with numerous zippers, from the apartment where he was arrested.  The evidence against this Defendant is overwhelmingly and exceptionally strong, and accordingly, the weight of the evidence weighs heavily in favor of detention.

### *Defendant's History and Characteristics*

The government recognizes that the Defendant has only one prior conviction for a misdemeanor possession of a controlled substance.  However, as noted in the Defendant's pleading, he apparently has two additional open matters pending in two different states.

The Defendant's glee and pride in his violent actions should also weigh in favor of detention. The Defendant did not just make one boastful claim that he later disavowed, rather he stopped repeatedly throughout the day to film his exploits for social media.  He then repeatedly discussed both what he had done and what he planned to do in multiple digital forums – going so far as to state that the only way he could be stopped was to be killed.  He even informed his mother what he had done, telling her she would be "proud" of him for his extreme violence against law enforcement.  In addition, he then leveraged a unique set of skills in social media to attempt to organize online groups of state militias and encourage them to stop the inauguration. Accordingly, the Defendant's history and characteristics also weigh in favor of detention.

### *Danger to the Community and Flight Risk*

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the Defendant's detention. The charged offenses involve violent assaultive conduct, and the assaults became more violent and more

App.40

dangerous as the day progressed.  He armed himself and assaulted law enforcement with the intent to unlawfully enter the Capitol and stop the functioning of our government as it met to certify election results. The Defendant repeatedly made it clear both on January 6 and the days that followed that he poses a danger to the functioning of our government and any law enforcement officers that stand in the way of his ideological beliefs.

His public comments about further escalation – like his noting that what happens next is "guns" and indicating that "we have got some big things planned" -- just add to the danger to the community already made clear by his decision to attack law enforcement officers guarding the Capitol on January 6, 2021 violently and repeatedly.

In particular, the fact that he appears to have been galvanized by his own violent actions on January 6 are particularly concerning.  In the weeks afterwards, the Defendant repeatedly threatened and attempted to plan future violence to stop President Biden from taking office – both in his public posts online and in the state militia Telegram chat groups he created.  He stated that he was "bringing the patriots together" and there was "nothing they can do but kill me."  As late as the day before a warrant was issued for his arrest, he stated "Our best and honestly easiest option right now is to make sure Joe Biden never gets in that office."  The Defendant has repeatedly made it clear to all who were willing to listen that he is a threat and a danger that cannot and will not deterred or stopped.  Accordingly, this factor also weighs heavily in favor of detention.

Given the above assessment of all four relevant factors, no conditions or combinations of conditions can effectively ensure the safety of any other person and the community.

**II.    The Defendant Has Not Demonstrated that the Conditions at the Jail Justify His Release.**

28

App.41

### A. The Defendant's Complaints about Access to Discovery and Counsel at the Jail Are Not a Basis for Release.

The Defendant's claims regarding access to discovery and counsel do not establish that he is entitled to the relief he seeks.   The Defendant claims that the conditions at the jail make confidential discussions with attorneys difficult, *see* Dkt 29. at 13-15, and keep him from being able to access to the voluminous discovery provided by the government in this case to date.   *See id.* at 16.   For these reasons, among others, the Defendant asserts that he should be released.   To be sure, the Defendant is entitled to reasonable access to discovery and the opportunity to meaningfully confer with counsel.   But the Defendant cites no authority suggesting that his complaints justify a different analysis at a detention hearing and ordering his release.   Indeed, the concerns raised by the Defendant are entirely independent of the factors this Court must analyze in making a detention decision under the Bail Reform Act.[2]

The Defendant also requests access to a laptop in his motion as an alternative to release. However, the Defendant's access to a laptop is immaterial to the question of whether he would pose a danger if released.   He has also not proffered to the Court whether he attempted to take advantage of the program at the jail that allows for inmates to review voluminous discovery on a computer provided by the jail and, if so, why he claims it is not sufficient to allow him to review discovery.

On March 30, 2020, a civil complaint was filed in the United States District Court for the District of Columbia, on behalf of defendants detained at the Central Detention Facility and Central

---

[2] Defendant complains that a "contact" visit from his attorney results in a 14-day quarantine. Dkt. at 14.   The government notes that the current policy only requires such quarantines for defendants who have elected not to be vaccinated.   *See* https://doc.dc.gov/page/coronavirus-prevention and https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html (both websites last visited August 6, 2021).

App.42

Treatment Facility (CTF), alleging that by the D.C. Department of Corrections (DOC) was failing to take reasonable precautions to prevent the spread and severity of a COVID-19 outbreak.  That case, *Banks v. Booth* (20-cv-849), was assigned to Judge Kollar-Kotelly, who on April 19, 2020 issued a temporary restraining order (ECF No. 48), and on June 18, 2020, issued a preliminary injunction (ECF No. 100) that addressed, in part inmates' access to confidential legal calls in light of enhanced restrictions in place to address the pandemic, and ordered DOC to ensure that all inmates have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters, and to "swiftly implement to use of such technology" necessary to accomplish this (ECF No. 100 at 39).

On December 12, 2020, *amici* filed a report to provide information to the Court regarding DOC's compliance with the Court's June 18, 2020, preliminary injunction (ECF No. 138).  That report noted that the DOC had purchased significant amounts of new technology to facilitate attorney client communications, including through the use of cell phones from within their cells; and that the DOC facilitated more than 1500 such calls each month.  The report also noted that DOC had purchased a number of tablets that inmates were permitted to use review discovery and to communicate with their attorneys using secure messaging (ECF No. 139 at 42).  Finally, the report noted that the DOC facilitated 1,209 videoconferences between attorneys and their clients between May and October 2020 (*Id.* at 40-41).[3]

On March 15, 2021, DOC issued a new procedure for voluminous electronic discovery, which the undersigned provided to the defense via email on April 7, 2021.  The policy is similar to, but more flexible than, the policy appended to the Defendant's motion, and it would allow him to

---

[3]     On July 6, 2021, the D.C Circuit Court of Appeals found that the preliminary injunction had expired.

review electronic materials in his cell on a laptop provided by DOC.  The government's position

is that this procedure satisfies the requirements of the Protective Order regarding discovery in this

case, so it would not limit the Defendant's access to sensitive materials.

The Defendant makes no attempt to explain why the program already in place at the jail is

inadequate to allow him to review discovery and engage in privileged discussions.[4]  The Defendant

also claims—without any explanation or citation—that the waiver required by the jail "on its face

has the potential to invade attorney-client privilege." Dkt. 29 at 18.  It is unclear what, specifically,

the Defendant contends is potentially violative of attorney-client privilege, but if there is a problem

with the waiver, the Defendant should take the issue up with DOC, with involvement of the

government and Court only if necessary.  Any allegedly offensive language in a waiver regarding

discovery is not material to the Court's detention determination.[5]

### B.  The Defendant's Complaints about Mistreatment at the Jail Are Not a Basis for Release.

The Defendant similarly cites no authority—and the government is not aware of any—standing

for the proposition that restrictive housing or any of the other conditions at the jail raised by the

---

[4]      The defendant also requests that if he is provided a laptop, he has the ability to email his attorneys and to take notes. Dkt. 29 at 19.  The defendant cites no authority in support of this demand, and in any event, it is irrelevant to his dangerousness.  He also requests a guarantee that "no one shall access the laptop in an effort to gain access to attorney client privileged materials."  He has not proffered that anyone is currently trying to access any privileged materials he may possess, and the government is aware of no such attempts.

[5]      The defendant also claims that the conditions of attorney-client visits at the jail require release because they are tantamount to an intrusion of the Attorney-Client privilege.  *See* Dkt. 29 at 14-15.  We note that the cases cited by the defendant are inapposite, even to his proffered facts.  The defendant has made no allegation that any of the information stated in any meetings with his attorneys has made its way to the U.S. Attorney's Office or the FBI, much less that government counsel or agents obtained information on privileged communications.  *See* Dkt. 29 at 15, citing *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995).  Neither the information proffered by the Defendant with respect to his communications with counsel at the jail, nor his hypotheticals about government intrusion into those interactions, are material to whether the defendant would pose a danger if released.

Defendant entitle him to release under the Bail Reform Act, which is the relief he seeks in this

motion.

   The government is committed to ensuring the safety all of inmates, regardless of their

detention status.  But it is also critical, from the government's perspective, to allow the issues to

be properly litigated in their proper course.  Civil litigation is the proper venue to address

complaints of mistreatment by the jail.  *See United States v. Brooks*, 2020 U.S. Dist. LEXIS

230323, at *10 (D.D.C. Dec. 7, 2020) ("As the government correctly rejoins, any such

constitutional claim must be raised via a separate civil suit and cannot be part of a

compassionate-release motion in the underlying criminal case. Courts all over the country have

concurred."); *United States v. Smith*, 2020 U.S. Dist. LEXIS 213050, 2020 WL 6702173, at *6

n.8 (S.D. Ohio Nov. 13, 2020) (collecting cases); *see also, e.g.*, *United States v. Banks*, 422 F.

App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion

filed in his criminal case was not the proper vehicle for raising the claims about prison conditions

contained in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006)

(noting that, because the defendants' "challenge[s] to the conditions of confinement . . . were

raised in motions filed in their respective criminal cases . . . they were properly denied by the

district court"). The proper way to raise such a claim is to file a civil suit against the DOC or its

warden. *See, e.g.*, *United States v. Folse*, Nos. CR 15-2485 JB, CR 15-3883 JB, 2016 WL

3996386, at *15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a

separate civil action to address his conditions of confinement."); *United States v. Luong*, No. Cr.

99-433 WBS GGH, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009) ("As several courts have

recognized, the proper procedure to redress a defendant's grievances regarding treatment within

App.45

a jail or prison is to file a civil suit against the relevant parties . . . rather than a motion in his criminal case."); *United States v. Wells*, Cr. No. 3:02CR-20-H, 2007 WL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action."); *Campbell v. McGruder*, 416 F. Supp. 100, 101 (D.D.C. 1975) (addressing "class action brought by unconvicted pre-trial detainees incarcerated at the District of Columbia jail").

The Defendant relies on a U.S. District Court case holding that courts have the power to grant some form of relief to pretrial detainees who complain of violations of their Constitutional rights while in pretrial detention as the basis for his request for release. *See United States v. Medina*, 628 F. Supp. 2d 52, 55 (D.D.C. 2009) (Lamberth, J.). *Medina* involved procedures surrounding access to counsel and discovery, as well as the security designation of the defendants, and Judge Lamberth held that he possessed the power to grant the relief requested. *Id.* Notably, this defendant largely does not ask this Court to grant the type of relief Judge Lamberth concluded that he had the authority to provide in *Medina*.[6] He also does not ask the Court to order the jail to grant relief from alleged human rights violations. He instead seeks his outright release, and the information he proffers does not meet the standard set out in the Bail Reform Act to support a decision to release the Defendant on the merits. Here, as discussed above, the Bail Reform factors weigh heavily in favor of detention.

**III.   Detention Should Be Analyzed Based on the Bail Reform Act, Not the Volume of Discovery in this Case.**

---

[6]      The Defendant does request access to a laptop as an alternative to release. The government addresses that request *supra*.

App.46

The United States is aware of and takes seriously its obligations pursuant to Federal Rule of Criminal Procedure 16 and Local Criminal Rule 5.1(a), the provisions of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), and the Jencks Act, 18 U.S.C. § 3500.  Accordingly, as set forth in detail in the United States' Memorandum Regarding Status of Discovery as of August 23, 2021 (ECF No. 30), the United States has exercised and continues to exercise due diligence: (1) to obtain potentially discoverable materials from multiple sources; (2) to review those materials for discoverability; (3) to process discoverable materials into loadable, searchable formats that are accessible and useable for  the defense and consistent with industry-wide standards; (4) to organize productions in a manner that will be meaningful to the defense; and (5) to ensure that any materials produced are subject to adequate protections and/or redactions.  The United States is managing the ingestion, review, processing, and production of an unprecedented volume of materials generated by an extraordinary crime.  These materials come from a wide range of sources and vary in format.  The steps the government is undertaking are designed to ensure the defense can receive such evidence in loadable, searchable formats that are consistent with industry-wide standards.  Processing takes time but the government is taking all appropriate measures to expedite this process.  Ultimately this process will significantly benefit the defense in terms of its ability to review the information produced.  Any other production method would make defense review of the materials incredibly burdensome and time-consuming, given the nature and volume of the materials involved.

It is important to note that the government is taking a very expansive view of what may be exculpatory and thus discoverable in these Capitol Breach matters.  It is the government's commitment to ensuring that all arguably exculpatory materials are produced in a comprehensive,

34

App.47

accessible, and useable format that, in the main, underlies the government's need for time to provide discovery.   The government's approach to discovery is designed to ensure that the Defendant's rights are observed, including ensuring he has meaningful access to voluminous information that may contain exculpatory material, and that we do not overproduce or produce in a disorganized manner.  *Brady v. Maryland*, 373 U.S. 83 (1963), imposes a constitutional obligation on the government to disclose information favorable to the Defendant where it is material to either guilt or punishment.  *Id.* at 87.

The government's overarching discovery plan is designed to provide the Defendant with all data that may contain such information in a manner that will facilitate the search, retrieval, sorting, and management of that information.  Given the nature and volume of material – a large portion of which was generated on January 6 when thousands of individuals, including the defendant, collectively participated in an attack at a heavily surveilled location, chose to record their actions on their own digital devices, and subsequently posted evidence of their criminal conduct on social media – our plan will take time.

The government is acting diligently, but this case creates very complex discovery issues, not of the government's making, that we need reasonable time to address. In view of the government's ongoing exercise of due diligence, our need for reasonable time to address discovery obligations is not something the court should take into account when considering whether detention is warranted in this case.  As explained above, the facts in this case warrant a conclusion by clear and convincing evidence that no condition or combination of conditions of release can assure the safety of the community.

## **CONCLUSION**

App.48

WHEREFORE, the United States respectfully requests that the Court grant the

government's motion to detain the Defendant pending trial.


Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793


By: _____

**MELISSA JACKSON**
Assistant United States Attorney
D.C Bar Number 996787
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 815-8585
Email: Melissa.Jackson@USDOJ.GOV

App.49

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 7, 2021, I caused a copy of the foregoing motion to be

served on counsel of record via electronic filing.


                                         */s/ Melissa Jackson*
                                         MELISSA JACKSON
                                         Assistant United States Attorney

App.50

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on January 8, 2021**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-CR-53 (CJN)** |
| | : | |
| v. | : | **MAGISTRATE NO. 21-MJ-061** |
| | : | |
| **EDWARD JACOB LANG,** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. § 111(a)(1)** |
| Defendant. | : | **(Assaulting, Resisting, or Impeding** |
| | : | **Certain Officers)** |
| | : | **18 U.S.C. §§ 111(a)(1) and (b)** |
| | : | **(Assaulting, Resisting, or Impeding** |
| | : | **Certain Officers Using a Dangerous** |
| | : | **Weapon)** |
| | : | **18 U.S.C. §§ 111(a)(1) and (b)** |
| | : | **(Assaulting, Resisting, or Impeding** |
| | : | **Certain Officers Using a Dangerous** |
| | : | **Weapon and Inflicting Bodily Injury on** |
| | : | **Certain Officers)** |
| | : | **18 U.S.C. § 231(a)(3)** |
| | : | **(Civil Disorder)** |
| | : | **18 U.S.C. § 1512(c)(2)** |
| | : | **(Obstruction of an Official Proceeding)** |
| | : | **18 U.S.C § 2** |
| | : | **(Aiding and Abetting)** |
| | : | **18 U.S.C. § 1752(a)(2) and (b)(1)(A)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds with a** |
| | : | **Deadly or Dangerous Weapon)** |
| | : | **18 U.S.C. § 1752(a)(4) and (b)(1)(A)** |
| | : | **(Engaging in Physical Violence in a** |
| | : | **Restricted Building or Grounds with a** |
| | : | **Deadly or Dangerous Weapon)** |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| | : | **(Disorderly Conduct in** |
| | : | **a Capitol Building)** |
| | : | **40 U.S.C. § 5104(e)(2)(F)** |
| | : | **(Act of Physical Violence in the Capitol** |
| | : | **Grounds or Buildings)** |

**SUPERSEDING INDICTMENT**

App.51

The Grand Jury charges that:

## COUNT ONE

On or about January 6, 2021, at or around 2:57 p.m., within the District of Columbia, **EDWARD JACOB LANG**, did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, that is, Sgt. J.M., an officer from the Metropolitan Police Department, while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

(**Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 111(a)(1) and 2)

## COUNT TWO

On or about January 6, 2021, at or around 3:08 p.m. to 3:13 p.m., within the District of Columbia, **EDWARD JACOB LANG** did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

(**Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 111(a)(1) and 2)

## COUNT THREE

On or about January 6, 2021, at or around 4:01 p.m. to 4:02 p.m., within the District of

2

App.52

Columbia, **EDWARD JACOB LANG** did forcibly assault, resist, oppose, impede, intimidate, and

interfere with an officer and employee of the United States, and of any branch of the United States

Government (including any member of the uniformed services), and any person assisting such an

officer and employee, that is, Det. W.M. an officer from the Metropolitan Police Department,

while such person was engaged in and on account of the performance of official duties, and where

the acts in violation of this section involve physical contact with the victim and the intent to commit

another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers**, in violation of Title 18, United
> States Code, Section 111(a)(1))

## COUNT FOUR

On or about January 6, 2021, at or around 4:10 p.m. to 4:13 p.m., within the District of

Columbia, **EDWARD JACOB LANG** did forcibly assault, resist, oppose, impede, intimidate, and

interfere with an officer and employee of the United States, and of any branch of the United States

Government (including any member of the uniformed services), and any person assisting such an

officer and employee, that is, Det. P.N., an officer from the Metropolitan Police Department, while

such person was engaged in and on account of the performance of official duties, and where the

acts in violation of this section involve physical contact with the victim and the intent to commit

another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers**, in violation of Title 18, United
> States Code, Section 111(a)(1))

## COUNT FIVE

On or about January 6, 2021, at or around 4:44 p.m. to 4:46 p.m., within the District of

Columbia, **EDWARD JACOB LANG**, using a deadly and dangerous weapon, that is, a shield,

did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee

App.53

of the United States, and of any branch of the United States Government (including any member

of the uniformed services), and any person assisting such an officer and employee, that is, Officer

T.C., an officer from the Metropolitan Police Department, while such officer or employee was

engaged in or on account of the performance of official duties, and where the acts in violation of

this section involve physical contact with the victim and the intent to commit another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon**, in
> violation of Title 18, United States Code, Sections 111(a)(1) and (b))

## COUNT SIX

On or about January 6, 2021, at or around 4:54 p.m. to 5:00 p.m., within the District of

Columbia, **EDWARD JACOB LANG**, using a deadly and dangerous weapon, that is, a bat, did

forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of

the United States, and of any branch of the United States Government (including any member of

the uniformed services), and any person assisting such an officer and employee, that is, Officer

I.F., an officer from the Metropolitan Police Department, while such officer or employee was

engaged in or on account of the performance of official duties, and where the acts in violation of

this section involve physical contact with the victim and the intent to commit another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon**, in
> violation of Title 18, United States Code, Sections 111(a)(1) and (b))

## COUNT SEVEN

On or about January 6, 2021, at or around 4:54 p.m. to 5:00 p.m., within the District of

Columbia, **EDWARD JACOB LANG**, using a deadly and dangerous weapon, that is, a bat, did

forcibly assault, resist, oppose, impede, intimidate, and interfere with, and inflict bodily injury on,

an officer and employee of the United States, and of any branch of the United States Government

(including any member of the uniformed services), and any person assisting such an officer and

4

App.54

employee, that is, Officer H.S., an officer from the Metropolitan Police Department, while such officer or employee was engaged in or on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury** in violation of Title 18, United States Code, Sections 111(a)(1) and (b))

## COUNT EIGHT

On or about January 6, 2021, within the District of Columbia, **EDWARD JACOB LANG** committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

> (**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

## COUNT NINE

On or about January 6, 2021, within the District of Columbia and elsewhere, **EDWARD JACOB LANG** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

## COUNT TEN

On or about January 6, 2021, in the District of Columbia, **EDWARD JACOB LANG** did

5

App.55

knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions and, during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a bat and shield.

**(Disorderly and Disruptive Conduct in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon**, in violation of Title 18, United States Code, Section 1752(a)(2) and (b)(1)(A))

### COUNT ELEVEN

On or about January 6, 2021, in the District of Columbia, **EDWARD JACOB LANG** did knowingly, engage in any act of physical violence against any person and property in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting and, during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a bat and shield.

**(Engaging in Physical Violence in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon**, in violation of Title 18, United States Code, Section 1752(a)(4) and (b)(1)(A))

### COUNT TWELVE

On or about January 6, 2021, within the District of Columbia, **EDWARD JACOB LANG** willfully and knowingly engaged in disorderly and disruptive conduct within the United States Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct

6

App.56

in that building of a hearing before or any deliberation of, a committee of Congress or either House

of Congress.

> **(Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(D))

## COUNT THIRTEEN

On or about January 6, 2021, in the District of Columbia, **EDWARD JACOB LANG**

willfully and knowingly engaged in an act of physical violence within the United States Capitol

Grounds and any of the Capitol Buildings.

> **(Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(F))

A TRUE BILL:


FOREPERSON.


*Channing D. Phillips/jph*
Attorney of the United States in
and for the District of Columbia.

7

App.57

# United States District Court for the District of Columbia

UNITED STATES OF AMERICA )
                                        )
            vs.                  )     Criminal No.   21-cr-53 (CJN)
                                          )
Edward Jacob Lang                 )

## NOTICE OF APPEAL

Name and address of appellant:      United States of America

Name and address of appellant's attorney:      Elizabeth H. Danello, Assistant US Attorney
Office of the US Attorney for DC
601 D Street, NW Room 6.232
Washington, DC  20253

Offense:   18 USC secs. 111(a)(1)&(b), sec 231 (a)(3), 1512(c)(2), 2, 1752(a)(2), (a)(4), & (b)(1)(A), 40 USC sec. 5104(e)(2)(D)&(F)

Concise statement of judgment or order, giving date, and any sentence:

    Order, entered on June 7, 2022, dismissing Count Nine

Name and institution where now confined, if not on bail:   Alexandria, VA Jail

      I, the above named appellant, hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the above-stated judgment.

June 22, 2022                       United States of America
DATE                               APPELLANT
                                   Elizabeth H. Danello
                                   ATTORNEY FOR APPELLANT

GOVT. APPEAL, NO FEE  [✓]
CJA, NO FEE  [ ]
PAID USDC FEE  [ ]
PAID USCA FEE  [ ]
Does counsel wish to appear on appeal?      YES [✓]    NO [ ]
Has counsel ordered transcripts?      YES [ ]    NO [✓]
Is this appeal pursuant to the 1984 Sentencing Reform Act?      YES [ ]    NO [✓]

App.58

# 1:21cr119, USA v. MILLER

US District Court Criminal Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 08/02/2022**

## Header

**Date Filed:** 02/12/2021                                          **Class Code:** Open
**Other Docket:** None                                                      **Closed:**

## Participants

### Defendant

**Name**
GARRET MILLER
Appeals court case number: 22-3041

**Attorneys**
Camille Wagner
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WAGNER PLLC
1629 K Street Suite 300
Washington, DC 20006
USA
law@myattorneywagner.com
202-630-8812

Clinton Broden
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED;
BRODEN & MICKELSEN
2600 State Street
Dallas, TX 75204
USA
clint@texascrimlaw.com
214-720-9552  Fax: 214-720-9594  Designation: Retained

## Charges                                        ## Disposition

**Complaints:** COMPLAINT in Violation of 18:1752(a)(1), (2),
40:5104(e)(2)(G), 18:1512(c)(2), 18:231(a)(3) and 18:875(c)
**Pending:** 18 U.S.C. 231(a)(3); CIVIL DISORDER; Civil
Disorder(1-2)

18:231(a)(3); CIVIL DISORDER; Civil Disorder(1s-2s)

18:231(a)(3); CIVIL DISORDER; Civil Disorder(1ss-2ss)

18 U.S.C. 1512(c)(2) and 2; TAMPERING WITH A
WITNESS, VICTIM OR INFORMANT; Obstruction of an
Official Proceeding and Aiding and Abetting(3)

18:1512(c)(2) and 2; TAMPERING WITH A WITNESS,

App.59

VICTIM OR INFORMANT; Obstruction of an Official
Proceeding and Aiding and Abetting(3s)

18 U.S.C. 111(a)(1); ASSAULTING/RESISTING/IMPEDING
OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding
Certain Officers(4)

18:111(a)(1); ASSAULTING/RESISTING/IMPEDING
OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding
Certain Officers(4s)

18:111(a)(1); ASSAULTING/RESISTING/IMPEDING
OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding
Certain Officers(4ss)

18 U.S.C. 875(c); INTERSTATE COMMUNICATIONS -
THREATS; Interstate Threats to Injure or Kidnap(5-6)

18:875(c); INTERSTATE COMMUNICATIONS - THREATS;
Interstate Threats to Injure or Kidnap(5s-6s)

18:875(c); INTERSTATE COMMUNICATIONS - THREATS;
Interstate Threats to Injure or Kidnap(5ss-6ss)

18 U.S.C. 1752(a)(1); TEMPORARY RESIDENCE OF THE
PRESIDENT; Entering and Remaining in a Restricted
Building or Grounds(7)

18:1752(a)(1); TEMPORARY RESIDENCE OF THE
PRESIDENT; Entering and Remaining in a Restricted
Building or Grounds(7s)

18:1752(a)(1); TEMPORARY RESIDENCE OF THE
PRESIDENT; Entering and Remaining in a Restricted
Building or Grounds(7ss)

18 U.S.C. 1752(a)(2); TEMPORARY RESIDENCE OF THE
PRESIDENT; Disorderly and Disruptive Conduct in a
Restricted Building or Grounds(8)

18:1752(a)(2); TEMPORARY RESIDENCE OF THE
PRESIDENT; Disorderly and Disruptive Conduct in a
Restricted Building or Grounds(8s)

18:1752(a)(2); TEMPORARY RESIDENCE OF THE
PRESIDENT; Disorderly and Disruptive Conduct in a
Restricted Building or Grounds(8ss)

18 U.S.C. 1752(a)(3); TEMPORARY RESIDENCE OF THE
PRESIDENT; Impeding Ingress and Egress in a Restricted
Building or Grounds(9)

18:1752(a)(3); TEMPORARY RESIDENCE OF THE
PRESIDENT; Impeding Ingress and Egress in a Restricted
Building or Grounds(9s)

18:1752(a)(3); TEMPORARY RESIDENCE OF THE
PRESIDENT; Impeding Ingress and Egress in a Restricted
Building or Grounds(9ss)

40 U.S.C. 5104(e)(2)(D); FEDERAL STATUTES, OTHER;
Disorderly Conduct in a Capitol Building(10)

40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY
CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in
a Capitol Building(10s)

40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY
CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in
a Capitol Building(10ss)

40 U.S.C. 5104(e)(2)(E); FEDERAL STATUTES, OTHER;
Impeding Passage Through the Capitol Grounds or
Buildings(11)

40:5104(e)(2)(E); VIOLENT ENTRY AND DISORDERLY
CONDUCT ON CAPITOL GROUNDS; Impeding Passage
Through the Capitol Grounds or Buildings(11s)

40:5104(e)(2)(E); VIOLENT ENTRY AND DISORDERLY
CONDUCT ON CAPITOL GROUNDS; Impeding Passage
Through the Capitol Grounds or Buildings(11ss)

40 U.S.C. 5104(e)(2)(G); FEDERAL STATUTES, OTHER;
Parading, Demonstrating, or Picketing in a Capitol
Building(12)

40:5104(e)(2)(G); VIOLENT ENTRY AND DISORDERLY
CONDUCT ON CAPITOL GROUNDS; Parading,
Demonstrating, or Picketing in a Capitol Building(12s)

40:5104(e)(2)(G); VIOLENT ENTRY AND DISORDERLY
CONDUCT ON CAPITOL GROUNDS; Parading,
Demonstrating, or Picketing in a Capitol Building(12ss)

**Offense Level (Opening):** Felony

**Terminated:** 18:1512(c)(2) and 2; TAMPERING WITH A          DISMISSED WITHOUT PREJUDICE.
WITNESS, VICTIM OR INFORMANT; Obstruction of an
Official Proceeding and Aiding and Abetting(3ss)

**Offense Level (Terminated):** Felony

**Case Assigned To:** Judge Carl J. Nichols

## U.S. Attorneys

Elizabeth Harper Danello

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA

Appellate Division 555 4th Street, NW

Washington, DC 20530

USA

elizabeth.danello@usdoj.gov

(202) 252-6768
Designation: Assistant U.S. Attorney

Amanda Jawad

ATTORNEY TO BE NOTICED

DOJ-USAO

211 W. Fort Street Suite 2001

Detroit, MI 48226

USA

amanda.jawad@usdoj.gov

(313) 226-9116
Designation: Assistant U.S. Attorney

Benjamin Edward Kringer

07/20/2022

DOJ-USAO

United States Attorney's Office 555 4th Street NW

Washington, DC 20001

USA

benjamin.kringer@usdoj.gov

202-256-2397
Designation: Assistant U.S. Attorney

David Lieberman

12/30/2021

DOJ-CRM Appellate

950 Pennsylvania Avenue NW Suite 1264

Washington, DC 20530

USA

david.lieberman@usdoj.gov

202-262-6805
Designation: Assistant U.S. Attorney

Elizabeth C. Kelley

11/30/2021

U.S. ATTORNEY'S OFFICE

555 4th Street, N.W.

Washington, DC 20350

USA

elizabeth.kelley@usdoj.gov

202-252-7238
Designation: Assistant U.S. Attorney

James Pearce

ATTORNEY TO BE NOTICED

U.S. DEPARTMENT OF JUSTICE CRIMINAL DIVISION APPELLATE SECTION

Department of Justice, Criminal Division 950 Pennsylvania Ave NW Suite 1250

Washington, DC 20530

USA

james.pearce@usdoj.gov

(202) 532-4991
Fax: (202) 305-2121
Designation: Assistant U.S. Attorney

Stephen James Rancourt

ATTORNEY TO BE NOTICED

DOJ-USAO

Northern District of Texas 1205 Texas Avenue Suite 700

Lubbock, TX 79412

USA

stephen.rancourt@usdoj.gov

806-472-7351
Designation: Assistant U.S. Attorney

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 01/19/2021 | SEALED COMPLAINT as to GARRET MILLER (1). (Attachments: # 1 Statement of Facts) (zstd) [1:21-mj-00117-ZMF *SEALED*] (Entered: 01/19/2021) | |
| 3 | 01/19/2021 | MOTION to Seal Case by USA as to GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21-mj-00117-ZMF *SEALED*] (Entered: 01/19/2021) | |
| 4 | 01/19/2021 | ORDER granting 3 Motion to Seal Case as to GARRET MILLER (1). Signed by Magistrate Judge Zia M. Faruqui on 1/19/2021. (zstd) [1:21-mj-00117-ZMF *SEALED*] (Entered: 01/19/2021) | |
| 5 | 01/19/2021 | Amended Complaint by USA as to GARRET MILLER re 1 Complaint (Sealed) (Attachments: # 1 Amended Statement of Facts)(zstd) [1:21-mj-00117-ZMF *SEALED*] (Entered: 01/25/2021) | |
| 7 | 01/19/2021 | Amended MOTION to Seal Case by USA as to GARRET MILLER. (zstd) (Additional attachment(s) added on 1/25/2021: # 1 Text of Proposed Order) (zstd). [1:21-mj-00117-ZMF *SEALED*] (Entered: 01/25/2021) | |
| 8 | 01/19/2021 | ORDER granting 7 Motion to Seal Case as to GARRET MILLER (1). Signed by Magistrate Judge Zia M. Faruqui on 1/19/2021. (zstd) [1:21-mj-00117-ZMF *SEALED*] (Entered: 01/25/2021) | |
| | 01/20/2021 | Arrest of GARRET MILLER in US DISTRICT COURT OF THE NORTHERN DISTRICT OF TEXAS. (zltp) [1:21-mj-00117-ZMF *SEALED*] (Entered: 02/16/2021) | |
| 9 | 01/29/2021 | Rule 5(c)(3) Documents Received as to GARRET MILLER from US DISTRICT COURT OF THE NORTHERN DISTRICT OF TEXAS Case Number 3:21-MJ-00052-BN (zltp) [1:21-mj-00117-ZMF *SEALED*] (Entered: 02/16/2021) | |
| 10 | 02/12/2021 | INDICTMENT as to GARRET MILLER (1) count(s) 1-2, 3, 4, 5-6, 7, 8, 9, 10, 11, 12. (zltp) (Entered: 02/16/2021) | |
| | 02/16/2021 | Case unsealed as to GARRET MILLER (bb) (Entered: 03/01/2021) | |
| 12 | 03/02/2021 | NOTICE OF ATTORNEY APPEARANCE Elizabeth C. Kelley appearing for USA.  (Kelley, Elizabeth) (Entered: 03/02/2021) | |
| 13 | 03/18/2021 | MOTION for Leave to Appear Pro Hac Vice Camille Wagner F. Clinton Broden F. Clinton Broden Filing fee $ 100, receipt number ADCDC-8311751. Fee Status: Fee Paid. by GARRET MILLER. (Attachments: # 1 Declaration declaration of out-of-state attorney, # 2 Exhibit certificate of good standing)(Wagner, Camille) (Entered: 03/18/2021) | |
| 14 | 03/19/2021 | MOTION to Revoke Detention Order by GARRET MILLER. (Attachments: # 1 Exhibit motion to revoke detention order attachments, # 2 Text of Proposed Order proposed order)(Wagner, Camille) (Entered: 03/19/2021) | |
| | 03/23/2021 | MINUTE ORDER as to GARRET MILLER. Upon review of Defendant's 14 Motion to Revoke Detention Order, it is hereby ORDERED that the Government shall file any response by March 26, 2021. The Government's response should clarify how and whether it plans to transport Defendant to the District of Columbia. It is further ORDERED that the Parties shall appear for oral argument via teleconference at 4 P.M. on April 1, 2021. Speedy | |

App.63

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Trial as GARRET MILLER is excluded from March 21, 2021 to April 1, 2021, in the interests of justice. Signed by Judge Carl J. Nichols on March 23, 2021. (lccjn3) (Entered: 03/23/2021) | |
| | 03/23/2021 | Set/Reset Deadlines/Hearings as to GARRET MILLER: Government Response due by 3/26/2021. Status Conference set for 4/1/2021 at 04:00 PM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 03/24/2021) | |
| 15 | 03/25/2021 | MOTION for Extension of Time to File Response/Reply as to 14 MOTION to Revoke Detention Order  by USA as to GARRET MILLER. (Kelley, Elizabeth) (Entered: 03/25/2021) | |
| | 03/25/2021 | MINUTE ORDER. Upon review of the government's 15 Motion for Extension of Time, it is hereby ORDERED that the Motion is GRANTED. The government shall file its response to Defendant's 14 Motion to Revoke Detention Order by March 29, 2021. Signed by Judge Carl J. Nichols on March 25, 2021. (lccjn3) (Entered: 03/25/2021) | |
| | 03/25/2021 | Set/Reset Deadlines as to GARRET MILLER: Government Response due by 3/29/2021. (zcal) (Entered: 03/26/2021) | |
| 16 | 03/29/2021 | Memorandum in Opposition by USA as to GARRET MILLER re 14 MOTION to Revoke Detention Order  (Kelley, Elizabeth) (Entered: 03/29/2021) | |
| 17 | 03/30/2021 | MOTION to Continue , MOTION to Exclude Time by USA as to GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Kelley, Elizabeth) (Entered: 03/30/2021) | |
| | 03/30/2021 | MINUTE ORDER. The Court having considered Defendant's 13 Motion For Admission Pro Hac Vice of F. Clinton Broden, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that F. Clinton Broden is ADMITTED to practice before the Court pro hac vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Carl J. Nichols on March 30, 2021. (lccjn3) (Entered: 03/30/2021) | |
| 18 | 03/31/2021 | REPLY to Opposition to re 14 MOTION to Revoke Detention Order (Reply) by GARRET MILLER. (Attachments: # 1 Exhibit Attachment to Reply Motion)(Wagner, Camille) Modified event title on 4/5/2021 (znmw). (Entered: 03/31/2021) | |
| 19 | 03/31/2021 | NOTICE OF ATTORNEY APPEARANCE: Clinton Broden appearing for GARRET MILLER  (Broden, Clinton) (Entered: 03/31/2021) | |
| 20 | 03/31/2021 | RESPONSE by GARRET MILLER re 17 MOTION to Continue MOTION to Exclude Time  (Broden, Clinton) (Entered: 03/31/2021) | |
| 21 | 03/31/2021 | SUPPLEMENT by GARRET MILLER re 14 MOTION to Revoke Detention Order  (Attachments: # 1 Attachment A)(Broden, Clinton) (Entered: 03/31/2021) | |
| | 04/01/2021 | Minute Entry and Order for proceedings held before Judge Carl J. Nichols: Telephone Motion Hearing as to GARRET MILLER held on 4/1/2021 re 17 and 18 / Arraignment as to GARRET MILLER (1): Count 1-2,3,4,5-6,7,8,9,10,11,12 held on 4/1/2021. Not Guilty Plea as to all counts. Government's Motion 17 ; Granted in Part and Denied in Part. Defendant's Motion 18 ; Denied for reasons set forth on the record. Further Order to be issued by the Court. Speedy Trial as to GARRET MILLER is Excluded from 4/1/2021 to 5/3/2021, in the Interest of Justice, XT. Status Conference set for 5/3/2021 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Clint Broden and Camille Wagner; US Attorney: Elizabeth Kelley. (zcal) (Entered: 04/01/2021) | |
| 22 | 04/01/2021 | ORDER. Signed by Judge Carl J. Nichols on April 1, 2021. (lccjn3) (Entered: 04/01/2021) | |
| 23 | 04/05/2021 | Unopposed MOTION for Protective Order  by USA as to GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Kelley, Elizabeth) (Entered: 04/05/2021) | |
| 24 | 04/05/2021 | Unopposed MOTION for Disclosure of 6(e) and Sealed Materials by USA as to GARRET MILLER. (Kelley, Elizabeth) (Entered: 04/05/2021) | |
| | 04/06/2021 | MINUTE ORDER. Upon review of the government's 23 Motion for Protective Order, it is hereby ORDERED that the Motion is DENIED without prejudice. While the Court is otherwise prepared to approve the proposed Protective Order, paragraph 4.d, for the filing of documents under seal, appears to be inconsistent with Local Rule of Criminal Procedure 49(f)(6)(i), which requires an accompanying motion for leave to file under seal. Signed by Judge Carl J. Nichols on April 6, 2021. (lccjn3) (Entered: 04/06/2021) | |
| 25 | 04/07/2021 | Unopposed MOTION for Protective Order  by USA as to GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Kelley, Elizabeth) (Entered: 04/07/2021) | |
| 26 | 04/15/2021 | ORDER granting 25 Motion for Protective Order as to GARRET MILLER. Signed by Judge Carl J. Nichols on April 15, 2021. (lccjn3) (Entered: 04/15/2021) | |
| | 04/21/2021 | MINUTE ORDER. Upon review of the government's 24 Motion to Disclose, it is hereby ORDERED that the Motion is GRANTED. The government may provide Defendant with discovery materials protected by Federal Rule of Criminal Procedure 6(e) and sealed materials covered by the 26 Protective Order governing discovery. Signed by Judge Carl J. Nichols on April 21, 2021. (lccjn3) (Entered: 04/21/2021) | |
| 27 | 04/22/2021 | ENTERED IN ERROR.....RESPONSE by GARRET MILLER re 25 Unopposed MOTION for Protective Order  Attachment A (Broden, Clinton) Modified on 4/28/2021 (zstd). (Entered: 04/22/2021) | |
| | 04/22/2021 | NOTICE OF CORRECTED DOCKET ENTRY: as to GARRET MILLER re 27 Response to motion was entered in error and counsel was instructed to refile said pleading. The document should be a notice of filing (zstd) (Entered: 04/28/2021) | |
| | 04/28/2021 | Set/Reset Hearings as to GARRET MILLER: Status Conference RESET for 5/3/2021 at 09:30 AM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 04/28/2021) | |
| 28 | 04/28/2021 | ENTERED IN ERROR.....NOTICE of Attachment A by GARRET MILLER re 25 Unopposed MOTION for Protective Order  (Broden, Clinton) Modified on 5/8/2021 (zstd). (Entered: 04/28/2021) | |
| | 04/28/2021 | NOTICE OF CORRECTED DOCKET ENTRY: as to GARRET MILLER re 28 Notice (Other) was entered in error and counsel was instructed to refile said pleading. The document cannot be file alone, a notice of filings needs to be the main document and defendant's acceptance of the Protective Order will be the attachment (zstd) (Entered: 05/08/2021) | |
| | 04/29/2021 | MINUTE ORDER as to GARRET MILLER (1). The Court was advised on April 29, 2021 that GARRET MILLER, who is currently detained, has been transported to the local jurisdiction. Upon review of the docket in this jurisdiction, the docket in the jurisdiction of arrest, and after consultation with counsel where necessary, the Court has confirmed that GARRET MILLER: has had a full Rule 5 initial appearance in the jurisdiction of arrest; has | |

App.65

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | retained counsel; has been ordered held without bond pending trial; has been charged by Indictment; and has been arraigned. As such, there are no pending matters necessitating action by a magistrate judge. The parties are directed to contact the assigned District Judge to schedule a status hearing, if one has not yet been set. The parties are instructed to address any requests to toll the Speedy Trial Act to the assigned District Judge. Signed by Magistrate Judge G. Michael Harvey on 4/29/2021. (zpt) (Entered: 04/29/2021) | |
| | 05/03/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to GARRET MILLER held on 5/3/2021. Speedy Trial as to GARRET MILLER is Excluded from 5/3/2021 to 5/26/2021, in the Interest of Justice, XT. Status Conference set for 5/26/2021 at 04:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Clinton Broden and Camille Wagner; US Attorney: Elizabeth Kelley. (zcal) (Entered: 05/03/2021) | |
| 29 | 05/10/2021 | NOTICE of Defendant's Acceptance of the Protective Order by GARRET MILLER re 25 Unopposed MOTION for Protective Order (Attachments: # 1 Attachment A)(Broden, Clinton) (Entered: 05/10/2021) | |
| 30 | 05/12/2021 | SUPERSEDING INDICTMENT as to GARRET MILLER (1) count(s) 1s-2s, 3s, 4s, 5s-6s, 7s, 8s, 9s, 10s, 11s, 12s. (zstd) (Entered: 05/14/2021) | |
| | 05/26/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference/Arraignment as to GARRET MILLER (1): Counts 1s-2s,3s,4s,5s-6s,7s,8s,9s,10s,11s,12s held on 5/26/2021. Not Guilty Plea as to all counts. Speedy Trial as to GARRET MILLER (1) is Excluded from 5/26/2021 to 6/9/2021, in the Interest of Justice, XT. Status Conference set for 6/9/2021 at 04:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Nancy Meyer; Defense Attorney: Clinton Broden; US Attorney: Elizabeth Kelley. (zcal) (Entered: 05/26/2021) | |
| | 06/09/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to GARRET MILLER held on 6/9/2021. Speedy Trial as to GARRET MILLER is Excluded from 6/9/2021 to 6/29/2021, in the Interest of Justice, XT. Status Conference set for 6/29/2021 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Bryan Wayne; Defense Attorney: Clinton Broden and Camille Wagner; US Attorney: Elizabeth Kelley. (zcal) (Entered: 06/09/2021) | |
| 32 | 06/24/2021 | MOTION for Discovery and for an Evidentiary Hearing in Support of Defendant's Claim of Selective Prosecution as It Relates to Counts One, Two and Four of the Superseding Indictment by GARRET MILLER. (Attachments: # 1 Attachments 1-31)(Broden, Clinton) (Entered: 06/24/2021) | |
| 33 | 06/24/2021 | MOTION for an Evidentiary Hearing by GARRET MILLER. (See docket entry 32 to view document). (zstd) (Entered: 06/25/2021) | |
| 34 | 06/28/2021 | MOTION to Dismiss Count Three of the Superseding Indictment for Failure to State an Offense and Memorandum of Law in Support Thereof by GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Broden, Clinton) (Entered: 06/28/2021) | |
| | 06/29/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to GARRET MILLER held on 6/29/2021. Government Response to Motion 34 due by 7/12/2021. Defense Reply due by 7/19/2021. Government Response Motion | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | 32 / 33 due by 7/22/2021. Defense Reply due upon notification to the Court. Speedy Trial as to GARRET MILLER is Excluded from 6/29/2021 to after motions have been briefed. Status Conference set for 8/30/2021 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Clinton Broden and Camille Wagner; US Attorney: Elizabeth Kelley. (zcal) (Entered: 06/29/2021) |   |
| 35 | 07/09/2021 | Memorandum in Opposition by USA as to GARRET MILLER re 34 MOTION to Dismiss Count Three of the Superseding Indictment for Failure to State an Offense and Memorandum of Law in Support Thereof  (Kelley, Elizabeth) (Entered: 07/09/2021) |   |
| 36 | 07/12/2021 | NOTICE OF ATTORNEY APPEARANCE Amanda Jawad appearing for USA.  (Jawad, Amanda) (Entered: 07/12/2021) |   |
| 37 | 07/14/2021 | NOTICE of Memorandum Regarding Status of Discovery by USA as to GARRET MILLER (Jawad, Amanda) (Entered: 07/14/2021) |   |
| 38 | 07/16/2021 | REPLY by GARRET MILLER re 35 Memorandum in Opposition (Broden, Clinton) (Entered: 07/16/2021) |   |
| 39 | 07/22/2021 | Memorandum in Opposition by USA as to GARRET MILLER re 32 MOTION for Discovery and for an Evidentiary Hearing in Support of Defendant's Claim of Selective Prosecution as It Relates to Counts One, Two and Four of the Superseding Indictment (Kelley, Elizabeth) (Entered: 07/22/2021) |   |
| 40 | 08/04/2021 | NOTICE of Filing Discovery Letter by USA as to GARRET MILLER (Attachments: # 1 Discovery Letter)(Kelley, Elizabeth) (Entered: 08/04/2021) |   |
| 41 | 08/06/2021 | Unopposed MOTION to Exclude Time under the Speedy Trial Act by USA as to GARRET MILLER. (Kelley, Elizabeth) (Entered: 08/06/2021) |   |
| 42 | 08/09/2021 | NOTICE of Filing Discovery Letter by USA as to GARRET MILLER (Attachments: # 1 Discovery Letter)(Kelley, Elizabeth) (Entered: 08/09/2021) |   |
|   | 08/10/2021 | MINUTE ORDER. Upon review of Defendant's 32 33 34 pretrial motions, the Parties are hereby ORDERED to appear via teleconference for an oral argument on the Motions at 2 pm ET on August 24, 2021. It is further ORDERED that the government's 41 Unopposed Motion to Exclude Time is hereby GRANTED, as Defendant's substantive pretrial motions have tolled the Speedy Trial Act as a matter of law. See 18 U.S.C. 3161(h)(1)(D). Signed by Judge Carl J. Nichols on August 10, 2021. (lccjn3) (Entered: 08/10/2021) |   |
| 43 | 08/11/2021 | Consent MOTION to Continue Oral Argument by USA as to GARRET MILLER. (Kelley, Elizabeth) (Entered: 08/11/2021) |   |
|   | 08/12/2021 | MINUTE ORDER. Upon review of the Parties' 43 Consent Motion to Continue Oral Argument, it is hereby ORDERED that the Motion is GRANTED. Accordingly, the oral argument on Defendant's pretrial 32 33 34 motions is continued until September 16, 2021, at 11:00 am ET, and the status hearing scheduled for August 30, 2021, is VACATED. It is further ORDERED that the time between June 24, 2021, (the date Defendant filed his first pretrial 32 motion) and September 16, 2021, is excluded from calculations under the Speedy Trial Act. See 18 U.S.C. 3161(h)(1)(D). Signed by Judge Carl J. Nichols on August 12, 2021. (lccjn3) (Entered: 08/12/2021) |   |
| 44 | 08/20/2021 | NOTICE OF ATTORNEY APPEARANCE David Lieberman appearing for USA.  (Lieberman, David) (Entered: 08/20/2021) |   |
| 45 | 09/03/2021 | NOTICE OF ATTORNEY APPEARANCE James Pearce appearing for USA.  (Pearce, James) (Entered: 09/03/2021) |   |

1:21cr119, USA v. MILLER

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 46 | 09/09/2021 | ENTERED IN ERROR.....Unopposed MOTION to Continue Evidentiary Hearing by GARRET MILLER. (Broden, Clinton) Modified on 9/10/2021 (zstd). (Entered: 09/09/2021) | |
| 47 | 09/09/2021 | SUPPLEMENT re 34 MOTION to Dismiss Count Three of the Superseding Indictment for Failure to State an Offense and Memorandum of Law in Support Thereof (Broden, Clinton) (Entered: 09/09/2021) | |
| 48 | 09/09/2021 | Amended Unopposed MOTION to Continue Evidentiary Hearing by GARRET MILLER. (Broden, Clinton) Modified text on 9/10/2021 (zstd). (Entered: 09/09/2021) | |
| | 09/09/2021 | NOTICE OF CORRECTED DOCKET ENTRY: as to GARRET MILLER re 46 Unopposed MOTION to Continue Evidentiary Hearing was entered in error and counsel refiled said pleading. The correct document is filed at DE # 48. (zstd) (Entered: 09/10/2021) | |
| 49 | 09/10/2021 | NOTICE of Filing Discovery Letter by USA as to GARRET MILLER (Attachments: # 1 Discovery Letter)(Kelley, Elizabeth) (Entered: 09/10/2021) | |
| 50 | 09/13/2021 | NOTICE of Filing Discovery Letter by USA as to GARRET MILLER (Attachments: # 1 Discovery Letter)(Kelley, Elizabeth) (Entered: 09/13/2021) | |
| | 09/13/2021 | MINUTE ORDER. Upon consideration of Defendant's 48 Unopposed Motion to Continue Evidentiary Hearing, it is hereby ORDERED that the Motion is GRANTED. The oral argument on Defendant's pretrial 32 33 34 motions is continued until November 10, 2021, at 10:00 am ET. The status hearing scheduled for September 16, 2021, is VACATED. It is further ORDERED that the time between September 16, 2021 and November 10, 2021, is excluded from calculations under the Speedy Trial Act, 18 U.S.C. 3161(h)(1)(D). Signed by Judge Carl J. Nichols on September 13, 2021. (lccjn3) (Entered: 09/13/2021) | |
| 51 | 09/27/2021 | NOTICE of Filing Discovery Letter by USA as to GARRET MILLER (Attachments: # 1 Discovery Letter)(Kelley, Elizabeth) (Entered: 09/27/2021) | |
| 52 | 10/25/2021 | NOTICE of Status of Discovery as of October 21, 2021 by USA as to GARRET MILLER (Kelley, Elizabeth) (Entered: 10/25/2021) | |
| 53 | 10/25/2021 | NOTICE of Filing by USA as to GARRET MILLER (Attachments: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 2, # 4 Exhibit 3)(Kelley, Elizabeth) Modified text on 10/26/2021 (zstd). (Entered: 10/25/2021) | |
| 55 | 10/26/2021 | MOTION to Determine Whether to Seal Defendant's Motion to Reopen Detention Hearing by GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Broden, Clinton) (Entered: 10/26/2021) | |
| | 10/27/2021 | MINUTE ORDER as to GARRET MILLER. Upon review of Defendant's 54 Sealed Motion to Reopen Detention Hearing, it is hereby ORDERED that the Government shall file any response by November 5, 2021. The Government should also address if the Motion should remain sealed. Defendant's reply, if any, is due November 10, 2021. Argument will be conducted on November 12, 2021, at 10:00 am. The argument will be conducted telephonically unless any party files a request for in-person or video argument by November 5. Signed by Judge Carl J. Nichols on October 27, 2021. (lccjn3) (Entered: 10/27/2021) | |
| | 10/27/2021 | Set/Reset Deadlines/Hearings as to GARRET MILLER: Response due by 11/5/2021. Reply due by 11/10/2021. Motion Hearing RESET for 11/12/2021 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 10/28/2021) | |
| | 10/28/2021 | Set/Reset Hearings as to GARRET MILLER: Motion Hearing | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | RESET for 11/22/2021 at 12:30 PM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 10/28/2021) | |
| 57 | 11/05/2021 | Unopposed MOTION to Exclude Time under the Speedy Trial Act by USA as to GARRET MILLER. (Kelley, Elizabeth) (Entered: 11/05/2021) | |
| | 11/09/2021 | MINUTE ORDER. Upon consideration of the United States' 57 Unopposed Motion to Exclude Time Under the Speedy Trial Act, it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that the time between November 10, 2021 and November 22, 2021, is excluded under the Speedy Trial Act, 18 U.S.C. 3161(h)(1)(D). Signed by Judge Carl J. Nichols on November 9, 2021. (lccjn3) (Entered: 11/09/2021) | |
| 61 | 11/10/2021 | SECOND SUPERSEDING INDICTMENT as to GARRET MILLER (1) count(s) 1ss-2ss, 3ss, 4ss, 5ss-6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss. (bb) (Entered: 11/17/2021) | |
| 59 | 11/15/2021 | SECOND SUPPLEMENT by GARRET MILLER re 34 MOTION to Dismiss Count Three of the Superseding Indictment for Failure to State an Offense and Memorandum of Law in Support Thereof (Attachments: # 1 Attachment A)(Broden, Clinton) Modified text on 11/15/2021 (zstd). (Entered: 11/15/2021) | |
| 60 | 11/15/2021 | MOTION for Leave to File Supplemental Authority by USA as to GARRET MILLER. (Attachments: # 1 Proposed Supplemental Authority)(Jawad, Amanda) (Entered: 11/15/2021) | |
| 63 | 11/17/2021 | MOTION for Leave to File Supplemental Brief in Response to Defendant's Second Supplement to Motion to Dismiss Count Three by USA as to GARRET MILLER. (Attachments: # 1 Exhibit A)(Jawad, Amanda) (Entered: 11/17/2021) | |
| | 11/22/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Motion Hearing/Arraignment as to GARRET MILLER (1): Counts 1ss-2ss,3ss,4ss,5ss-6ss,7ss,8ss,9ss,10ss,11ss, and 12ss held on 11/22/2021. NOT GUILTY Plea as to all counts. Motions 32-34, 54-55; taken under advisement. Speedy Trial as to GARRET MILLER is Excluded from 11/22/2021 to 12/21/2021, in the Interest of Justice, XT. status Conference set for 12/21/2021 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Clinton Broden and Camille Wagner; US Attorney: Elizabeth Kelley, Amanda Jawad, David Lieberman, and James Pearce. (zcal) (Entered: 11/22/2021) | |
| 64 | 11/30/2021 | NOTICE OF WITHDRAWAL OF APPEARANCE  by USA as to GARRET MILLER (Kelley, Elizabeth) (Entered: 11/30/2021) | |
| 66 | 12/17/2021 | NOTICE OF ATTORNEY APPEARANCE Benjamin Edward Kringer appearing for USA.  (Kringer, Benjamin) (Entered: 12/17/2021) | |
| 67 | 12/21/2021 | ORDER as to 32 Motion for Discovery and for an Evidentiary Hearing. Signed by Judge Carl J. Nichols on December 21, 2021. (lccjn3) (Entered: 12/21/2021) | |
| | 12/21/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to GARRET MILLER held on 12/21/2021. Speedy Trial as to GARRET MILLER is Excluded from 12/21/2021 to 1/27/2022, in the Interest of Justice, XT. Status Conference set for 1/27/2022 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Clinton Broden and Camille Wagner; US Attorney: Amanda Jawad and Ben Kringer. (zcal) (Entered: 12/21/2021) | |

1:21cr119, USA v. MILLER

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 68 | 12/22/2021 | REDACTED ORDER. Signed by Judge Carl J. Nichols on December 22, 2021. (lccjn3) Modified on 12/22/2021 to correct order title (zcal). (Entered: 12/22/2021) | |
| 69 | 12/30/2021 | NOTICE OF WITHDRAWAL OF APPEARANCE  by USA as to GARRET MILLER (Lieberman, David) (Entered: 12/30/2021) | |
| 70 | 01/26/2022 | NOTICE of Memorandum Regarding Status of Discovery by USA as to GARRET MILLER (Jawad, Amanda) (Entered: 01/26/2022) | |
| | 01/27/2022 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to GARRET MILLER held on 1/27/2022. Speedy Trial as to GARRET MILLER is Excluded from 1/27/2022 to 3/8/2022, in the Interest of Justice, XT. Status Conference set for 3/8/2022 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Clinton Broden; US Attorney: Amanda Jawad and Ben Kringer. (zcal) (Entered: 01/27/2022) | |
| 71 | 02/15/2022 | NOTICE of Memorandum Regarding Status of Discovery by USA as to GARRET MILLER (Kringer, Benjamin) (Entered: 02/15/2022) | |
| 72 | 03/07/2022 | MEMORANDUM OPINION as to 34 Motion to Dismiss Count Three. Signed by Judge Carl J. Nichols on March 7, 2022. (lccjn3) Modified on 3/15/2022 to correct document type (zcal). (Entered: 03/07/2022) | |
| 73 | 03/07/2022 | ORDER as to 34 Motion to Dismiss Count Three and 63 Motion for Leave to File a Supplemental Brief. Signed by Judge Carl J. Nichols on March 7, 2022. (lccjn3) (Entered: 03/07/2022) | |
| 74 | 03/07/2022 | Supplemental Brief by USA as to GARRET MILLER re 59 Second Supplement (zstd) (Entered: 03/10/2022) | |
| | 03/08/2022 | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to GARRET MILLER held on 3/8/2022. Speedy Trial as to GARRET MILLER is Excluded from 3/8/2022 to 10/11/2022, in the Interest of Justice, XT. Proposed Pretrial Order due by 4/7/2022. Jury Selection / Jury Trial set for 10/11/2022 at 09:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Clinton Broden; US Attorney: Benjamin Kringer. (zcal) (Entered: 03/08/2022) | |
| 75 | 04/01/2022 | MOTION for Reconsideration re 73 Order, 72 Order  by USA as to GARRET MILLER. (Attachments: # 1 Exhibit Ex. A (Reffitt trial transcript), # 2 Exhibit Ex. B (Reffitt trial transcript), # 3 Exhibit Ex. C (Miller hearing transcript))(Pearce, James) (Entered: 04/01/2022) | |
| 76 | 04/07/2022 | Consent MOTION for Order Governing Pretrial Deadlines  by USA as to GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Jawad, Amanda) (Entered: 04/07/2022) | |
| 77 | 04/11/2022 | MOTION for Extension of Time to File Response/Reply as to 75 MOTION for Reconsideration re 73 Order, 72 Order   by GARRET MILLER. (Broden, Clinton) (Entered: 04/11/2022) | |
| | 04/14/2022 | MINUTE ORDER as to GARRET MILLER. Upon consideration of MILLER's 77 Motion to Extend Time, it is hereby ORDERED that the Motion is GRANTED. The United States has not opposed MILLER's request for an extension. It is thus ORDERED that MILLER shall file a Response to the United States' 75 Motion no later than April 28, 2022. Signed by Judge Carl J. Nichols on April 14, 2022. (lccjn3) (Entered: 04/14/2022) | |
| | 04/14/2022 | Set/Reset Deadlines as to GARRET MILLER: Response due by 4/28/2022 (zcal) (Entered: 04/15/2022) | |
| 78 | 04/21/2022 | SCHEDULING ORDER. Signed by Judge Carl J. Nichols on April | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 21, 2022. (lccjn3) (Entered: 04/21/2022) | |
| | 04/21/2022 | Set/Reset Deadlines/Hearings as to GARRET MILLER: Exhibit List due by 9/15/2022. Motions due by 8/12/2022. Proposed Voir Dire due by 9/15/2022. Proposed Jury Instructions due by 9/15/2022. Pretrial Statement due by 9/15/2022. Responses due by 8/26/2022 Replies due by 9/2/2022. Witness List due by 9/15/2022. Pretrial Conference set for 9/9/2022 at 10:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Pretrial Conference set for 9/29/2022 at 10:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 04/21/2022) | |
| 79 | 04/28/2022 | NOTICE OF ATTORNEY APPEARANCE Stephen James Rancourt appearing for USA.  (Rancourt, Stephen) (Entered: 04/28/2022) | |
| 80 | 04/28/2022 | RESPONSE by GARRET MILLER re 75 MOTION for Reconsideration re 73 Order, 72 Order   (Broden, Clinton) (Entered: 04/28/2022) | |
| 81 | 05/02/2022 | Unopposed MOTION for Extension of Time to File Response/Reply as to 75 MOTION for Reconsideration re 73 Order, 72 Order  Dismissing Count Three of the Indictment by USA as to GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Rancourt, Stephen) (Entered: 05/02/2022) | |
| 82 | 05/02/2022 | MOTION for Leave to File Supplemental Authority to its Motion For Reconsideration of the Court's Ruling Dismissing Count Three of the Indictment by USA as to GARRET MILLER. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Rancourt, Stephen) (Entered: 05/02/2022) | |
| | 05/03/2022 | MINUTE ORDER as to GARRET MILLER. Upon consideration of the United States' 81 Unopposed Motion for Extension of Time, it is hereby ORDERED that the Motion is GRANTED. The United States shall file its reply in support of its Motion for Reconsideration on or before May 12, 2022. Signed by Judge Carl J. Nichols on May 3, 2022. (lccjn3) (Entered: 05/03/2022) | |
| | 05/03/2022 | Set/Reset Deadlines as to GARRET MILLER: Reply due by 5/12/2022. (zcal) (Entered: 05/04/2022) | |
| 83 | 05/04/2022 | MOTION for Leave to File Supplemental Authority to its Motion for reconsideration of the Court's Ruling Dismissing Count Three of the Indictment by USA as to GARRET MILLER. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Rancourt, Stephen) (Entered: 05/04/2022) | |
| 84 | 05/12/2022 | REPLY TO OPPOSITION to Motion by USA as to GARRET MILLER re 75 MOTION for Reconsideration re 73 Order, 72 Order (Attachments: # 1 Exhibit D (Hale-Cusanelli MTD hrg. transcript))(Pearce, James) (Entered: 05/12/2022) | |
| 85 | 05/25/2022 | MOTION for Leave to File Supplemental Authority by USA as to GARRET MILLER. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Rancourt, Stephen) (Entered: 05/25/2022) | |
| 86 | 05/27/2022 | MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on May 27, 2022. (lccjn3) (Entered: 05/27/2022) | |
| 87 | 05/27/2022 | ORDER. Signed by Judge Carl J. Nichols on May 27, 2022. (lccjn3) (Entered: 05/27/2022) | |
| 88 | 06/22/2022 | NOTICE OF APPEAL (Interlocutory) by USA as to GARRET MILLER re 73 Order. Fee Status: No Fee Paid. Parties have been notified. (Danello, Elizabeth) (Entered: 06/22/2022) | |
| 89 | 06/22/2022 | NOTICE OF ATTORNEY APPEARANCE Elizabeth Harper Danello appearing for USA.  (Danello, Elizabeth) (Entered: 06/22/2022) | |
| 90 | 06/22/2022 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | docketing fee was not paid because the appeal was filed by the government as to GARRET MILLER re 88 Notice of Appeal - Interlocutory. (zstd) (Entered: 06/22/2022) | |
| 91 | 06/23/2022 | Transmitted Supplemental Record on Appeal and Docket Sheet to USCA as to GARRET MILLER re 88 Notice of Appeal - Interlocutory. (zstd) (Entered: 06/23/2022) | |
| | 06/28/2022 | USCA Case Number as to GARRET MILLER 22-3041 for 88 Notice of Appeal - Interlocutory filed by USA. (zstd) (Entered: 06/28/2022) | |
| 92 | 07/20/2022 | NOTICE OF WITHDRAWAL OF APPEARANCE of Benjamin Kringer by USA as to GARRET MILLER (Kringer, Benjamin) (Entered: 07/20/2022) | |
| 93 | 07/25/2022 | MOTION to Hold Status Conference  by GARRET MILLER. (Attachments: # 1 Text of Proposed Order)(Broden, Clinton) Modified event on 7/25/2022 (znmw). (Entered: 07/25/2022) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br>Garret Miller<br><br><br>_____<br>**Date of Birth:  XXXXXXXX**<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case: 1:21-mj-00117
Assigned to: Judge Zia M. Faruqui
Assign Date: 1/19/2021
Description: COMPLAINT W/ARREST WARRANT

## AMENDED CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 6, 2021_____ in the county of _____ in the

_____ in the District of ____Columbia____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|

18 U.S.C. 1752(a)(1), (2)- Knowingly Entering or Remaining in any Restricted Buildings or
Grounds Without Lawful Authority
40 U.S.C. 5104(e)(2)(G)- Violent Entry and Disorderly Conduct on Capitol Grounds
18 U.S.C. 1512(c)(2)- Obstructing or Impeding Any Official Proceeding
18 U.S.C. 231(a)(3)- Certain Acts During Civil Disorder
18 U.S.C. 875(c) - Threats

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Kevin Palomino, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by telephone.

Date: ____01/19/2021____

Zia M. Faruqui
2021.01.19 23:01:20
-05'00'
_____
*Judge's signature*

City and state: ____Washington, D.C.____

Zia M. Faruqui, U.S. Magistrate Judge
*Printed name and title*

App.73

Case 1:21-cr-00119-CJN   Document

USCA Case #22-3039      Document #1958171      Filed: 08/09/2022      Page 77 of 515

Case: 1:21-mj-00117
Assigned to: Judge Zia M. Faruqui
Assign Date: 1/19/2021
Description: COMPLAINT W/ARREST WARRANT

## STATEMENT OF FACTS

On January 6, 2021, your affiant, Special Agent Kevin Palomino, was on duty and performing my official duties Special Agent with the United States Department of Homeland Security, Federal Protective Service, assigned to the Federal Bureau of Investigation ("FBI"), North Texas Joint Terrorism Task Force. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

On January 8, 2021, the FBI received a referral from law enforcement indicating that an individual using the Twitter account "@garretamiller" posted a video from inside the U.S. Capitol. FBI agents viewed the video on Twitter, which was publicly-available. The video was posted on January 6, 2021 at about 6:56 p.m. It is fourteen seconds long and pans across a crowd who is inside the U.S. Capitol Rotunda, waving pro-Trump and American flags. The caption to the video is "From inside congress."



A subpoena return related to the Twitter account "@garretamiller," where the video was posted, revealed that the account is associated with a cellular telephone number that is registered to GARRET A. MILLER of Dallas County, Texas, which the FBI confirmed through an AT&T subpoena. The Twitter account "@garretamiller" is also associated with Facebook account "facebook.com/garret.a.miller." That Facebook account is associated with the same phone number and lists the user's birthday as the same birthday as MILLER.

In examining MILLER's Facebook account, there are many posts relating to his involvement in criminal activities at the Capitol. For example, on January 2, 2021, MILLER posted to Facebook, "I am about to drive across the country for this trump shit. On Monday . . . Some crazy shit going to happen this week. Dollar might collapse. . . . civil war could start . . . not sure what to do in DC." He also stated on January 3, 2021, that he was bring with him "a grappling hook and rope and a level 3 vest. Helmets mouth guard and bump cap," but last time he came to D.C. for a pro-Trump rally he "had a lot of guns" with him.

On January 6, 2021, MILLER posted a selfie to his Facebook account garret.a.miller. In the selfie he is wearing a pro-Trump red hat and appears to be standing in a grassy area:

App.75



On January 11, 2021, MILLER posted to his Facebook account (garret.a.miller) a photograph of himself with another individual inside the U.S. Capitol building Rotunda. In the photograph he is wearing a pro-Trump hat and behind him is a statue from the Rotunda.



Your Affiant retrieved a driver's license photograph of MILLER, and as the driver's license photograph demonstrates, this appears to be the same person.



After MILLER posted the selfie above showing him inside the U.S. Capitol building, an individual on Facebook commented, "bro you got in?! Nice!," to which MILLER replied, "just wanted to incriminate myself a little lol."

Additionally, surveillance video from inside the U.S. Capitol building on January 6, 2021, shows MILLER in the Capitol Rotunda at about 2:46 p.m.  Screenshots from the video are below:





MILLER is wearing a backpack that appears to be patterned, a backwards red baseball hat, has what appears to be a balaclava around his neck, and is carrying two flags, an American flag and a pro-Trump flag.

A video of the entrance to the U.S. Capitol Rotunda shows a crowd of people pushing to get past U.S. Capitol Police officers, who are attempting to stop them from coming into the building.  As seen in the screen capture of that video below, MILLER appears to be part of the crowd that pushes past the officers to gain entrance to the building:



After acknowledging his participation in the pro-Trump riots, multiple individuals commented to MILLER'S Facebook account.  One individual tried to blame Antifa for the riots, but MILLER countered, "[Y]ou don't think we should have stormed the capital [sic]?"

App.78

Also, when asked on Facebook, "were you in the building?," MILLER responded, "Yah . . . we charged . . . We where [sic] going in . . . No matter what . . . Decided before the trump speech . . . I charged the back gates myself with an anti masker."

In addition to his Facebook posts, MILLER also posted about his activities at the Capitol on Twitter. On January 6, 2021, MILLER repeatedly posted comments on Twitter using his Twitter account (@garretamiller).  In one tweet, an individual posted, "The people storming The Capitol are not Patriots. They are PAID INFILTRATORS," to which MILLER responded, "Nah we stormed it. We where [sic] gentle. We where [sic] unarmed. We knew what had to be done. A beautiful soul was lost today. We must know her name. She will not be forgotten."



In another tweet, MILLER threatened, "They are right next time we bring the guns."



In another, a Baptist pastor tweeted, "I am deeply saddened by what took place in our nation's capital [sic] today. Our country is in trouble. We need God's healing and we need God's help. Pray for peace and the protection of our nation. Let's come together—on our knees." MILLER responded, "It was Beutiful [sic]. Wake the fuck up already!"



He also claimed in one tweet, "It was not a coup. We where [sic] gentle with police. We where [sic] unharmed. We overwhelmed them but did not injure them. . . ."



In a string of tweets to a U.S. House of Representatives member, MILLER first claims, "We acted with honor and we where [sic] not armed. We where [sic] gentle with the police.  They murdered a child."  He then further directed, "Assassinate [House member]."



MILLER also posted about entering the Capitol on his Instagram account, which is associated with his Facebook account, "We stormed the capital [sic] as peacefully as we could without weapons . . . The congress building."  A few days later, MILLER admitted on Instagram that he "had a rope in [his] bag on that day."  He also posted to his Twitter account (@garretamiller) a photograph from the U.S. Capitol grounds and stated, "It was Beutiful! [sic] #Trump." The photograph shows a large crowed of pro-Trump supporters in front of the U.S. Capitol building.



In addition to discussing his own actions at the Capitol, MILLER also discussed the shooting of a woman by a U.S. Capitol Police Officer during the pro-Trump riots on January 6, 2021. During that discussion on January 10, 2021, MILLER stated, "We going to get a hold of [the USCP officer] and hug his neck with a nice rope[.]"  The individual with whom he was chatting responded, "Didn't you say you were a Christian or some lie?" to which MILLER responded, "Justice . . . Not murder . . . Read the commandment . . . theres [sic] a difference."

On January 16, 2021, MILLER again got into a discussion on Facebook, about the USCP officer and said that the officer is "not going to survive long."  MILLER claimed that "millions" of people agree with him that the officer "deserve[s] to die" "so its [sic] huntin season."  He then says that the woman who was killed "was a sister in battle were bravery achieve victory and she paid the ultimate price. . . . Dead serious she fought fir [sic] me, now I fight fir [sic] her[.]"  He later claimed, "Well we got the traitor cop as a target and as long as we don't shoot him we don't get accused of firing the first shot. He shot first. His death prevents civil war by liberal history teller arguments."

On January 15, 2021, MILLER admitted in a Facebook chat that he is "happy to make death threats so I been just off the rails tonight lol," and is "happy to be banned now [from Twitter]."  When asked whether the police know his name, he responded, "[I]t might be time for me to …. Be hard to locate."

On January 15, 2021, FBI agents obtained a search warrant for MILLER's cellphone number, the same number associated with his Facebook account, for prospective cell site and Global Positioning System (GPS) data.  That same day, prospective location data showed the phone inside the house where MILLER lives according to a law enforcement database.  MILLER had previously identified this same address as his home address in a Facebook chat from January 2, 2021. FBI agents also confirmed the next day that a van which is registered to MILLER, was parked in the driveway of the house.

Based on the foregoing, your affiant submits that there is probable cause to believe that GARRET A. MILLER violated 18 U.S.C. § 1752(a)(1)-(2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do so and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions.

Your affiant submits there is also probable cause to believe that MILLER violated 40 U.S.C. § 5104(e)(2)(G), which makes it a crime to willfully and knowingly (G) parade, demonstrate, or picket in any of the Capitol Buildings.

Your affiant submits there is probable cause to believe that MILLER violated 18 U.S.C. § 1512(c)(2), which makes it a crime to corruptly otherwise obstruct, influence, or impede any official proceeding, or attempt to do so, or conspire to do so.

App.82

Your affiant further submits there is probable cause to believe that MILLER violated 18 U.S.C. § 875(c), which makes it a crime to "transmit in interstate . . . commerce any communication containing . . . any threat to injure the person of another."

Your affiant submits there is probable cause to believe that MILLER violated 18 U.S.C. 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects . . . the conduct or performance of any federally protected function. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

KEVIN PALOMINO
Special Agent
Federal Protective Service
FBI Task Force Officer

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 19th day of January 2021.

Zia M. Faruqui
2021.01.19
23:03:16 -05'00'

Zia M. Faruqui
U.S. Magistrate Judge

App.83

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on January 8, 2021**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-CR-119 (CJN)** |
| | : | |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| **GARRET MILLER,** | : | **18 U.S.C. § 231(a)(3)** |
| | : | **(Civil Disorder)** |
| **Defendant.** | : | **18 U.S.C. §§ 1512(c)(2), 2** |
| | : | **(Obstruction of an Official Proceeding and** |
| | : | **Aiding and Abetting)** |
| | : | **18 U.S.C. § 111(a)(1)** |
| | : | **(Assaulting, Resisting, or Impeding** |
| | : | **Certain Officers)** |
| | : | **18 U.S.C. § 875(c)** |
| | : | **(Interstate Threats to Injure or Kidnap)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(3)** |
| | : | **(Impeding Ingress and Egress in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| | : | **(Disorderly Conduct in** |
| | : | **a Capitol Building)** |
| | : | **40 U.S.C. § 5104(e)(2)(E)** |
| | : | **(Impeding Passage Through the Capitol** |
| | : | **Grounds or Buildings)** |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | **(Parading, Demonstrating, or Picketing in** |
| | : | **a Capitol Building)** |

**I N D I C T M E N T**

The Grand Jury charges that:

## COUNT ONE

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**, committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer, that is an officer from the United States Capitol Police, in an entryway to the United States Capitol Building, lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

(**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

## COUNT TWO

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**, committed and attempted to commit an act to obstruct, impede, and interfere with law enforcement officers, that is, an officer from the Metropolitan Police Department in the United States Capitol Building Rotunda, lawfully engaged in the lawful performance of her/his official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

(**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

## COUNT THREE

On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET MILLER**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College

2

vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§

15-18.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title
18, United States Code, Sections 1512(c)(2) and 2)

## COUNT FOUR

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**, did

forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of

the United States, and of any branch of the United States Government (including any member of

the uniformed services), and any person assisting such an officer and employee, while such person

was engaged in and on account of the performance of official duties, and where the acts in violation

of this section involve the intent to commit another felony.

(**Assaulting, Resisting, or Impeding Certain Officers**, in violation of Title 18, United
States Code, Section 111(a)(1))

## COUNT FIVE

On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET**

**MILLER**, did transmit in interstate and foreign commerce a communication containing a threat

to kidnap and injure Congresswoman Alexandria Ocasio-Cortez, specifically, by threatening to

assassinate her.

(**Interstate Threats to Injure or Kidnap**, in violation of Title 18, United States Code,
Section 875(c))

## COUNT SIX

On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET**

**MILLER**, did transmit in interstate and foreign commerce a communication containing a threat

3

App.86

to kidnap and injure a United States Capitol Police officer, specifically, by threatening to "hug his neck with a nice rope," stating that the officer deserves to die, and stating that it is "huntin season."

(**Interstate Threats to Injure or Kidnap**, in violation of Title 18, United States Code, Section 875(c))

## COUNT SEVEN

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**, did unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so.

(**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(1))

## COUNT EIGHT

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**, did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

(**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(2))

## COUNT NINE

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER** did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, obstructed and impeded ingress and egress to and from a restrict building and

App.87

grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States

Capitol and its grounds, where the Vice President was temporarily visiting.

(**Impeding Ingress and Egress in a Restricted Building or Grounds**, in violation of Title
18, United States Code, Section 1752(a)(3))

## COUNT TEN

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**,

willfully and knowingly engaged in disorderly and disruptive conduct in any of the Capitol

Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of

Congress and either House of Congress, and the orderly conduct in that building of a hearing before

or any deliberation of, a committee of Congress or either House of Congress.

(**Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code,
Section 5104(e)(2)(D))

## COUNT ELEVEN

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**,

willfully and knowingly obstructed, and impeded passage through and within, the United States

Capitol Grounds and any of the Capitol Buildings.

(**Impeding Passage Through the Capitol Grounds or Buildings**, in violation of Title 40,
United States Code, Section 5104(e)(2)(E))

App.88

## COUNT TWELVE

On or about January 6, 2021, within the District of Columbia, **GARRET MILLER**,
willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol
Building.

> **(Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of Title 40,
> United States Code, Section 5104(e)(2)(G))

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia.

6

App.89

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 1:21-cr-00119 (CJN) |
| GARRET MILLER, | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION</u>

On January 6, 2021, as a joint session of Congress convened in the U.S. Capitol to certify the vote count of the Electoral College, thousands of people, many of whom had marched to the Capitol following a rally at which then-President Donald Trump spoke, gathered outside.  ECF No. 1-1; *United States v. Montgomery*, No. 21-cr-46, 2021 WL 6134591, at *2 (D.D.C. 2021). Things soon turned violent.  *See* ECF No. 1-1.  By approximately 2:00 p.m., rioters had broken through the protective lines of the Capitol Police, assaulting officers and breaking windows in the process.  *Id.*  The violence escalated, often cheered on by certain members of the mob.  *Id.*  And the rioters soon stormed through the halls of Congress, forcing members of the House of Representatives, the Senate, and the Vice President to flee.  *Id.*  "The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol." *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021).

The government alleges that Defendant Garret Miller was an active participant in these events.  On May 12, 2021, a grand jury returned a second superseding indictment that charges Miller with twelve different criminal offenses, several of which are felonies.  The government asserts that Miller predicted the likelihood of violence on January 6; pushed past officers to gain entrance to the Capitol; posted videos and pictures on social media from inside; and made various

App.90

self-incriminating statements in the days thereafter.  *See infra* at 3–4.  The government has also proffered evidence that Miller made several threats on social media following January 6, including to Representative Alexandria Ocasio-Cortez and a Capitol Police Officer.  *See id.* at 4–5.

Miller has filed several pretrial motions.  He moved to revoke the detention order that had been entered by the District Court for the Northern District of Texas.  ECF No. 14.  The Court denied that request on the ground that no conditions of release could reasonably ensure the safety of the community were Miller to be released before trial.  *See* Minute Entry of April 1, 2021. Miller also moved for discovery and for an evidentiary hearing regarding what he claimed was the government's selective prosecution of him as compared to the protestors in Portland, Oregon, ECF No. 32, 33.  The Court denied those motions.  ECF No. 67.

Still pending is Miller's Motion to Dismiss Count Three of the Superseding Indictment ("Mot."), ECF No. 34, in which Miller seeks to dismiss one of the twelve counts in the Second Superseding Indictment.  For the reasons discussed below, the Court agrees with Miller that his conduct does not fit within the scope of the statute he is charged with violating, 18 U.S.C. § 1512(c)(2).

## BACKGROUND

### A.  January 6, 2021[1]

At approximately 1:00 p.m. on January 6, 2021, a joint session of Congress convened in the U.S. Capitol.  ECF No. 1-1 at 1.  Its purpose was to certify the vote count of the Electoral College, as required by the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15.  Then-

---

[1] The facts in this subsection are meant for background only.  The Court's analysis of Miller's Motion to Dismiss is limited to the Indictment alone.  *See United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 109–10 (D.D.C. 2016) (citing *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015)).

App.91

Vice President Michael Pence, as President of the Senate, presided over the joint session.  ECF No. 1-1 at 1.

The proceedings started relatively smoothly.  After about thirty minutes, the Senate returned to its chambers so the two houses could separately consider an objection from the State of Arizona.  *Montgomery*, 2021 WL 6134591, at *2.  During this period, the mob mentioned above—having marched to the Capitol following a rally at which then-President Donald Trump spoke, *id.*—started to form outside, ECF No. 1-1 at 1.

The Capitol is a secure building, guarded at all times by the United States Capitol Police.  *Id.*  But on January 6, 2021, the Capitol Police had taken extra precautions, erecting temporary and permanent barriers around the building's perimeter.  *Id.*  The Capitol Police also closed the entire exterior plaza of the building to the public.  *Id.*

Those extra precautions were not enough.  The mob soon turned violent.  *See id.*  Rioters broke through the protective lines of the Capitol Police, assaulted officers, and shattered windows in the process.  *Id.*  Members of the House of Representatives, the Senate, and the Vice President fled as rioters mobbed the halls.  *Id.*  All the while, looting and destruction continued, *see id.*, producing devastating results, *see Thompson*, 20 F.4th at 15–16.

The government alleges that Miller was part of this violent mob, pushing past officers to gain entrance to the building.  ECF No. 1-1 at 2, 5.  The government alleges that he foresaw the violence coming, as he posted to Facebook four days before that he was "about to drive across the country for this [T]rump shit.  On Monday . . . Some crazy shit going to happen this week.  Dollar might collapse . . . civil war could start . . . not sure what to do in DC."  *Id.* at 2.[2]  It further alleges that Miller posted videos to his Twitter account from the Capitol rotunda, showing rioters waving

---

[2] It is unclear whether the ellipses are Miller's own or added by the government.

App.92

flags of support for then-President Trump.  *Id.*  Miller allegedly captioned the video as being "From inside [C]ongress."  *Id.*  And he is claimed to have posted a selfie of himself inside the Capitol. When a commentor wrote "bro you got in?!  Nice!" Miller allegedly replied, "just wanted to incriminate myself a little lol."  *Id.* at 4.

The government contends that Miller made several additional incriminating social-media posts in the days following the attack on January 6.  When individuals on Twitter claimed that those who stormed the Capitol were "paid infiltrators" or "antifa," Miller is alleged to have consistently corrected them:  "Nah we stormed it.  We where [sic] gentle.  We where [sic] unarmed. We knew what had to be done."  *Id.* at 6.  And when others asked him if he was in the building, he allegedly responded, "Yah . . . we charged . . . We where [sic] going in . . . No matter what . . . Decided before the [T]rump speech . . . I charged the back gates myself with an anti[-]masker." *Id.*

The government also alleges that Miller made several threats on social media following January 6.  Regarding Representative Alexandria Ocasio-Cortez, he tweeted, "Assassinate AOC." *Id.* at 8.  And when discussing the shooting of a woman by a Capitol Police Officer during the riot, Miller is alleged to have written, "We going to get a hold [sic] of [the officer] and hug his neck with a nice rope[.]"  *Id.* at 9.  When the person with whom he was chatting responded, "Didn't you say you were a Christian or some lie?," Miller is alleged to have typed, "Justice . . . Not murder . . . Read the commandment . . . there[']s a difference."  *Id.*  He also is alleged to have made several additional comments about "huntin[g]" this police officer.  *See id.*  And he is alleged to have later written in a Facebook chat, "Happy to make death threats so I been just off the rails tonight lol." *Id.*

App.93

### B.  Miller's Indictment

For purposes of Miller's Motion to Dismiss Count III, the Court must assume as true the allegations contained in the Indictment—but may rely only on those allegations.  *United States v. Akinyoyenu*, 199 F. Supp. 3d. 106, 109–10 (D.D.C. 2016) (citing *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015)).  The Second Superseding Indictment, and particularly Count Three, is quite sparse.  It provides:

<u>**COUNT THREE**</u>

On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET MILLER**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

Second Superseding Indictment ("Indictment"), ECF No. 61 at 2–3.[3]  The Indictment further specifies that this is an alleged violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2, what the government titles "Obstruction of an Official Proceeding and Aiding and Abetting" the same.  *Id.* at 3.  The Indictment provides no other facts in support of this Count.

### C.  Miller's Motion to Dismiss

Miller moves to dismiss only Count Three.  *See generally* Mot.  The statute he is charged with violating, 18 U.S.C. § 1512(c)(2), provides:

**(c)** Whoever corruptly—

**(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or

---

[3] Miller moved to dismiss Count Three of the First Superseding Indictment, ECF No. 30, but the language of Count Three is identical in the Second Superseding Indictment.  His original Motion is thus not moot.  *See United States v. Goff*, 187 Fed. App'x 486, 491 (6th Cir. 2006).

App.94

      **(2)** otherwise obstructs, influences, or impedes any official proceeding,
            or attempts to do so,

    shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).[4]   Miller presents various objections to Count III, either in his own briefs or

by adopting arguments made by other January 6 defendants.

    First, Miller claims that Congress's certification of the 2020 presidential election was not

an "official proceeding." Mot. at 8–11.  He argues that because the certification was not judicial

in nature, it was not a "proceeding" at all.  Miller marshals several definitions of "proceeding" to

support this position.  *See id.*

    Second, Miller argues that § 1512(c)(2) must be read as a catchall to the narrowly focused

subsection preceding it, § 1512(c)(1)—not as an untethered, wholly unrelated crime.  *See* Miller's

Second Supplemental Brief ("Sec. Supp."), ECF No. 59 at 3–7.   In Miller's view, since

§ 1512(c)(1) is narrowly tailored to evidence spoliation, and "specific examples enumerated prior

to [a] residual clause are typically read as refining or limiting in some way the broader catch-all

term used in the residual clause," *id.* at 4, § 1512(c)(2) must be limited to "conduct [that]

undermined the official proceeding's truth-finding function through actions impairing the integrity

and availability of evidence," *id.* at 7 (quotations omitted).

    Finally, Miller argues that the mens rea requirement of § 1512(c)(2)—that the criminal act

be committed "corruptly"—lacks a limiting principle, and is thus unconstitutionally vague as

applied to him. Sec. Supp. at 7–16.  "Corruptly," he notes, is not defined in the statute, and relying

---

[4] Count Three also charges a violation of 18 U.S.C. § 2.  That section states that anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2(a).  In the context of Count III, a violation of § 2 is thus dependent on some violation of § 1512(c)(2)—the only offense against the United States charged in Count III.

App.95

on *United States v. Pointdexter*, 951 F.2d 369 (D.C. Cir. 1991), he argues that it is unconstitutionally vague here.  Sec. Supp. at 9–14.

The government contends that Miller's alleged conduct fits comfortably within § 1512(c)(2).  Relying on the statute's definition of "official proceeding" as including "a proceeding before Congress," 18 U.S.C. § 1515(a)(1)(B), the government argues that the certification of the electoral vote was plainly a proceeding before Congress.  *See generally* Opp. to Def.'s Mot. to Dismiss ("Resp."), ECF No. 35.  As to the scope of § 1512(c)(2), the government argues that the statute "comprehensively prohibit[s] conduct that intentionally and wrongfully obstructs official proceedings," and does not require any connection to evidence or documents.  Gov't Resp. to Defs.' Joint Supp. Br. ("*Montgomery* Br."), ECF No. 63-1 at 6.[5]  And with respect to Miller's vagueness argument, the government contends that, as used here, "corruptly" is not unconstitutionally vague—and indeed that the Court of Appeals and Supreme Court have rejected vagueness challenges to convictions under statutes requiring that a defendant acted "corruptly." *Id.* at 17–20.

For each contention, Miller notes that the Court is under an obligation to exercise restraint in construing criminal laws and to apply the rule of lenity should genuine ambiguity persist.  Mot. at 7 & n.1.  The government does not challenge either of these interpretive principles.  *See generally Montgomery* Br.

---

[5] In response to Miller's Second Supplemental Brief, the government lodged in this case the brief it filed in *United States v. Montgomery*, No. 21-cr-46.

App.96

LEGAL STANDARDS

**A.  Motions to dismiss generally**

Before trial, a criminal defendant may move to dismiss a charge based on a "defect in the indictment."  Fed R. Crim. P. 12(b)(3)(B).  "The operative question is whether the allegations in the indictment, if proven, permit a jury to conclude that the defendant committed the criminal offense as charged."  *Akinyoyenu*, 199 F. Supp. 3d at 109.  The Court thus bases its analysis only on the language charged in the Indictment and the language of the statute alleged to have been violated.  *See id.* at 109–10 (collecting citations).

**B.  The Court must exercise restraint when assessing the reach of criminal statutes**

Because Miller challenges the scope of a federal criminal statute and its application to his alleged conduct, additional interpretive rules apply.  First, federal courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute."  *United States v. Aguilar*, 515 U.S. 593, 600 (1995).  The Supreme Court has urged this restraint "both out of deference to the prerogatives of Congress and out of concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.' "  *Id.* at 600 (citations omitted); *cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1223–28 (2018) (Gorsuch, J., concurring in part and concurring in judgment).  This "prudent rule of construction" continues with force today.  *Dowling v. United States*, 473 U.S. 207, 214 (1985); *see Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (endorsing the rule).

Running parallel to this principle is the rule of lenity.  "[T]he rule of lenity is venerable," *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring), having arisen to mitigate draconian sentences in England and having been firmly established in English law by the time of Blackstone, *id.* at 473.  "[I]t took root in our law soon thereafter."  *Id.*

8

App.97

"Under the rule of lenity, courts construe penal laws strictly and resolve ambiguities in favor of the defendant," *id.*, so long as doing so would not "conflict with the implied or expressed intent of Congress," *Liparota v. United States*, 471 U.S. 419, 427 (1985).  Under current doctrine, the rule of lenity applies to instances of "grievous" ambiguity, *see Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (collecting citations), a construction that is arguably in tension with the rule's historical origins, *see* 1 William Blackstone, *Commentaries* \*88 ("Penal statutes must be construed strictly.").  *See also Wooden v. United States*, ___ U.S. ___, ___ (2022) (Gorsuch, J., concurring in judgment) (slip op. at 9–12); *but see id.* (Kavanaugh, J., concurring) (slip op. at 1–4).

## I. CONGRESSIONAL CERTIFICATION OF ELECTORAL COLLEGE RESULTS IS AN "OFFICIAL PROCEEDING"

Miller's first argument is that the Congressional certification of the Electoral College was not an "official proceeding."  Mot. at 8–11.  But this argument essentially ignores that, as used in § 1512, "official proceeding" is a defined term, and its definition covers the Congressional certification of Electoral College results.

18 U.S.C. § 1515(a)(1) provides that, "[a]s used in section[ ] 1512 . . . *the term 'official proceeding' means . . . a proceeding before the Congress*."  18 U.S.C. § 1515(a)(1)(B) (emphasis added).  A "proceeding" is "a particular thing done: affair, transaction, negotiation," as in "an illegal proceeding" or "business proceedings."  *Proceeding*, def. f, *Merriam-Webster's Unabridged Dictionary* (2021).  The certification of the Electoral College is, of course, "a particular thing done" before Congress.

Miller argues that the "legal," as opposed to "lay," understanding of "proceeding" should control here.  Mot. at 9; *see also United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013).  But Black's Law Dictionary—the leading authority on "legal" uses of words—defines a

App.98

"proceeding" as "[t]he business conducted by a court or other official body; a hearing." *Proceeding*, def. 4, Black's Law Dictionary (11th ed. 2019).  The certification of the Electoral College results by Congress is "business conducted by a[n] . . . official body." *Id.*  Indeed, it is business required by both the Twelfth Amendment and the Electoral Count Act.  *See* U.S. Const. Amend. XII; 3 U.S.C. § 15.

To be sure, several definitions of the word "proceeding"—whether "lay" or "legal" definitions—focus on judicial proceedings.  *See, e.g.*, *Proceeding*, def. 1, Black's Law Dictionary (11th ed. 2019) ("The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment").  But context matters, and it makes little if any sense, in the context here, to read "a proceeding before Congress" as invoking only the judicial sense of the word "proceeding."  After all, the only proceedings of even a quasi-judicial nature before Congress are impeachment proceedings, and Miller has offered no reason to think Congress intended such a narrow definition here.

\*   \*   \*

Miller's Indictment thus properly alleges an involvement with an official proceeding—"that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18." Indictment at 2–3.  On that ground, at least, his Motion to Dismiss fails.

## II. MILLER'S ALLEGED CONDUCT DOES NOT FIT WITHIN THE SCOPE OF SECTION 1512(C)(2)

Miller's second challenge is broader:  he argues that § 1512(c)(2) does not make criminal his alleged actions on January 6.  In order to assess the merits of this challenge, the Court must determine what conduct § 1512(c)(2) prohibits and whether Miller's alleged actions fall within that prohibition.  Applying the traditional tools of statutory interpretation—text, structure, and the

App.99

development of the statute over time—the Court concludes that three readings of the statute are possible, and two are plausible.  This is therefore a circumstance in which the Court must "exercise[ ] restraint in assessing the reach of a federal criminal statute," *Aguilar*, 515 U.S. at 600, and "resolve ambiguities in favor of the defendant," *Nasir*, 17 F.4th at 473 (Bibas, J., concurring) (citing *Liparota*, 471 U.S. at 427).

### A.  The text of § 1512(c) supports three possible readings of the statute

The Court begins, as it must, with the text.  Recall what § 1512(c) proscribes:

> **(c)**  Whoever corruptly—
>
> > **(1)**  alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > **(2)**  *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c) (emphasis added).  Miller is charged with violating only subsection (2).

Reading § 1512(c)(2) alone is linguistically awkward.  That is because of the adverbial use of the word "otherwise," such that § 1512(c)(2), on its own, makes criminal "whoever corruptly . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so."  The parties are therefore in agreement that the meaning of "otherwise" is critical to determining what § 1512(c)(2) covers.  They differ, however, over what that meaning is, and whether or how the word "otherwise" ties § 1512(c)(2) to the prior subsection—§ 1512(c)(1).

*Otherwise as a clean break between subsections*.  When § 1512(c) became law, "otherwise" had three different definitions that are plausible in this context:  "in a different way or manner: differently"; "in different circumstances: under other conditions"; and "in other respects." *Otherwise*, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002).

App.100

Relying on the first definition—"in a different way or manner"—and the breadth of the terms in § 1512(c)(2), the government suggests that "otherwise" essentially serves as a clean break between subsections (c)(1) and (2), and thus the only question is whether Miller "corruptly . . . obstruct[ed], influence[d], or impede[d] any official proceeding, or attempt[ed] to do so." Under this reading, there would be no relationship between subsections (c)(1) and (c)(2) at all.

There are a number of problems with this interpretation. *First*, it ignores that "otherwise" has several different (though related) definitions, each of which implies a relationship to something else—here, subsection (c)(1).

*Second*, and more important, this interpretation does not give meaning to the word "otherwise." When possible, of course, the Court must give effect to every word in a statute. *Setser v. United States*, 566 U.S. 231, 239 (2012). But if § 1512(c)(2) is read as wholly untethered to § 1512(c)(1), then "otherwise" would be pure surplusage. In other words, under this reading, subsection (c)(2) would have the same scope and effect as if Congress had instead omitted the word "otherwise."

*Third*, reading "otherwise" in this way is inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015). There, the Supreme Court considered whether drunk driving was a "violent felony" under the Armed Career Criminal Act. The ACCA defined a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that "is burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a risk of physical injury to another." *Begay*, 553 U.S. at 139–40 (quoting 18 U.S.C. § 924(e)(2)(B)(ii) (2000)) (emphasis added). Crucial to the Court's analysis was thus what "otherwise" meant.

App.101

Both the five-Justice majority and Justice Scalia concluded that the ACCA's use of the word "otherwise" in some way tethered the text preceding the word to the text following it; the majority and Justice Scalia differed only in *how* it did so.  The majority opinion concluded that the text preceding "otherwise" influenced the meaning of the text that followed:  it "limit[ed] the scope of the clause to crimes that are *similar to the examples themselves*."  *Begay*, 553 U.S. at 143 (emphasis added).  The Court thus held that "driving under the influence" fell outside of the ACCA's "violent felony" definition because it was not like burglary, arson, or extortion.  *Id.* at 142.

As for Justice Scalia, he agreed with the majority that "otherwise" tethered the text preceding it to the text following, but he disagreed regarding how they related.  In Justice Scalia's view, "by using the word 'otherwise' the writer draws a substantive connection between two sets only on one specific dimension—*i.e.*, whatever *follows* 'otherwise.'"  *Id.* at 151 (Scalia, J., concurring in judgment) (emphasis added).  Thus, in Justice Scalia's view, the text before "otherwise" did not limit the text that follows it.[6]

Justice Alito dissented.  In the dissent's view, the "offenses falling within the residual clause must be similar to the named offenses in one respect only:  They must 'otherwise'—which is to say, 'in a different manner'—'involv[e] conduct that presents a serious potential risk of physical injury to another.'"  *Id.* at 159 (Alito, J., dissenting) (citations omitted) (modification in original).  As a result, Justice Alito concluded, the only question was whether drunk driving "involv[es] conduct that presents a risk of physical injury to another"—and, Justice Alito

---

[6] Justice Scalia had previously advanced this position in his dissent in an earlier ACCA case.  *See James v. United States*, 550 U.S. 192, 218 (2007) (Scalia, J., dissenting).

App.102

concluded, it does. *Id.* This position, of course, is very similar to the interpretation suggested by

the government here. *See Montgomery* Br. at 7–8. But it garnered only three votes.

The Court recognizes that certain courts of appeals have adopted this clean-break reading

of "otherwise" in § 1512(c)(2), but the Court is not persuaded that those decisions are correct.

Take *United States v. Petruk*, 781 F.3d 438 (8th Cir. 2015), for example. That decision's textual

analysis is curt, and only one paragraph discusses the statutory language:

> While we acknowledge that § 1512(c)(1) is limited to obstruction relating
> to "a record, document, or other object," § 1512(c)(2) is not so limited.
> Section 1512(c)(2) gives defendants fair warning in plain language that a
> crime will occur in a different ("otherwise") manner compared to
> § 1512(c)(1) if the defendant "obstructs, influences, or impedes any official
> proceeding" without regard to whether the action relates to documents or
> records. *See* Webster's New World College Dictionary 1021 (4th ed. 2007)
> (defining "otherwise" as "in another manner; differently"). Thus,
> § 1512(c)(2) "operates as a catch-all to cover otherwise obstructive
> behavior that might not constitute a more specific offense like document
> destruction, which is listed in (c)(1)." *United States v. Volpendesto*, 746
> F.3d 273, 286 (7th Cir. 2014) (citation omitted) (internal quotation marks
> omitted); *see also Aguilar*, 515 U.S. at 598 (interpreting similar language in
> 18 U.S.C. § 1503(a) as a "catchall" omnibus clause that is "far more general
> in scope than the earlier clauses of the statute").

*Id.* at 446–47.

The decision in *Petruk* does not mention, let alone discuss, the Supreme Court's decision

in *Begay*. Moreover, it relies on an incorrect reading of the Court's decision in *Aguilar*. In

particular, as reflected in the quotation above, *Petruk* described *Aguilar* as having "interpret[ed]"

a clause in 18 U.S.C. § 1503 as a " 'catchall' omnibus clause that 'is far more general in scope than

the earlier clauses of the statute.' " *Id.* (quoting *Aguilar*, 515 U.S. at 598). But that language from

*Aguilar* came at the *beginning* of the Supreme Court's opinion, when the Court was merely

explaining how "[t]he statute is structured." *Aguilar*, 515 U.S. at 598. The actual opinion in

*Aguilar* went on to *reject* such a broad reading of the "omnibus clause," instead adopting

14

App.103

"decisions of Courts of Appeals [that] have . . . place[d] metes and bounds on the very broad language of the catchall provision." *Id.* at 599–600. And *Aguilar* explained the Court's traditional restraint in assessing the reach of criminal statutes as support for this holding. *See id.* at 600.[7]

*Subsection (c)(1) provides examples of conduct that violates subsection (c)(2).* The government also presents an alternative reading of the statute: that subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2). On this interpretation, the word "otherwise" in § 1512(c)(2) does tether the two subsections together, with the text preceding the word—subsection (c)(1)—providing examples that fit within (c)(2)'s broader scope. Under this reading, a common element in, or link between, the subsections is that the unlawful conduct must relate to an "official proceeding." *See Montgomery*, 2021 WL 6134591 at *12.

This interpretation solves several of the problems posed by the interpretation discussed above. It acknowledges that "[b]y using the word 'otherwise,' Congress indicated a substantive connection between" the text preceding and the text following the word. *United States v. Begay*, 470 F.3d 964, 980 (McConnell, J., dissenting in part), *overruled by Begay*, 553 U.S at 148. And it is consistent with Justice Scalia's concurrence in *Begay*.

But this interpretation has other problems. If Congress intended for the common, linking element in both subsections to be the pendency of an "official proceeding," then the use of "otherwise" in § 1512(c)(2) would be superfluous. After all, both subsections include the term

---

[7] The Seventh Circuit's decision in *United States v. Burge*, 711 F.3d 803 (7th Cir. 2013), similarly misconstrued *Aguilar*. *See id.* at 809 (relying on *Aguilar* as having "interpret[ed] similar language in 18 U.S.C. § 1503 as an 'Omnibus Clause . . . prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice' and concluding that the language is 'general in scope.'") And, in any event, the scope of § 1512(c)(2) was not before the Seventh Circuit in *Burge*; the question there was whether an official proceeding needed to be *pending* for a defendant to violate the statute. *Id.* The Seventh Circuit later relied on *Burge* in *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)—which did not even involve a prosecution under § 1503, let alone § 1512(c)(2).

App.104

"official proceeding," suggesting that the common link should be something other than the pendency of an official proceeding; otherwise there would be no reason to repeat the term in both subsections.

Moreover, while this approach echoes Justice Scalia's concurrence in *Begay*, there are important differences between § 1512(c) and the ACCA. With respect to the ACCA, "burglary, arson, and extortion"—the specific crimes listed before the word "otherwise"—are paradigmatic examples of crimes that "involve[ ] conduct that presents a risk of physical injury to another." There is thus a relative parity between the two sides of "otherwise" in the ACCA that makes Justice Scalia's view potentially compelling. But not so with § 1512(c)(2). As the government argues, and other courts have recognized, *see, e.g.*, *Montgomery*, 2021 WL 6134591, at *10, "obstruct," "influence," and "impede," are quite broad terms. In contrast, "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]" a record or document is a relatively narrow and discrete prohibition; that is, those are very limited ways in which to obstruct, influence or impede an official proceeding. Without some limitation, the text following "otherwise" is extraordinarily broad in relation to the text preceding it.

The structure of § 1512(c) cuts against this reading, as well. To say that the text of § 1512(c)(1) provides merely *examples* of crimes that fit within § 1512(c)(2)'s scope is to say that the principal (indeed, only) criminal offense in subsection (c) is listed in its second subsection. That turns expectation on its head and is, at the very least, not how a reasonable reader would expect a statute to be organized—a flaw when talking about any statute, but especially a criminal one. *Cf. Dimaya*, 138 S. Ct. at 1223–28 (Gorsuch, J., concurring in part and concurring in judgment).

16

App.105

*Subsection (c)(2) is a residual clause for subsection (c)(1).*  A third interpretation of the statute—implied, at least, by Miller's arguments—is that subsection (c)(2) operates as a residual clause or catchall for the prohibition contained in subsection (c)(1).  Under this reading, the word "otherwise" links the two subsections, but the link or commonality is found in the conduct prescribed by subsection (c)(1).

This interpretation is consistent with *Begay*.  In particular, the *Begay* majority opinion rejected the government's argument "that the word 'otherwise' is *sufficient* to demonstrate that the examples [preceding 'otherwise'] do not limit the scope of the clause [following 'otherwise']." *Begay*, 553 U.S. at 144 (emphasis in original); *contra Montgomery* Br. at 8 ("Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when the result is accomplished by a different *means, i.e.*, by conduct other than destruction of a document, record, or other object.").  To be sure, *Begay* acknowledged that "otherwise" could sometimes have that meaning, but it made clear that it did not *always* have such a limited role.  As the Court put it, "the word 'otherwise' *can* (we do not say *must*, cf. *post*, at [150–51] (Scalia, J., concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others."  *Begay*, 553 U.S. at 144.

Moreover, the Court *held* that "the provision's listed examples"—that is, the text before "otherwise"—". . . indicate[ ] that the statute covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.' " *Id.* at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)) (emphasis in original).  Justice Scalia himself understood that to be the holding, noting that the majority "read[s] the residual clause to mean that the unenumerated offenses must be similar to the enumerated offenses not only in the degree of risk they pose, but also 'in kind,'

App.106

despite the fact that 'otherwise' means that the *common* element of risk must be presented 'in a *different* way or manner.' " *Id.* at 151 (Scalia, J., concurring in judgment) (emphasis in original).[8]

Under this interpretation, subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in subsection (c)(1)—"alter[ation], destr[uction], mutilat[ion], or conceal[ment]"—Congress was not underinclusive.  Compare, for example, § 1519.  That statute targets anyone who "alters, destroys, mutilates, conceals, *covers up, falsifies, or makes a false entry in* any record, document, or tangible object" for certain purposes in the context of department or agency investigations.  18 U.S.C. § 1519 (emphasis added).  The highlighted acts are additional ways in which an individual can corruptly act on a "record, document, or tangible object" that are not covered by subsection (c)(1) but would be covered, on this reading, by subsection (c)(2).

To be sure, while the ACCA and § 1512(c)(2) both use the word "otherwise," there are key differences between those statutes.  Perhaps most importantly, the ACCA has no line break or semicolon before its use of "otherwise."  The government therefore argues that § 1512(c)(2) is more like the statute at issue in *Loughrin v. United States*, 573 U.S. 351 (2014), in which the Supreme Court pointed to "two clauses hav[ing] separate numbers, line breaks before, between, and after them, and equivalent indentation" as "placing the clauses visually on an equal footing and indicating that they have separate meanings," *id.* at 359; *Montgomery* Br. at 36.

---

[8] Another court has concluded that "*Begay*'s discussion of the word 'otherwise' is remarkably agnostic," and that the Supreme Court "placed little or no weight on the word 'otherwise' in resolving the case."  *Montgomery*, 2021 WL 6134591 at *11.  The Court does not read the *Begay* decision as so limited.  That particular sentence is a response to Justice Scalia's view (rejected by the majority) regarding the use of "otherwise."  As noted above the line, Justice Scalia recognized that the majority had "read[ ] the residual clause to mean that the unenumerated offenses must be similar to the enumerated offenses not only in the degree of risk they pose, but also 'in kind.' " *Begay*, 553 U.S. at 151 (Scalia, J., concurring in judgment).

App.107

*Loughrin* dealt with a challenge to a conviction under the federal bank-fraud statute, 18 U.S.C. § 1344, which provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
>> (1) to defraud a financial institution; or
>>
>> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.  A jury convicted Loughrin of violating § 1344(2) for cashing false checks at a Target, but it did so without finding that he acted with "intent to defraud a financial institution"— the language of § 1344(1).  *See Loughrin*, 573 U.S. at 354–55.  The Court held that such proof was not required for a conviction under § 1344(2).  *See id.* at 355–58.

The statute in *Loughrin* is different from § 1512(c) in important ways.  Most obviously, subsection (2) of the bank-fraud statute does not include the adverb "otherwise," and thus the Court did not even address the primary interpretive question here.  One might even conclude that the fact that Congress did *not* include the word "otherwise" in § 1344(2) suggests that it was aware of how to write broad prohibitions untethered to the text before it.

But the statutes are also similar.  After all, both have separate numbering and line breaks, and as *Loughrin* makes clear, such choices matter.  And when writing § 1512(c), Congress did opt for this drafting technique.

*     *     *

In sum, looking just to the text of 18 U.S.C. § 1512(c), there are three possible, and two quite plausible, interpretations.  It is possible that subsections (c)(1) and (c)(2) are not related at

19

App.108

all (though this is not a very plausible interpretation).  Subsection (c)(1) may contain just examples of the much broader prohibition contained in subsection (c)(2).  Or subsection (c)(2) may be limited by subsection (c)(1).  Based solely on the text of § 1512(c), the third option seems to present the fewest interpretive problems.  But it is not abundantly clear that that interpretation is the correct one.

While the text is this Court's lodestar, however, it is not the only factor it must consider.  "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (quoting *United States v. Heirs of Boisdore*, 8 How. 113, 122 (1850)).  The Court thus turns next to structure.

### B.  The statutory context suggests that subsection (c)(2) has a narrow scope

The structure and scope of § 1512 also suggest that subsection (c)(2) has a narrow focus. In particular, the other subsections of the statute criminalize fairly discrete conduct in narrow contexts.[9]  As examples, subsection (a) criminalizes, among other things, killing another person to prevent the attendance of a person at an official proceeding, 18 U.S.C. § 1512(a)(1)(A), or using physical force (or a threat of it) against a person with the intent to cause someone to withhold testimony from an official proceeding, *id.* § 1512(a)(2)(B)(i).  Subsection (b), in turn, focuses on verbal conduct, such as knowingly using threats with intent to influence, delay, or prevent some testimony at an official proceeding.  *Id.* § 1512(b)(1).  And subsection (d) criminalizes the intentional harassment of a person and thereby hindering, delaying, preventing, or dissuading any person from attending or testifying in an official proceeding.  *Id.* § 1512(d)(1).

---

[9] The title of the section is "Tampering with a witness, victim, or an informant."  And while that might not describe subsection (c), it also captures the narrow, evidentiary focus of the rest of the statute.

App.109

Subsection (c)(1) continues the statute's focus on specific and particularized actions, albeit in a slightly different manner.  Instead of making unlawful an individual's action with respect to *another* person to achieve some illicit end—as subsections (a), (b), and (d) do—subsection (c)(1) prohibits an individual from taking certain actions *directly*.  It prohibits "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with intent to impair the object's integrity or availability for use in an official proceeding."  *Id.* § 1512(c)(1).  Unlike the other subsections of § 1512, it does not require action directed at another person.  But like the other subsections of § 1512, it homes in on a narrow, focused range of conduct.

If, however, the scope of subsection (c)(2) is not limited by subsection (c)(1)—if "otherwise" either signals a clean break or means subsection (c)(1) is only an example fitting within (c)(2)'s scope—it would introduce something of an internal inconsistency:  subsection 1512(c)(2) would be the only provision in § 1512 not to have a narrow focus.  Indeed, the government has relied on the breadth of (c)(2)'s terms to form the basis of its argument.  And this inconsistency would come in the oddest of places:  in a subsection of a subsection nestled in the middle of the statute.  At a minimum, a reader would not expect to find in a statute that is otherwise narrowly (and consistently) tailored a criminal prohibition of exceptionally broad scope, especially in that location.  Congress does not hide elephants in mouseholes, *see Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001), but this seems precisely that.

A different reading would also create substantial superfluity problems.  After all, if subsection (c)(2) is not limited by subsection (c)(1), then the majority of § 1512 would be unnecessary.  At a minimum, conduct made unlawful by at least eleven subsections— §§ 1512(a)(1)(A),    1512(a)(1)(B),    1512(a)(2)(A),    1512(a)(2)(B)(i),    1512(a)(2)(B)(iii),

App.110

1512(a)(2)(B)(iv), 1512(b)(1), 1512(b)(2)(A), 1512(b)(2)(C), 1512(b)(2)(D), and 1512(d)(1)—

would also run afoul of § 1512(c)(2).  To be sure, superfluity is not typically, by itself, sufficient

to require a particular statutory interpretation.  *See Hubbard v. United States*, 514 U.S. 695, 714

n.14 (1995).  But here, such substantial overlap within the same section suggests that Congress did

not mean § 1512(c)(2) to have so broad a scope.

     Another court has sought to allay this overlap concern by pointing to the language Congress

could have used:

> [I]t would have been easy for Congress to craft language to achieve the goal
> that Defendants now hypothesize.  Congress, for example, could have
> substituted Section 1512(c)(2) with the following:  "engages in conduct that
> otherwise impairs the integrity or availability of evidence or testimony for
> use in an official proceeding."  The fact that Congress, instead, enacted
> language that more generally—and without the limitations that Defendants
> now ask the Court to adopt—criminalized efforts corruptly to obstruct
> official proceedings speaks volume.

*Montgomery*, 2021 WL 6134591, at *12.  That is certainly true, and in fact is why the Court does

not believe that there is a single obvious interpretation of the statute.  But it is also the case that

reading § 1512(c)(1) as limiting the scope of § 1512(c)(2) avoids many of these structural or

contextual issues altogether.  Under such a reading, § 1512(c)(2) operates as a catchall to the

narrow prohibition Congress created in § 1512(c)(1)—not as a duplicate to nearly all of § 1512.[10]

---

[10] Perhaps another way of reading § 1512(c)(2) without creating substantial superfluity problems
would be as creating "direct" liability for the other types of conduct covered by § 1512—that is,
that it makes criminal an individual doing directly those things for which the rest of § 1512 requires
action directed at another person.  Neither party presses this argument (or anything like it), so the
Court does not address it further.  But the Court does note that, while this reading might eliminate
some superfluity, placing this kind of catchall in a subsection of a subsection in the middle-back
of § 1512 is still unintuitive.

App.111

**C. The historical development of § 1512 suggests that § 1512(c)(2) operates as a catchall to § 1512(c)(1)**

Prior to the enactment of subsection 1512(c) in 2002, § 1512 made criminal only actions directed at other persons. For example, at that time subsection (b)(2) provided:

> **(b)** Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades *another person*, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> **(2)** cause or induce any person to—
>
>> **(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>>
>> **(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
>>
>> **(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
>>
>> **(D)** be absent from an official proceeding to which such person has been summoned by legal process; . . .
>
> shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. §§ 1512(b)(1) (1996). Other subsections similarly prohibited conduct directed at causing or influencing "another person" to take improper action. *Id.* §§ 1512(a)(1)(A)–(C), 1512(c)(1)–(4). This created a gap in the statutory scheme: § 1512 made it unlawful to cause "another person" to take certain steps—such as to "alter, destroy, mutilate, or conceal an object"—but did not make it unlawful for a person to take such action directly.

Section 1512(c) filled that gap, and took much of its language from § 1512(b). Compare the two provisions:

| | |
|---|---|
| **(b)** Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to | **(c)** Whoever corruptly—<br><br> **(1)** *alters, destroys, mutilates, or conceals a record, document, or other object, or* |

App.112

do so, or engages in misleading conduct toward another person, with intent to—

(**2**) cause of induce any person to—

    (**A**) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

    (**B**) *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

    (**C**) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

    (**D**) be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be fined under this title or imprisoned not more than ten years, or both.

*attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding*; or

(**2**) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(b)(2) (1996) (left) (emphasis added); 18 U.S.C. § 1512(c) (2002) (right) (emphasis added).  Just three months later, the same Congress added § 1512(a)(2)(B), which again drew on § 1512(b):

(**b**) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(**2**) cause or induce any person to—

    (**A**) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(**a**)

  . . .

(**2**) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—

    (**B**) cause or induce any person to—

        (**i**) withhold testimony, or withhold a record, document, or other

App.113

**(B)** *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

**(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(D)** be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be fined under this title or imprisoned not more than ten years, or both.

object, from an official proceeding;

**(ii)** *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

**(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(iv)** be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(b)(2) (1996) (left) (emphasis added); 18 U.S.C. § 1512(a)(2)(B) (2002) (right) (emphasis added).

A fair inference is that, by adding subsection (c) to fill the gap in § 1512, and by drawing heavily from a single provision out of four already included in subsection (b), Congress intended subsection (c) to have a narrow, limited focus—just like subsection (b)(2)(B). The only difference is that subsection (c) does not include the requirement of acting through another person. That the same Congress further adopted *all* of § 1512(b)(2) in § 1512(a)(2)(B)—rather than just one sub-subsection of § 1512(b)(2)—further suggests that its enactment of §1512(c)(1) was intended to be narrow. Perhaps just as important, if subsection 1512(c)(2) is as broad as the government contends here, there would have been no need for the very same Congress to add § 1512(a)(2)(B) just three months later.

App.114

**D.  If anything, the legislative history supports a narrow reading of subsection (c)(2)**

"Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011).  The government relies on legislative history, but it does not support the government's position.

Section 1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, 116 Stat. 745. "The Sarbanes-Oxley Act, all agree, was prompted by the exposure of Enron's massive accounting fraud and revelation that the company's outside auditor, Arthur Andersen LLP, had systematically destroyed potentially incriminating documents."  *Yates v. United States*, 574 U.S. 528, 535–36 (2015) (plurality opinion).   As discussed above, while § 1512(b) "made it an offense to 'intimidat[e], threate[n], or corruptly presuad[e] *another person*' to shred documents," the statute did not prohibit individuals from shredding documents themselves. *Id.* at 536 (emphasis added). The Senate Report for the Act identified this statutory loophole:

> Indeed, even in the current Andersen case, prosecutors have been forced to use the "witness tampering" statute, 18 U.S.C. § 1512, and to proceed under the legal fiction that the defendants are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves. Although prosecutors have been able to bring charges thus far in the case, in a case with a single person doing the shredding, this legal hurdle might present an insurmountable bar to a successful prosecution.

S. Rep. No. 107–146, p. 7 (2002).

As the plurality opinion in *Yates* explains, 18 U.S.C. § 1519 was originally introduced to plug this gap, *Yates*, 574 U.S. at 535–36, and § 1512(c) was added later, *id.* at 542.  In particular, Senator Lott introduced § 1512(c) on July 10, 2002.  *See Montgomery*, 2021 WL 6134591, at *15. He stated that the amendment's "purpose" was "[t]o deter fraud and abuse by corporate executives"—in line with the Enron concern.  148 Cong. Rec. S6542 (daily ed. July 10, 2002).  He later stated that the new subsection "*would enact stronger laws against document shredding*. Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding

App.115

is pending and a subpoena has been issued for the evidence that has been destroyed or altered. Timing is very important." *Id.* at S6545 (emphasis added). In Senator Lott's view, his amendment would fill this gap: "So this section would allow the Government to charge obstruction *against individuals who acted alone*, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year." *Id.* (emphasis added) Then-Senator Joseph Biden referred to new subsection (c) as "making it a crime for document shredding," something he thought the pending bill already did. *Id.* at S6546.

Senator Hatch made similar statements regarding the focus of the proposed new subsection on documents and document-shredding, as well as its ties to the then-recent Enron scandal. Senator Hatch explained that "the amendment strengthens an existing federal offense that is often used to prosecute document shredding and other forms of obstruction of justice," noting that current law "does not prohibit an act of destruction committed by a defendant acting alone. While other existing obstruction of justice statutes cover acts of destruction that are committed by an[] individual acting alone, such statutes have been interpreted as applying only where a proceeding is pending, and a subpoena has been issued for the evidence destroyed." *Id.* at S6550. To Senator Hatch, the addition of § 1512(c) "closes this loophole by broadening the scope of Section 1512." *Id.* It "*would permit the government to prosecute an individual who acts alone in destroying evidence, even where the evidence is destroyed prior to the issuance of a grand jury subpoena*." *Id.* (emphasis added). He concluded by noting that the Arthur Andersen prosecutors "had to prove that a person in the corporation corruptly persuaded *another* to destroy or alter documents, and acted with the intent to obstruct an investigation." *Id.* (emphasis added). The new § 1512(c) would ensure "that individuals acting alone would be liable for such criminal acts." *Id.*

27

App.116

To the extent it is relevant at all, the weight of this legislative history is inconsistent with the government's position here.  It suggests that, in the wake of the Enron scandal, Congress was faced with a very specific loophole:  that then-existing criminal statutes made it illegal to cause or induce *another* person to destroy documents, but did not make it illegal to do so by oneself. Congress closed that loop by passing subsection (c), and nothing in the legislative history suggests a broader purpose than that.

### E.  Miller's alleged conduct falls outside of § 1512(c)(2)

For all the foregoing reasons, the Court believes there are two plausible interpretations of the statute:  either § 1512(c)(1) merely includes examples of conduct that violates § 1512(c)(2), or § 1512(c)(1) limits the scope of § 1512(c)(2).  The text, structure, and development of the statute over time suggest that the second reading is the better one.  But the first is, at a minimum, plausible.

At the very least, the Court is left with a serious ambiguity in a criminal statute.  As noted above, courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute," *Aguilar*, 515 U.S. at 600, and have "construe[d] penal laws strictly and resolve[d] ambiguities in favor of the defendant," *Nasir*, 17 F.4th at 473 (Bibas, J., concurring) (citing *Liparota*, 471 U.S. at 427).  Applying these principles here "gives citizens fair warning of what conduct is illegal, ensuring that [an] ambiguous statute[ ] do[es] not reach beyond [its] clear scope." *Nasir*, 17 F.4th at 473 (Bibas, J., concurring).  And it makes sure that "the power of punishment is vested in the legislative, not the judicial department." *Id.* (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.)).  The Court therefore concludes that § 1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding.

28

App.117

Miller, however, is not alleged to have taken such action.  Instead, Count Three of the Second Superseding Indictment alleges only that he "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18."  Indictment at 2–3.  Nothing in Count Three (or the Indictment more generally) alleges, let alone implies, that Miller took some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote.

The government nevertheless argues that Miller's conduct "'otherwise obstruct[ed], influence[d], or impede[d]' Congress's ability to review documents that it was constitutionally and statutorily required to receive and act upon, thereby obstructing the certification of the Electoral College vote."  *Montgomery* Br. at 40–41 (modifications in original).  But none of those facts are set forth in the indictment, and the Court cannot consider them on this Motion to Dismiss. *Akinyoyenu*, 199 F. Supp. 3d at 109–10.  And in any event, the government does not argue that Miller *himself* took or attempted to take any action with respect to those records or documents. Absent such an allegation, the Indictment fails to allege a violation of 18 § U.S.C. 1512(c)(2).

\*        \*        \*

For the foregoing reasons, the Court will grant Miller's Motion to Dismiss Count Three of the Superseding Indictment, ECF No. 34.  An appropriate order will follow.

DATE:  March 7, 2022

CARL J. NICHOLS
United States District Judge

29

App.118

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 21-CR-119 (CJN) |
| | : | |
| GARRET MILLER, | : | |
| Defendant. | : | |

## GOVERNMENT'S MOTION FOR RECONSIDERATION OF THE COURT'S RULING DISMISSING COUNT THREE OF THE INDICTMENT

On March 7, 2022, the Court granted Defendant Garret Miller's motion to dismiss a count charging him with a violation of 18 U.S.C. § 1512(c)(2) (Count Three), which prohibits corruptly obstructing, influencing, or impeding an official proceeding. ECF 73. In the Court's view, a defendant violates Section 1512(c)(2) only when that individual "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." Memorandum Opinion (Mem. Op.), ECF 72, at 28. Because, according to the Court, the indictment did not allege or imply that Miller took any such action, the Court dismissed Count Three. *Id.* at 29.

Reconsideration is appropriate where, as here, it furnishes a district court "the opportunity to correct [its] own alleged errors" and thereby "prevents unnecessary burdens" on the court of appeals. *United States v. Ibarra*, 502 U.S. 1, 5 (1991) (per curiam). The government moves the Court to reconsider its ruling dismissing Count Three on two independent grounds. First, the Court erred by applying the rule of lenity. Rejecting an interpretation of Section 1512(c)(2)'s scope that every other member of this Court to have considered the issue and every reported case to have considered the issue (to the government's knowledge) has adopted, the Court found "serious ambiguity" in the statute. Mem. Op. at 28. The rule of lenity applies "'only if, after seizing

App.119

everything from which aid can be derived,'" the statute contains "a '*grievous* ambiguity or uncertainty,'" and the Court "'can make no more than a guess as to what Congress intended.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998)) (emphasis added); *see also* Mem. Op. at 9 (citing "'grievous' ambiguity" standard).   Interpreting Section 1512(c)(2) consistently with its plain language to reach any conduct that "obstructs, influences, or impedes" a qualifying proceeding does not give rise to "serious" or "grievous" ambiguity.

Second, even if the Court's document-focused interpretation of Section 1512(c)(2) were correct, such that the government must prove that Miller "took some action with respect to a document," Mem. Op. at 29, the Court erred in dismissing Count Three in full based on the purported insufficiency of the indictment.   Count Three sufficiently alleged a violation of Section 1512(c)(2) by tracking the provision's "operative statutory text." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018).   The indictment did not need to more specifically allege that the obstruction took the form of taking some action with respect to a document.   In other words, the indictment's allegations, by charging the operative statutory text, permissibly embrace two theories: (1) that Miller obstructed an official proceeding by "tak[ing] some action with respect to a document," Mem. Op. at 28; and (2) that Miller obstructed an official proceeding without taking some action with respect to a document.   The Court's ruling finding the second theory invalid left the first theory intact.   Moreover, Rule 12 of the Federal Rules of Criminal Procedure does not permit dismissal where, as here, additional facts would assist in resolving the pretrial motion.   In particular, evidence at trial could establish the documents and records used in the Certification proceeding and prove that Miller's conduct had the natural and probable effect of destroying or imperiling those documents and records.   Because the indictment's allegations sufficiently charge

2

App.120

the first theory that Miller obstructed the proceeding by taking action with respect to a document, the Court should not have dismissed Count Three.

## I.    Relevant Background

The grand jury returned a multi-count indictment that charged Miller with, among other things, one count of congressional obstruction, in violation of 18 U.S.C. § 1512(c)(2).  Congress enacted Section 1512 as a prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" in Section 1102 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 807, and codified it in Chapter 73 of Title 18 of the United States Code, placing it within the pre-existing Section 1512 as subsection (c).  That prohibition applies to

(c) [w]hoever corruptly--

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.

18 U.S.C. § 1512(c).  Count Three charges that on January 6, 2021, Miller "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's Certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18."  ECF 61, at 2-3.

Miller moved to dismiss that count on three grounds.  *See* ECF 34.  He argued that (1) the Certification of the Electoral College vote was not an "official proceeding"; (2) Section 1512(c)(2) did not apply to his alleged conduct because it is limited to conduct impairing the availability and integrity of evidence; and (3) Section 1512(c)(2) is unconstitutionally vague as applied to him.  *Id.* The Court rejected the first argument, *see* Mem. Op. at 9-10, but agreed that Miller's alleged conduct did not fall within Section 1512(c)(2)'s scope, *id.* at 10-29.  The Court did not address

3

App.121

Miller's third argument.

Focusing on the word "otherwise" in Section 1512(c)(2), the Court identified "three possible readings" of Section 1512(c)(2)'s scope. Mem. Op. at 11. First, Section 1512(c)(2) could serve as a "clean break" from Section 1512(c)(1), *id.* at 11-12, a reading that "certain courts of appeals have adopted," *id.* at 14. The Court, however, identified multiple "problems" with that interpretation, all focused on the interpretation of the term "otherwise." The Court reasoned that reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" is "inconsistent" with the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). Mem. Op. at 12-14. The Court accordingly rejected the first interpretation. *Id.* at 19-20. Second, in the Court's view, Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2). *Id.* at 15-16. Third, Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1). *Id.* at 17. After considering Section 1512(c)'s structure, "historical development," and legislative history, the Court found "serious ambiguity" as to which of the two "plausible" readings—the second and third readings identified above—Congress intended. Applying what the Court described as principles of "restraint," the Court then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading). *Id.* at 28. Because, in the Court's view, the indictment did not encompass an allegation that Miller took any such action, the Court dismissed Count Three. *Id.* at 29.

App.122

Both before and after the ruling in this case, judges on this Court have rejected a document-focused interpretation of Section 1512(c)(2).  In *United States v. Sandlin*, No. 21-cr-88, 2021 WL 5865006 (D.D.C. Dec. 10, 2021), the Honorable Dabney L. Friedrich found that Section 1512(c)(2)'s terms are "expansive and seemingly encompass all sorts of actions that affect or interfere with official proceedings" and determined that the use of the word "otherwise" in Section 1512(c)(2) "clarifies" that it "prohibits obstruction by means *other than* document destruction*.*" *Id*. at *5-*6.  She did not view the Supreme Court's decision in *Begay* as altering that conclusion, because *Begay* rested on the ACCA's different statutory language and history.  *Id.* at *6.  Judge Friedrich also rejected the defendant's reliance on *Yates v. United States*, 574 U.S. 528 (2015) (plurality opinion).  *Sandlin*, 2021 WL 5865006, at *6-*8.  Finally, Judge Friedrich concluded that, although a plain-text construction of Section 1512(c)(2) creates "substantial overlap" with other provisions in Section 1512 and Chapter 73, it does not create "intolerable overlap."  *Id.* at *7-*8 (citing *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part and dissenting in part)) (emphasis omitted).

Decisions from other judges on this Court before *Miller* followed suit.  For example, in *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718 (D.D.C. Dec. 20, 2021), the Honorable Amit P. Mehta concluded that Section 1512(c)(2) is not "limited" to conduct "affecting the integrity or availability of evidence in a proceeding."  *Id.* at *11 (brackets and internal quotation marks omitted); *see id.* at *11-*19 (addressing Section 1512(c)(2)'s text and structure, *Begay*, and *Yates*).  In *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891 (Dec. 21, 2021), the Honorable James E. Boasberg found persuasive the analysis in *Sandlin* and *Caldwell*.  *See id.* at *11.  In *United States v. Nordean*, 21-cr-175, 2021 WL 6134595 (D.D.C. Dec. 28, 2021), the Honorable Timothy J. Kelly reasoned that an interpretation of Section 1512(c)(2) limiting it to

App.123

"impairment of evidence" could not "be squared with" Section 1512(c)(2)'s "statutory text or structure." *Id.* at *6; *see id.* at *6-*9 (addressing *Yates* and superfluity concerns). And in *United States v. Montgomery*, 21-cr-46, 2021 WL 6134591 (D.D.C. Dec. 28, 2021), the Honorable Randolph D. Moss reached the same conclusion following an extended discussion of Section 1512(c)'s text, structure, and legislative history, as well as the *Begay* and *Yates* decisions. *Id.* at *10-*18; *see also United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.) (reaching the same conclusion on the scope of Section 1512(c)(2)); *United States v. Grider*, 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.) (same).

Following this Court's decision in *Miller*, two judges on this Court have disagreed with the *Miller* analysis. In denying a defendant's post-trial motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, Judge Friedrich indicated that she was "not inclined to reconsider" her ruling in *Sandlin* and described her points of disagreement with *Miller*. *United States v. Reffitt*, 21-cr-32, Trial Tr. 1502-05 (Mar. 8, 2022) (attached as Exhibit A). And in *United States v. Puma*, 21-cr-454, 2022 WL 823079 (D.D.C. Mar 19, 2022), the Honorable Paul J. Friedman concluded that the word "otherwise" in Section 1512(c)(2) "clarifies" that a defendant violates that section "through 'obstruction by means *other than* document destruction.'" *Id.* at *12 (quoting *Mostofsky*, 2022 WL 6049891, at *11). In reaching that conclusion, Judge Friedman rejected *Miller*'s "premise that any 'genuine ambiguity persist[s],'" *id.* at *12 n.4 (quoting Mem. Op. at 7), and therefore found the rule of lenity "inapplicable," *id.*

## II.   Argument

Reconsideration of the Court's ruling is appropriate for two reasons. First, the Court erred by applying the rule of lenity to Section 1512(c)(2) because, as many other judges have concluded after examining the statute's text, structure, and history, there is no genuine—let alone "grievous"

or "serious"—ambiguity.    Second, even if the Court's narrow interpretation of Section 1512(c)(2)'s scope were correct, the Court erred by dismissing Count Three in full because the indictment's allegations, by charging defendant using the statutory text, validly encompassed that narrower theory, particularly if this Court were to consider proffered evidence that the government would adduce at trial. *See, e.g.*, *United States Firtash*, 392 F.Supp.3d 872, 887 (N.D. Ill. 2019) (upholding money laundering charge in indictment based in part on government's proffer of evidence regarding the nature of the financial transaction).

### A.  Legal standard

A reconsideration motion gives district courts "the opportunity to correct their own alleged errors," which in turn "prevents unnecessary burdens being placed on the courts of appeals." *United States v. Ibarra*, 502 U.S. 1, 5 (1991) (per curiam).  Although not provided for under the Federal Rules of Criminal Procedure, a motion to reconsider is available "as justice requires," *United States v. Hassanshahi*, 145 F.Supp.3d 75, 80 (D.D.C. 2015) (internal quotation marks omitted), and when "necessary under the relevant circumstances," *United States v. Caldwell*, 21-cr-28, 2022 WL 203456, at *1 (D.D.C. Jan. 24, 2022) (quoting *Cobell v. Norton*, 355 F.Supp.2d 531, 539 (D.D.C. 2005)).  Reconsideration may be appropriate where a court "patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court." *Caldwell*, 2022 WL 203456, at *1 (internal quotation marks omitted).  A reconsideration motion can address issues not discussed or briefed by the parties, but it is "not simply an opportunity to reargue facts and theories upon which a court has already ruled." *Hassanshahi*, 145 F.Supp.3d at 80-81 (internal quotation marks omitted); *see Arias v. DynCorp*, 856 F.Supp.2d 46, 52 (D.D.C.

App.125

2012) (noting that litigants who "have once battled for the court's decision . . . should not be permitted to battle for it again") (brackets and internal quotation marks omitted). Reconsideration is warranted here to address two issues not presented to the Court: "the degree of ambiguity required to trigger the rule of lenity," *Wooden v. United States*, 142 S. Ct. 1063, 1084 (2022) (Gorsuch, J., concurring), and whether a court is limited only to the indictment's allegations when considering a pretrial challenge to the scope of conduct that a statute encompasses.

**B. The Court's ruling erroneously applied the rule of lenity.**

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955). That principle underlies the "venerable" rule of lenity, Mem. Op. at 8 (quoting *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring)), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

The rule of lenity, however, does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019).

App.126

In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork.  *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted).  "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'"  *Wooden*, 142 S. Ct. at 1074 (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

The Court erroneously applied the rule of lenity in this case.  The Court referred to the "'grievous' ambiguity" standard when initially discussing the rule, *see* Mem. Op. at 9, and found "a serious ambiguity" regarding the conduct that Section 1512(c)(2) reaches, *id.* at 28; *see also id.* at 22 ("[T]he Court does not believe that there is a single obvious interpretation of the statute.").  But the Court's interpretation of Section 1512(c)(2)'s scope places undue emphasis on a single word ("otherwise") and a single Supreme Court decision (*Begay*) that interpreted that word as used in an entirely different statute and statutory context.  A proper reading of Section 1512(c)(2)'s text, structure, and history demonstrates that Section 1512(c)(2) prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding, not merely where a "defendant ha[s] taken some action with respect to a document, record, or other object," *id.* at 28, to corruptly obstruct an official proceeding.

Simply put, the rule of lenity is "inapplicable" here.  *Puma*, WL 823079, at *12 n.4.  Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself.  Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who

App.127

threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute.  Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted.  *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws.").  It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so."  18 U.S.C. § 1512(c)(2).  Confirming the absence of ambiguity—serious, grievous, or otherwise—is that despite Section 1512(c)(2)'s nearly 20-year existence, no other judge has found ambiguity in Section 1512(c)(2), including eight judges on this Court considering the same law and materially identical facts.  *See supra* at 5-6.

> 1. **Section 1512(c)(2)'s text and structure make clear that it covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).**

While Section 1512(c)(1) prohibits the corrupt destruction or alteration of documents, records, and other objects in connection with an official proceeding, Section 1512(c)(2) prohibits corrupt conduct that "otherwise" obstructs, influences, or impedes an official proceeding.  Before this Court's decision to the contrary, every reported case to have considered the scope of Section 1512(c)(2), *see* Gov't Supp. Br., ECF 74, at 7-9,[1] and every judge on this Court to have considered

---

[1] *See, e.g.*, *United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects about issuance of arrest warrants before "outstanding warrants could be executed, thereby potentially interfering with an ongoing grand jury proceeding"), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (defendant attempted to secure a false alibi witness while in jail for having stolen a vehicle); *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (defendant solicited information about a grand

App.128

the issue in cases arising out of the events at the Capitol on January 6, 2021, *see supra* at 5-6, concluded that Section 1512(c)(2) "prohibits obstruction by means *other than* document destruction." *Sandlin*, 2021 WL 5865006, at \*5.  That conclusion follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at \*12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 2021 WL 6134591, at \*12 (internal quotation marks omitted).

This Court was thus mistaken in concluding that this interpretation either "ignores" that "otherwise" is defined with reference to "something else," namely Section 1512(c)(1), or fails to "give meaning" to the term "otherwise."  Mem. Op. at 12.  Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.*, "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1).  *See* ECF 74, at 8.  That understanding of "otherwise" is both fully consistent with each definition the Court surveys, *see* Mem. Op. at 11 (noting that "otherwise" in Section 1512(c)(2) may plausibly be read as "in a different way or manner; differently"; "in different circumstances: under other conditions";

---

jury investigation from corrupt "local police officers'); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (defendant disclosed identity of an undercover officer, thus preventing him from making controlled purchases from methamphetamine dealers); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (false testimony before a grand jury); *United States v. Reich*, 479 F.3d 179, 185-87 (2d Cir. 2007) (Sotomayor, J.) (defendant an opposing part a forged court order that purported to recall and vacate a legitimate order, causing the opposing party to withdraw an application for a writ of mandamus).

or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at 12. In sum, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

The fact that some cases "could be brought under either or both prongs of Section 1512(c)," *Montgomery*, 2021 WL 6134591, at *12, does not imply that Section 1512(c)(2) "would have the same scope and effect . . . if Congress had instead omitted the word 'otherwise,'" Mem. Op. at 12. For one thing—and as noted in the government's supplemental brief, *see* ECF 74, at 11-13— overlap is "not uncommon in criminal statutes," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014), and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). Moreover, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1). To be sure, practical considerations may militate against seeking such a potentially Pyrrhic victory—where success leads to reindictment under Section 1512(c)(1)—but those practical considerations provide no reason to reject the straightforward interpretation of Section 1512(c) as divided between a provision that targets evidence destruction (Section 1512(c)(1)) and a provision that applies to "otherwise" obstructive conduct (Section 1512(c)(2)). And, in any event, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

App.130

The Court further concluded that interpreting "otherwise" in the manner described above is "inconsistent" with *Begay*, where, in the Court's view, analysis of what "'otherwise' meant" was "[c]rucial" to the Supreme Court's analysis. Mem. Op. at 12. That conclusion is flawed in several respects. First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. § 924(e)(2)(B)(ii), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2). *See Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009). Unlike in the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples."[2] *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14. Although this Court recognized the structural difference between the ACCA residual clause and Section 1512(c)(2), *see* Mem. Op. at 18-19, it offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

Second, describing the Supreme Court's interpretation of "what 'otherwise' meant" as

---

[2] The Court suggested (Mem. Op. at 15-16) that "[t]he government also presents an alternative reading" that Section 1512(c)(1) "provides examples of conduct that violates" Section 1512(c)(2). *Id.* at 15. That is incorrect. Neither the government nor Miller nor (to the government's knowledge) any court has proposed or adopted that construction of Section 1512(c)(2). Considering an interpretation that no party advocates and no court has adopted injects the kind of "front-end ambiguity" that "lead[s] to significant inconsistency, unpredictability, and unfairness in application." *Wooden*, 142 S. Ct. at 1076 (Kavanaugh, J., concurring).

App.131

"[c]rucial" to that Court's decision in *Begay* is an inaccurate description of *Begay*'s analysis.   The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes.   *Begay*, 553 U.S. at 142.   Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves."  *Id.* at 142-43.   The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples.  *Id.* at 143-44.   In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must*, cf. *post* at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others."  *Id.* at 144.

A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot be described as "crucial."   The majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise. *Montgomery*, 2021 WL 6134591, at *11; *see Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*).   In short, the majority in *Begay* "placed little or no weight on the word

14

App.132

'otherwise' in resolving the case."  *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why this Court should not embark on imposing an extra-textual requirement within Section 1512(c)(2).  The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, violent, and aggressive conduct."  553 U.S. at 144-45.  But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause."  *Johnson v. United States*, 576 U.S. 591, 600 (2015).  Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment) (internal quotation marks omitted), so too this Court engrafts onto Section 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding, Mem. Op. at 28.  In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have adopted the Court's interpretation, and for good reason.  That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "taking some action with respect to a document" in order to obstruct an official proceeding.  *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object").[3]  In brief, the Court's interpretation is likely to give rise to the very ambiguity it purports

---

[3] The Court's interpretation of Section 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished and neither of which the Court cites.  As noted in the

App.133

to avoid.

The Court's observation that only "certain courts of appeals," Mem. Op. at 14, have interpreted Section 1512(c)(2) to reach conduct that obstructs an official proceeding other than document destruction significantly understates the case law. Every reported case—both in the courts of appeals and in district courts—has interpreted Section 1512(c)(2) in that manner. *See* ECF 74, at 7-9 (discussing cases). Moreover, the Court's effort to distinguish one of those cases, *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015), misses the mark. That *Petruk* did not cite or discuss *Begay*, Mem. Op. at 14, says nothing about the logic of its analysis, particularly given how "remarkably agnostic" *Begay*'s discussion of "otherwise" is. *See Montgomery*, 2021 WL 6134591, at *11. The Court likewise faulted *Petruk* for misreading the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995), where the Supreme Court interpreted the omnibus clause in 18 U.S.C. § 1503 to require a "relationship in time, causation, or logic," *id.* at 599, between the obstructive conduct and the proceeding—a grand jury investigation—at issue in the defendant's case. But the restraint the Supreme Court exercised by interpreting Section 1503 to require that "nexus" is paralleled by interpreting the same nexus requirement to apply to Section 1512(c)(2)—as other judges on this Court have done, *see* ECF 74, at 20-22 (explaining that the nexus requirement applies to Section 1512(c)(2)); *Montgomery*, 2021 WL 6134591, at *20-*21—and not by imposing an additional, atextual requirement that a defendant must "have

---

main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

App.134

taken some action with respect to a document" for his conduct to fall within the scope of Section 1512(c)(2).[4]

### 2. Other tools of statutory interpretation do not undermine that straightforward reading.

Because Section 1512(c)(2)'s text and context make clear that it reaches conduct that obstructs, influences, or impedes an official proceeding in a manner other than document destruction or evidence tampering, resorting to other tools of statutory interpretation is not necessary.  In any event, those tools reinforce that straightforward interpretation of Section 1512(c)(2)'s scope.  *See* ECF 74, at 9-17.  In reaching a contrary conclusion, the Court erred in several respects.

First, the Court suggested that reading Section 1512(c)(2) consistently with its plain language and structure as described above would "introduce something of an internal inconsistency" because Section 1512(c)(2) would have greater breadth than neighboring provisions in Section 1512.  Mem. Op. at 21; *see id.* (describing Section 1512(c)(2) as an "elephant[] in [a] mousehole[]").  That reasoning is inconsistent with *Yates*, where a plurality of the Supreme Court recognized that Section 1512 consisted of "broad proscriptions," not "specialized provisions expressly aimed at corporate fraud and financial audits."  574 U.S. at 541 (plurality opinion).  Moreover, the narrowing construction the Court imposes on Section 1512(c)(2) fails to consider that Section 1512(c)(2) reaches more broadly precisely because other

---

[4] The Court's similar criticism of *United States v. Burge*, 711 F.3d 803 (7th Cir. 2013), Mem. Op. at 15 n.7, fails for the same reason.  And the Court's related criticism that *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014), which relied in part on *Burge*, "did not even involve a prosecution under § 1503, let alone § 1512(c)(2)," Mem. Op. at 15 n.7, falls short.  The defendants in *Volpendesto* were prosecuted for, among other things, conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k), and the jury was instructed on the elements of 18 U.S.C. § 1512(c)(2).  *See United States v. Volpendesto*, 08-cr-115, Dkt. No. 518, at 88-95 (N.D. Ill. Dec. 22, 2010).

provisions within Section 1512 leave gaps that Section 1512(c)(2) fills.  *Cf. Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949) ("The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.").

Second, the Court worried that a reading of Section 1512(c)(2) that encompasses obstructive conduct unrelated to documents or records would give rise to "substantial superfluity problems."  Mem. Op. at 21.  But even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in Section 1512 is "hardly remarkable."  *Sandlin*, 2021 WL 5865006, at *8; *accord Nordean*, 2021 WL 6134595, at *8.  More troubling, by interpreting Section 1512(c)(2) to require "some action with respect to a document," Mem. Op. at 28, the Court risks rendering Section 1512(c)(2) itself superfluous in light of the "broad ban on evidence-spoliation" in Section 1512(c)(1), *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted).  Moreover, because Section 1512(c)(1) includes both completed and *attempted* evidence tampering, *see* 18 U.S.C. § 1512(c)(1) (reaching "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, *or attempts to do so*) (emphasis added), it is unlikely that a defendant who "take[s] some action with respect to a document, record, or other object," Mem. Op. at 28, has not also taken a "substantial step" toward altering, destroying, mutilating, or concealing that document sufficient to fall within the scope of Section 1512(c)(1).  *See United States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) (explaining that the "general meaning of 'attempt' in federal criminal law" is "an action constituting a 'substantial step' towards commission of a crime and performed with the requisite criminal intent").

App.136

The canon against superfluity, which is "strongest when an interpretation would render superfluous another part of the same statutory scheme," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013), is even stronger when it renders superfluous "other provisions in the *same enactment*." *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted); *cf. Yates*, 574 U.S. at 543 (plurality opinion) ("We resist a reading of § 1519 that would render superfluous an entire provision passed . . . as part of the same Act."). That principle comes into play here because Sections 1512(c)(1) and 1512(c)(2) were enacted together as part of the Sarbanes-Oxley Act. *See* ECF 74, at 15-16.

Third, the Court's discussion of statutory and legislative history, Mem. Op. at 23-28, provides no sound reason to deviate from the straightforward interpretation of Section 1512(c)(2) described above. For example, the Court suggested that Congress would have had no reason to add Section 1512(a)(2)(B) three months after enacting Section 1512(c)(2) if the latter provision were construed broadly. Mem. Op. at 25. Section 1512(a)(2)(B) prohibits the use or threatened use of physical force against "any person" with the intent to "cause or induce any person" to take one of four actions, including "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] an object with intent to impair the integrity or availability of the object for use in an official proceeding." 18 U.S.C. § 1512(a)(2)(B)(ii). But as the Court noted, Mem. Op. at 21 & 23, unlike Section 1512(a)(2)(B), Section 1512(c) aimed generally to impose "direct" liability for obstructive conduct that was not directed at intimidating or influencing another person, *see* ECF 74, at 16.[5] Understood

---

[5] The Court suggested (Mem. Op. at 22 n.10) that Section 1512(c)(2) could be read as "creating 'direct' liability for the other types of conduct covered by § 1512—that is, that it makes criminal an individual doing directly those things for which the rest of § 1512 requires action directed at another person." Although the government's supplemental brief described Section 1512(c)(2) in those terms, *see* ECF 74, at 16 ("Section 1512(c) aimed at closing a 'loophole' in Section 1512: the existing prohibitions did not adequately criminalize a defendant's *personal* obstructive conduct

App.137

in that light, Section 1512(a)(2)(B) operates harmoniously with both subsections in Section 1512(c): Section 1512(a)(2)(B)(ii) reaches a defendant's use of force or threatened use of force at *another person* in order to cause that person to destroy documents in connection with an official proceeding; Section 1512(c)(1) reaches a defendant's direct destruction of documents in connection with an official proceeding; and Section 1512(c)(2) reaches a defendant's non-document-related conduct that obstructs or impedes an official proceeding.  And while the legislators who enacted Section 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, *see* Mem. Op. at 26-28; *accord* ECF 74, at 15 (noting floor statements addressing concern about document shredding in the *Arthur Andersen* prosecution), "it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 2021 WL 6134591, at *16.  In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'" *Id.*

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results.  *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd").  That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify Electoral College vote results by "drag[ging]

---

*not* aimed at another person."), the Court decided (Mem. Op. at 22 n.10) "not [to] address" the interpretation "further" because "[n]either party presses this argument (or anything like it)."

App.138

lawmakers out of the Capitol by their heels with their heads hitting every step," *United States v. Reffitt*, 21-cr-32 (DLF), Trial Tr. 1502, carrying a gun onto Capitol grounds, *id.* at 1499, and then leading a "mob and encourag[ing] it to charge toward federal officers, pushing them aside to break into the Capitol," *id.* at 1501-02, unless he also picked up a "document or record" related to the proceeding during that violent assault.  The statutory text does not require such a counterintuitive result.

### C. Even if the Court's interpretation of Section 1512(c)(2)'s scope were correct, pretrial dismissal based on the indictment's allegations is premature.

Reconsideration is additionally appropriate even if the Court adheres to its interpretation of Section 1512(c)(2)'s scope because dismissal of Count Three in full is improper under Rules 7 and 12 of the Federal Rules of Criminal Procedure.

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018).  "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'"  *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)).  And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed."  *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*."  Fed. R. Crim. P. 12(b)(1) (emphasis added).  It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on

App.139

sufficiency-of-the-evidence grounds" unless the government "has made a full proffer of evidence"

or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47

(D.C. Cir. 2005)—neither of which has occurred here.  Indeed, "[i]f contested facts surrounding

the commission of the offense would be of *any* assistance in determining the validity of the motion,

Rule 12 doesn't authorize its disposition before trial."  *United States v. Pope*, 613 F.3d 1255, 1259

(10th Cir. 2010) (Gorsuch, J.).

 Although Miller has styled his challenge to Section 1512(c)(2)'s scope as an attack on the

indictment's validity, the scope of the conduct covered under Section 1512(c)(2) is distinct from

whether Count Three adequately states a violation of Section 1512(c)(2).[6]  Here, Count Three of

the indictment puts Miller on notice as to the charges against which he must defend himself, while

also encompassing both the broader theory that a defendant violates Section 1512(c)(2) through

any corrupt conduct that "obstructs, impedes, or influences" an official proceeding *and* the

narrower theory that a defendant must "have taken some action with respect to a document," Mem.

Op. at 28, in order to violate Section 1512(c)(2).  The Court's conclusion that only the narrower

theory is a viable basis for conviction should not result in dismissal of Count Three in full; instead,

the Court would properly enforce that limitation by permitting conviction on that basis alone.  *See*

*United States v. Ali*, 885 F.Supp.2d 17, 33 (D.D.C. 2012) (limiting the government's aiding and

abetting theory under 18 U.S.C. § 1651 to acts of piracy committed while the defendant was on

the high seas but not dismissing the count), *reversed in part by* 718 F.3d 929, 941 (D.C. Cir. 2013)

(disagreeing with the district court's limitation on aiding and abetting liability under Section 1651).

---

[6] Although Miller argues that the indictment must contain "some allegation" that his conduct "undermined an official proceeding's 'truth-finding function through actions impairing the integrity and availability of evidence," ECF 59, at 7, this Court's ruling does not appear to announce a new rule that its narrowed interpretation of Section 1512(c)(2)'s scope creates a new offense *element* that must be alleged in an indictment.

App.140

Critically, cases involving successful challenges by defendants concerning whether their *conduct*—and not merely the allegations against them—falls within the scope of the charged statute arise not under Rule 12 but following trials that establish the evidentiary record necessary to determine precisely what the defendant's conduct entailed. *See, e.g.*, *Marinello v. United States*, 138 S. Ct. 1101, 1105 (2018) (considering scope of 26 U.S.C. § 7212(a) following defendant's conviction at trial); *Yates*, 574 U.S. at 534-35 (plurality opinion) (considering scope of the phrase "tangible object" in 18 U.S.C. § 1519 following defendant's conviction at trial); *Aguilar*, 515 U.S. at 597 (considering scope of omnibus clause in 18 U.S.C. § 1503 following the defendant's conviction at trial).

It is clear why that is so. Even assuming the Court's interpretation of Section 1512(c)(2) were correct, and that the government therefore must prove "Miller took some action with respect to a document, record, or other object in order to corruptly obstruct, impede[,] or influence Congress's certification of the electoral vote," Mem. Op. at 29, the Court cannot determine whether Miller's conduct meets that test until after a trial, at which the government is not limited to the specific allegations in the indictment.[7] And at trial, the government could prove that the Certification proceeding "operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections." ECF 74, at 41. For example, evidence would show Congress had before it boxes carried into the House chamber at the beginning of the Joint Session that contained "certificates of votes from the electors of all 50 states plus the District of Columbia." *Reffitt*, *supra*, Trial Tr. at 1064 (Mar. 4, 2022) (testimony of the general counsel to the Secretary of the United States Senate) (attached as Exhibit B). Evidence

---

[7] The government made this argument during the hearing on Miller's dismissal motion. *See United States v. Miller*, 21-cr-119, Transcript of Video Oral Argument, at 27-28 (Nov. 22, 2021) (attached as Exhibit C).

App.141

would further show that, as rioters began to breach the restricted area around the Capitol building and grounds on January 6, 2021, legislators were evacuated from the House and Senate chambers, and the staff for the Secretary of the United States Senate "took the ballot boxes and other paraphernalia of the proceeding" out of the chamber "to maintain custody of the ballots and make sure nothing happen[ed] to them." *Id.* at 1072.

Additional evidence could establish that Miller's conduct had the "natural and probable effect," *Aguilar*, 515 U.S. at 599 (internal quotation marks omitted), of destroying or imperiling the ballots and "other paraphernalia" from the Certification proceeding.  Although the government does not anticipate presenting evidence that Miller envisioned placing or in fact placed hands on a document or record connected to the Certification proceeding, his forcible entry into the Capitol building and interference with law enforcement officers contributed to the chaos that led to the evacuation of lawmakers, the entrance of a Capitol police officer with a "very long, very large long gun" onto the Senate floor, and the scramble to remove the sealed electoral ballots to safety. *Reffitt*, *supra*, Trial Tr. at 1071-72.  In that respect, Miller "took" many "action[s]" with respect to Congress's consideration of documents and records central to the Certification proceeding and thereby corruptly obstructed and impeded that Certification proceeding, including blocking lawmakers from considering such documents and records.  In acting to thwart the commencement and operation of an official proceeding that involved such documents, the evidence will establish that Miller violated Section 1512(c)(2) even under an interpretation of Section 1512(c)(2) that requires "some nexus to tangible evidence," *Singleton*, 2006 WL 1984467, at *3, or some "conduct in relation to a tangible object," *Hutcherson*, 2006 WL 270019, at *2; or that the defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding, Mem. Op. at 28.

App.142

### III.      Conclusion

For the foregoing reasons, the Court should reconsider its ruling and reinstate Count Three.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:   */s/ James I. Pearce*
James I. Pearce
Appellate Counsel to the Capitol Siege
Section
United States Attorney's Office
NC Bar No. 44691
555 Fourth Street, N.W.
Washington, DC 20530
James.Pearce@usdoj.gov
(202) 532-4991

*/s/ Amanda Jawad*
AMANDA JAWAD
Assistant United States Attorney
District of Columbia Detailee
N.Y. Bar Number 5141155
Benjamin E. Kringer
Detailed to the U.S. Attorney's Office
for the District of Columbia
DC Bar No. 482852
211 W. Fort Street
Detroit, MI 48226
(313) 226-9116
Amanda.Jawad@usdoj.gov


April 1, 2022

25

App.143

<pre>
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-cr-32
 4             Plaintiff,             .
                                      .
 5        vs.                         .
                                      .
 6   GUY WESLEY REFFITT,              .  March 8, 2022
                                      .  9:30 a.m.
 7             Defendant.             .
     - - - - - - - - - - - - - - - -

 8

 9                       TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      JEFFREY NESTLER, AUSA
                                 RISA BERKOWER, AUSA
14                               United States Attorney's Office
                                 555 Fourth Street Northwest
15                               Washington, D.C. 20530

16   For the Defendant:         WILLIAM WELCH, III, ESQ.
                                 5305 Village Center Drive
17                               Suite 142
                                 Columbia, Maryland 21044
18

19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
</pre>

App.144

```
 1              P R O C E E D I N G S
 2        (Jury not present.)
 3             COURTROOM DEPUTY:  Your Honor, we are in Criminal
 4   Action 21-32, the United States of America versus Guy Reffitt.
 5             Representing Mr. Reffitt, we have Mr. William Welch, and
 6   representing the United States, we have Mr. Jeffrey Nestler and
 7   Ms. Risa Berkower.
 8             THE COURT:  Okay.  So we'll bring the jury in.  I will
 9   read the concluding instructions.
10        And you all, I take it, have gone through the exhibits and
11   are all on the same page about what's going back in the jury
12   room?
13             MR. WELCH:  Yes, Your Honor.
14             THE COURT:  All right.  And you're all okay with the
15   verdict form and the set of instructions I've read thus far and
16   you've seen?
17             MR. WELCH:  I haven't seen the verdict form.  I've
18   seen the instructions and read them.
19             THE COURT:  The law clerk has copies.  Why don't you
20   give them those two copies, and then we will have to take one
21   back to go in the binders for the jurors.
22             MR. NESTLER:  The verdict form is fine with us.  The
23   instructions are fine with us.
24        This morning, Mr. Welch, Mr. Hopkins, and I went through
25   all of the exhibits, physical items, the multimedia exhibits on
```

1    a flash drive, and also a binder with the photographs.

2            THE COURT:  Okay.

3            Mr. NESTLER:  And we've given them all to Mr. Hopkins

4    and --

5            THE COURT:  Great.

6            MR. NESTLER:  -- believe they are ready to go.

7            THE COURT:  Great.  Are you all going to be, if not in

8    the courthouse, nearby, 15 minutes away?

9            MR. NESTLER:  Yes, Your Honor.

10           THE COURT:  All right.  Mr. Welch, are you okay with

11   everything?

12           MR. WELCH:  Yes.  I will be in the courthouse.

13   Mr. Hopkins knows where to find me.

14           THE COURT:  Okay.  Terrific.

15        Yes, Mr. Nestler.

16           MR. NESTLER:  Sorry.  The only last issue is we had

17   prepared an exhibit list to accompany our exhibits.  Mr. Welch

18   objected to providing the jury with a copy of the exhibit list.

19   And so we leave that question for the Court's consideration.

20           THE COURT:  Mr. Welch, how do you propose that the

21   jury is going to be able to identify what they might want to see

22   on the computer without any kind of list at all?

23           MR. WELCH:  Well, Your Honor, it was all discussed

24   during the evidence phase of trial.  They've been taking notes.

25   And the exhibit list is not evidence and hasn't been entered in

App.146

1   evidence.  I have never had a case where the exhibit list was

2   given to the jury.

3          THE COURT:  Will it be evident to the jurors what the

4   various exhibits on the computer are, or is it just number, you

5   know, random number, 201, 306?

6          MR. NESTLER:  Just numbers.  There's no other

7   identifying information for each file; it's just the number.

8          THE COURT:  Yeah.

9          MR. NESTLER:  And contrary to Mr. Welch, I've never

10  had a trial where the jury didn't have an exhibit list.  I

11  usually found the jury appreciates having an exhibit list.  It

12  makes their deliberations far more efficient.

13         THE COURT:  Mr. Welch, in a case with this number of

14  exhibits, I just don't know how the jury can possibly find what

15  it needs to look at without some list of some type.

16      Is there anything prejudicial about the exhibit list, other

17  than it's a guide, like a table of contents to what's on the

18  computer?

19      If you can explain to me what's objectionable about the

20  list.  If it's just a listing of items that are on the computer,

21  I will entertain it, but I don't see how they can possibly find

22  what they're looking for without spending hours just clicking on

23  files.

24         MR. WELCH:  I need to just review it one more time and

25  make sure that there are no references like "riot" or

App.147

1    inappropriate comments in the titles.

2             THE COURT:  That's fine.  And I'm not whetted to the

3    exhibit list itself.  I just think that the jury needs something

4    that identifies by file number what it is so they don't

5    literally click on every item in order to watch the video of,

6    you know, the pepper spray or whatever the case might be.

7             MR. NESTLER:  I totally understand, Your Honor, and I

8    can go over it again with Mr. Welch.  And perhaps Your Honor

9    could instruct the jury that the exhibit list is being provided

10   solely as a guide to identify certain exhibits and it's not in

11   evidence.  That might ameliorate some of the defense's concerns.

12            THE COURT:  All right.  Do you want a few minutes to

13   take a look at it now?

14            MR. WELCH:  I can read that while you're reading the

15   remaining instructions, which are not controversial.

16            THE COURT:  All right.  And then if you are all in

17   agreement, then I would give an instruction similar to what

18   Mr. Nestler proposed, unless you have an alternative.

19            MR. WELCH:  No, that's fine.

20            THE COURT:  Okay.  Mr. Hopkins, do you want to get the

21   jurors?

22            COURTROOM DEPUTY:  Absolutely, Your Honor.

23        (Pause.)

24            THE COURT:  Mr. Welch, will you be nearby?

25            MR. WELCH:  Yes, I will.

App.148

```
 1            (Jury entered courtroom.)

 2            THE COURT:  Good morning, ladies and gentlemen.

 3    Welcome back.  I hope you had a nice evening.  I have just a few

 4    more instructions, and then I will -- we will recess, and you

 5    can go to the jury room to begin your deliberations.

 6        You will be provided with a verdict form for use when you

 7    have concluded your deliberations.  The form is not evidence in

 8    this case, and nothing on it should be taken to suggest or

 9    convey any opinion by me as to what the verdict should be.

10    Nothing on the form replaces the instructions of law I have

11    already given you, and nothing on it replaces or modifies the

12    instructions about the elements which the government must prove

13    beyond a reasonable doubt.  The verdict form is meant only to

14    assist you in recording your verdict.

15        A verdict must represent the considered judgment of each

16    juror, and in order to return a verdict, each juror must agree

17    on the verdict.  In other words, your verdict must be unanimous.

18        During the course of this trial, a number of exhibits were

19    admitted into evidence.  Sometimes only those parts of an

20    exhibit that are relevant to your deliberations were admitted.

21    Where this has occurred, I have required the irrelevant parts of

22    the statement to be blacked out or deleted.  Thus, as you

23    examine the exhibits and you see or hear a statement where there

24    appear to be omissions, you should consider only those portions

25    that were admitted.  You should not guess as to what was taken
```

1    out.

2        I will be sending into the jury room with you the exhibits

3    that have been admitted into evidence, except for the firearms,

4    ammunition, and bear spray.  You may examine any or all of them

5    as you consider your verdicts.

6        Please keep in mind that exhibits that were only marked for

7    identification but were not admitted into evidence will not be

8    given to you to examine or consider in reaching your verdict.

9        If you wish to examine the firearms, ammunition, or bear

10   spray, please notify the clerk by a written note, and the

11   marshal will bring them to you.  For security purposes, the

12   marshal will remain in the jury room while each of you has the

13   opportunity to examine the evidence.  You should not discuss the

14   evidence or otherwise discuss the case among yourselves while

15   the marshal is present in the jury room.  You may ask to examine

16   the evidence as often as you find it necessary.

17       When you return to the jury room, you should first select a

18   foreperson to preside over your deliberations and to be your

19   spokesperson here in court.  There are no specific rules

20   regarding how you should select a foreperson.  That is entirely

21   up to you.  However, as you go about the task, be mindful of

22   your mission:  To reach a fair and just verdict based on the

23   evidence.  Consider selecting a foreperson who will be able to

24   facilitate your discussions, who can help you organize the

25   evidence, who will encourage civility and mutual respect among

1    all of you, who will invite each juror to speak up regarding his

2    or her views about the evidence, and who will promote a full and

3    fair consideration of that evidence.

4        As I have mentioned frequently throughout the trial, there

5    may be reports in the newspapers or on the radio, Internet, or

6    television about this case.  You may be tempted to read, listen

7    to, or watch this media coverage.  But as I've explained

8    already, you must not read, listen to, or watch such reports,

9    because you must decide this case solely on the evidence

10   presented in this courtroom.

11       If you receive automatic alerts from any source, as I've

12   mentioned, you may need to change your push notifications, news

13   subscriptions, or RSS or Twitter needs.  If any publicity about

14   this trial inadvertently comes to your attention, do not discuss

15   it with other jurors or anyone else.  Just let the clerk know as

16   soon as it happens, and I will then briefly discuss it with you.

17       As you retire to the jury room to deliberate, I also wish

18   to remind you of another instruction that I've given you on

19   multiple occasions throughout this trial.  I previously told you

20   not to communicate with anyone about that -- this case.  Now

21   during your deliberations, you may not communicate with anyone

22   who is not on the jury about this case.  This includes any

23   electronic communications such as e-mail or text or any blogging

24   about the case.

25       In addition, you may not conduct any independent

investigation during deliberations.  This means you may not

conduct any research in person or electronically via the

Internet or in any other way.

    If it becomes necessary during your deliberations to

communicate with me, you may send a note by the clerk or

marshal, signed by your foreperson or by one or more members of

the jury.  No member of the jury should try to communicate with

me except by such a signed note.  And I will never communicate

with any member of the jury on any matter concerning the merits

of this case except in writing or orally here in open court.

    Bear in mind also that you are never, under any

circumstances, to reveal to any person, not the clerk, the

marshal, or to me, how the jurors are voting until after you

have reached a unanimous verdict.  This means that you should

never tell me in writing or in open court how the jury is

divided on any matter, for example 6 to 6 or 7 to 5 or 11 to 1,

or in any other fashion, whether the vote is for conviction or

acquittal, or on any other issue in the case.

    It is your duty as jurors to consult with one another and

to deliberate expecting to reach an agreement.  You must decide

the case for yourself, but you should do so only after

thoroughly discussing it with your fellow jurors.  You should

not hesitate to change an opinion when convinced that it is

wrong.  You should not be influenced to vote in any way on any

question just because another juror favors a particular decision

1    or holds an opinion different from your own.

2        You should reach an agreement only if you can do so in good

3    conscience.  In other words, you should not surrender your

4    honest beliefs about the effect or weight of evidence merely to

5    return a verdict or solely because of other jurors' opinions.

6        The attitude and conduct of jurors at the beginning of

7    their deliberations are matters of considerable importance.  It

8    may not be useful for a juror, upon entering the jury room, to

9    voice a strong expression of an opinion on the case or to

10   announce a determination to stand for a certain verdict.  When

11   one does that at the outset, a sense of pride may cause that

12   juror to hesitate, to back away from an announced position after

13   a discussion of a case.

14       Furthermore, many jurors find it useful to avoid an initial

15   vote upon retiring to the jury room.  Calmly reviewing and

16   discussing the case at the beginning of deliberations is often a

17   more useful way to proceed.

18       Remember that you are not partisans or advocates in this

19   matter, but you are the judges of the facts.

20       When you have reached your verdict, just send me a note

21   informing me of this fact and have your foreperson sign the

22   note.  Do not tell me what your verdict is.  The foreperson

23   should fill out and sign the verdict form that will be provided.

24   I will then call you into the courtroom and ask your foreperson

25   to read your verdict in open court.

```
 1          All right.  Counsel, let's discuss the other issue.

 2          (Pause.)

 3              THE COURT:  I just wanted to raise the issue we

 4      discussed before the jurors came in.

 5              MR. WELCH:  No issue.

 6              THE COURT:  No issue, okay.

 7          All right.  Ladies and gentlemen, one last point I would

 8      like to make is that the exhibit list is being provided to you

 9      solely as a guide to help you identify the exhibits that have

10      been admitted into evidence.  You should understand that the

11      exhibit list itself is not evidence in the case.  It's just a

12      way for you to find what you need on the computer.  All right?

13          All right, Mr. Hopkins.  We will dismiss the jurors to

14      deliberate.

15          Thank you, ladies and gentlemen.

16          (Jury exited courtroom.)

17              THE COURT:  All right.  Anything else?

18              MR. WELCH:  I don't believe so.

19              MR. NESTLER:  No, Your Honor.

20              THE COURT:  All right.  I will be available, and we

21      will be in touch if there's a note from the jury.  Thank you.

22              MR. NESTLER:  Your Honor, just scheduling-wise, if we

23      don't hear anything all day, Your Honor is going to dismiss them

24      at 4:30?

25              THE COURT:  Yes.  And they will probably take an hour
```

App.154

1494

```
 1    break for lunch.  But I won't bring them back in the courtroom
 2    for that, just to dismiss them.
 3            (Jury deliberations.)
 4            (Call to order of the court.)
 5                THE COURT:  All right.  So we were informed that we
 6    have a verdict.  I will have Mr. Hopkins bring the jurors in.
 7    Before we bring them in, are there any issues to discuss?
 8                MR. NESTLER:  Not from the government, Your Honor.
 9                MR. WELCH:  No, Your Honor.
10                THE COURT:  All right.
11            (Jury entered courtroom.)
12                THE COURT:  All right.  Good afternoon, everyone.
13        Who on the jury speaks as its foreperson?
14            (Jury foreperson raises hand.)
15                THE COURT:  All right.  Madam Foreperson, has the jury
16    unanimously agreed on its verdict?
17                FOREPERSON:  Yes, we have.
18                THE COURT:  Okay.  Could you, please, hand the verdict
19    form to the clerk to inspect.
20            (Foreperson complied.)
21                THE COURT:  All right.  Your verdict will now be
22    published.
23                COURTROOM DEPUTY:  As to Count One, transporting a
24    firearm in furtherance of a civil disorder, guilty.
25        As to Count Two, obstruction of an official proceeding,
```

App.155

1    guilty.

2        As to Count Three, entering or remaining in a restricted

3    building or grounds with a firearm, guilty.

4        As to Count Four, obstructing officers during a civil

5    disorder, guilty.

6        And as to Count Five, obstruction of justice, hindering

7    communication through force or threat of physical force, guilty.

8        Dated March the 8th, signed by the foreperson.

9            THE COURT:  Is there a request to poll the jury?

10           MR. WELCH:  Yes, Your Honor.

11           THE COURT:  All right.  The courtroom deputy will now

12   poll the jury.

13           COURTROOM DEPUTY:  Members of the Jury, as your number

14   is called, please indicate if your individual verdict is the

15   same as they were just announced.  If it is, please answer

16   "yes."  If it is not, please answer "no."

17       Juror number 1?

18           JUROR:  Yes.

19           COURTROOM DEPUTY:  Juror number 3?

20           JUROR:  Yes.

21           COURTROOM DEPUTY:  Juror number 4?

22           JUROR:  Yes.

23           COURTROOM DEPUTY:  Juror number 5?

24           JUROR:  Yes.

25           COURTROOM DEPUTY:  Juror number 6?

```
 1              JUROR:  Yes.

 2              COURTROOM DEPUTY:  Juror number 7?

 3              JUROR:  Yes.

 4              COURTROOM DEPUTY:  Juror number 8?

 5              JUROR:  Yes.

 6              COURTROOM DEPUTY:  Juror number 9?

 7              JUROR:  Yes.

 8              COURTROOM DEPUTY:  Juror number 11?

 9              JUROR:  Yes.

10              COURTROOM DEPUTY:  Juror number 12?

11              JUROR:  Yes.

12              COURTROOM DEPUTY:  Juror number 14?

13              JUROR:  Yes.

14              COURTROOM DEPUTY:  Juror number 16?

15              JUROR:  Yes.

16              COURTROOM DEPUTY:  Your Honor, the jury has been

17      polled, and the verdict is indeed unanimous.

18              THE COURT:  All right.  The clerk is directed to file

19      and record the verdict, the unanimous verdict.

20          All right, ladies and gentlemen.  This ends your duty.  And

21      as I told you many, many times during the trial when you weren't

22      supposed to talk about this case, that ends.  You're now free to

23      talk about this case to anyone, but it is entirely your choice.

24      You are not obligated to talk to anyone, but you may talk to

25      anyone that you decide you want to talk to.
```

App.157

1          We had a lot of unexpected challenges during the trial with

2      the COVID restrictions and with issues with technology, and I

3      just want to thank you on behalf of the entire court for your

4      patience and your dedication.

5          As I said at the outset, our criminal justice system works

6      because of the willingness of citizens like you to come forward

7      and take time out of your busy schedule to fulfill this very

8      important duty.  And you have done so with dedication, and we

9      are all grateful for your service.

10         So with that, I will excuse you now to the jury room.

11     Thank you again.

12         (Jury exited courtroom.)

13         THE COURT:  All right.  So Mr. Welch, we need to set

14     deadlines for the filing of post-trial motions.  I did want to

15     address on the record your earlier motion under Rule 29.  I will

16     give a brief ruling now, but I do, you know, welcome and

17     anticipate briefing from both sides on this.

18         But while I'm thinking about the calendar, does 14 days

19     give you adequate time?

20         MR. WELCH:  Yes, it does.

21         THE COURT:  All right.  So the defense will file any

22     post-trial motions within 14 days, the government shall respond

23     within 14 days with any oppositions, and any reply within seven

24     days.  If there's a need for a hearing, I will let you all know.

25         And in terms of -- well, I should wait for Mr. Hopkins to

App.158

1    set the sentencing date.  Why don't I, while he's out, go ahead

2    and address the pending motion under Rule 29.

3         Mr. Welch, now that the jury has spoken, did you wish to

4    make any argument on this?

5              MR. WELCH:  I do, Your Honor, but in view of the

6    Court's, not Your Honor's but another judge's ruling on a 1512

7    motion as well, I would like to consider that and see if there's

8    anything that's appropriate for me to include in my written

9    papers.

10             THE COURT:  Absolutely.

11             MR. WELCH:  I don't want to add any oral comments

12   now --

13             THE COURT:  Okay.

14             MR. WELCH:  -- because that would just complicate

15   that.

16             THE COURT:  That's fine.  So I'm going to give you a

17   brief ruling now.  And I am familiar with that decision, and

18   I've taken a look at it.  But I do welcome your briefing.

19        But considering -- this is defendant's motion, Rule 29

20   motion for judgment of acquittal on all counts that was made at

21   the close of the government's case that I reserved ruling on

22   until now.

23        Considering the evidence in the light most favorable to the

24   government, as the Court must, the Court finds that a rational

25   jury could find the essential elements of the crimes charged

App.159

1   beyond a reasonable doubt.  See *U.S. v. Wahl*, 290 F.3d at 375.

2       With respect to Count One, the jury could credit

3   Mr. Reffitt's own statements captured on tape and in text

4   messages, along with Rocky Hardie and Jackson Reffitt's

5   testimony, Mr. Reffitt's cell phone records and photographs that

6   show that Mr. Reffitt transported guns in commerce from Texas to

7   D.C. in 2021.

8       The testimony of Capitol police officers and videos show

9   that the January 6 riot qualifies as a civil disorder, a public

10  disturbance that caused an immediate danger to persons and

11  property.

12      Although some testimony shows that Mr. Reffitt intended to

13  use his firearms for self-defense or to protect others, other

14  evidence, including Mr. Reffitt's own taped statements, show

15  that he was prepared, if necessary, to use at least his handgun

16  at the Capitol.

17      Thus, a jury could well find beyond a reasonable doubt that

18  Mr. Reffitt knew or intended that the guns would be used in

19  furtherance of the civil disorder in violation of Title 18

20  United States Code Section 231(a)(2).

21      For these same reasons, a rational jury could find beyond a

22  reasonable doubt that Mr. Reffitt entered or remained in a

23  restricted area with a firearm in violation of Title 18 United

24  States Code Section 1752(a)(1) and (b)(2).

25      The testimony of Capitol police officers shows that

App.160

1    Mr. Reffitt knew he was on restricted grounds and did not have

2    the lawful authority to be there, as he ignored police

3    barricades, signs, and officers' commands to retreat.

4        A rational jury could also find beyond a reasonable doubt

5    that Mr. Reffitt obstructed officers during a civil disorder in

6    violation of Title 18 United States Code Section 231(a)(3).  Not

7    only did the evidence demonstrate that the January 6 riot

8    constituted a civil disorder, the parties stipulated that the

9    riot adversely affected commerce, and the riot adversely

10   affected the Secret Service's plans to protect Vice President

11   Pence and his family, thus interfering with the performance of a

12   federally protected function.

13       A jury could also reasonably credit the Capitol police

14   officers' testimony, along with video evidence of Mr. Reffitt

15   charging up the stairs to the Senate chamber, as establishing

16   his intent to obstruct, impede, or interfere with those

17   officers.

18       And separately, a jury could certainly find that

19   Mr. Reffitt took a substantial step toward obstructing,

20   impeding, or interfering with those officers.

21       A rational jury could also find that Mr. Reffitt obstructed

22   justice by threatening physical force in violation of Title 18

23   United States Code Section 1512(a)(2)(C) or that he took a

24   substantial step toward obstructing justice.

25       A jury could credit Jackson Reffitt's testimony that

1    Mr. Reffitt threatened to shoot his children or put a bullet

2    through his daughter's phone if they informed the FBI about his

3    actions on January 6, and the information that they would have

4    provided, and indeed Jackson had already provided, related to

5    federal offenses.

6        Finally, a rational jury could find beyond a reasonable

7    doubt that Mr. Reffitt obstructed an official proceeding in

8    violation of Title 18 United States Code Section 1512(c)(2) or

9    that he attempted the offense or aided and abetted others in

10   committing the offense.

11       Witness testimony revealed that because of the Capitol

12   breach Congress was forced to halt its joint session to certify

13   the electoral results.  Mr. Reffitt's own taped statements and

14   video footage of his ascent on the west stairs show that he led

15   a throng of people who first breached the Capitol.

16       As he admitted to another Three Percenter, he knew that

17   Congress was in the joint session, and at a minimum, he knew of

18   and intended the natural consequence of that action that

19   Congress would be unable to continue with the joint session.

20       Plus, substantial evidence supports the charge that

21   Mr. Reffitt acted corruptly.  The officers' testimony and video

22   footage shows that he assisted and encouraged others who used

23   unlawful means, namely assaults of federal officers, to forcibly

24   breach the Capitol.  He led the mob and encouraged it to charge

25   toward federal officers, pushing them aside to break into the

1    Capitol.

2          He also acted with an unlawful purpose to physically over-

3    throw Congress, and he expressed this clear purpose on numerous

4    occasions before, during, and after January 6.  Mr. Reffitt

5    repeatedly said that the government would be destroyed in the

6    fight and that he wanted to drag lawmakers out of the Capitol by

7    their heels with their heads hitting every step.

8          Lastly, a reasonable jury could find that Mr. Reffitt acted

9    with consciousness of wrongdoing.  Despite his stated view that

10   his actions were justified and protected by the Constitution, he

11   knew, as he acknowledged, that the Capitol police officers were

12   faithfully doing their jobs when they ordered them to retreat.

13   Yet, he continually refused their orders.  He also acknowledged

14   many times his violation of D.C. gun laws.

15         A jury could reasonably interpret all of his statements as

16   demonstrating his awareness that his actions were wrong.

17         For those reasons, the Court finds that a rational jury

18   could find that the government has proven all the elements of

19   the charged offenses beyond a reasonable doubt.

20         As Mr. Welch mentioned, last night, another judge in this

21   district issued an opinion dismissing the Section 1512(c)(2)

22   charge in another case, *United States v. Miller*, 21-cr-119.

23         Again, I do anticipate briefs being filed on this issue

24   with respect to the upcoming motion or motions, and I look

25   forward to reviewing them.  But based on what I've read so far,

App.163

1    I'm not inclined to reconsider my earlier ruling.

2         Once the issue has been fully briefed, I will provide my

3    reasons in greater detail, but for now, let me state that I'm

4    not inclined to follow *Miller*, because as I explained in

5    *Sandlin*, the plain meaning of the words "obstruct," "impede,"

6    and "influence" are broad and encompass all sorts of actions

7    that affect or interfere with official proceedings, including

8    interfering with the evidence that may be considered in an

9    official proceeding or halting the occurrence of the proceeding

10   altogether.

11        And in my view, the plain meaning of the word "otherwise,"

12   which is defined as "any different way or manner, differently,

13   in different circumstances, under other conditions, in other

14   respects."  See *Miller* opinion at 11, quoting Webster's Third

15   New International Dictionary of the English Language Unabridged

16   2002.

17        That definition does nothing to limit the expansive meaning

18   of Section 1512(c)(2)'s verbs.  Rather, the word "otherwise"

19   simply indicates that a defendant violates Section 1512(c)(2) by

20   corruptly obstructing or impeding a proceeding in a manner or

21   respect that is different than altering or concealing documents.

22        Moreover, I don't believe that the Supreme Court's decision

23   in *Begay* alters this conclusion.  The *Begay* Court expressly

24   indicated that its interpretation of the word "otherwise" was

25   not the only permissible one.  See *Begay v. United States*,

App.164

1    553 U.S. at 144.

2          The Court held that a violent felony that otherwise

3    involves conduct that presents a serious physical risk of injury

4    to another must be similar in kind to the example crimes listed

5    before that catchall clause.  That's *Begay* at 142.

6          But the *Begay* Court also recognized that "otherwise" in

7    other contexts could instead be interpreted as a link to what

8    follows the word as opposed to what comes before.  *Begay* at 144.

9          And Section 1512(c) presents a sufficiently different

10   context such that I don't believe *Begay* controls here.

11         First, the two statutes are structured differently, with

12   Section 1512(c)(2) housed in a separate subsection as opposed to

13   the same sentence.  Second, *Begay* found that the examples listed

14   in the Armed Career Criminal Act were insufficiently similar

15   with respect to the serious physical risk of injury that they

16   pose, such that the other violent felonies must be similar to

17   those examples beyond their degree of risk.  *Begay* at 142

18   through 143.

19         By contrast, the actions covered by Section 1512(c)(1) can

20   each obstruct, impede, or influence a proceeding.  So Section

21   1512(c)(2)'s residual clause can simply cover any different

22   manner of obstructing, impeding, or influencing.

23         Plus, the *Begay* Court relied on the particular statutory

24   history of ACCA, which is not replicated here.  *Begay* at 143

25   through 144.

App.165

1        The Court's interpretation admittedly creates

2   superfluities, but as I explained in *Sandlin*, the same is true

3   for a narrowing construction that covers only acts affecting

4   evidence.  See *Sandlin* opinion at 14 through 15.

5        Finally, the rule of lenity is inapplicable here.  The rule

6   applies only when a statute is ambiguous after seizing

7   everything from which aid can be derived.  *Ocasio v. United*

8   *States*, 578 U.S. at 295, Note 8, quoting *Muscarello v. United*

9   *States*, 524 U.S. at 138 through 139.

10       The Supreme Court has underscored that point through its

11   repeated use of the phrase "grievous ambiguity."  See

12   *e.g., Shaw v. United States, 580 U.S. at 71, Salman v. United*

13   *States*, 580 U.S. at 51.

14       As Justice Kavanaugh summarized current Supreme Court

15   precedent in an opinion released just yesterday, a Court must

16   first exhaust all the tools of statutory interpretation and

17   determine the best reading of the statute before the rule of

18   lenity comes into play and only then when the Court has

19   identified a grievous ambiguity.  See *Wooden v. United States*,

20   Slip Opinion at 2, Kavanaugh concurring.

21       That is not the case here.  So this is not one of those

22   rare situations where lenity comes into play.

23       All right.  So for all those reasons, I will deny for now

24   the defense Rule 29 motion.

25       In terms of sentencing, we're looking roughly 90 days out,

App.166

```
1      which I think takes us to some time the week of June 6.

2            Mr. Hopkins, if you can consult the calendar.

3            Mr. Welch, I take it this would be an in-person sentencing?

4                  MR. WELCH:  Yes, please.

5                  THE COURT:  Okay.  Do you have any conflicts that

6      week?

7                  MR. WELCH:  No, I don't.

8                  COURTROOM DEPUTY:  The first week of June, Your Honor,

9      we are free that week, Your Honor.

10                 THE COURT:  The week of June 6?

11                 COURTROOM DEPUTY:  Yes, Your Honor.

12                 THE COURT:  All right.  I will start with you,

13     Mr. Welch.  Do you have a preference for that week?

14                 MR. WELCH:  I do not.

15                 THE COURT:  Mr. Nestler?

16                 MR. NESTLER:  No preference, Your Honor.

17                 THE COURT:  All right.  Bear with me just a moment.

18           All right.  So let's set this for sentencing on June 8 at

19     10:00 a.m.  And I would ask the parties to file their sentencing

20     memoranda 14 days before sentencing, which is May 25, I think.

21                 COURTROOM DEPUTY:  You are correct.

22                 THE COURT:  And to the extent either side wants to

23     respond to the other -- I'm not asking for that, but you're

24     welcome to do so -- you should file any response by June 1.

25           Mr. Nestler, do you expect any victims to seek to be heard
```

```
 1   at that sentencing hearing?
 2              MR. NESTLER:  It's possible, Your Honor.
 3              THE COURT:  Can you let us know sufficiently in
 4   advance and let Mr. Welch know?
 5              MR. NESTLER:  Of course, Your Honor.
 6              THE COURT:  And does either side -- Mr. Welch, do you
 7   expect the need for any expert testimony or any other
 8   evidentiary testimony?
 9       If you don't know now, you can let me know later.  But
10   again, for planning purposes for the calendar, it would be
11   helpful to know ahead of time.
12              MR. WELCH:  I don't expect that.  There might be
13   mitigation witnesses.
14              THE COURT:  All right.  But again, reports or you
15   think testimony?  You're not sure?
16              MR. WELCH:  More like letters and possibly testimony.
17              THE COURT:  All right.  I would ask both of you to let
18   us know two weeks before.
19       Given what I've seen in the trial, I don't need the
20   government -- as I've requested in other January 6 cases, have
21   the government post things on USAfx.  I have it all now.  So I
22   don't need anything additional.
23       Any other issues we should discuss now?
24       All right.  So we have this set for sentencing on June 8 at
25   10:00 a.m.  Mr. Reffitt, we will see you back on June 8.
```

App.168

1          Thank you all.

2          (Proceedings adjourned at 1:57 p.m.)

3

4     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6               CERTIFICATE OF OFFICIAL COURT REPORTER

7

8          I, Sara A. Wick, certify that the foregoing is a correct

9     transcript from the record of proceedings in the above-entitled

10    matter.

11

12

13

14    /s/ Sara A. Wick_____          March 9, 2022_____

15    SIGNATURE OF COURT REPORTER          DATE

16

17

18

19

20

21

22

23

24

25

```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2


 3     UNITED STATES OF AMERICA,           .
                                           .   Case Number 21-cr-32
 4              Plaintiff,                  .
                                           .
 5          vs.                            .
                                           .
 6     GUY WESLEY REFFITT,                 .   March 4, 2022
                                           .   9:02 a.m.
 7              Defendant.                 .
       - - - - - - - - - - - - - - - -

 8


 9                      TRANSCRIPT OF JURY TRIAL
                            (MORNING SESSION)
10            BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                    UNITED STATES DISTRICT JUDGE
11


12     APPEARANCES:

13     For the United States:      JEFFREY NESTLER, AUSA
                                   RISA BERKOWER, AUSA
14                                 United States Attorney's Office
                                   555 Fourth Street Northwest
15                                 Washington, D.C. 20530

16     For the Defendant:         WILLIAM WELCH, III, ESQ.
                                   5305 Village Center Drive
17                                 Suite 142
                                   Columbia, Maryland 21044

18


19


20


21     Official Court Reporter:   SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 U.S. Courthouse, Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24

       Proceedings recorded by stenotype shorthand.
25     Transcript produced by computer-aided transcription.
```

App.170

C O N T E N T S

TESTIMONY

| | | |
|---|---|---|
| DANIEL SCHWAGER | Direct Examination.............. | 1053 |
| | Cross-Examination.............. | 1073 |
| | Redirect Examination........... | 1075 |
| PAUL WADE | Direct Examination.............. | 1077 |
| | Cross-Examination.............. | 1092 |
| | Redirect Examination........... | 1093 |
| ROCKY HARDIE | Direct Examination.............. | 1095 |
| | Cross-Examination.............. | 1159 |
| | Redirect Examination........... | 1165 |

EXHIBITS RECEIVED

Government 411, 415, 500, 501.15 through 501.18,
504 through 507, 702, and 703......................... 1048

Government 410 and 221................................ 1077

Government 405, 111, and 163.......................... 1094

1               P R O C E E D I N G S

2        THE COURT:  Good morning, everyone.  So there is just one

3    brief matter that I wanted to talk to you all about under seal.

4    I know there's a logistical issue.  We could go in the jury

5    room.  That would take her longer.  I think we could also do

6    it -- it shouldn't take that long -- by the phone.

7        (Sealed bench conference.)

8    ████████████████████████████████████

9    ███████████████████████████

10   ███████████████████████████████████████████

11   █████████████████████████████████████████████

12   ██████████████████████████████████████████████

13   █████████████████████████████████████████████

14   █████████████████████████████████████████

15   ██████████

16   ███████████████████████████████████████████

17   █████████████████████████████████████████████

18   █████████████████████████████████████████████

19   █████████████████████████████████████████████

20   █████████████████████████████████████████████

21   ███████████████████

22   ████████████████████████████████████████████

23   ███████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ███████████████████████████████████████████













```
 1
 2
 3
 4
 5
 6
 7
 8
 9    (End sealed bench conference.)
10         MR. NESTLER:  I just have some logistical matters.
11         THE COURT:  And I have a couple of things, too.
12         COURTROOM DEPUTY:  Your Honor, I don't think I
13    actually called the case for the record.
14    For the record, Your Honor, we're in United States of
15    America versus Guy Reffitt, Docket Number -- Criminal Action
16    21-32.
17    Representing Mr. Reffitt, we have Mr. William Welch, and
18    representing the United States, we have Mr. Jeffrey Nestler and
19    Ms. Risa Berkower.
20    Thank you, Your Honor.
21         THE COURT:  Go ahead, Mr. Nestler.
22         MR. NESTLER:  Thank you, Your Honor.
23    There are several exhibits that we believe are admissible
24    pursuant to a certification from a business record and/or from
25    they're self-authenticating.  We thought, in the interest of
```

```
1    efficiency, we would just ask the Court and counsel now to have

2    them pre-admitted so that when we show them to the juror we're

3    not --

4              THE COURT:  Yes.  And I want to address that issue

5    generally.

6         I take it you have no objection, Mr. Welch, to introducing

7    these just outside the presence of the jury, or alternatively,

8    as soon as the jury comes in, you can say that?

9         What's your pleasure, Mr. Welch?  But I want to start

10    moving things in in bulk.

11             MR. WELCH:  That would be fine, but I need to know

12    what specific ones they are talking --

13             THE COURT:  It's probably the Constitution --

14             MR. NESTLER:  I can read it right now.

15             COURTROOM DEPUTY:  Forgive me, Mr. Welch.  If you can

16    move the microphone closer.

17             MR. NESTLER:  So these exhibits would be 411, the

18    folio from the Melrose Hotel.  We have a business record

19    certification.  415, Mayor Bowser's curfew order, which is a

20    public document.  We have Exhibit 500, which is the Twelfth

21    Amendment; Exhibits 501.15 through 501.18, which are 3 U.S.C.

22    15 through 3 U.S.C. 18, which are public documents.  We have

23    Exhibit 504, which is Senate Concurrent Resolution 1, also a

24    public document.  Exhibits 505 and 506 are screen shots from the

25    video inside of the House and Senate chambers which we have
```

App.179

1    business record certifications for.  Exhibit 507 is a video

2    montage that contains some of those same video clips with the

3    same certifications, as well as Congressional Record snippets,

4    which are public documents.

5         Those are the materials we're going to be referring to,

6    Your Honor, and then there's also two additional stipulations we

7    intend to also read in while the witnesses are on the stand.

8    Those are Exhibits 702, about the Electoral College, and 703,

9    about Safeway and commerce.

10              THE COURT:  Any objections, Mr. Welch?

11              MR. WELCH:  No, now that I know what they are.

12              THE COURT:  Okay.  Any objection to him just moving

13   those now --

14              MR. WELCH:  No.

15              THE COURT:  -- or do you want him to do it in front of

16   the jury?

17              MR. WELCH:  No, it's just a matter of knowing what

18   they're going to do.  As long as I know.  They don't tell me

19   what they're doing.  They just do stuff.

20              THE COURT:  So you move to admit all that?

21              MR. NESTLER:  Yes.

22              THE COURT:  No objection?

23              MR. WELCH:  No objection.

24              THE COURT:  So all of those exhibits are admitted.

25         (Government Exhibits 411, 415, 500, 501.15 through 501.18,

App.180

1   504 through 507, 702, and 703 received into evidence.)

2               THE COURT:  Now, Mr. Nestler and Ms. Berkower, today

3   we have the agents, I think, Wade and Kennedy.  Tomorrow, we

4   have Hightower and Lane.  I think that's right.  Regardless --

5               COURTROOM DEPUTY:  Monday.

6               THE COURT:  Thank goodness it's Friday.

7       All right.  I know a number of those witnesses will move in

8   physical items, and those will have to be done one by one.  But

9   there's no need to -- correct me if I'm wrong, Mr. Welch, but I

10  see no need for things like photographs and videos, when they

11  have the right witness on the stand, to not say, "You have

12  reviewed Exhibits 1 through 20, and do they fairly and

13  accurately represent?"

14      Do we need to do these, you know, authenticate and publish

15  individually, Mr. Welch?

16              MR. WELCH:  We wouldn't if they would just tell me

17  ahead of time.

18              THE COURT:  Okay.

19              MR. WELCH:  They don't tell me.  They just do this

20  stuff, Your Honor.

21              THE COURT:  All right.  I know that they did try to

22  tell you which witness would be introducing the exhibits, and

23  you wanted them to be individually authenticated.

24      But I think given how this has gone, we're really slowing

25  things down, and it's putting the jurors to sleep.  So I would

1    like you all to talk before each witness and make sure Mr. Welch

2    has no issue.  And if not, then at the outset, move them all in.

3              MR. NESTLER:  We can do that right now, Your Honor.

4    The witness who has the bulk of the remaining exhibits is

5    Ms. Kennedy, who took the photographs during the search warrant

6    of the defendant's house.

7        We would move to batch admit all of those photographs.

8    They are in the 100 series in our exhibit list.  They've been

9    provided to defense counsel many weeks ago.

10             THE COURT:  Any objection, Mr. Welch?

11             MR. WELCH:  No.  And that would be fine, too.  And

12   just for the sake of clarity, the reason this became a problem

13   is when they changed up the other day who they were going to --

14             THE COURT:  Mr. Welch --

15             MR. WELCH:  They didn't tell me --

16             THE COURT:  -- I saw in the witness list -- so the

17   exhibit list just said "certification."  But the witness list

18   mentioned three witnesses would be looking at that document or

19   that exhibit, I think it was 200, and it was identified that

20   that witness -- I don't remember the name of that witness, but

21   that that witness would be referring to that exhibit.

22       So you should have been on notice.  I understand why you

23   thought it was coming in with a different witness, given its

24   location on the exhibit list.  But they did give you notice of

25   that.

```
1              MR. WELCH:  It's not that these things aren't out

2      there.  We can look at this.  This is a --

3              THE COURT:  I know, it's long; it's long.  All right.

4              MR. WELCH:  And we can't anticipate what they're going

5      to do.  They don't tell me what they're going to do, Your Honor.

6      They just do stuff.

7              THE COURT:  But we're all on the same page for the

8      remainder of the trial; right?  We can move these things today

9      at least?  We've covered this one witness for the morning, and

10     then at lunch, you all talk, and let's cover the other ones for

11     the afternoon.

12         Let's just -- the jurors are -- it's mind-numbing to do

13     these one by one.

14             MR. NESTLER:  We concur, Your Honor.  And just so Your

15     Honor is aware, we've introduced the bulk of our exhibits

16     already through our first three witnesses.

17             THE COURT:  Yes, I realize that.  I was asleep at the

18     switch for a while.

19             MR. NESTLER:  And now we plan to have these witnesses

20     testify about some of these remaining exhibits but do not have

21     to introduce much more.

22             THE COURT:  All right.  And when we get to, for

23     example, the Capitol Police, I get that you want to play certain

24     aspects so that the jury can hear the audio that wasn't clear

25     the first day, but to rewatch all that, I really think that
```

1   you're losing your jurors.

2           MR. NESTLER:  We understand, Your Honor.

3           THE COURT:  Okay.  Schwager is the Senate counsel?

4           MR. NESTLER:  Yes, your Honor.

5           THE COURT:  So he is going to testify to some of what

6   he saw that day in the chamber, right, in the gallery?

7           MR. NESTLER:  Yes, Your Honor.

8           THE COURT:  I take it none of this relates to the

9   Ashli Babbitt shooting?

10          MR. NESTLER:  Correct, Your Honor.

11          THE COURT:  All right.  And how much -- at some point

12  I think the potential prejudicial effect of what actually

13  happened in and around that room exceeds the probative value as

14  to Mr. Reffitt.  I get that you are entitled to present some

15  evidence of how close they got, but he never got in the

16  building.

17      So I just want to make sure you're not spending a lot of

18  time on that part of the case, because it's really minimal

19  probative value for him.  All right?

20          MR. NESTLER:  We do need to prove that --

21          THE COURT:  The obstruction.  But I just -- the

22  shooting and all of that seems too far.

23          MR. NESTLER:  We're not mentioning the shooting at

24  all.  It's not a part of the case.

25          THE COURT:  Okay.  I just wanted to make sure.

```
1              MR. NESTLER:  This is Mr. Schwager talking about the

2      official proceeding, why it was happening, what he saw, where he

3      went, and then his experiences in the Senate chamber and being

4      evacuated.

5              THE COURT:  Okay.  Great.  Anything else for you,

6      Mr. Welch?

7              MR. WELCH:  No, Your Honor.

8              THE COURT:  All right.

9              MR. NESTLER:  No, Your Honor.  Thank you.

10             THE COURT:  So we've got a few minutes.  Maybe the

11     jurors are here early.  Do you want to go check?

12             COURTROOM DEPUTY:  I can check, but don't hold your

13     breath.

14        (Pause.)

15             THE COURT:  Just one issue.  The law clerk noticed, in

16     reviewing the rough transcript last night, there were five

17     exhibits where they were offered by the government, there was no

18     objection, and then the government immediately said publish it

19     to the jury, and I didn't say they're admitted.

20         We'll need to look and see what the exhibits are.  But I

21     just want to make sure for the record that I've admitted them.

22     I intended to admit all of them, and I want to make the record

23     clear as to that.  So we will get those exhibit numbers and just

24     do that outside the presence of the jury at some point.

25             MR. WELCH:  I don't think that's going to be a
```

```
 1    problem.  There is nothing that has been admitted that I made an
 2    objection to and you hadn't ruled on or anything.
 3              MR. NESTLER:  All right.  My recollection is, I
 4    thought Your Honor had said "admitted."  So it may have been
 5    just --
 6              THE COURT:  I probably thought I said admitted when
 7    you said what you said.
 8              MR. NESTLER:  I apologize if I published something and
 9    Your Honor hadn't actually said admitted.
10              THE COURT:  No worries.
11              MR. NESTLER:  May I step out for one minute?
12              THE COURT:  Sure.
13         (Pause.)
14         (Jury entered courtroom.)
15              THE COURT:  Good morning, ladies and gentlemen.
16    Welcome back.  I know you're happy it's Friday.  I think we all
17    are.  I want to remind you that we will be stopping at 4:00
18    today.  And the government is prepared to call its next witness.
19              MR. NESTLER:  Thank you, Your Honor.  The government
20    calls Daniel Schwager.
21         DANIEL SCHWAGER, WITNESS FOR THE GOVERNMENT, SWORN
22                        DIRECT EXAMINATION
23              BY MR. NESTLER:
24    Q.  Good morning, sir.
25    A.  Good morning.
```

App.186

```
 1   Q.   If you are comfortable, you are permitted to remove your
 2   mask.
 3        Could you please tell us what your name is.
 4   A.   Dan Schwager.
 5   Q.   And how do you spell your name?
 6   A.   Schwager is S-c-h-w-a-g-e-r.  Dan is common spelling.
 7   Q.   Mr. Schwager, what was your title on January 6, 2021?
 8   A.   I was the general counsel to the Secretary of the U.S.
 9   Senate.
10   Q.   What does the general counsel to the Secretary of the U.S.
11   Senate do?
12   A.   I have multiple responsibilities.  Chiefly, I advise the
13   Secretary of the Senate on a host of issues, on legal issues
14   related to her work, on policy issues, on operational issues,
15   and then a lot of general counsel duties, contracts, continuity
16   of government, things like that.
17   Q.   What does the Secretary to the U.S. Senate do?
18   A.   The Secretary can be thought of as the chief administrative
19   officer of the Senate.  She is an officer to the Senate.  She
20   has some constitutional functions, many statutory functions.
21   She is responsible for the financial administration of the
22   Senate.  She is responsible for many administrative offices, the
23   curator of the Senate, the historian, the public records, office
24   of public records, and she's also responsible for the staffing
25   of the floor of the Senate chamber.
```

1    The -- all of the different types of legislative clerks are

2  under the Secretary's supervision.  The parliamentarian is under

3  the Secretary's supervision.

4  Q.   How many people approximately work for the Secretary of the

5  Senate?

6  A.   Around 225 or so.

7  Q.   How long did you serve as general counsel to the Secretary

8  of the Senate?

9  A.   Almost six years.

10 Q.   And how long did you work in Congress total?

11 A.   Almost ten years.

12 Q.   How long have you been a lawyer?

13 A.   Over 20.

14 Q.   Do you still work for the Secretary of the Senate?

15 A.   I do not.

16 Q.   How long ago did you leave?

17 A.   At the end of January, this year.

18 Q.   So just about a month ago?

19 A.   Correct.

20 Q.   Why did you leave?

21 A.   I was called by a recruiter and offered an opportunity for

22 a job that was a great opportunity in a lot of ways for me.

23 Q.   Do you now work at a non-profit organization?

24 A.   I do.

25 Q.   Mr. Schwager, how many houses of Congress are there?

```
 1    A.    Two houses of Congress.

 2    Q.    Can you please name them?

 3    A.    The Senate and the House of Representatives.

 4    Q.    Let's start with the House of Representatives.  What is the

 5    title of the person who is in charge of the House of

 6    Representatives?

 7    A.    Well, the member who is -- the person who is chosen by all

 8    of the members to perform leadership roles is the Speaker of the

 9    House of Representatives.

10    Q.    And who held the role of Speaker of the House of

11    Representatives as of January 6, 2021?

12    A.    Nancy Pelosi.

13    Q.    And moving to the Senate side now, who is the person who is

14    in charge of the agenda and the day-to-day sort of functioning

15    of the Senate?

16    A.    Right.  The person, the party who holds the majority of

17    seats in the Senate chooses from amongst themselves a person to

18    manage the agenda and the day-to-day operations.  That person is

19    known as the majority leader.

20    Q.    And who was the majority leader of the U.S. Senate on

21    January 6 of 2021?

22    A.    Senator Mitch McConnell.

23    Q.    And under the Constitution, is there a different person who

24    formally presides over the United States Senate?

25    A.    Yes, the President of the Senate is different from the
```

App.189

1    majority leader.

2    Q.    And who is the President of the Senate?

3    A.    The President of the Senate is the Vice President of the

4    United States.

5    Q.    And as of January 6 of 2021, who was the Vice President of

6    the United States?

7    A.    Mike Pence.

8          MR. NESTLER:  At this time we're going to put on the

9    screen, Ms. Rohde, if you could, a stipulation between the

10   parties.  It's stipulation -- it's Exhibit 702.  If you could

11   just highlight the text for me, Ms. Rohde.

12         Mr. Hopkins, if you could please publish that to the jury.

13         And I will now read to the jury stipulation -- Government

14   Exhibit 702.

15         "The United States and defendant Guy Reffitt agree and

16   stipulate to the following:

17         "On January 6, 2021, a joint session of the United States

18   Congress convened at the U.S. Capitol.  During the joint

19   session, elected members of the United States House of

20   Representatives and the United States Senate were meeting in

21   both the House and Senate chambers of the Capitol to certify the

22   vote count of the Electoral College of the 2020 presidential

23   election, which had taken place on Tuesday, November 3, 2020.

24         "On January 6, 2021, the House of Representatives began its

25   session at approximately 12:00 p.m., the Senate began its

1    session at approximately 12:30 p.m., and the two Houses met

2    together at approximately 1:00 p.m. in the House of

3    Representatives chamber to begin the joint session.

4        "Vice President Mike Pence was in the Capitol building and

5    presiding over the joint session.  At approximately 1:15 p.m.,

6    the House and Senate adjourned to their separate chambers for up

7    to two hours to resolve a particular objection.

8        "At approximately 2:12 p.m., Vice President Pence evacuated

9    the Senate chamber, and approximately one minute later, the

10   senator who had become the presiding offer in Vice President

11   Pence's absence declared the Senate would stand in recess.

12   Senators evacuated the Senate chamber."

13          THE COURT:  Ladies and gentlemen, let me remind you

14   that a stipulation of fact is something you should consider as

15   undisputed evidence.

16          MR. NESTLER:  Thank you, Your Honor.

17       And just continuing on to page 2, two additional

18   paragraphs.

19       "At approximately 2:15 p.m., Speaker Nancy Pelosi, who was

20   presiding over the House of Representatives, evacuated the House

21   chamber, and approximately 15 minutes later, the representative

22   who had become the presiding officer in her absence declared

23   that the House would stand in recess.  Representatives evacuated

24   the House chamber.

25       "The Senate and House resumed meeting at approximately

App.191

1    8:06 p.m. and 9:02 p.m. respectively.  Congress's joint session

2    continued until approximately 3:44 a.m. on January 7, 2021, when

3    it completed the certification of the Electoral College vote."

4           BY MR. NESTLER:

5    Q.   At this time I would like to display to the jury Government

6    Exhibit 500, already in evidence.

7           Are you familiar with the Constitution of the United

8    States, Mr. Schwager?

9    A.   Generally, yes.

10   Q.   Go to page 2, please, Ms. Rohde.

11          And this is Amendment Twelve.  Do you know what the Twelfth

12   Amendment is, Mr. Schwager?

13   A.   I do.

14   Q.   I'm going to ask you to read the highlighted portion here

15   of the Twelfth Amendment to the U.S. Constitution, please.

16   A.   The first portion says, "The electors shall meet in their

17   respective states and vote by ballot for President and Vice

18   President."

19          The second highlighted section says, "Which lists they

20   shall sign and certify and transmit sealed to the seat of the

21   government of the United States, directed to the President of

22   the Senate, the President of the Senate shall, in the presence

23   of the Senate and House of Representatives, open all the

24   certificates and the votes shall then be counted.  The person

25   having the greatest number of votes for president shall be

App.192

1    president."

2    Q.    Just remind us, who is the President of the Senate?

3    A.    The Vice President of the United States.

4    Q.    At this time we will go to Government Exhibit 501.15,

5    already admitted into evidence, and this is a portion of the

6    United States Code.

7          Are you familiar with the United States Code, Mr. Schwager?

8    A.    Generally, yes.

9    Q.    What is it?

10   A.    It is the compilation of the federal laws of the United

11   States of America.

12   Q.    And if you could, please, read the title of 3 United States

13   Code 15.

14   A.    "Congress shall be in session on the Sixth day of January

15   succeeding every meeting of the electors.  The Senate and House

16   of Representatives shall meet in the hall of the House of

17   Representatives at the hour of 1 o'clock in the afternoon on

18   that day, and the President of the Senate shall be their

19   presiding officer."

20   Q.    Thank you.  Do you know what the hall of the House of

21   Representatives is?

22   A.    Yes.  We refer to it as the House chamber.

23   Q.    Is that in the U.S. Capitol building?

24   A.    It is.

25   Q.    If we could now go, Ms. Rohde, please, to Exhibit 501.16,

```
 1     already admitted into evidence.  It's 3 United States Code.
 2          Mr. Schwager, if you could read the highlighted portion for
 3     us.
 4     A.   "Such joint meeting shall not be dissolved until the count
 5     of electoral votes shall be completed and the result declared."
 6     Q.   In this section, when you see the word "dissolved," what
 7     does that mean as a part of your job?
 8     A.   The adjournment of that session, that day's session, or it
 9     could be multiple sessions.
10     Q.   Dissolve, does that mean end?
11     A.   Yes.
12     Q.   Let's go to Exhibit 501.17, which is Title 3 of the United
13     States Code, Chapter 17.  Can you please read the highlighted
14     portion.
15     A.   "When the two Houses separate to decide upon an objection
16     that may have been made to the counting of any electoral vote."
17     Q.   Mr. Schwager, what does it mean when the Houses separate?
18     A.   Since the joint session is in the House chamber, the Senate
19     walks back to the Senate chamber, and they each deliberate on
20     their own in their own chambers.  The House stays in the House
21     chambers.
22     Q.   Thank you.  Ms. Rohde, if you could pull up Exhibit 501.18,
23     already admitted into evidence.
24          And if you could, please, just read the highlighted portion
25     for us, Mr. Schwager.
```

App.194

A.   "While the two Houses shall be in meeting as provided in
this Chapter, the President of the Senate shall have power to
preserve order."

Q.   Thank you.  Now let's move, please, to Exhibit 504,
Ms. Rohde, already admitted into evidence.

     And this is Senate Concurrent Resolution 1.  What is a
Senate Concurrent Resolution, Mr. Schwager?

A.   A Concurrent Resolution is something short of a law, but
it's a legislative act that both chambers agree to.  And if it's
called a Senate Concurrent Resolution, then it originates in the
Senate.

Q.   And if you could, please, read the highlighted portion
here.

A.   "Resolved by the Senate, the House of Representatives
concurring, that the two Houses of Congress shall meet in the
hall of the House of Representatives on Wednesday, the 6th day
of January, 2021, at 1:00 post meridian, pursuant to the
requirements of the Constitution and laws relating to the
election of President and Vice President of the United States,
and the President of the Senate shall be their presiding
officer."

Q.   Thank you.  Ms. Rohde, if you could go down to the bottom
to the signature section.

     And do you see at the bottom where it says "attest" and
there is somebody's name above Secretary of the Senate?

1    A.    I do.

2    Q.    Who is that?

3    A.    Julie E. Adams was the Secretary of the Senate at that

4    time.

5    Q.    Was she your boss?

6    A.    She was.

7    Q.    Okay.  Let's move on.  If you could take that down, please,

8    Ms. Rohde.

9         Do you know what the Congressional Record is, Mr. Schwager?

10   A.    I do.

11   Q.    What is it?

12   A.    It is the compilation of the proceedings of each chamber of

13   Congress for every -- every day.

14   Q.    Thank you.  At this time I would like to display for the

15   jury Government Exhibit 507, already admitted into evidence.

16        Mr. Hopkins, if you could take it down from the jury screen

17   just for a quick second.  Thank you.  And if you could put it

18   back up, please.  Thank you.

19        At this time -- it does have audio.  Agent Ryan, if you

20   wouldn't mind manning our speaker contraption.  Thank you.

21        (Video played.)

22   Q.    If you could pause for a minute, Ms. Rohde.

23        Mr. Schwager, do you see those young people walking into

24   the House chamber?

25   A.    I do.

1    Q.    Do you see what they're carrying?

2    A.    I do.

3    Q.    What are they carrying?

4    A.    They are carrying what we refer to as the Electoral College

5    ballots.  They're certificates of votes from the electors of all

6    50 states plus the District of Columbia.

7    Q.    And how do you know what's inside of those boxes?

8    A.    I was involved in ensuring that the ballots were placed

9    inside those boxes.

10   Q.    Thank you.  If we could, please, continue, Ms. Rohde.

11         (Video played.)

12   Q.    Can you, please, pause right there, Ms. Rohde.

13         Mr. Schwager, do you see yourself in this video?

14   A.    I do.

15   Q.    Could you, please, tell us which side you're on and what

16   you're doing?

17   A.    From our perspective, I'm to the left of the Vice President

18   and standing up in front of the -- in between the bottom desk

19   and the middle desk.

20   Q.    Is there anything in front of you?

21   A.    Yes.  There is an Electoral College ballot box, as we refer

22   to it.

23   Q.    Thank you.  If we can continue, Ms. Rohde.

24         (Video played.)

25   Q.    Do you see what chamber we're looking at here,

App.197

```
 1    Mr. Schwager?
 2    A.    That's the Senate chamber.
 3    Q.    Who is the person sitting in the presiding officer's chair
 4    in the Senate chamber?
 5    A.    The President of the Senate, Vice President Pence.
 6    Q.    This is at 1:39 p.m., according to the time stamp at the
 7    bottom; is that correct?
 8    A.    That's what it says.
 9    Q.    If we could go forward to the next slide, please.
10          And at 1:48 p.m., who was sitting in the presiding
11    officer's chair?
12    A.    Still the President of the Senate.
13    Q.    And if we can go forward, at 1:54 p.m.?
14    A.    President of the Senate.
15    Q.    And if we can go forward, at 2:00 p.m.?
16    A.    President of the Senate.
17    Q.    If we can go forward, at 2:05 p.m.?
18    A.    President of the Senate.
19    Q.    And if we can go forward, at 2:10 p.m.?
20    A.    President of the Senate.
21    Q.    Thank you.  If we could then move to Government
22    Exhibit 506, Ms. Rohde, already admitted into evidence.
23          Do you recognize what chamber this is, Mr. Schwager?
24    A.    That is the House chamber.
25    Q.    Who is standing at the presiding officer's chair in the
```

App.198

```
 1   House chamber?

 2   A.   It looks like Nancy Pelosi.  It's a little blurry.

 3   Q.   This is at 1:43 p.m.

 4        If we can move to the next slide, at 1:48 p.m.?

 5   A.   Speaker Pelosi.

 6   Q.   If we could move forward, at 1:54 p.m.?

 7   A.   The Speaker.

 8   Q.   1:49?

 9   A.   The Speaker.

10   Q.   If we could move forward, at 2:04 p.m.?

11   A.   The Speaker.

12   Q.   If we could move forward, at 2:10 p.m.?

13   A.   The Speaker.

14   Q.   If we could move forward, at 2:14 p.m.?

15   A.   The speaker.

16   Q.   If we could move forward.  And that is the final slide.

17   Thank you.

18        Okay.  Mr. Schwager, let's talk about your role on

19   January 6 of 2021 and what you observed.

20        If we could, please, start, Mr. Rohde, by pulling up

21   Exhibit 507 and going to 540 on the counter at approximately

22   2:13 p.m.   If we could just stop it at 540.

23        So up on the screen in front of you, Mr. Schwager, this is

24   approximately 2:13 p.m.  Can you identify what chamber we're

25   looking at here?
```

```
 1    A.    Senate chamber.

 2    Q.    Are you visible in this view?

 3    A.    I am.

 4    Q.    Can you please tell us where you're positioned?

 5    A.    As you're facing this exhibit, the door on the right, I'm

 6    just inside to the left of the door on the right facing forward,

 7    the bald guy.

 8    Q.    Are you standing or sitting?

 9    A.    I am standing up.

10    Q.    Sorry.  You mentioned that you're the bald guy?

11    A.    I am usually the bald guy, yes.

12    Q.    Got it.  Okay.  Were you in this position the entire time

13    the Senate was having its proceeding?

14    A.    I was not.

15    Q.    Why did you take yourself to this position at this time

16    around 2:13 p.m.?

17    A.    Prior to this, maybe a few minutes, judging by Officer

18    Billings (phonetic), prior to this I had been told that --  I

19    was standing at the back of the chamber.

20              MR. WELCH:  Objection.

21         (Bench conference.)

22              THE COURT:  I take it you're not offering this for the

23    truth?

24              MR. NESTLER:  That's correct, to explain why he ended

25    up where he ended up.
```

App.200

```
 1            THE COURT:  All right.  So Mr. Welch, if you want an
 2    instruction, I can give that.
 3            MR. WELCH:  Please.
 4        (End of bench conference.)
 5            THE COURT:  Ladies and gentlemen, the testimony you're
 6    about to hear this witness say is not being offered for the
 7    truth of the matter, but to explain why he took the actions he
 8    took.
 9            BY MR. NESTLER:
10    Q.    Please continue, Mr. Schwager.
11    A.    Thank you.  Just prior to this, I had been informed by a
12    Senate staffer that protestors had come into the Capitol
13    building, had breached the Capitol building, and I immediately
14    went down to that position to be near the Secretary of the
15    Senate, my boss, so I could -- and the legislative clerks on the
16    dais, so I could assist them and advise the Secretary and help
17    with whatever came next.
18    Q.    Just prior to you moving down to this position, who had
19    been presiding over the Senate chamber?
20    A.    The last senator presiding who recessed the Senate would
21    have been the President Pro Tempore, which is Senator Chuck
22    Grassley -- was Senator Chuck Grassley at that time.
23    Q.    And prior to Senator Chuck Grassley being there at the
24    presiding officer's chair, did you see who was there just before
25    him?
```

App.201

1069

```
1    A.    Yeah, the President of the Senate, Vice President Pence.

2    Q.    Did you see Vice President Pence leave the Senate chamber?

3    A.    I did.

4    Q.    How would you characterize his departure from the Senate

5    chamber?

6    A.    He was accompanied by several people that I believed to

7    be -- that were not senators.  I don't know.  They appeared to

8    be officers or Secret Service or something like that.

9    Q.    Had you seen them before?

10   A.    I don't recall if I had seen any of them before.  I don't

11   recall if any of them were people I was familiar with or not.

12   Q.    And when you saw Vice President Pence leave the Senate

13   chamber with these people who you assumed to be his security

14   people, what did you believe was happening?

15   A.    Well, I knew we were in a dangerous situation and that we

16   were about to go into some protocols we had drilled on for

17   locking down, for when the chamber was under threat.

18   Q.    Did you see Senator Grassley leave the chamber?

19   A.    I don't recall exactly when Senator Grassley left the

20   chamber.  I saw him coming down from the presiding officer's

21   chair on the dais.

22   Q.    And the person standing in the presiding officer's chair at

23   2:13 p.m., is that a Capitol police officer?

24   A.    It is.

25   Q.    What did that make you think about what was happening at
```

App.202

1    this time?

2    A.    Well, I had already recognized what was happening as a part

3    of our procedures that we had drilled on when there is a -- for

4    when there is a threat to the chamber.  And so I believed that

5    those were the procedures and those were the posture that we

6    were under.

7    Q.    Around this time, what, if anything, did you observe about

8    the doors to the Senate chamber?

9    A.    At that time, as we had practiced, the Capitol police

10   officers or door keepers were locking all of the doors to the

11   galleries and some of the external doors on the chamber floor.

12   Q.    Are these small doors or large doors?

13   A.    They're very tall doors.  They're large, ornate, wooden

14   doors, and I saw one small police officer had to jump up to lock

15   one.

16   Q.    Do they make noises when they open and close?

17   A.    Typically, we try to avoid them making noises to disturb,

18   but they are heavy doors.

19   Q.    How did you feel when you saw the doors started being

20   locked?

21   A.    Again, I already -- from the moment -- from the moment I

22   was told that protestors had breached the Capitol, I was in a

23   state of alarm, and we were in a grave situation at that point,

24   to my understanding.  And closing the doors was just -- locking

25   the doors was just a part of what we had trained for, and I,

App.203

1    frankly, was happy that they were being locked.

2    Q.   Were the people inside of the Senate chamber, yourself

3    included, given any instructions around this time?

4    A.   Yes.  The Capitol police officer on the -- who was standing

5    by the presiding officer's chair, his purpose there was to

6    instruct us that there was a threat and to give us further

7    instructions from the Capitol Police for our safety.

8    Q.   Shortly after that, did you come to notice any additional

9    Capitol police officers with any weapons inside of the Senate

10   chamber?

11   A.   Yes.  I took particular notice of a Capitol police

12   officer -- who I assumed to be a Capitol police officer.  He was

13   in plain clothes but with an orange sash and a very long, very

14   large long gun standing right in the center of the chamber right

15   between the majority leader's desk and the minority leader's

16   desk.

17   Q.   Had you experienced that during any of the drills you had

18   practiced?

19   A.   I don't recall if they ever used an actual gun in those

20   drills or not.  Nothing stands out to me that I've ever seen

21   something like that.

22   Q.   What did you think when you saw a Capitol police officer

23   with a long gun standing in the well of the Senate chamber?

24   A.   Again, I was already in a state of alarm, and things like

25   that, frankly, comforted me, because I already knew there was

1    a -- my perception already was that we were under severe threat.

2    Q.   Did there come a time when you left the Senate chamber?

3    A.   There did.

4    Q.   And why did you leave the Senate chamber?

5    A.   We were instructed by the Capitol Police to evacuate.

6    Q.   What, if anything, did you do with the boxes containing the

7    certificates of the votes at the time that you were leaving the

8    Senate chamber?

9    A.   I had moved closer to the table before we evacuated, the

10   table where the ballots were, to make sure that while we were

11   standing there waiting for instructions -- lots of people were

12   moving around, and I wanted to make sure nobody was opening the

13   boxes or touching the ballots.

14        At the time we evacuated, a number of our staff and floor

15   staff took the ballot boxes and other paraphernalia of the

16   proceeding with us.  I did not personally carry a ballot box at

17   that time.  I carried some other paraphernalia.

18   Q.   And why was it important to take the ballot boxes and other

19   paraphernalia with you as you evacuated the Senate chamber?

20   A.   First of all, we need to maintain custody of the ballots

21   and make sure nothing happens to them.  There are, by law, other

22   sets, but these were the ones we were using for the proceeding,

23   and we needed to protect those.

24        In addition, it was possible that we would need to

25   reconvene in another location to complete the proceeding.  I

App.205

1073

```
1   knew the mission was to complete the proceeding, and so whether
2   we did it in the chamber or whether we had to reconvene in
3   another location, we needed those with us for the proceeding.
4   Q.   Were the senators able to continue meeting when they were
5   not in the chamber here?
6   A.   Were they able to?  They did not reconvene outside of the
7   chamber.  They -- if it had become necessary, we could have.
8   Q.   I'm talking about in the Senate chamber here.  Did the
9   senators -- were they able to meet in the Senate chamber after
10  the time you evacuated?
11  A.   Yes.
12  Q.   While you were evacuated, were the senators meeting in the
13  Senate chamber?
14  A.   No, I'm sorry, not until we had come back at a later time.
15            MR. NESTLER:  Thank you.  No further questions.
16            THE COURT:  Mr. Welch?
17            MR. WELCH:  Thank you, Your Honor.
18                        CROSS-EXAMINATION
19            BY MR. WELCH:
20  Q.   Good morning, Mr. Schwager.
21  A.   Good morning.
22  Q.   My name is Bill Welch.  I'm also going to ask you some
23  questions.
24  A.   Certainly.
25  Q.   To the best of your recollection, was the time stamp of
```

App.206

1    approximately 1:14 p.m. on January 6 accurate as far as when the

2    joint session in the House chamber adjourned?

3    A.   I wasn't looking at my watch.  So I don't have an

4    independent recollection.

5    Q.   Okay.  Would that be the same as far as the other time

6    stamps that we saw in Government Exhibit 507?

7    A.   Yeah, I don't have any independent recollection of the

8    exact second at which any of these proceedings happened.

9    Q.   Okay.  Would you have any reason to believe that any of

10   them were incorrect?

11   A.   No.

12   Q.   When you were in the Senate chamber and we saw you on

13   Government Exhibit 507, you didn't see my client, Mr. Reffitt,

14   did you?

15   A.   No.

16   Q.   So when you left the Senate chamber at the direction of the

17   Capitol Police and had to go wherever you went, you did not see

18   my client, Mr. Reffitt, did you?

19   A.   I don't know if he was in the periphery of my vision in one

20   of the groups that we might have passed by.  So I don't know.

21   Q.   As you sit there right now -- please, feel free, take a

22   look.  Mr. Reffitt, take your mask down.

23        As you look at him, have you ever seen this man before?

24   A.   I don't know.

25             MR. WELCH:  Pass the witness.

App.207

```
 1            THE COURT:  Any further questioning?

 2            MR. NESTLER:  Thank you, Your Honor.

 3                        REDIRECT EXAMINATION

 4            BY MR. NESTLER:

 5    Q.   Just briefly, Mr. Schwager, Mr. Welch asked you about the

 6    word "adjourned," the House adjourning or the Senate adjourning

 7    to its chamber.

 8            During the joint session of Congress, when the two Houses

 9    are no longer meeting as a joint body but as separate bodies,

10    what do you call that?

11    A.   I'm sorry.  I missed that the word "adjourned" was used.  I

12    would have corrected that.

13            Adjourning is at the end of a session for the day or

14    proceeding.  We had recessed for the purpose of reconvening.  So

15    we had withdrawn to the Senate chamber.  But the proceeding for

16    the day had not been adjourned officially.

17    Q.   And we went over the law earlier that used the

18    word "dissolved."  What happens when the joint session is

19    dissolved?  What's going on at that point?

20    A.   The Vice President, President of the Senate, presiding

21    officer of the joint session, would have gaveled us out is how

22    we say it, and he would have declared the session dissolved.

23            And then I think -- I don't recall whether he adjourned the

24    joint session in the Senate or whether the Speaker did or what

25    happened at that point.
```

```
 1    Q.   But until the joint session is dissolved, is the joint
 2    session still ongoing?
 3    A.   It is, and it could have been for a long time.
 4         But yes, the joint session was not dissolved until some
 5    time after 3:00 a.m.
 6    Q.   And were you still there?
 7    A.   I was.
 8              MR. NESTLER:  No further questions.
 9              THE COURT:  May this witness be excused?
10              MR. WELCH:  Yes, Your Honor.
11              THE COURT:  All right.  Thank you, sir.
12              THE WITNESS:  Thank you.
13              THE COURT:  Mr. Nestler, your next witness?
14              MR. NESTLER:  Thank you, Your Honor.  The United
15    States calls United States Secret Service Special Agent Paul
16    Wade.
17              THE COURT:  Mr. Nestler, will there be multiple
18    exhibits for this witness?
19              MR. NESTLER:  There will be three.  Two of them have
20    not been moved in yet, but I will move them in now.
21              THE COURT:  Do you have any objection, Mr. Welch, to
22    the government admitting the two exhibits?  Which numbers?
23              MR. NESTLER:  Exhibit 410, the Head of State
24    Notification Worksheet.
25              MR. WELCH:  No objection to that.
```

App.209

```
1              MR. NESTLER:  And Exhibit 221 is a surveillance video
2    clip.
3              MR. WELCH:  No objection to that.
4              THE COURT:  All right.  Those exhibits are admitted.
5         (Government Exhibits 410 and 221 received into evidence.)
6              MR. NESTLER:  Thank you, Your Honor.
7              PAUL WADE, WITNESS FOR THE GOVERNMENT, SWORN
8                       DIRECT EXAMINATION
9              BY MR. NESTLER:
10   Q.   Good morning, sir.
11   A.   Good morning.
12   Q.   Can you please state and spell your name.
13   A.   Paul Wade, W-a-d-e.
14   Q.   And where do you work?
15   A.   I'm with the United States Secret Service.
16   Q.   And if you could do me a favor, that large black thing in
17   front of you is a microphone.  Move a little bit closer to it
18   when speaking.  Thank you.
19        What is your position with the United States Secret
20   Service?
21   A.   I am a assistant to the Special Agent-in-Charge.
22   Q.   Are you also a Special Agent?
23   A.   Correct.
24   Q.   What does the assistant to the Special Agent-in-Charge do?
25   A.   It's a supervisory special agent position.
```

1    Q.   And how many people do you supervise?

2    A.   Four special agent staff assistants.

3    Q.   Where is your physical office located?

4    A.   At the United States Capitol.

5    Q.   How long have you been with the United States Secret

6    Service?

7    A.   22-and-a-half years.

8    Q.   You say your physical office is at the United States

9    Capitol.  Which part of the United States Secret Service are you

10   in?  Which division?

11   A.   Liaison Division.

12   Q.   And what does the Liaison Division do?

13   A.   We primarily coordinate Secret Service protectee visits to

14   the Capitol.

15   Q.   And what is the mission of the United States Secret

16   Service?

17   A.   Dual mission.  It's investigations and protection.

18   Q.   And who are you supposed to protect?

19   A.   We protect the president, vice president, and their

20   families, and foreign heads of state that visit the country.

21   Q.   Is the Secret Service part of an executive department of

22   the United States government?

23   A.   Correct.

24   Q.   Which one?

25   A.   It is the Department of Homeland Security.

App.211

```
 1    Q.   Let's talk about prior to January 6 of 2021.  What, if

 2    anything, did you do to prepare for security on January 6th?

 3    A.   Prior to January 6, we -- the security plan was primarily

 4    under the Capitol Police Board, their policies and procedures.

 5    We did conduct a couple walk-throughs and sent formal

 6    notification to the Capitol Police.

 7    Q.   And did you have various conversations with your colleagues

 8    at the Capitol Police on a regular basis about security and

 9    issues like that?

10    A.   Correct.  We were also planning for the inauguration.  So

11    yeah, almost daily.

12    Q.   Let's pull up on the screen, Ms. Rohde, Exhibit 410,

13    previously admitted into evidence.  And if you could highlight

14    the top portion.

15         Are we looking at an e-mail here, Special Agent Wade?

16    A.   Correct.

17    Q.   Who sent this e-mail?

18    A.   Lanelle Hawa.

19    Q.   Who is Lanelle Hawa?

20    A.   She was one of my agents that I supervised at that time.

21    Q.   Were you copied on this e-mail?

22    A.   Yes.

23    Q.   What was the purpose of her sending this e-mail?

24    A.   The HOS notification is a Head of State Notification, and

25    it is our formal notification to the United States Capitol
```

App.212

1    Police of a Secret Service protectee visit.

2    Q.   And in the subject line, there are three individuals

3    listed.  Vice President Michael Pence, was he a Secret Service

4    protectee?

5    A.   Yes.

6    Q.   Was Mrs. Pence?

7    A.   Yes.

8    Q.   And was Charlotte Pence?

9    A.   Yes.

10   Q.   And if we could scroll to the next page, please, and if we

11   could start at the "USCP (tail) car," and highlight that,

12   Ms. Rohde.

13       What is a USCP (tail) car rendezvous location, Agent Wade?

14   A.   That's the location the United States Capitol Police would

15   send a vehicle to join up with our protectee's motorcade.

16   Q.   And where was the Capitol Police's vehicle supposed to join

17   up with the protectee's motorcade for January 6 of 2021?

18   A.   The Naval Observatory.

19   Q.   And who lives at the Naval Observatory?

20   A.   The Vice President.

21   Q.   And if we could just scroll down, please, to the itinerary.

22       And why does the Secret Service include an itinerary on the

23   information it provides to the Capitol?

24   A.    It's the latest information derived from staff and

25   sergeant-at-arms entities on the Capitol complex of the

1   protectee's itinerary.

2   Q.   And so according to the proposed itinerary, approximately

3   what time was the Vice President supposed to arrive at the

4   United States Capitol?

5   A.   Approximately 12:30.

6   Q.   And when it says "via M/C to Senate carriage," what does

7   that mean?

8   A.   Via motorcade.

9   Q.   And why does the Vice President travel in a motorcade?

10   A.   It's an organized Secret Service-protected motorcade.

11   Q.   And why does he use a motorcade, not in a regular car, for

12   instance?

13   A.   For his protection.

14   Q.   And where was the motorcade supposed to stage and wait for

15   the Vice President while he was inside of the Capitol on

16   January 6?

17   A.   On the east side of the Capitol, known as the Plaza.

18   Q.   Which agency is ultimately responsible for the Vice

19   President's security and safety while he is at the Capitol

20   building?

21   A.   The United States Secret Service.

22   Q.   Let's pull up on the screen, if you could, Ms. Rohde,

23   Exhibit 601A, already admitted into evidence.

24        Do you recognize the building in the center of this

25   photograph, Agent Wade?

App.214

1    A.    Yes.

2    Q.    What is it?

3    A.    The United States Capitol.

4    Q.    I want to talk about the perimeter on the west side between

5    the Peace monument and the Garfield monument.  Are you familiar

6    with those monuments?

7    A.    Yes.

8    Q.    On the morning of January 6, 2021, did you personally

9    observe that security perimeter?

10   A.    Yes.

11   Q.    What role, if any, would you have had if you believed that

12   the Capitol Police's security perimeter on January 6 of 2021 was

13   inadequate to protect your protectees, including the Vice

14   President?

15   A.    We could have raised any objections to United States

16   Capitol Police.

17   Q.    And on January 6, did you believe the security perimeter to

18   be adequate to protect your protectee when you saw it that

19   morning?

20   A.    Yes.

21   Q.    If we can take this down, please, Ms. Rohde.

22         So, on January 6, 2021, Agent Wade, did the Vice President

23   actually arrive at the Capitol complex?

24   A.    Yes.

25   Q.    How do you know?

App.215

1    A.   Because I saw him.

2    Q.   Approximately what time did he arrive?

3    A.   Approximately 12:37.

4    Q.   And what was your role in facilitating his arrival?

5    A.   I was there with an additional liaison to facilitate access

6    for the Vice President, Mrs. Karen Pence, and their daughter

7    Charlotte Pence.

8    Q.   And what's your role with respect to his security while he

9    is there?

10   A.   I was dedicated to Mrs. Pence and Charlotte Pence.

11   Q.   When the Vice President got to the United States Capitol,

12   did he make his way to the Senate chamber?

13   A.   Yes.  Well, he first went to his office.

14   Q.   And around the time he went to the Senate chamber, what did

15   you do?

16   A.   The Senate chamber -- well, first, they went there -- they

17   went to his office as a family.  He went onto the Senate floor.

18   And then I took Mrs. Pence and Charlotte up to the third floor,

19   to the gallery level.

20   Q.   And while they were watching the proceeding from the third

21   floor gallery level, what were you doing?

22   A.   I was in the hallway outside the gallery.

23   Q.   And did there come a time when the Vice President left the

24   Senate chamber to go to the House chamber?

25   A.   Yes.

App.216

1    Q.   At that time what did you do?

2    A.   I escorted Mrs. Pence and Charlotte Pence via the third

3    floor over to the House gallery.

4    Q.   And did they enter the House gallery?

5    A.   Yes.

6    Q.   And at the time they entered the House gallery, what did

7    you do?

8    A.   I stood outside the House gallery.

9    Q.   Did there come a time when you escorted Mrs. Pence and

10   Charlotte Pence from the House gallery back to the Senate

11   gallery?

12   A.   Yes.

13   Q.   When you arrived back at the Senate gallery, what did you

14   do?

15   A.   I staged again outside the Senate gallery and engaged my

16   counterparts from the Capitol Police and the vice presidential

17   detail.

18   Q.   Did there come a time when you left that area outside the

19   Senate gallery?

20   A.   Yes.

21   Q.   Why?

22   A.   After briefing up my counterparts on any potential

23   emergency action procedures, I then went to the basement --

24   responded to the basement level to obtain some inauguration

25   paperwork.

App.217

1   Q.   And the basement level of the Capitol, is that where your

2   office is?

3   A.   Yes.

4   Q.   And you mentioned earlier you were also planning for the

5   inauguration around this time; is that right?

6   A.   Yes.  I was the lead liaison planner for the inauguration.

7   Q.   While you were in the basement of the United States

8   Capitol, what, if anything, did you hear that was out of the

9   ordinary?

10   A.   I was only down there a few minutes, and then I heard

11   scuffling and running about outside my office.

12   Q.   What did you think at that time?

13   A.   As I went out -- as I went -- peered outside, I saw

14   officers running and scrambling and saying that people were

15   breaching the bike racks.

16   Q.   What did you think to do?

17   A.   I immediately went to the protectees on the second floor.

18   Q.   And is there a certain place that you went to meet up with

19   the protectees?

20   A.   Yes.  Knowing that his office was on the second floor

21   outside the chamber, that's where I responded.

22   Q.   That's the Vice President's ceremonial office?

23   A.   Correct.

24   Q.   And when you got to the Vice President's ceremonial office,

25   did you observe Mrs. Pence and Charlotte Pence?

App.218

1   A.    Yes.

2   Q.    Was the Vice President there as well?

3   A.    Yes.

4   Q.    Where is the Vice President's ceremonial office located

5   with respect to the Senate chamber itself?

6   A.    It's on the north side of the chamber.

7   Q.    Is it very close to the chamber?

8   A.    Yes, just outside the -- what they call the Senate floor.

9   Q.    Let's discuss the motorcade we talked about a little while

10  ago.  Around this time, did you have any concerns with respect

11  to the Vice President's motorcade?

12  A.    Yes.

13  Q.    What concerns were those?

14  A.    Based on the intel we were receiving from officers and from

15  folks outside in the motorcade, that people were breaching the

16  bike rack and running onto the plaza.  So at that point, our

17  first thought is to relocate the motorcade if we could not use

18  it to relocate the Vice President, if needed.

19  Q.    And why is it important to relocate the motorcade if people

20  were around it?  In other words, what's the problem if people

21  are near the motorcade?

22  A.    The way the intel was, there was perceived threat on the

23  plaza from people breaching the bike racks.

24  Q.    At this time I'm going to pull up Government Exhibit 220,

25  which has been admitted.

App.219

```
1          And are you familiar with this view?
2     A.   Yes.  That's the east plaza.
3     Q.   And all of those cars in the center of this view, do you
4     know what those cars are?
5     A.   Yes.  The Vice President's motorcade.
6     Q.   And is this what the Vice President's motorcade looked like
7     approximately on January 6 of 2021 at around 1:58 p.m.?
8     A.   I did not witness it get staged there, but that is a common
9     staging location for the motorcade.
10    Q.   Got it.
11         So if we could play this forward.
12         (Video playing.)
13    Q.   Do you see all those cars moving?
14    A.   Yes.
15    Q.   Which cars are those?
16    A.   Those are -- that's the motorcade package for the Vice
17    President.
18    Q.   And are they at this time leaving the east plaza, where
19    they were supposed to be staged?
20    A.   Correct.
21    Q.   Okay.  You can stop it there, Ms. Rohde.  Thank you.
22         Let's go back to your presence in the Vice President's
23    ceremonial office, Agent Wade.  Did there come a time when the
24    Secret Service escorted the Vice President out of his ceremonial
25    office?
```

App.220

1   A.   Yes.

2   Q.   What role did you have with respect to that?

3   A.   After communicating with my liaison and additional Capitol

4   Police, the information received led us to believe that there

5   was imminent threat, as people were breaching the building at

6   that time.  So the decision was made that the Vice President

7   should be relocated.

8   Q.   And did you escort him while he was being relocated?

9   A.   Yes.

10   Q.   I'm going to pull up on the screen Government Exhibit 221,

11   already admitted into evidence.

12       And before we start playing it, Ms. Rohde, can you help us

13   understand, Agent Wade, what we're looking at here?  Where was

14   this view?

15   A.   You're looking at a lobby area just outside the rear of the

16   Senate chamber.  So that wooden and glass door enters the back

17   lobby area of the Senate floor, which goes into the Senate

18   chamber.

19   Q.   And how close is the Vice President's ceremonial office

20   once one enters through these wooden doors with the glass

21   inserts?

22   A.   Just inside to the right.

23   Q.   Do you see a blonde woman down on the first landing here?

24   A.   Yes.

25   Q.   And who is that?

App.221

 1    A.    That's Lanelle Hawa.

 2    Q.    And she's the one who works for you who sent that e-mail

 3    that we talked about earlier?

 4    A.    Correct.

 5    Q.    And the man with his arms outstretched, do you know what

 6    agency he works for?

 7    A.    Actually, if you could rewind that so I could be clearer.

 8    Q.    Sure.  We can play it forward for a second.  If you could

 9    pause it there.

10          Do you know what agency he works for?

11    A.    Yeah, the Secret Service.

12    Q.    And do you know what's about to happen here?

13    A.    Yes.  This was just prior to us moving the Vice President.

14    Q.    And if we could play it forward.

15          (Video played.)

16    Q.    And then stop.  This is at 2:25:54 p.m.

17          Who is the man who is just about to walk down the stairs?

18    A.    Which gentleman?

19    Q.    Sure.  Why don't we rewind for a second.

20          The back gentleman.

21    A.    That would be me.

22    Q.    So that's you right there where we see the back of your

23    head?

24    A.    Yes, the third person just about to get to the staircase.

25    Q.    And if we could play it forward, stopping at 2:26 even.

1       (Video played.)

2   Q.   Who is the woman with the darker blonde hair on the right

3   side?

4   A.   In the front, the first female is Karen Pence.

5   Q.   And who is the woman behind her with the lighter blonde

6   hair?

7   A.   Charlotte Pence.

8   Q.   And if we could play it forward for an extra two seconds.

9       (Video played.)

10  Q.   And stop it there.  Who is the person with the white hair

11  at 2:26:01 who is facing backwards briefly?

12  A.   That's Vice President Mike Pence.

13  Q.   And if we could play it forward, Ms. Rohde.

14      (Video played.)

15  Q.   Thank you, Ms. Rohde.  You can take it down.

16      Agent Wade, did you stay with the Vice President and his

17  family after he exited the area of the Senate chamber?

18  A.   Yes.

19  Q.   And did you return with the Vice President and his family

20  to the Senate chamber area in the evening of January 6 of 2021?

21  A.   Yes.

22  Q.   At approximately what time?

23  A.   Approximately 7:00 p.m.

24  Q.   Now, how would you compare the number of Secret Service

25  personnel at the time you left the chamber when we just looked

App.223

1   at it at about 2:25 to the time you returned to the chamber at

2   about 7:00 p.m.?

3   A.   We added additional agents for his return.

4   Q.   And why did the Secret Service add additional agents for

5   the Vice President's return?

6   A.   Even though the Capitol Police gave us the all clear and

7   they had several tactical teams sweeping the building, just to

8   ensure his safety.

9   Q.   Earlier in your testimony, you used a phrase "emergency

10   action."

11       Do you remember doing that?

12   A.   Yes.

13   Q.   Is that a Secret Service phrase?

14   A.   Yes.

15   Q.   What does an emergency action mean to a layperson?

16   A.   An emergency action plan is something you'd execute if a

17   threatening action or a threatening event happened to a

18   protectee where you had to either move, relocate, or extract a

19   protectee from a situation.

20   Q.   Did the Secret Service take any emergency actions on

21   January 6 with regard to the safety and security of Vice

22   President Pence and his family?

23   A.   Yes.

24   Q.   Can you name some of those emergency actions for us?

25   A.   Well, it was a relocation for his safety.

App.224

```
 1    Q.    So when you relocated the Vice President and his family,
 2    that was an emergency action?
 3    A.    Yes.
 4    Q.    And what about bringing additional Secret Service personnel
 5    to the Capitol?
 6    A.    That could be considered as well, yes.
 7    Q.    And what about relocating the Vice President's motorcade?
 8    A.    Yes.
 9              MR. NESTLER:  Thank you.  No further questions.
10              THE COURT:  Mr. Welch?
11              MR. WELCH:  Thank you.
12                        CROSS-EXAMINATION
13              BY MR. WELCH:
14    Q.    Good morning, Agent Wade.
15    A.    Good morning, sir.
16    Q.    My name is Bill Welch.  I'm also going to ask you some
17    questions.
18         To the best of your recollection, was the time stamp on the
19    last video that we watched with you and Vice President Pence
20    walking down those stairs at 2:28 p.m., was that approximately
21    correct, to the best of your recollection?
22    A.    Yes.
23    Q.    When you initially went and -- when you initially arrived
24    at the Capitol on January 6, you did not see my client
25    Mr. Reffitt, did you?
```

1    A.   No.

2    Q.   Now, when you went to Mrs. Pence and Charlotte Pence and

3    met with them because you were assigned to protect them, you did

4    not see my client Mr. Reffitt, did you?

5    A.   No.

6    Q.   And when you went with them to the Senate gallery and you

7    were in the hall, you did not see my client Mr. Reffitt, did

8    you?

9    A.   At no point on January 6 did I see your client.

10   Q.   At no point?

11        MR. WELCH:   Court's indulgence.

12        I'll pass the witness.

13        THE COURT:   Anything further?

14        MR. NESTLER:   Just briefly, Your Honor.

15                    REDIRECT EXAMINATION

16        BY MR. NESTLER:

17   Q.   Agent Wade, did you take those emergency actions,

18   relocating the Vice President and his family and the motorcade,

19   because of a specific person's actions?

20   A.   No.

21   Q.   Why did you take all those actions?

22   A.   Because we were advised there were hundreds of people

23   breaching the U.S. Capitol building.

24        MR. NESTLER:   No further questions.

25        THE COURT:   All right.   May this witness be excused?

App.226

```
 1              MR. WELCH:  Yes, Your Honor.
 2              THE COURT:  All right.  Thank you, sir.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  So ladies and gentlemen, we can take a
 5    break now or start with the government's next witness.  Does
 6    anyone need a break?
 7         Anyone on the trial teams need a break?
 8              MS. BERKOWER:  We're ready to start, Your Honor.  And
 9    there are three exhibits that are to be admitted:  405, 111, and
10    163.
11              THE COURT:  Why don't you confer with Mr. Welch and
12    see if we can pre-admit those.
13         (Pause.)
14              MS. BERKOWER:  Your Honor, I've spoken to Mr. Welch.
15    I believe he does not object to pre-admitting 405, 111, and 163.
16              THE COURT:  Is there any objection, Mr. Welch?
17              MR. WELCH:  No, Your Honor.
18              THE COURT:  All right.  Those exhibits are admitted.
19         (Government Exhibits 405, 111, and 163 received into
20    evidence.)
21              MS. BERKOWER:  Your Honor, the government calls Rocky
22    Hardie.
23           ROCKY HARDIE, WITNESS FOR THE GOVERNMENT, SWORN
24              THE WITNESS:  May I remove my mask?
25              MS. BERKOWER:  You may.
```

App.227

```
 1                    DIRECT EXAMINATION

 2          BY MS. BERKOWER:

 3     Q.   Good morning.

 4     A.   Good morning.

 5     Q.   Can you please say and spell your name.

 6     A.   My whole name?

 7     Q.   Yes.

 8     A.   Rocky Hardie, R-o-c-k-y H-a-r-d-i-e.

 9     Q.   What state are you from?

10     A.   Texas.

11     Q.   What part of Texas?

12     A.   In the Austin area.

13     Q.   And do you work?

14     A.   Yes, I do.

15     Q.   What kind of work do you do?

16     A.   I build -- I manufacture in-ear earphones for listening to

17     music.

18     Q.   Did you previously belong to a group called the Texas Three

19     Percenters?

20     A.   Yes.

21     Q.   Do you know someone named Guy Reffitt?

22     A.   Yes.

23     Q.   Did you meet him through that group?

24     A.   Yes.

25     Q.   And in January of last year, did you travel to D.C. with
```

App.228

```
 1   him?
 2   A.    Yes.
 3   Q.    Were you present on the U.S. Capitol grounds on January 6?
 4   A.    Yes.
 5   Q.    Did you also travel back to Texas with Mr. Reffitt?
 6             MR. WELCH:  Objection.
 7             THE COURT:  Overruled.
 8             BY MS. BERKOWER:
 9   Q.    You may answer.
10   A.    Yes.
11   Q.    So I'm going to ask you questions about each of those
12   topics.  Okay?
13   A.    Okay.
14   Q.    But I'm going to ask you about a few other things first.
15         Starting with the Texas Three Percenters, you said you were
16   a member of that group?
17   A.    Yes.
18   Q.    Do you also call yourselves by an acronym?
19   A.    You mean the Three Percenters by an acronym or --
20   Q.    The Texas Three Percenters, do you go by an acronym?
21   A.    An acronym?
22   Q.    Is TTP something that you all call the group?
23             MR. WELCH:  Objection.
24             THE COURT:  Overruled.
25             THE WITNESS:  Yes, TTP is what we're known as also.
```

App.229

```
 1              BY MS. BERKOWER:

 2    Q.   Approximately when did you join TTP?

 3    A.   I'm not exactly sure.  It was either the end of 2019 or the

 4    first part of 2020.

 5    Q.   Why did you join TTP?

 6    A.   A matter of concern for my safety.  I was -- during the

 7    summer, they had a lot of riots, and the news media that I would

 8    watch on YouTube, for instance, showed a lot of antifa burning

 9    things down, destroying things, breaking windows, throwing fire

10    bombs at police officers and everything.

11         There is this one video where a guy, they're a part of BLM

12    or somebody, and he says, "Oh, you think this is just down here?

13    We're coming to your community."  And I got to thinking, well,

14    in my community, I don't know -- I don't know anybody that

15    could, you know, could watch my back.

16         And so I started looking around for some group of people

17    that was like-minded, that if I got in trouble I could pick up

18    the phone and say hey, I need some help.

19    Q.   And when you were in TTP, did you have a role assigned to

20    you in the group?

21    A.   I did.

22    Q.   What was the role?

23    A.   I was the comms officer, state-level comms officer.

24    Q.   What does "comms" mean?

25    A.   Comms is short for communications.
```

App.230

1    Q.   And what are the beliefs of TTP?

2    A.   The beliefs of TTP?  Well, I will tell you, when I joined,

3    I asked if they were racists, and they said no.  I said are

4    you -- are you like a white supremacist group, and they said no.

5    I said do you hate the government, and they said no.

6    Q.   Mr. Hardie, could you please explain what the beliefs of

7    the group are?

8    A.   What they are?  Okay.  The beliefs of the group -- well,

9    part of it is that they support law enforcement, and they

10   believe in supporting the Constitution, and they believe in

11   supporting the government as long as it follows the

12   Constitution.

13   Q.   And what does the Three Percenters' part of the group name

14   mean?

15   A.   The term 3 percent comes from the concept that during the

16   Revolutionary War of 1776, out of the whole population, only

17   3 percent actually took action, and that the other 97 percent

18   were happy to be under the King's rule.

19   Q.   And did TTP ever have in-person meetings?

20   A.   Yes.

21   Q.   Who was the leader of TTP?

22   A.   The state leader was Russ Teer.

23   Q.   Did he have nicknames in the group?

24   A.   He did.

25   Q.   What are the nicknames?

App.231

```
 1    A.    His was "Dead Shot."

 2    Q.    Did he also have a handle on online communications?

 3    A.    Bowen, William Bowen.

 4    Q.    Now, was Guy Reffitt in this group?

 5    A.    Yes.

 6    Q.    Did he have a job assigned to him?

 7    A.    Yes.  Well, I would say loosely assigned, but assigned,

 8    yes.

 9    Q.    What was his job?

10    A.    He was like a vetting officer.  So if anybody wanted to

11    join, he would do research on them to see what their background

12    was before they're admitted.

13    Q.    Did you meet him in person through the group?

14    A.    Yes.

15    Q.    And was one of the group meetings at his house?

16    A.    Yes.

17    Q.    Are you still a member of TTP?

18    A.    No.

19    Q.    Around when did you leave the group?

20    A.    It would -- I think late -- gosh.  It was -- I had a visit

21    by the FBI.  I don't remember the exact date, but it was shortly

22    thereafter I was thinking, well, okay, this is not really what I

23    want to --

24    Q.    Was that before or after January 6 of 2021?

25    A.    It was after January 6th.
```

App.232

1   Q.   Now let's talk about your relationship with Mr. Reffitt.

2   Okay?  Did you ever hang out with him?

3   A.   A little bit.

4   Q.   Let's talk about the first time you hung out with him.

5   Okay?

6   A.   Okay.

7   Q.   Where did you meet when you went to hang out with him?

8   A.   We met at a park.

9   Q.   And was this before or after the 2020 election?

10  A.   Before.

11  Q.   Why were you interested in meeting him in person?

12  A.   Because I had talked to him on the phone.  I thought he was

13  an interesting person, and I thought we had similar beliefs.

14  Q.   Was there anything else that drew you to him in particular?

15  A.   Yeah.  In life, most people talk, but they don't do.  And

16  he seems to be a person that actually does things.  He gets

17  things done.

18  Q.   And why was that significant to you?

19  A.   Well, because I'm kind of the same way, you know?  If I say

20  I'm going to do something, I'm going to do it.

21  Q.   And when you met, did you bring your cell phones with you?

22  A.   We did bring them, yes.

23  Q.   Did you have them with you while you were sitting in the

24  park together?

25  A.   Not on my person, no.

1101

1    Q.   Do you know if he had his on his person?

2    A.   I believe he did not.

3    Q.   And why didn't you have your phones with you?

4    A.   Because we have a general belief that we can be listened

5    to, and we didn't want to be listened to.

6    Q.   So where was your phone?

7    A.   In my car.

8    Q.   Did you talk about politics when you were in the park with

9    him?

10   A.   Yes.  We talked about a variety of things, but yes,

11   politics.

12   Q.   Generally speaking, did you have similar views?

13   A.   Yes.

14   Q.   And what did you talk about with respect to politics that

15   day?

16   A.   We talked about how the country is pretty much going down

17   the tubes, and we talked about what's going on in Washington and

18   the people that seemed to be corrupt and destroying our country.

19   Q.   Were there any people in particular that you felt were

20   destroying the country?

21   A.   Well, yes, there were.  We talked about a few.

22   Q.   Who?

23   A.   Well, one would be Nancy Pelosi.  We pretty much felt like

24   she's evil incarnate.

25   Q.   And anyone else?

App.234

1    A.   Let me think.  Well, we talked about President Trump, you

2    know, and we talked about what he stood for in the country and

3    everything and trying to make things right.

4    Q.   Now, you mentioned you were drawn to Mr. Reffitt because

5    you felt he was someone who did things?

6    A.   Yes.

7    Q.   Did you talk about doing things with him?

8    A.   We -- let's see.  I don't remember specifically at that

9    time if we talked about doing things.  There were -- there was a

10   thing in Temple at one point, but I don't remember exactly what

11   we talked about.

12   Q.   Did you speak about your philosophy on when it might be

13   appropriate to take action?

14   A.   I don't have a specific memory, but I would say that we --

15   we do ask ourselves, or we did ask ourselves, you know, how far

16   do you let things go before you have to take action and protect

17   your country.

18   Q.   And when you say "take action to protect your country,"

19   what kind of action were you talking about?

20   A.   I don't think that we had a specific -- we didn't have a

21   specific action, but -- let me think just a moment.

22        There was no singular event, for instance, that we were

23   discussing.

24   Q.   Well, let me be clear.  When you were referring to action,

25   were you talking about political action?

App.235

1103

1    A.   It was nebulous.   Political action is one.

2    Q.   Did you also talk about when it might be appropriate to use

3    violent action?

4    A.   I know at various times that topic came up.   I don't recall

5    at that particular meeting if we talked about any kind of

6    violent action, but we knew that something has to be done at

7    some point.

8    Q.   Did the term "1776" come up at that meeting?

9    A.   At that particular meeting?   I don't recall if that term

10   came up, but I'm familiar with the term and what it means.

11   Q.   Did you previously tell the FBI that at that meeting you

12   talked about it being 1776?

13   A.   Oh, you mean like the scenario that we're in is like 1776?

14   Q.   Yes.

15   A.   Yes.

16   Q.   Can you explain what that part of the conversation was

17   about?

18   A.   Okay.   Well, during 1776 is the time of the Revolutionary

19   War when the colonists were rebelling against the King of

20   England.   And the idea was that the king was a tyrant and the

21   people had no redress of grievances.

22        And so basically, the -- this time frame that we're in now

23   is analogous to 1776, where a lot of people in society feel like

24   their government's not listening to them, and so they have no

25   choice but to rebel in some form.

 1    Q.   So let's go on to a different topic.  After the 2020

 2    election, did you have concerns about the integrity of the

 3    election?

 4    A.   Yes, I did.

 5    Q.   Did you believe the results needed to be recounted?

 6    A.   Yes.

 7    Q.   Do you still -- or excuse me.

 8         Did you believe the election was stolen?

 9    A.   Yes, I did.

10    Q.   Do you hold those beliefs today?

11    A.   Today?  Yes, I do.

12    Q.   After the election but before January 6, did you

13    communicate with others in TTP about these views?

14    A.   Yes.

15    Q.   And did other people in TTP share those views?

16    A.   Yes.

17    Q.   Did you discuss this issue with Mr. Reffitt?

18    A.   Yes.

19    Q.   What was his view of whether the election was stolen?

20    A.   He agreed.  He felt like the election was stolen.

21    Q.   Let's talk now about your trip to D.C.  When did you start

22    considering traveling to D.C. for January 6?

23    A.   It was probably a week or ten days, something like that,

24    beforehand.

25    Q.   And during that time period, were you on a messaging chain

 1    with TTP members?

 2    A.   Yes.

 3    Q.   Why were you considering going to D.C. initially?

 4    A.   I guess a couple of reasons.  One, I felt like what's

 5    happening in our country right now has historical context.  I

 6    felt like the -- my perception that the election was stolen is

 7    very, very significant.  It's kind of a catastrophic event for

 8    our country, and I felt like I needed to be there.  The

 9    president said hey, you know, I'd like 10 million people to show

10    up, and I said, well, I think maybe I need to be counted.

11         And then we had some communications on -- on the Telegram,

12    and then I saw something and said, well, okay, I think I need to

13    go.

14    Q.   So let's pull up some of that Telegram now.  Ms. Rohde, if

15    we could have Government Exhibit 1B4.1, going to PowerPoint

16    slide 2 and 3, and we will start with 2.

17         Mr. Hardie, do recognize you this to be a message that you

18    received over Telegram?

19    A.   Yes.

20    Q.   Who sent this message?

21    A.   That would be Mr. Reffitt, who is also known as Call to

22    Arms.

23    Q.   Was that his handle on Telegram?

24    A.   Yes.

25    Q.   Could you read this message out loud, please.

App.238

```
 1   A.    Okay.  "We march on D.C. January the 6th with every beating
 2   American heart.  We drain the swamp.  The House and Senate must
 3   be held accountable for the tyrannical against the republic of
 4   the people.  I will be leaving on January 4th to make the trip
 5   and stand in solidarity or fight if needed.  Those of you
 6   patriots that are true blooded warriors can join or you can join
 7   or be tread on.  It's a commitment and that's no doubt, yet the
 8   travel, commitment, and time will either be sacrificed now for
 9   the greater good of the future.  Or we will lose the moment
10   forever.  Not making the sacrifice for this short time in your
11   life could be detrimental for the rest of your life.  Stand and
12   be counted."
13   Q.    What date was that sent?
14   A.    December 21st, 2020.
15   Q.    Was this one of the messages you considered when making a
16   decision to travel?
17   A.    Yes, I did, you know.
18   Q.    Could you explain how this impacted your decision?
19   A.    Well, I was already thinking about it, and then I read
20   this, and I said, well, I need to go.
21   Q.    And what about this in particular made you want to go?
22   A.    Stand and be counted, because it was pretty much what I was
23   thinking on my own.
24   Q.    Now, have you participated in various Telegram messaging
25   threads with members of TTP?
```

```
 1   A.   Yes.

 2   Q.   Did some of those include the defendant Mr. Reffitt?

 3   A.   Yes.

 4   Q.   Generally speaking, what is the tone of the exchanges in

 5   those messaging threads?

 6   A.   The tone?  Could you clarify "the tone" a little bit?

 7   Q.   Well, generally speaking, do people speak in stark terms in

 8   the messaging threads?

 9   A.   In stark terms?  I think so.  I think there's kind of an

10   apocalyptic tone that permeates the thought process.

11   Q.   And before January 6, how seriously did you take messages

12   that had apocalyptic tone?

13   A.   I didn't take them that serious.  I understand that people

14   were concerned.  I was concerned.  But nobody -- you know, I

15   didn't think people would go down and do anything like other

16   than go to some local or regional protest and things like that.

17   Q.   Now, did you take the trip to D.C. with Mr. Reffitt?

18   A.   Yes.

19   Q.   How did you decide to travel with him?

20   A.   You mean what led to my decision?

21   Q.   How did it come about that the two of you traveled

22   together?

23   A.   Okay.  Well, I was already planning to go by myself, and

24   then I got word from Mister -- from the leader of TTP, Russ

25   Teer, and he said, Oh, well, Call to Arms wants to go, and his
```

App.240

```
1    travel companion dropped out.  He said, You might want to
2    contact him.
3        I did.  I called him, and he said yeah, and I said, okay,
4    great, we can save some money, let's go.
5    Q.   And after that, did you connect with Mr. Reffitt about the
6    plans?
7    A.   Yes.
8    Q.   So what did he tell you about the plan?
9    A.   What did he tell me?  Well, we discussed the travel.  I
10   said, Well, how are we going to get there, what's our path?  And
11   he said, We're going to travel up -- I forget what the
12   interstate is, and we will spend the night in Nashville, and
13   then we'll go from there to D.C. on the night before the event.
14   Q.   Did you discuss flying?
15   A.   I don't recall discussing flying.  I think we decided
16   immediately on that we were going to drive.
17   Q.   And who made the bookings for any hotels you were going to
18   stay at?
19   A.   Mr. Reffitt.
20   Q.   Now, during that conversation, did he explain the reason
21   why he wanted to go to D.C.?
22   A.   Well, he wanted to go to D.C. to -- do you have maybe a
23   specific question on that?
24   Q.   Well, did you talk about your separate reasons for wanting
25   to go?
```

App.241

1    A.    Yeah, we talked.

2    Q.    And you said you wanted to go to be counted --

3    A.    Right.

4    Q.    -- and to stand and be counted?  Is that what you testified

5    to a few minutes ago?

6    A.    Right.

7    Q.    What was his part of that conversation?  Why was he saying

8    he wanted to go?

9    A.    Well, we discussed and we talked about the need for the

10   people who are the corrupt people to be removed and replaced

11   with people who are not corrupt.

12   Q.    That was something that he raised or that you raised?

13   A.    He raised.

14   Q.    And what was he saying about needing to -- about these

15   corrupt people?  What did he express about them?

16   A.    That they need to be dragged out.  And he said no matter

17   whether they're Republican or Democrat, they're all corrupt,

18   they need to be dragged out and replaced with people that are

19   patriotic to the country.

20   Q.    What went through your mind as he said things like that?

21   A.    Well, I had pictures in my mind.  I'm a visual person.

22   So -- well, I didn't think it was something that anybody was

23   going to act on.  I had no concept before I went to D.C. that

24   there would be anything other than people standing around

25   listening to the president and then going and standing around

1    the Capitol building.

2    Q.   So did he share any specific plans with you to actually go

3    and remove people from the building?

4    A.   We had discussions that at the time it seemed like we were

5    joking around, and I considered it hyperbole.  And we talked

6    about Nancy Pelosi in particular.

7    Q.   Now, with regard to your plans in D.C., did you expect that

8    you would go to the Capitol area, the building, Capitol building

9    area?

10   A.   I didn't have a clear idea how it would unfold, because I

11   had never really been there.  I knew that the general plan was

12   that we would listen to the president speak, and then at some

13   point, the whole group of people can move toward the Capitol.

14        Other than that general idea, I didn't have anything

15   specific.

16   Q.   Well, what did you think was going to happen at the Capitol

17   itself?

18   A.   Well, you know, part of me counted -- I watched people do

19   protests on TV with signs and everything.  So I thought that

20   with that many people, there was probably over a million people

21   there, that's pretty significant, and I thought for sure that

22   people in the Capitol building would look out the window and say

23   wow, look at all those people, maybe we need to think about

24   this, you know.

25   Q.   Now, let me ask you a few follow-up questions on that.

App.243

1    A.    Okay.

2    Q.    Did you know what was happening inside the Capitol building

3    that day?

4    A.    Well, in general terms.  I knew what I read from the media

5    or heard, and that was that they were going to certify the vote.

6    Q.    So you knew they were meeting inside?

7    A.    Yes, uh-huh.

8    Q.    And when you said you were hoping they'd look outside, what

9    exactly were you hoping they would look outside and do?

10   A.    Well, I know that they were supposed to be certifying the

11   vote.  In my mind, I was like they would -- somebody would say

12   hey, you know -- there was a political struggle going on in that

13   building and in our society.  Some people want to stop the vote

14   or want to recertify or cancel it or whatever, and others don't.

15         And so I thought somewhere, somebody would look at it and

16   say okay, we're going to do something.  The end result would be

17   that they didn't certify the vote that day.

18   Q.    They did not certify?

19   A.    In my mind, that was the objection -- the objective, was

20   that by our presence there, that they would not certify the vote

21   that day.

22   Q.    Now, as you were planning the trip with Mr. Reffitt, did

23   you discuss bringing firearms to D.C.?

24   A.    Yes, we did.

25   Q.    Could you explain what discussion you had with him?

App.244

1    A.   The only thing that I -- well, there's a couple of things.

2    We discussed it.  I don't remember how it came about, but I

3    remember that we had a discussion.

4         And I have a concealed carry license in Texas, and I asked

5    what about reciprocity laws -- we're traveling through these

6    states, are we going to have any issues.  And we discussed,

7    well, it seems like every state that we're going to go through

8    is going to have reciprocity except for D.C.

9    Q.   And who had the information about what the laws were in the

10   different places you would be going?

11   A.   Well, I understood the basics of reciprocity.  I didn't

12   know anything about D.C. law.  And Mr. Reffitt knew a little bit

13   more than I did, and he said well, we can do these things, but

14   we can't do those things.

15   Q.   And when he said -- did he know about the laws in D.C.

16   specifically?

17   A.   I don't know how much he knew.

18   Q.   Did he give you information about the laws in D.C.?

19              MR. WELCH:  Objection.

20              THE COURT:  Overruled.

21              THE WITNESS:  I don't remember anything specific, but

22   I do remember that we discussed is it legal in D.C. to have a

23   handgun.

24              BY MS. BERKOWER:

25   Q.   And what was your discussion about that?

App.245

1    A.   Well, it's not legal.  And I said, Well, how about getting

2    a permit?  And he said, Well, you're not going to get a permit

3    in D.C.

4    Q.   So going into that conversation, did you know it was not

5    legal to have a handgun in D.C. without a permit?

6    A.   Yes, we did.

7    Q.   Did you personally know that before you spoke with

8    Mr. Reffitt?

9    A.   Yes, I did.

10   Q.   How did you know that?  I thought you just said you didn't

11   know much about the laws.

12   A.   Well, I know that I've read that it's almost impossible to

13   get a -- there may be laws that say yes, you can have a permit,

14   but in practical terms, you're probably not going to get one.

15   Q.   So who provided you with that information?

16   A.   I was reading the -- in that part, I was reading the media.

17   I think we both discussed and agreed that we weren't going to

18   get a permit.

19   Q.   So what conclusions did you reach, at the end of that

20   discussion about firearms, as to whether you would bring

21   firearms to D.C.?

22   A.   Well, first of all, what's the purpose?  The purpose was

23   for self-defense, you know.  And that's based on the things that

24   I had seen on the media before, with all the burning and the

25   looting and the fire bombing and stuff like that.  I had no idea

App.246

```
 1    what to expect.
 2         At one point, we discussed, you know, what are the
 3    consequences, and are we willing to risk the consequences.  And
 4    we decided that -- I think we used an expression it's better to
 5    be tried by a jury of 12 than carried by six.
 6    Q.   What does that mean to you?
 7    A.   That means basically if you violate a handgun law and
 8    you -- you'll probably go to jail, and at some point you will
 9    get out, but if you die, you're not coming back.
10    Q.   And what conclusion did you reach about whether or not you
11    would bring guns to D.C. during that discussion?
12    A.   Well, we agreed on that one concept, and we said okay,
13    we're willing to take that risk.  We felt like that nobody would
14    ever know, nobody would ever get hurt.  We would be in, we would
15    be out, nobody would know, and we would go on with our life.
16    Q.   Now, before we go any further, I'm going to ask you a few
17    questions about an agreement you entered into with the
18    government.  Okay?
19    A.   Okay.
20    Q.   Ms. Rohde, if we could please have Government Exhibit 405,
21    which is in evidence, and may we publish it, please.
22         Mr. Hardie, do you recognize this exhibit?
23    A.   Yes, I do.
24    Q.   Is this an agreement you entered into with the government?
25    A.   Yes.
```

```
1    Q.   Did you sign this document?

2    A.   I did.

3    Q.   Did your attorneys sign this document?

4    A.   Yes.

5    Q.   And did Mr. Nestler sign this document on behalf of the

6    government?

7    A.   Yes.

8    Q.   So let's talk about the terms.  And Ms. Rohde, if we could

9    please go back to the first page.  Thank you for scrolling down.

10        Do you see the date on this document?

11   A.   It says May 19, 2021.

12   Q.   Did you first enter into this agreement in connection with

13   testimony you gave to the grand jury that was investigating this

14   matter?

15   A.   I'm sorry.  Could you repeat that, please?

16   Q.   Did you first enter into this agreement in connection with

17   testimony you gave to the grand jury?

18   A.   Yes.

19   Q.   And do you understand the agreement to also cover your

20   testimony here today?

21   A.   Yes.

22   Q.   Does this agreement require you to testify about both what

23   Mr. Reffitt did and what you did, even if that testimony

24   incriminates you?

25   A.   Yes.
```

App.248

1    Q.   And in exchange, has the government agreed not to use your

2    testimony to bring a criminal case against you?

3    A.   That's correct.

4    Q.   To be clear, though, does this mean the government cannot

5    charge you with a crime for what you did on January 6?

6    A.   I believe -- oh, okay.  Could you state that again, please?

7    Q.   Does this agreement prevent the government from charging

8    you with a crime for what you did on January 6?

9    A.   No.

10   Q.   So you can still be prosecuted for what you did?

11   A.   It's possible.

12   Q.   Is it the case that the government could bring a case

13   against you so long as it doesn't use the statements you gave in

14   connection with that agreement?

15   A.   Yes.

16   Q.   And does the FBI know information about you concerning

17   January 6 from sources other than your testimony?

18   A.   Yes.

19   Q.   Before this agreement existed, did you voluntarily talk to

20   FBI agents about what you did?

21   A.   Yes.

22   Q.   Did the FBI search your business?

23   A.   Yes.

24   Q.   Did the FBI search your house?

25   A.   Yes.

App.249

1    Q.   Did the FBI seize your firearms?

2    A.   Yes.

3    Q.   And did the FBI seize and search your electronic devices

4    such as your phone?

5    A.   Yes.

6    Q.   Court's brief indulgence.

7         So Ms. Rohde, you can take that down.

8         Mr. Hardie, let's talk now about your trip itself.  Okay?

9    A.   Okay.

10   Q.   Where did you leave from to go to D.C. for January 6?

11   A.   I left from my home near Austin.

12   Q.   How did you meet up with Mr. Reffitt?

13   A.   I drove to his home in Wylie.

14   Q.   When you got to his house, who else was there?

15   A.   To my knowledge, only Mr. Reffitt and myself.

16   Q.   And what did you -- what did you do when you got to his

17   house?

18   A.   We -- I pretty much transferred things from my car into his

19   car.

20   Q.   And what did you pack?

21   A.   Well, I packed clothing, and then I had an AR-15,

22   ammunition, and then I had a concealed handgun and extra

23   ammunition.

24   Q.   Where did you put your AR-15?

25   A.   The AR-15 was in a plastic case with a lock on it.  It was

App.250

1118

1   broken down into two pieces, and it was put in the back cargo

2   area.

3   Q.   And I think, Ms. Rohde, if we could, please, show

4   Government's Exhibit 106 in evidence.  And Mr. Hopkins, please

5   publish it to the jury.  Thank you.

6        Do you recognize this vehicle?

7   A.   Yes.

8   Q.   What vehicle is it?

9   A.   It's a Chevy Equinox.  It's the vehicle we rode to D.C. in.

10  Q.   And where in this vehicle did you put your AR-15?

11  A.   Back in this back cargo area, you know.  They're long.  So

12  we just kind of put them in on kind of the left side in the

13  back.

14  Q.   And you said you brought ammunition for that firearm?

15  A.   Yes.

16  Q.   Where did you put the ammunition?

17  A.   The ammunition was under lock and key, and it was put on

18  the right side of the vehicle.

19  Q.   Did you also bring radios?

20  A.   Yes.

21  Q.   Why did you bring radios?

22  A.   So that we could remain in communication as we got

23  separated.

24  Q.   And how many radios did you bring?

25  A.   I brought two.

App.251

1    Q.   Now let's talk about some of the items that Mr. Reffitt

2    brought.  What did you see him pack into the car?

3    A.   Well, I saw that he had an AR, and he had his various gear,

4    various, you know, gear.  He had -- well, when he actually

5    packed the car, I didn't pay that close of attention, you know.

6    Q.   Well, you mentioned an AR.  Did you see him put his AR into

7    the vehicle?

8    A.   I saw him put his AR in the case in the vehicle, yes.

9    Q.   Did you see at that time what was inside the case?

10   A.   I don't recall what was in the case.  I don't think that he

11   actually opened the case.

12   Q.   At a later time, did he open the case, when you were in

13   D.C.?

14   A.   Hang on a second.  Let me think about that statement.  I

15   remember we had to make sure that they were broken down.  And so

16   we might have opened the cases and broken them down.  There's a

17   pivot pin.  You have to pull some pins and take the uppers and

18   lowers apart and set them aside.  We might have done that at

19   that location, but I don't recall specifically.

20   Q.   Did you know how to break yours down?

21   A.   I did, but it had been like 25 years.  I kind of forgot.

22   Q.   So how did you break yours down that day?

23   A.   Well, I had some assistance.  I asked, How do you do this?

24   I forgot.  It's kind of embarrassing.  So basically, you've

25   got -- an AR has a pivot pin here and another pin here, and you

App.252

1120

```
 1   pop the pin, and it can cause the rifle to break apart.  Then
 2   you pull the other pin out, and you can separate the two halves.
 3   Q.   And you said you asked someone a question about how to
 4   break it down.  Who did you ask?
 5   A.   I asked Mr. Reffitt.
 6   Q.   And did he assist you?
 7   A.   Yes.
 8   Q.   Now, did Mr. Reffitt have any other weapons with him when
 9   you were packing the car?
10   A.   Yes.
11   Q.   What other weapons?
12   A.   He had a handgun.
13   Q.   What kind of handgun?
14   A.   I'm not sure about the make and model, but I just know --
15   it was probably like a 9mm or something like that, I guess.
16   Q.   Well, did you examine it yourself?
17   A.   No, no, I didn't.
18   Q.   So 9mm is just a guess?
19   A.   Yeah, okay.  So I wouldn't know if it's 9 millimeters or
20   .45.
21   Q.   Now, where did you see this handgun?
22   A.   Well, in my course of knowing him --
23   Q.   Let's focus on the day you were packing the car.
24   A.   Okay.
25   Q.   Where did you see the handgun?
```

1    A.   Okay.  I don't know that I actually saw the handgun,

2    because it would have been concealed.  Mine is concealed.  So I

3    don't recall seeing it at that particular moment.

4    Q.   Did you later see it in D.C.?

5    A.   Yes.

6    Q.   And you said you had a handgun.  Could you explain where

7    you had your handgun?

8    A.   Yes.  I had a shoulder holster, and I kept my -- I have a

9    .45 caliber, and I kept it under my left armpit, and I had two

10   magazines under my right armpit.

11   Q.   I see you're gesturing under your jacket.  Do you have it

12   with you today?

13   A.   No, I don't.

14   Q.   Now, did you stay long at Mr. Reffitt's house before you

15   started the drive?

16   A.   Not terribly long, just long enough to transfer things over

17   and just kind of get everything organized.

18   Q.   Who drove?

19   A.   He did.

20   Q.   And did you talk along the way?

21   A.   Yes, we did.

22   Q.   About how many hours does it take to drive from that part

23   of Texas to Washington, D.C.?

24   A.   It's about 24 hours when you include your overnights.

25   Q.   And what did you talk about as you drove?

 1    A.   We talked about family, and we talked about what's the

 2    purpose of the trip and politics and things like that.

 3    Q.   When you say "what's the purpose of the trip," what

 4    specifically were you talking about?

 5    A.   Talking about, again, you know, the condition of the

 6    government and that people need to be -- people need to be taken

 7    out of government and, you know, replaced with people who are

 8    going to follow the Constitution.

 9    Q.   Were there specific phrases that Mr. Reffitt used when he

10    was discussing removing people in government?

11    A.   Do you have like an example or --

12              MR. WELCH:  Objection.

13              MS. BERKOWER:  I can rephrase the question.

14              THE COURT:  Yes, please be more specific so he can

15    answer the question.

16              BY MS. BERKOWER:

17    Q.   Were there specific words Mr. Reffitt used when he talked

18    about removing people from the government?

19    A.   Let me think.  Specific words.  Well, we talked about we

20    gotta get the bastards out of there, and we talked about --

21    well, we kind of made a joke about Nancy Pelosi.

22    Q.   What joke did you make?

23    A.   Well, someone -- and I'm kind of going from a picture in my

24    mind, but we said something about she needs to be dragged out by

25    her ankles or by her feet or something.  And I made a joke,

1    because I could just imagine as she's going down, her head is

2    going boomp, boomp, boomp down the stairs, and I made a joke

3    about that.

4    Q.   When you talked about removing legislators, did you take

5    him serious at that point in time, as you're driving to D.C.?

6    A.   I didn't think he or anybody was going to get close to the

7    Capitol.  I thought that was impossible.

8    Q.   Why?

9    A.   You watch the news media and you always -- once in a while,

10   there's a news report about someone tries to jump the fence and

11   get close to the Capitol and he gets shot.  And I thought

12   nobody's going to get very close to the Capitol.  So I just

13   never took it seriously.

14   Q.   Did you also talk about TTP in the car?

15   A.   Yes.

16   Q.   What did you talk about with regard to TTP?

17   A.   Let me think.  I don't know specifically.  We talked --

18   Q.   I can ask a more specific question.

19   A.   Yeah.

20   Q.   Did you talk about whether people in TTP had joined you in

21   D.C.?

22   A.   Yeah, we did.  Basically, we were the only two that I know

23   that went up there, and we were kind of complaining about our

24   leader, because he was back there, I call, sorting his sock

25   drawer while he's telling everybody they need to go to D.C., and

1    he sits back at home with his family where it's nice and

2    comfortable.  And then that, you know, we made the commitment to

3    go stand and be counted.

4    Q.   When you say we made the decision to stand and be counted,

5    is that a reason that Mr. Reffitt gave you, or is that your

6    reason, or both?

7    A.   Let me think about that.  It was definitely my reason to be

8    counted.  He also wanted to be counted.

9         Do you have another --

10   Q.   I can ask you another question.  As you were driving, did

11   you stop anywhere overnight?

12   A.   Yes, we did.

13   Q.   Where did you stop?

14   A.   We stopped in Nashville, Tennessee.

15   Q.   And why did you stop there?

16   A.   To spend the night, sleep, get rested.

17   Q.   Is that about halfway between -- halfway point in the trip?

18   A.   Pretty much.

19   Q.   When you resumed the drive, in Virginia, did you do

20   something with your firearms before you arrived in D.C.?

21   A.   Yes, we did.

22   Q.   Could you explain what you did?

23   A.   Well, we already had broken down the ARs, because that's

24   what we thought was a legal way to transport them.  And we had

25   our handguns.  And so in Virginia, I believe that's where we

App.257

```
1    stopped, is right outside of D.C., then we took our handguns and
2    put them under lock and key.  We removed the ammunition from the
3    handguns, handguns in one case under lock and key, ammunition in
4    another case under lock and key.
5    Q.   And when you did that, did you see Mr. Reffitt's handgun?
6    A.   I didn't look at it specifically, because I was focused on
7    my own, but I know he had one, and he put it in a case.
8    Q.   And who was driving at the time that you stopped to put
9    these guns in a case?
10   A.   He was.
11   Q.   So did he pull over the car?
12   A.   Yes, he did.
13   Q.   Now, let's talk about what you did when you got to D.C.
14   A.   Okay.
15   Q.   Did you arrive on the night of January 5?
16   A.   Yes.
17   Q.   Did you go straight to the hotel?
18   A.   Yes.
19   Q.   And what hotel did you stay at?
20   A.   I always have a hard time remembering the name of the
21   hotel.  It was -- if you know the name -- I can't remember it,
22   but if you say it, I will remember yes or no if that was
23   correct.
24   Q.   Was it the Melrose Hotel?
25   A.   Yes.
```

App.258

```
1          THE COURT:  Ms. Berkower, sorry to interrupt, but can
2     you estimate how much more direct you have?
3          MS. BERKOWER:  I think we're about halfway done with
4     this witness, Your Honor.
5          THE COURT:  All right.  Ladies and gentlemen, I think
6     it's probably a good time to take a break.  So we will come back
7     in ten minutes, at approximately 11:35.  I will remind you all,
8     no talking, reading, or research.
9          (Jury exited courtroom.)
10          THE COURT:  All right.  You all good?  Any issues?
11          MR. WELCH:  May I be excused for a few minutes,
12     please?
13          THE COURT:  Of course.  You all take a break.
14          (Recess taken from 11:23 a.m. to 11:33 a.m.)
15          (Bench conference.)
16          THE COURT:  Just quickly while the jury is out, I
17     thought I would ask you, Mr. Welch, you've made a reference
18     several times to a witness having a Fifth Amendment issue.  Is
19     there anything we should be addressing now that you expect to
20     spring on cross that would require us to send the jury out?
21          MR. WELCH:  No, I don't imagine, because there's an
22     immunity letter on this witness.  So there wouldn't be a Fifth
23     Amendment privilege.
24          THE COURT:  You said someone might invoke the Fifth.
25     If that's going to happen with this witness -- maybe that's
```

```
 1    coming with another witness, but I thought this might be the
 2    witness.
 3            MR. WELCH:  I had thought this might be the witness,
 4    too, but if there's an immunity letter, he's probably not going
 5    to do that.  And Jackson has already testified.
 6            THE COURT:  All right.  I just wanted to check so that
 7    we wouldn't keep them waiting.
 8        Does the government have another witness on call after
 9    Kennedy?
10            MS. BERKOWER:  We do.  We have several, actually, two
11    more.
12            THE COURT:  Great.  Thank you.
13        (End of bench conference.)
14        (Jury entered courtroom.)
15            MS. BERKOWER:  Your Honor, may we bring the witness
16    back in?
17            THE COURT:  Yes, of course.
18        (Witness resumed stand.)
19        THE COURT:  Sir, let me remind you that you're still under
20    oath.
21            BY MS. BERKOWER:
22    Q.  Good morning, again.
23    A.  Good morning.
24    Q.  Mr. Hardie, we were talking when we took a break about your
25    arrival at the hotel in D.C.
```

App.260

1           Do you remember being asked questions about that?
2      A.   Yes.
3      Q.   So let's pick back up there.
4           When you got to the hotel, what did you do?
5      A.   I was pretty tired.  I took a few -- I think maybe I took a
6      bag or something and was in the hotel lobby.
7      Q.   And what happened with the car?
8      A.   Mr. Reffitt parked the car.
9      Q.   Did you remove your firearms from the car at that time?
10     A.   No.
11     Q.   So where were the firearms being kept?
12     A.   They were still under lock and key in the compartment --
13     the cargo area of the vehicle.
14     Q.   And you didn't bring them inside, any of the guns that
15     evening, to your hotel room?
16     A.   No.
17     Q.   After you checked in, what did you do?
18     A.   Went upstairs and relaxed a little bit.
19     Q.   And Ms. Rohde, if we could, please, put up on the screen --
20     and this is admitted into evidence -- Government's Exhibit
21     1B20.1.1.
22          Mr. Hardie, do you recognize this exhibit?
23     A.   Yes, I do.
24     Q.   What is it?
25     A.   It's a selfie that I took of he and I together in the hotel

 1   room.

 2   Q.   And --

 3   A.   Go ahead.

 4   Q.   Could you explain who the person is on the left in this

 5   photo?

 6   A.   On the left is Mr. Reffitt.  On the right --

 7   Q.   Who is on the right?

 8   A.   Myself.

 9   Q.   What do you have on your shoulders?

10   A.   That's my shoulder holster.

11   Q.   We can take that down, Ms. Rohde.  Thank you.

12        So let's go on now to what happened on January 6.  That

13   morning, did you and Mr. Reffitt prepare for the day's events at

14   the hotel?

15   A.   I'm sorry?  Say again, please.

16   Q.   Did you and Mr. Reffitt prepare for the day at your hotel

17   that morning on the 6th?

18   A.   Yes.

19   Q.   And in the room -- I should have asked you, when you stayed

20   at the hotel, did you have separate rooms or share a room with

21   Mr. Reffitt?

22   A.   We had a room with two separate beds.

23   Q.   So a shared room with two beds?

24   A.   Yes, uh-huh.

25   Q.   In the hotel room, what did you do to prepare for the day?

App.262

1    A.   I had an armored plate, but I didn't have the carrier vest.

2    And so I needed a way of securing it.  So I put newspaper and

3    Gorilla tape and made kind of a thing over my shoulders and

4    around my chest.

5    Q.   And who made the Gorilla tape -- who dealt with the Gorilla

6    tape?

7    A.   Well, I was assisted by Mr. Reffitt.

8    Q.   What else did you do to prepare for the day in your hotel

9    room?

10   A.   Let's see.  What did we do?  Let's see.  We organized --

11   what did we organize?

12   Q.   Well, I can ask you a more specific question.

13   A.   Okay.

14   Q.   Did Mr. Reffitt give you anything for the day?

15   A.   Yes.

16   Q.   What did he give you?

17   A.   He gave me some zip ties.

18   Q.   And what do you mean by -- what are these zip ties?  Why --

19   A.   These are like the real big heavy ones you use as

20   handcuffs.

21   Q.   And did you ask him about those items?

22   A.   Yes.  I said, What are these for?

23   Q.   What did he say?

24   A.   He said, well, in case we need to detain anybody or, you

25   know, something to that effect.

App.263

1    Q.   Ms. Rohde, if we could please have Government's Exhibit 11

2    in evidence.

3        Mr. Hardie, do you see any items that you recognize in this

4    exhibit?

5    A.   Yes.

6    Q.   Could you explain what they are?

7    A.   On the right is a helmet, and then in the middle is -- are

8    the zip ties.  And then I see --

9    Q.   Let me stop you there.

10   A.   Okay.

11   Q.   So the middle, could you describe what you're referring to

12   as zip ties?

13   A.   Well, they look like -- well, they're folded through and --

14   well, I don't know how you describe it.  It looks like a set of

15   eyeglasses turned sideways.

16   Q.   In this section of the photograph that Ms. Rohde just

17   expanded, are those the zip ties you're referring to?

18   A.   Yes.

19   Q.   Thank you, Ms. Rohde.

20       How many zip ties did the defendant give to you in the

21   hotel room?

22   A.   To the best of my recollection, it was two.

23   Q.   And what did you do with them?

24   A.   Put them on my -- somewhere on my belt or somewhere on my

25   side here.

```
1    Q.   Did he have any zip ties?

2    A.   Yes.

3    Q.   Where did he have zip ties?

4    A.   In a similar location, on his body.

5    Q.   Now, did you also -- you said that you had packed radios

6    for this trip.

7    A.   Yes.

8    Q.   What did you do with the radios on the morning of the 6th?

9    A.   I believe the radios were still in the vehicle, and then

10   when we left the hotel room, we went down to the vehicle, and we

11   started preparing for our walk to the Capitol.

12   Q.   Okay.  So let's talk about that now.  When you were down at

13   Mr. Reffitt's vehicle, did you take additional preparations for

14   the day?

15   A.   Yes.

16   Q.   Could you explain what you did?

17   A.   Okay.  We opened our cases for our ARs, and we reassembled

18   the ARs, you know, put the pivot pins back in so it's just one

19   long rifle.  We put it back in the case and locked the case.

20        We took out --

21   Q.   Well, let me stop you there and ask you a few more

22   questions about that.

23   A.   Okay.

24   Q.   Who assembled -- who reassembled your AR?

25   A.   I assembled my AR.
```

App.265

```
1   Q.   And did you see what the defendant was doing with his?

2   A.   I didn't specifically.  I was so focused on what I was

3   doing.  I was kind of in a hurry, nervous, and things like that.

4   Q.   And were you aware of whether he was doing anything with

5   his AR while you were doing that with yours?

6   A.   Well, he was doing the same thing.  He was reassembling his

7   and putting it back in the case.

8   Q.   And where was he standing in relation to you?

9   A.   He would be on my left side.  I'm on the right side.

10  Q.   And how much distance was between you?

11  A.   I don't know, three or four feet.

12  Q.   You're gesturing with your arm.  Fair to say an arm's

13  length between you?

14  A.   Something like that.  Pretty close.

15  Q.   So why were you reassembling your ARs?

16  A.   Because we were being prepared for like what if we needed

17  them, like what if something bad happened and we needed to get

18  them quickly; we don't have time to put everything together.

19  Q.   So what were you anticipating doing with them?

20  A.   Well, we were concerned for our safety, and we were

21  concerned for the safety of the people in general.  That's based

22  on the things that I saw on -- we saw on YouTube videos like

23  where police were being fire bombed, people were in precincts,

24  boarded up, and antifa is trying to burn them out alive, all

25  kinds of stuff like that.
```

App.266

```
1          We just said, well, we don't know what's going to happen,
2     but we may need to protect other people as well as ourselves.
3     Q.   Did your plan for the ARs relate to using them in the event
4     of violent action on the streets?
5     A.   By "violent action," you mean -- okay.  The concept that I
6     had, and I believe -- I'm going to speak for my own self.  The
7     concept that I had was there could be violence on the street
8     from these violent groups like antifa.
9     Q.   And what were you going to do with regard to your ARs if
10    there was violence that day?
11    A.   I didn't have a specific plan, but the idea was if these
12    people were hurting other human beings, then we would use the
13    ARs against them.
14    Q.   Mr. Hardie, didn't you previously say that your plan was to
15    come back and get your ARs if you needed them?
16    A.   Yes.
17    Q.   Is that true?
18    A.   Yes.
19    Q.   And did you discuss that with Mr. Reffitt --
20    A.   Yes.
21    Q.   -- prior to the 6th?
22    A.   Yes.
23    Q.   Now let's talk about other preparations that you made while
24    you were down at the car.
25          Did you see Mr. Reffitt put on any items of clothing?
```

App.267

```
 1    A.   Yes.

 2    Q.   What items did he put on?

 3    A.   A plate carrier vest, I believe it was green, and there was

 4    the helmet that you saw in that last picture, and a GoPro camera

 5    on the helmet.

 6    Q.   And what kind of vest was it?

 7    A.   Well, it kind of looked like an armored vest like you would

 8    use in the Army or something.

 9    Q.   Did you pick it up?

10    A.   I didn't, no.

11    Q.   Do you know if it had plates in it?

12    A.   I didn't see the plates go in the vest, but I believe there

13    were plates in the vest.

14    Q.   Was that based on things he was saying?

15    A.   Well, it's based on the fact that over the course of time

16    people talked about the plates -- on the messaging, people

17    compared what they were buying:  I bought these plates, and I

18    bought those plates, and I got mine, did you get yours, you

19    know.

20    Q.   Now, did you -- you mentioned that you had left the radios

21    in the car.  So did you do anything with the radios when you got

22    down to the car?

23    A.   Yes.  I just quickly, you know, checked to make sure the

24    batteries were good and that they were on the proper channel and

25    the proper squelch numbers.
```

App.268

```
 1    Q.    And did you take one of the radios for yourself?

 2    A.    Yes.

 3    Q.    What did do you with the other radio?

 4    A.    Gave it to Mr. Reffitt.

 5    Q.    Did Mr. Reffitt have a coat on?

 6    A.    A coat?

 7    Q.    Yeah.

 8    A.    Yes.

 9    Q.    What color?

10    A.    Blue.

11    Q.    And was there anything on top of Mr. Reffitt's helmet?

12    A.    Yes.

13    Q.    What was on top?

14    A.    A GoPro camera.

15    Q.    Did he bring any items -- well, let me rephrase that.

16          Did he give you any items to carry throughout the day?

17    A.    Yes.

18    Q.    What did he give you?

19    A.    Two American flags.

20    Q.    And did he have anything in his hands as you were walking?

21    A.    Yes.

22    Q.    What?

23    A.    He had a megaphone.

24    Q.    Now let's talk about the handguns.

25          You said that before you got to D.C. you had pulled over to
```

1   the side of the road and put them in a locked case; is that

2   right?

3   A.   Yes.

4   Q.   What did you do with the handgun you brought on the morning

5   of the 6th?

6   A.   I recovered my handgun from its case, and I loaded it with

7   a magazine, put the handgun in my shoulder holster, and I put

8   two additional magazines also in my shoulder holster.

9   Q.   What did Mr. Reffitt do with his handgun?

10  A.   I didn't see specifically, but he would have it on his hip.

11  Q.   And after that, what did you do next?

12  A.   We locked the car and began walking toward the Capitol.

13  Q.   And to be clear, where were the ARs when you locked the car

14  and walked off?

15  A.   Okay.  The ARs were in their respective carry cases under

16  lock and key in the cargo area, the rear cargo area of the car.

17  Q.   Were they assembled or disassembled?

18  A.   They were assembled.

19  Q.   So after you assembled them, you left them assembled?

20  A.   That's correct.

21  Q.   Court's brief indulgence.

22       Now, after this, where did you go?

23  A.   We walked on the street, kind of like in the front of the

24  hotel.  I don't remember the name of the street, but we were

25  walking in the general direction of the Capitol.

App.270

1    Q.    Did you go to the National Mall and the Ellipse area?

2    A.    Yes.

3    Q.    And were you with Mr. Reffitt at that time?

4    A.    Yes.

5    Q.    What did you find when you got to the Mall?

6    A.    A lot of people.

7    Q.    And what did you do at the Mall?

8    A.    I was there, I was watching -- well, let's see.  What did

9    we do at the Mall?  I took pictures.  Myself, I took pictures.

10   Mr. Reffitt was in the crowd as well.

11   Q.    Was Mr. Reffitt speaking with people?

12   A.    Yes.

13   Q.    Could you hear the content of what he was saying?

14   A.    No.  I wasn't really paying attention.

15   Q.    Now, Ms. Rohde, if we could, please, pull up -- and this is

16   already admitted into evidence, so we can have the jury screen

17   on as well -- Government Exhibit 1B20.2.1.

18         Mr. Hardie, do you see them on the screen in front of you?

19   A.    Yes.

20   Q.    Prior to coming to court, did you review this exhibit?

21   A.    Yes.

22   Q.    And can you tell us what you see on the screen in front of

23   you?

24   A.    It looks like a wide-angle view of Mr. Reffitt looking

25   upward from about the waist.

1    Q.   Do you see a black box in the center of the screen?

2    A.   A black box?

3    Q.   Well, a square item, rectangular item.

4    A.   Yes.  It looks like the radio that I provided.

5    Q.   Now, Ms. Rohde, if you could just play the video from the

6    start to 12 seconds.

7         (Video played.)

8    Q.   You can stop it there at 13 seconds.  Thank you.

9         Mr. Hardie, did you see yourself in those few seconds of

10   video?

11   A.   Yes, I did.

12   Q.   Where were you standing?

13   A.   I was standing in close proximity to Mr. Reffitt.

14   Q.   And did you hear him say "all right, Rocky," or "okay,

15   Rocky, gotta push forward"?

16   A.   I would have, but I turned my body to turn in another

17   direction, but yes.

18   Q.   Was he referring to you?

19   A.   If he said Rocky, he was referring to me.

20   Q.   While you were on the Mall, did you listen to the

21   president's speech?

22   A.   I listened to it on and off.  I wasn't really -- I couldn't

23   hear very well.  My attention was more on the people at the

24   crowd.

25   Q.   After the speech, what did you do next?

App.272

1   A.   After the speech, the whole crowd started just -- like a

2   herd of cattle started moving in one direction, and I just

3   followed along with them.

4   Q.   And where was Mr. Reffitt at this point?

5   A.   Well, just before that, somebody called and said oh, we

6   need help, somebody needs medical attention, or something to

7   that effect.  And I think he might have raised his voice and

8   said, I can help, or something like that.

9        Anyway, he was following through, and people were kind of

10  opening up, and he was going through, and I was trying to follow

11  behind him.

12  Q.   As far as you know, does Mr. Reffitt have any medical

13  training?

14  A.   I don't know that he does.

15  Q.   Okay.  And at that point, after he left through the crowd,

16  were you still with him, or were you separated?

17  A.   I lost track of him.

18  Q.   So did you continue to communicate with him after that

19  point?

20  A.   Yeah, at various times, yes, I would make radio contact.

21  Q.   Was that through the radios you had provided?

22  A.   Yes.

23  Q.   And so when -- after that point when he went through the

24  crowd, when did you next see him?  Not talk to him but actually

25  see him.

App.273

1    A.    Oh, back at the hotel that evening.

2    Q.    In the interim time, while you were still at the Mall and

3    walking to the Capitol, did you communicate with him on the

4    radio?

5    A.    Yes.

6    Q.    And what information did you get from him over the radio?

7    A.    His location.  He was well ahead of me.  And he said, "I'm

8    at the Capitol," and I said, "I'll be there soon."

9    Q.    And were you still heading in that direction?

10   A.    Yes.

11   Q.    Now, let's put a pin in what Mr. Reffitt was telling you

12   and talk about what you did at this point.  Okay?

13   A.    Okay.

14   Q.    Did you actually walk all the way down to the Capitol area

15   or the area of the Capitol building?

16   A.    Yes, I did.

17   Q.    What did you do when you got there?

18   A.    I was taking pictures and making videos and commentary and

19   just looking at people.

20   Q.    Did you go inside the building?

21   A.    No.

22   Q.    Did you go up the stairs, up to where the -- to the outside

23   of the building?

24   A.    Okay.  When I first got there, it was kind of what I call

25   the back of the building.  That's the place where people were

1    climbing up scaffolds and things like that.

2    Q.   What went through your mind when you saw people climbing up

3    scaffolds and things like that?

4    A.   Well, I first noticed it at a distance, and they looked

5    like spiders climbing up walls, and I said wow, these people are

6    really doing it, these guys are, like, climbing the walls of the

7    Capitol.

8    Q.   And when you got closer, what did you do?

9    A.   I continued taking pictures.  I got closer, and I got to

10   the point where there was a police barricade.

11   Q.   And what happened when you got to the police barricade?

12   A.   There were -- I could hear agitators around me, and then

13   there were people, you know, shouting, and then at one point,

14   police came out, and they just kind of did like this

15   (indicating).  And the police went back, and people started

16   shaking the barricades and pushed the barricades over.  And then

17   they started fighting with police and things like that.

18   Q.   Now, let's be clear about something.  Did you yourself have

19   any encounters with police that day?

20   A.   When you say "encounters," what do you mean?

21   Q.   Did you have any physical fights with police that day?

22   A.   No.

23   Q.   Did you have any verbal exchanges with police that day?

24   A.   I had a one-way.  When I was at the barricade, I said to

25   one of the -- there was a Capitol Police in riot gear in front

App.275

1    of me, and I said, "You know, we're all people."  I said, "Your
2    family is the same as my family.  It doesn't matter what color
3    we are or where we come from.  Those assholes up there are
4    making laws that affect us."  And I said, "I support law
5    enforcement.  I've got friends and family in law enforcement."
6        And that was the gist of what I said.
7    Q.   Did the police officer respond to you?
8    A.   No.
9    Q.   Did you engage in any other fights or physical
10   confrontations with people that day?
11   A.   No.
12   Q.   And how close did you get to the Capitol building?
13   A.   On the back wall, I actually got close enough to touch it.
14   Q.   Were you still on the ground, or had you climbed up?
15   A.   I never climbed.  I was always on the ground.
16   Q.   And how long did you stay in the area of the Capitol
17   building?
18   A.   I'm going to estimate about 30, 40 minutes on the back
19   side.
20   Q.   Why did you leave?
21   A.   I had a radio communication from Mr. Reffitt saying he was
22   going around to the other side.  At some point, I said, "Okay,
23   I'm going to go around there and meet you."
24   Q.   Let's talk more about the radio communications you were
25   getting from Mr. Reffitt.

App.276

1   A.   Okay.

2   Q.   What do you remember him telling you over the radio about

3   what he was doing at the Capitol?

4   A.   Well, at some point, he said he was trying to go inside the

5   building.

6   Q.   And could you see him at that point?

7   A.   No.

8   Q.   Did he mention whether or not he had gotten sprayed with

9   pepper spray?

10  A.   At some point, he did.

11  Q.   What did he say about that?

12  A.   He said, "I can't continue any farther.  This" -- I don't

13  remember specifically, but basically that he had gotten sprayed,

14  and he was in some pretty bad shape, and he was going to go back

15  to the hotel.

16  Q.   And did he -- did he tell you whether or not he was

17  continuing to try to advance toward the building?

18  A.   During the time we're at the Capitol, I don't recall

19  specifically that he said he did, but I know that we had a

20  conversation back at the hotel.

21  Q.   So while he was -- while you were at the Capitol building,

22  did you see Mr. Reffitt at all?

23  A.   No.

24  Q.   And the communications -- the information that you had

25  about him, where was that coming from?

1   A.   From my radios.

2   Q.   And about how many radio transmissions did you have with

3   him?

4   A.   Over the course of the day?

5   Q.   Just while you were at the Capitol building and you were

6   separated from each other.

7   A.   It could have been six, seven, something likes that.

8   Q.   Were they brief or long?

9   A.   Fairly brief.  The communication was broken because the

10  Capitol building blocked the signal.

11  Q.   So what did you do after that?

12  A.   Well, I -- are you asking what did I do after I left the

13  Capitol building?

14  Q.   Sorry.  I can ask a more specific question.

15       Let's go now to the next time you saw Mr. Reffitt.  Okay?

16  A.   Okay.

17  Q.   You said earlier that was when you were back at the hotel?

18  A.   Right, yeah.

19  Q.   So what happened when you saw Mr. Reffitt back at the

20  hotel?

21  A.   I walked in.  I was pretty tired.  And he said, "Man, this

22  bear spray or whatever," he said, "Man, this is kicking my ass."

23  He said, "My lips feel like they're on fire."

24  Q.   Did he give you details about his day?

25  A.   Over the course of time, yeah.

App.278

 1    Q.   So what did he tell you about his day?
 2    A.   Well, he said that he tried to get in, and he said there
 3    was a lady Capitol Police and that she had been shooting him
 4    with the rubber -- round rubber balls and shot him in the breast
 5    plate.  And he said that she was really surprised that they
 6    didn't phase him.  He said her eyes got big.  And then he said,
 7    "Hmm, I thought for a moment she was going to shoot me in my
 8    nuts, and she considered that and shot me in the legs instead."
 9    Q.   What did he say about how far he got toward the building?
10    A.   Well, I remember him saying he didn't get inside, but he
11    was attempting to go inside, and then he was being shot.  And
12    this Capitol police officer was a female, and he said she just
13    looked oh, my God, you know.  And he said, "Lady, I don't want
14    to hurt you, but every time you shoot me, I'm going to keep
15    going forward."  He said at one point, "Would you just stop
16    doing that?  It hurts, you know."
17    Q.   And what else did he tell you about going -- his
18    interaction with the police?
19    A.   Let me think.  I don't know if it was that female officer
20    or if it was somebody else, but they had used a smaller canister
21    of --
22    Q.   Let me stop you there.  Did he tell you what you're
23    describing now?
24    A.   Yes.  I didn't see it.
25    Q.   So what did he tell you about the other officers?

App.279

1    A.   Basically, that one person tried to -- sprayed him with

2    some kind of pepper spray.  Then they brought out kind of like

3    bear spray, and he said it was all over after that.  He said, "I

4    just couldn't go any further."

5    Q.   And did he express to you whether or not he wanted to go

6    further but for this pepper spray?

7    A.   Yes.

8    Q.   What did he say?

9    A.   He said, "Well, I couldn't continue on, but I made it

10   possible for other people to continue."

11   Q.   What else did he tell you about the other people that

12   continued?

13   A.   Nothing specific comes to mind right now.  I mean, there's

14   one person, a female, who offered him water and assistance, and

15   he felt like that she was his angel, you know.  That's the only

16   thing I can think of.

17   Q.   And as he told you this, what, if any, emotion was he

18   expressing?

19   A.   Could you give me an example of emotion?

20           MR. WELCH:  Objection.

21           THE COURT:  Just answer the question.  If you can't

22   answer the question, just say that.

23           THE WITNESS:  All right.  Emotion.

24       Back at the hotel, well, there was pain, obviously, and

25   then there was -- we talked about what we did, and we were kind

App.280

```
 1    of bragging a little bit.

 2              BY MS. BERKOWER:

 3    Q.    Was he proud?

 4    A.    Yeah.

 5    Q.    And how did he look physically?

 6    A.    He looked in pretty bad shape.  His face was red --

 7    Q.    Okay.  Sorry.  Describe what you mean by that.

 8    A.    I'm sorry?

 9    Q.    I'm sorry I interrupted you.  What did you mean by he

10    looked like he was in pretty bad shape?

11    A.    I guess it was bear spray or something, pretty strong

12    stuff.  He was red all over his body.  And then I took a picture

13    of his legs, where he had been shot with the little rubber

14    balls.

15    Q.    And Ms. Rohde, if we could please have Government's

16    Exhibit 163 in evidence.

17              Is this the photo you took?

18    A.    Yes.

19    Q.    And could you explain what's significant about this photo

20    to you?

21    A.    Well, he had told me that he got shot in the legs.  Of

22    course, this is where he got shot.

23    Q.    What are you referring to when you say "this is where he

24    got shot"?

25    A.    On each leg, there are round regular circles or disks.  On
```

```
 1    the right side, you see one; on the left side, you see two.

 2    Q.   And what did you understand those to be?

 3    A.   The welts -- the welt marks from being shot by the Capitol

 4    Police in the legs with the rubber balls.

 5    Q.   You can take that down, Ms. Rohde.  Thank you.

 6         When you got back to the hotel that day, how did you feel

 7    about what you had done?

 8    A.   I was kind of excited and a little fascinated.

 9    Q.   What were you excited about?

10    A.   I think just having -- well, I had this experience that's

11    like a once-in-a-lifetime experience, and I felt like it was

12    kind of historically significant.  I actually showed up, and I

13    saw a lot of different things that I don't normally see.

14    Q.   Were you proud of what you had done?

15    A.   I would say yeah.  I wasn't ashamed.  I was proud, yeah.

16    Q.   And when Mr. Reffitt told you about what he had done, how

17    did you feel about what he had done?

18    A.   Well, I was pretty impressed that he did what he did.

19    Q.   Why were you impressed?

20    A.   Well, I felt like he had more courage than I did.  I wasn't

21    going to go up there.

22    Q.   Now, that night, did you stay again in that same hotel room

23    you had been in the night before in D.C.?

24    A.   Yes, we did.

25    Q.   And did you see Mr. Reffitt's handgun that evening?
```

Case 1:21-cr-00119-CJN   Document 75-2   Filed 04/01/22   Page 114 of 134
USCA Case #22-3039   Document #1958171   Filed: 08/08/2022   Page 286 of 515

1150

```
 1   A.    I did.

 2   Q.    Where did you see it?

 3   A.    It was on the nightstand between the two beds.

 4   Q.    Was it in a holster or not?

 5   A.    I'm not sure.  I'm trying to see a picture in my mind, and

 6   I don't see a clear picture of whether it was in a holster.  I

 7   just remember seeing from the back.  I remember kind of seeing

 8   it from the back side.

 9   Q.    And where did you have your handgun that night?

10   A.    I would have had it in my shoulder holster.

11   Q.    That night while you were sleeping?

12   A.    Okay.  So we're talking about when we came back from the

13   Capitol --

14   Q.    Yes.

15   A.    Well, I wasn't sleeping with it like a teddy bear, but I

16   had it somewhere in my room.

17   Q.    Court's brief indulgence.

18         All right.  Let's talk now about your trip back to Texas.

19   A.    Okay.

20   Q.    When did you leave?

21   A.    The morning of the 7th.

22   Q.    And what did you do to prepare for your trip home?

23   A.    We packed our bags and took -- of course, we wore our

24   handguns going down to the parking garage, and we took our bags

25   down and put them in the car.
```

1    Q.   So coming in to D.C., you had disassembled and locked up

2    your handguns; is that right?

3    A.   That's correct.

4    Q.   Returning to Texas, did you follow that same procedure?

5    A.   Yes.  We returned our handguns to their case and the

6    ammunition to its case.  We opened the cases for the ARs, and we

7    disassembled them and relocked the cases and left them basically

8    in the rear area of the vehicle.

9    Q.   And did you do that for your AR?

10   A.   Yes.

11   Q.   Did you see Mr. Reffitt do that for his AR?

12   A.   Yes.  I know that he also disassembled his.

13   Q.   And what about the handguns?  Did you see Mr. Reffitt

14   disassemble his?

15   A.   I don't recall specifically seeing him, but -- I don't have

16   a specific visual memory of him doing that.

17   Q.   And did you disassemble yours, or did you just bring it on

18   your person for the drive home?

19   A.   I disassembled mine and -- I disassembled -- I've got to

20   stop and think for a moment.  I'm trying to remember specifics.

21   Q.   Take your time.

22   A.   Okay.  Yeah, we -- so we took our handguns and put them

23   back in the cases and the ammunition as we're preparing to

24   drive.

25   Q.   When did you reassemble the handguns?

App.284

1    A.    I don't recall specifically.

2    Q.    While you were driving back, did you make another overnight

3    stop?

4    A.    Yes.

5    Q.    Where did you stop?

6    A.    We stopped in Nashville.

7    Q.    Again?

8    A.    Yes, uh-huh.

9    Q.    Did you have your handguns on your persons while you were

10   in Nashville?

11   A.    I want to say we did, and I don't recall -- I don't recall

12   specifically what happened, but I think we did.

13   Q.    When you got back to Texas, did you have your handgun on

14   your person?

15   A.    Yes.

16   Q.    So at some point after leaving D.C., did you return your

17   handgun to your shoulder holster?

18   A.    Yes.

19   Q.    And what about Mr. Reffitt?  When he got back to Texas, did

20   he have his handgun out again?

21   A.    I -- well, okay.  I don't have a visual recollection of

22   seeing his handgun on him, but I believe that he did, because it

23   was our habit to carry them.

24   Q.    So -- hold on a second.

25              THE COURT:  Ms. Berkower, can you pick up?

App.285

```
1         (Bench conference.)
2              THE COURT:  How much longer are you going to go on the
3    handguns back in Texas?  Why is this so relevant?
4              MS. BERKOWER:  I believe Jackson Reffitt testified
5    that when Mr. Reffitt walked in the door his handgun was on his
6    hip.
7              THE COURT:  But the whole trip to Texas?
8              MS. BERKOWER:  Understood, Your Honor.  I'm trying to
9    see --
10         (End of bench conference.)
11              BY MS. BERKOWER:
12   Q.   During your trip home, did you speak with Mr. Reffitt about
13   the events of January 6?
14   A.   Yes.
15   Q.   And what was the conversation on the way home?
16   A.   We talked about -- kind of rehashed some of the things that
17   happened there.
18   Q.   And did you view that conversation differently than you had
19   viewed the conversation on the way up to D.C.?
20   A.   How do you mean?
21   Q.   Well, did you talk about similar topics that you talked
22   about on your way to D.C.?
23   A.   Similar, yes.
24   Q.   And you said previously when you drove up to D.C., you
25   didn't take it very seriously; right?
```

App.286

1    A.    Yeah.

2    Q.    Did you view this conversation differently on your way home

3    to Texas?

4    A.    Yes.

5    Q.    Why?

6    A.    Because when we were going up, everything was hypothetical,

7    and then the actual events happened.  Then people were climbing

8    the walls and trying to get into the Capitol building, and so

9    that was something I didn't anticipate whatever happened, and I

10   saw it happen.  So I said wow, people are serious.

11   Q.    And what about specifically with regard to Mr. Reffitt?

12   A.    Well, I guess he was serious.

13   Q.    And was that based on what he told you about the events of

14   January 6?

15   A.    It was based on my knowing from conversation that he had

16   attempted to go into the building, yes.

17   Q.    When you got back to Mr. Reffitt's house, what did you do?

18   A.    I transferred my equipment from his car to mine, and then I

19   went inside their home.

20   Q.    What did you do inside his home?

21   A.    I met his wife and his son and daughter.

22   Q.    How long did you stay there?

23   A.    I'm going to guess maybe it was 45 minutes.  I'm guessing.

24   Q.    What did you do while you were there?

25   A.    Talked to his wife, and we just kind of in general talked

App.287

1    about the trip.

2    Q.   After that, did you return to your home?

3    A.   I did.

4    Q.   Now, when you got back to D.C., did you continue to

5    communicate with members of TTP?

6    A.   I'm sorry.  Could you repeat that, please.

7    Q.   I'm sorry.  Mr. Nestler pointed out I misspoke.

8         After you left Mr. Reffitt's house, did you return to your

9    home?

10   A.   Yes.

11   Q.   When you got back to D.C. -- sorry.

12        When you got back to Austin or home --

13   A.   Yes.

14   Q.   -- did you continue to communicate with members of TTP?

15   A.   Yes.

16   Q.   What platform did you use?

17   A.   Primarily Telegram.

18   Q.   Did you also have -- participate in a Zoom meeting with two

19   other people from TTP?

20   A.   I did.

21   Q.   Who were those other two people?

22   A.   The other two that I remember were Mr. Russ Teer and then

23   Mr. Reffitt and myself.

24   Q.   Were you there for the very start of the conversation?

25   A.   I was a little bit late, I think, and I was trying to

```
 1    get -- they had already started, and I entered into the meeting.
 2    Q.   Ms. Rohde, if you can pull up what's already been admitted
 3    into evidence as Government Exhibit 1B.20.2.3.2.  If we could
 4    publish to the jury.  If you could, please, play that exhibit
 5    now.
 6         Actually, before you push play, Mr. Hardie, do you
 7    recognize the person on the screen?
 8    A.   Yes.
 9    Q.   Who is that?
10    A.   That's Mr. Reffitt.
11    Q.   Please play the exhibit.
12         (Video played.)
13    Q.   Mr. Hardie, do you recognize who that person is?
14    A.   Yes.
15    Q.   Who is it?
16    A.   That's Russ Teer.
17         (Video played.)
18    Q.   So in that clip that you just watched, was that you joining
19    that Zoom meeting?
20    A.   Yes, yes, it was.
21    Q.   Did you stay for the rest of the meeting?
22    A.   I believe I did.
23    Q.   Did you hear Mr. Reffitt refer to you as Oracle?
24    A.   Yes.
25    Q.   What is that a reference to?
```

1    A.    People have different handles.  Like Mr. Reffitt had Call

2    to Arms, and Mr. Teer had Dead Shot, and somebody else had

3    something else.  And I asked Mr. Teer -- I said, "Well, what

4    kind of handle would you give me?"  And he thought, and he said,

5    "Oracle."

6    Q.    Did you hear Mr. Reffitt reference Oscar and Tango in that

7    clip?

8    A.    Yes.

9    Q.    What was he talking about?

10   A.    When we used the radios, it was an abbreviation.  So Oscar

11   is the phonetic phrase for the letter O of the alphabet, because

12   O for Oracle.  And Call to Arms, Tango would be for the T in the

13   Call to Arms, so Tango and Oscar.

14   Q.    And when you said you were communicating with Oscar and

15   Tango, when were you using those names?

16   A.    That would be during the time we're -- of January the 6th

17   in the area of the Capitol.

18   Q.    Is that when you were separated and communicating by radio?

19   A.    Right.

20   Q.    Now, after this meeting, did someone learn that the leader

21   of TTP had been taken in for questioning?

22   A.    Yes.

23   Q.    Questioning by who?

24   A.    Law enforcement.  I don't know exactly who.

25   Q.    And did you learn that from a Telegram message?

App.290

1    A.    Yes.

2    Q.    Ms. Rohde, if we could, please, have what's been already

3    admitted into evidence as Government's Exhibit 1B4 and go to

4    PowerPoint slide 34.

5          Mr. Hardie, do you recognize this message?

6    A.    Yes.

7    Q.    Could you read it, please.

8    A.    "Everyone be aware.  As of this very minute, our state

9    leader is being escorted by three state officers for questioning

10   of things said on an app.  This is not a drill.  This is not a

11   drill.  He has just called me to spread the word.  Be prepared,

12   the shit is now hitting the fan."

13   Q.    What date was that?

14   A.    January the 10th, 2021.

15   Q.    And who sent that message to the group?

16   A.    That was -- it says Call to Arms.  That would be

17   Mr. Reffitt.

18   Q.    When you saw this message, what went through your mind?

19   A.    Huh-oh.  That's what came to my mind, is --

20   Q.    Why huh-oh?

21   A.    I know that we had gone to D.C., and it seems like for

22   some -- for whatever reason, things were coming back to us.

23   Q.    And Ms. Rohde, if we could go on to slide 39, please.  I

24   think we're one before that -- two before that, actually, 39.

25   Oh, I'm sorry.  The one before that.

1159

```
 1            Did Mr. Reffitt also send this message to the group?
 2    A.    Yes.
 3    Q.    Could you read it, please.
 4    A.    "Start purge of all previous conversations."
 5    Q.    What did you understand this to be a reference to?
 6    A.    To delete any of the Telegram conversations or any kind of
 7    conversation on your mobile phone.
 8    Q.    Did you do that?
 9    A.    I did delete some things, yes.
10    Q.    And what things did you delete?
11    A.    I had -- there was like the main Telegram, and then also I
12    had -- at one point, I had different sub-Telegrams for different
13    topics.  I don't remember specifics, but I did delete messages.
14    Q.    What were those messages about that you deleted?
15    A.    They would have been messages leading up to and following
16    January 6th.
17            MS. BERKOWER:  No further questions, Your Honor.
18            THE COURT:  All right.  Mr. Welch?
19            MR. WELCH:  Yes, Your Honor.
20                    CROSS-EXAMINATION
21            BY MR. WELCH:
22    Q.    Good afternoon, Mr. Hardie.
23    A.    Hello.
24    Q.    My name is Bill Welch.  I'm also going to ask you some
25    questions.
```

App.292

```
 1    A.    Okay.

 2    Q.    Around the 16th of January, 2020, some agents came to your

 3    house, didn't they?

 4    A.    Yes.

 5    Q.    And they wanted to speak with you; correct?

 6    A.    Yes.

 7    Q.    And you agreed to do so?

 8    A.    Yes.

 9    Q.    They asked you about where you had been; correct?

10    A.    Yes.

11    Q.    They asked you what you had been doing there; correct?

12    A.    They asked several questions, but in general, yes.

13    Q.    They asked to take a look at your phone; correct?

14    A.    At that particular meeting?  There was two visits.  There

15    was -- the first visit was on a Saturday morning, and then there

16    was a subsequent, you might say, raid on my home and my business

17    a few days afterwards.

18          So which one are you referring to?

19    Q.    I'm referring to the first one.

20    A.    Okay.

21    Q.    Do you remember that, the one at your home?

22    A.    Yeah.  When they went to my home, I don't recall them

23    asking to see anything on my phone, and I didn't offer it.

24    Q.    So you didn't share anything with -- you didn't give your

25    phone to the agents when they came to your house?
```

App.293

```
 1    A.    No.
 2    Q.    In fact, you didn't give them anything when they came to
 3    your house; correct?
 4    A.    Right.  They had asked if they could come inside, and I
 5    declined.
 6    Q.    And you answered some of their questions, but you didn't
 7    answer all of their questions that day, did you?
 8    A.    I probably -- well, I don't know what it means, all of
 9    them.  I believe I answered the questions that they asked me.
10    Q.    Well, isn't it true that they asked you about whether you
11    had a firearm with you in D.C., and you didn't answer that?
12    A.    Probably not, not at that time.
13    Q.    And you did agree to send them some items by e-mail; is
14    that right?
15    A.    I don't remember that discussion.
16    Q.    Okay.  Well, then, several days after that, they show up at
17    your place of business with a warrant; correct?
18    A.    Yes, uh-huh.
19    Q.    And they ultimately seized a lot of stuff from your
20    business; correct?
21    A.    Yes.
22    Q.    They seized your computers?
23    A.    Yeah -- well, my laptop.  Not every computer in the office,
24    but my laptop specifically.
25    Q.    They seized your firearms; correct?
```

App.294

```
 1    A.    They seized my AR-15, related ammunition, and they seized
 2    my .45-caliber handgun and related ammunition.
 3    Q.    And they showed you a copy of the search warrant on which
 4    they were relying; correct?
 5    A.    Yes.
 6    Q.    And did you look at it?
 7    A.    I was pretty nervous.  I looked at it, but I wasn't really
 8    focused on everything that it said.
 9    Q.    Eventually, did you sit down and read it?
10    A.    I looked at it again.  I don't remember how closely I
11    looked at it.
12    Q.    Do you recall seeing whether it indicated that you were
13    under investigation for crimes involving restricted buildings or
14    grounds?
15    A.    I don't remember that.
16    Q.    Do you recall whether it indicated that you were under
17    investigation for interstate travel with intent to riot?
18    A.    I remember reading that somewhere.  I don't remember if I
19    read it from a warrant.  But something to that effect, I did see
20    something like that.
21    Q.    Do you recall reading whether you were under investigation
22    for obstruction of Congress?
23    A.    These types of questions, I don't specifically recall
24    reading.  I mean, I got a search warrant, yes.  I was pretty
25    nervous that day.
```

1    Q.   And then eventually things progress, and a few months

2    later, you enter into the immunity agreement with the

3    government, which is Government's Exhibit 405.

4         You remember that; right?

5    A.   Yes.  That's the one we saw earlier.

6    Q.   Now, do you recall who has discretion under that agreement

7    about whether you have honored it or not?

8    A.   Who has discretion?

9    Q.   Yes.

10   A.   On whether I've honored it or not?

11   Q.   Yes.

12   A.   I think what you mean is who is deciding if I've honored it

13   or not?

14   Q.   Yes.

15   A.   Is that what you mean?  Okay.  I think that would be the

16   government.

17   Q.   Correct.  And who represents the government in this case?

18   A.   Well, it would be the attorney -- I'm sorry.  Nestler and

19   Berkower.

20   Q.   So for instance, it's not up to Judge Friedrich whether

21   you've honored that agreement or not; right?

22   A.   Well, that's a good question.  I never thought about it in

23   that detail.  Somebody in the government is going to decide did

24   I lie or did I not lie.

25   Q.   And it is your understanding that it is they, Mr. Nestler

App.296

```
 1    and Ms. Berkower, who would decide whether you've lied or not;
 2    correct?
 3    A.   I would assume that would be the case.
 4    Q.   Ms. Berkower, when she was asking you about the agreement,
 5    said that there's no guarantee that you wouldn't be charged with
 6    a crime; correct?
 7    A.   Right.
 8    Q.   But as of now, you have not been charged with a crime as a
 9    result of your conduct on January 6; correct?
10    A.   That's correct.
11    Q.   And you would agree that you have testified here today that
12    you went on restricted grounds; correct?
13    A.   That I went on restricted grounds?  Yes.
14    Q.   You would agree that you have testified here today you
15    carried a firearm onto restricted grounds; correct?
16    A.   Correct.
17    Q.   But you still haven't been charged with a crime; correct?
18    A.   That's true.
19    Q.   And you've been allowed in the meantime to go about your
20    business; isn't that right?
21    A.   That's true.
22    Q.   You've been able to travel to Mexico on business?
23    A.   Yes.
24    Q.   Florida on business?
25    A.   Yes.
```

```
 1    Q.   And you have another trip for business planned for next

 2    month; isn't that right?

 3    A.   I have another trip, yes.

 4    Q.   And where is that?

 5    A.   That's going to be to Thailand.

 6    Q.   Court's indulgence, please.

 7         You would agree that Mr. Reffitt brags, doesn't he?

 8    A.   Yes.

 9    Q.   You would agree that Mr. Reffitt uses hyperbole, doesn't

10    he?

11    A.   Yes.

12    Q.   A lot, doesn't he?

13    A.   From time to time.

14    Q.   You would also agree that things he says are embellished;

15    correct?

16    A.   Yes.

17    Q.   And that things he says are dramatized; correct?

18    A.   Yes.

19              MR. WELCH:  Court's indulgence, please.

20         I pass this witness.

21              THE COURT:  Ms. Berkower?

22                        REDIRECT EXAMINATION

23              BY MS. BERKOWER:

24    Q.   Good afternoon.

25    A.   Good afternoon.
```

App.298

```
1    Q.   Mr. Hardie, did you meet Mr. Reffitt in person in 2020?
2    A.   2020?  Yes.
3    Q.   And I think you testified earlier about a meeting in a
4    park --
5    A.   Yes.
6    Q.   -- with Mr. Reffitt.  That was the first time you met him
7    in person?
8    A.   Yes.
9    Q.   How many times after that did you see him in person before
10   you took this trip with him?
11   A.   The time that comes to mind was when I drove up to his home
12   for a meeting.
13   Q.   Did you have any other one-on-one hangouts?
14   A.   Hangouts?
15   Q.   Or social occasions with him.
16   A.   Let me think.  There was a time when, you know, people were
17   tearing down statues, like it was related to the BLM things.
18   And so in Temple, there was an event there where people were
19   going to go and just kind of help just kind of keep the peace,
20   so to speak, and I was there.
21   Q.   Was he there as well?
22   A.   I believe so.
23   Q.   Were other members of TTP there?
24   A.   Well, there were other members of TTP.  I'm trying to
25   remember if I saw him specifically there.  That's a fuzzy part
```

App.299

```
 1    of my memory.
 2    Q.   Sitting here today --
 3              THE COURT:  Wait.  Let him finish his answer.
 4              THE WITNESS:  I can't say -- I just brought this up.
 5    I mentioned this thing in Temple, but right now, I'm trying to
 6    visualize if I saw him.  I don't recall a picture in my mind
 7    where I saw him.  But I was there.
 8         Let me think.
 9              THE COURT:  It's all right, sir, if you can't
10    remember.
11              THE WITNESS:  I want to be accurate, but -- okay.
12              BY MS. BERKOWER:
13    Q.   Sitting here today, how many times do you remember seeing
14    Mr. Reffitt in person after that initial meeting you described
15    in the park before you went to D.C. with him?
16    A.   Okay.  I saw him at his home at that meeting.  I can't
17    think of a specific event other than that.  I believe we --
18    wait, wait.  Before or after -- oh, before.  Let me think.
19         Okay.  I had a meeting in my office warehouse.
20    Q.   Was that another TTP meeting?
21    A.   Yes.  I volunteered to host it.
22    Q.   So did he come to that?
23    A.   Yes.
24    Q.   So we have the meeting in the park; is that right?
25    A.   Uh-huh.
```

1    Q.    The TTP meeting at his house, is that what you were

2    referring to?

3    A.    Yes, and then my location.

4    Q.    And then the other meeting of TTP members at your business?

5    A.    Right, right.  So right now, we're discussing three; right?

6    Q.    Yes.

7    A.    Okay.  Yeah.

8    Q.    Now I'm going to ask you, do you remember seeing him in

9    person any other time before you met up with him to travel to

10   D.C.?

11   A.    I can't recall anything specifically.  These three main

12   events I can recall.

13   Q.    And about how far away is Austin from Wylie, drivewise?

14   A.    Probably close to 200 miles.

15   Q.    And was your contact with Mr. Reffitt primarily in

16   TTP-related messaging?

17   A.    Yes.  We would send messages through Telegram, or we would

18   make telephone calls to each other through Telegram.

19   Q.    One last question.  Mr. Welch mentioned the FBI coming to

20   your home.  Did you leave TTP of your own free will or because

21   of something that the FBI did?

22   A.    After the FBI came to visit me, I said oh, crap, this is

23   getting really weird.  I didn't really want any part of what

24   was -- well, I left of my own choice, basically.  Nobody

25   suggested it.  Nobody twisted my arm or anything like that.

App.301

```
 1              MS. BERKOWER:  Nothing further, Your Honor.  Thank

 2     you.

 3              THE COURT:  May this witness be excused?

 4              MR. WELCH:  Yes.

 5              THE COURT:  All right.  Thank you, sir.

 6         Ladies and gentlemen, I think this is a good time to take a

 7     break for lunch.  So if you could, please, come back at 1:35,

 8     and we will resume with the rest of the government's case.

 9         Again, another reminder, no talking about the case or

10     reading or doing any research, please.

11         (Jury exited courtroom.)

12              THE COURT:  All right.  So we will see you back at

13     1:35.

14         And counsel, I'm going to warn you, I'm going to start

15     cutting you off in front of the jury.  You're asking a lot of

16     cumulative questions.  There's jurors who, you know, are getting

17     frustrated.  You guys can move this more quickly.  I don't

18     understand why you're asking the same point ten different ways.

19         All right.  Anything we need to address?

20              MR. WELCH:  No, Your Honor.

21         (Recess taken at 12:38 p.m.)

22         (Afternoon session of this proceeding was reported by

23     Lorraine Herman and is bound under separate cover.)

24

25
```

App.302

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3           I, Sara A. Wick, certify that the foregoing is a

 4      correct transcript from the record of proceedings in the

 5      above-entitled matter.

 6

 7

 8      /s/ Sara A. Wick                 March 5, 2022

 9      SIGNATURE OF COURT REPORTER      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

App.303

**\*\*\* PARTIALLY SEALED \*\*\***


**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


UNITED STATES OF AMERICA,

                                        CR Action
                                        No. 1:21-119

          vs.                           Washington, DC
                                        November 22, 2021

GARRET MILLER,
                                        12:34 p.m.

          Defendant.
_____/


          TRANSCRIPT OF VIDEO ORAL ARGUMENT
    **BEFORE THE HONORABLE CARL J. NICHOLS**
          UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the U.S.:**          **AMANDA JAWAD**
                         DOJ-USAO
                         211 W. Fort Street, Suite 2001
                         Detroit, MI 48226
                         313-226-9116

                         **DAVID LIEBERMAN**
                         **JAMES PEARCE**
                         DOJ-CRM Appellate
                         950 Pennsylvania Avenue NW
                         Suite 1264
                         Washington, DC 20530
                         202-262-6805

                         **ELIZABETH C. KELLEY**
                         U.S. ATTORNEY'S OFFICE
                         555 4th Street, N.W.
                         Washington, DC 20350
                         202-252-7238

APPEARANCES (CONT'D.):


For the Defendant:        CLINT BRODEN
                          BRODEN & MICKELSEN
                          2600 State Street
                          Dallas, TX 75204
                          214-720-9552



                          CAMILLE WAGNER
                          WAGNER PLLC
                          1629 K Street, Suite 300
                          Washington, DC 20006
                          202-630-8812




Reported By:              LORRAINE T. HERMAN, RPR, CRC
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 6720
                          Washington, DC 20001
                          202-354-3196




App.305

1                    **P R O C E E D I N G S**

2              THE COURT:  Good afternoon, this is Judge Nichols

3      joining.  Assuming everyone can hear me, Ms. Lesley, will

4      you please call the next matter?

5              COURTROOM DEPUTY:  Yes, Your Honor.  This is

6      criminal case year 2021-119, *United States of America versus*

7      *Garret Miller,* who is present by video.

8              Counsel, please introduce yourselves for the

9      record, beginning with the government.

10             MS. KELLEY:  Good afternoon, Your Honor.  Beth

11     Kelley for the United States.  I am joined by Dave

12     Lieberman, James Pearce, and Amanda Jawad.

13             Just for Your Honor's background, Mr. Lieberman is

14     here to answer any question that the Court may have about

15     the defense's selective prosecution motion.  Mr. Pearce is

16     here to address any questions the Court may have about the

17     Motion to Dismiss the 1512 count.  And then I can handle any

18     remaining issues that may come up during this hearing.

19             THE COURT:  Thank you.  Good afternoon, Ms. Kelley

20     and everyone else.

21             MR. BRODEN:  Your Honor, Clint Broden and

22     Ms. Wagner for the defense.  I feel outnumbered, but I'm

23     going to handle all three motions myself.

24             THE COURT:  That will be just fine.  Mr. Broden,

25     does your client consent to proceed this afternoon by video

1    in light of the CARES Act and the pandemic?  Does your

2    client --

3              MR. BRODEN:  He does, Your Honor.

4              THE COURT:  Thank you.

5              I assume, Ms. Kelley, the government has no

6    objection to proceeding by video this afternoon?

7              MS. KELLEY:  Yes, Your Honor.  No objection to

8    proceeding by video.

9              THE COURT:  I find it is appropriate to do so in

10   light of the CARES Act, the pandemic and to allow this

11   matter to go forward now.

12             My understanding is that we need to arraign the

13   defendant on the superseding indictment; is that correct,

14   Ms. Kelley?

15             MS. KELLEY:  That's correct, Your Honor.

16             THE COURT:  Ms. Lesley, could you please arraign

17   the defendant on the superceding indictment?

18             COURTROOM DEPUTY:  Yes, Your Honor.

19             MR. BRODEN:  Your Honor, you froze on me for a

20   second.  I didn't hear what you had said.

21             THE COURT:  Did everyone else hear me?  I'll be

22   happy to repeat, Mr. Broden.  We've had a little bit of

23   technical difficulties in the past.  I want to make sure we

24   are not experiencing that again here.

25             MS. WAGNER:  I hear you now, yes, Judge.

1          THE COURT:  So I asked Ms. Lesley to please

2    arraign Mr. Miller on the superseding indictment.

3          MR. BRODEN:  Frankly, Your Honor, we just got

4    that, I think, on Friday.  I am not even sure Mr. Miller is

5    aware of the superceding indictment, but we can go ahead.

6    He will enter a not guilty plea.

7          THE COURT:  Would you like to defer that,

8    Mr. Broden?

9          MR. BRODEN:  No.  We might as -- it's very similar

10   to the other two.  So we can go ahead with that.  I just

11   wanted the Court to be aware.

12         THE COURT:  Ms. Lesley, why don't we go ahead and

13   at least give it a shot.

14         COURTROOM DEPUTY:  Yes, Your Honor.

15         May the record reflect that defendant Garret

16   Miller and counsel have received a copy of the second

17   superseding indictment.

18         Do you wish to waive the formal reading of the

19   12-count second superseding indictment and enter a plea?

20         MR. BRODEN:  We do.  Yes, we will waive the

21   reading and enter a not guilty plea.

22         COURTROOM DEPUTY:  Thank you.

23         THE COURT:  Thank you.

24         So we have at least three substantive motions

25   pending, as Ms. Kelley indicated.  One of them, at least

                                                      App.308

1    presumptively, I believe, needs to be addressed under seal,

2    at least portions of it.

3             Here is how I would like to proceed, then.  I

4    would like to, first, hear argument on the Motion to Dismiss

5    Count 3.  I will hear from Mr. Broden.  It sounds like I

6    will then hear from Mr. Pearce and then Mr. Broden, briefly,

7    I think, in rebuttal, if you would like.

8             We will then proceed to hear the selective

9    prosecution motion.  So I will hear from Mr. Broden,

10   Mr. Lieberman, it sounds like, and then Mr. Broden again.

11            Then we will seal the hearing and we will take up

12   the motion to reopen the detention hearing.  And at that

13   hearing I can also consider, obviously, the question of

14   whether the materials on which Mr. Miller is relying should

15   remain under seal.

16            So with that, Mr. Broden, why don't you go ahead

17   and start with your Motion to Dismiss Count 3.

18            MR. BRODEN:  Yes, Your Honor.

19            THE COURT:  Let me just note for the record, I've

20   reviewed all of the filings in this matter.  Obviously, some

21   of them are filings that were made in front of Judge Moss.

22   I reviewed the transcript of the proceeding before

23   Judge Moss.

24            I am quite familiar, certainly, on the Count 3

25   Motion to Dismiss with all of the papers.  So you don't need

1    to restate what is in the papers.  I think you need to

2    focus, you know, I suppose, on your most salient points but

3    then, of course, any questions I might have.

4              MR. BRODEN:  And, Your Honor, I was about to say,

5    smarter people than me have argued this motion, I think

6    several times.  The one in front of Judge Moss, I believe,

7    was the first one and, obviously, Judge Moss was very

8    engaged in that and had his own questions that led to

9    further briefing in that case.

10             So I don't know that there is much more to add

11   that's not in the papers and in the hearing in front of

12   Judge Moss, and I know Mr. Pearce had his say in front of

13   Judge Moss and represented the government in that

14   proceeding.

15             You know, the one -- just thinking about this,

16   because, I mean, there's got to be a limit to 1512(c).  I

17   think we all agree on that, and this is certainly a novel

18   implementation of it.

19             But it seemed to me probably the most salient

20   analogy -- and I have not seen it made but as I was thinking

21   about this -- is I know the Court is involved in the

22   culmination of the naturalization process where people come

23   before the Court and naturalization ceremony.

24             To me, that is the distinction in the court

25   versus -- using that distinction with the court proceedings

App.310

1    versus legislative proceedings.  I think we can all agree if

2    somebody ran into the courtroom during a trial and yelled,

3    This defendant is innocent or this defendant is guilty and

4    needs to be convicted or acquitted, or took steps like that,

5    that would certainly be interfering with an official

6    proceeding before the Court.

7         THE COURT:  Mr. Broden, let me pause you there.

8         MR. BRODEN:  I think I should hear from the

9    government on this whether -- (audio breaking up) --

10        THE COURT:  Mr. Broden, I don't know if it's maybe

11   your connection or mine, but you are breaking up a little

12   bit.

13        But let me just pause you there.  Your brief or

14   certainly the briefs filed in front of Judge Moss seem to

15   suggest that the act has to be directed at, at least sort of

16   the core, tampering or destruction or some act directed at

17   evidence or information that's at issue in the matter, but

18   if one just seeks to stop a court proceeding, how does that

19   have anything to do with evidence or witnesses at least in

20   the strictest sense?

21        MR. BRODEN:  And I probably got ahead of myself,

22   Judge.  I was at this point focused on the official

23   proceeding and really what we meant on that.

24        And, obviously, a court hearing where there is a

25   trial going on and defendant's trial and his liberty is at

App.311

1    stake, I think that the trial part of the court

2    proceeding -- or official proceeding -- but then contrast

3    that to the ceremonial nature of a naturalization -- the

4    culmination of the naturalization process and somebody comes

5    in and tries to interrupt that proceeding, whether that,

6    in fact, qualifies as an official proceeding.

7              I think when the defendants, Mr. Miller and all of

8    the others that have filed the motion -- I think that is

9    sort of the distinction we make between official proceeding

10   and nonofficial proceeding.

11             I mean, the Court has different functions other

12   than adjudicating trials.  It has the naturalization

13   ceremony.  The Court can perform weddings.  If somebody

14   comes in as the Court is performing a wedding, is that an

15   official proceeding?  And I think those are the type -- we

16   got to try to limit 1512(c) in some way.

17             And I think when we talk about official

18   proceedings in the Ninth Circuit case, which I think is most

19   salient on point, but the Third and Fifth Circuit cases

20   also, I think that those are some of the distinctions I

21   think we need to suss out, so to speak, to make sure that

22   people do have proper notice as to what 1512(c) encompasses,

23   and make sure Title 73 has -- all of the other provisions

24   are not redundant in Title 73.  And, as I said, just -- and

25   look at this all through the lens of lenity and try to come

1      to some sort of determination.

2              But you are right.  When the Court asked a

3      question, there were other issues that were raised by

4      Judge Moss, which I think need to be addressed, and that's

5      the otherwise clause, and that seemed to be the one that

6      concerned Judge Moss the most, along with the Supreme

7      Court's decisions in *Begay* and *Yates* and how they've applied

8      the otherwise clause in other provisions and then the

9      corruptly portion and where that takes us under *Poindexter*.

10             But as I said, most of this -- in fact, all of

11     this is in the pleadings and was argued in front of

12     Judge Moss, so I don't want to take too much of the Court's

13     time.  But I think 1512(c) needs to be more than it's

14     whatever the government says is before Congress and the

15     Court, and that seems to be where we are now.

16             It also, in some of the pleadings, seems to take

17     the position that most right-minded people have rejected

18     but, obviously, President Trump has not; that the vice

19     president had some ability not to certify the election

20     results in this case; and that is what makes it some sort of

21     official proceeding.  And I think that needs to be addressed

22     also because, as I said, I think it is taking the position

23     that former President Trump took, which does not seem to be

24     supported in the law and -- (audio breaking up) -- legal

25     thinking.

1         But with that, if the Court has no questions for

2   me, I will yield my time back to the Court.  As I said,

3   smarter people than I have argued this and I don't want to

4   be redundant.

5         THE COURT:  I do just want to make sure I

6   understand the arguments that you are making.  You don't

7   have to elaborate on them.

8         Obviously, Mr. Miller is arguing that the

9   proceeding here was not a proceeding before the Congress in

10  the sense meant by 1515(a)(1)(B).  Is he also arguing that

11  his conduct cannot, as a matter of law, satisfy 1512(c)(2)?

12        MR. BRODEN:  I guess when you talk about conduct,

13  we first have raise the official proceeding question.  But

14  if we get past that, and somehow the Court decides that the

15  electoral college was an official proceeding, as that term

16  is meant using, the legalistic term rather than the lay

17  term, then the question is the "otherwise" clause.  And as I

18  said, Judge Miller [sic] addressed that in the -- (audio

19  breaking up) -- position that, no, his conduct would not

20  satisfy limiting the "otherwise" clause to the section that

21  precedes it.

22        And then, finally, the question of corrupt -- I'm

23  sorry, Judge.

24        THE COURT:  That's okay.  I was going to ask that

25  next question about corrupt --

1          MR. BRODEN:  Right.  And so the first one was made

2     in the initial motion and then after the proceeding in

3     Judge Moss where I think some of the issues were clarified

4     and additional questions were raised by Judge Moss.

5          We filed the second supplement, which addresses

6     the "otherwise" in the lens of the *Begay* and *Yates* and Barr

7     memo.  And then also the "corruptly" and talking about

8     *Poindexter* there where the D.C. Circuit said that lying to

9     Congress wasn't necessarily corrupt in the expansion of the

10    statute, again applying the -- applying all of this through

11    the lens of lenity.  And if that's the case, corrupt is

12    certainly vague as applied to Mr. Miller's conduct.

13         THE COURT:  Are you asking me to dismiss the

14    indictment because the term as it's used in the -- or

15    dismiss Count 3 because corruptly is vague or is the more

16    appropriate course as to that particular question, in your

17    view, to give the jury a very strict definition of corrupt

18    or corruptly?

19         MR. BRODEN:  Well, I think under *Poindexter*, it

20    would be appropriate to dismiss, Judge.  In looking at

21    that -- of the three particular arguments Mr. Miller raises,

22    the corrupt argument -- in any of them, but I think the

23    corrupt one, to answer the Court's question directly, would

24    be to dismiss.

25         THE COURT:  Thank you, Mr. Broden.

App.315

 1          So, Mr. Pearce, obviously, the defendant is making

 2     three arguments relating to Count 3.  I reviewed the

 3     transcript of the argument in front of Judge Moss.  I have

 4     some -- probably some different questions than he had, but I

 5     am happy to hear from you on how the government thinks of

 6     these interrelated arguments.

 7          MR. PEARCE:  Certainly, Your Honor.  And please, I

 8     welcome the Court's questions at any point.  I am really, I

 9     think, most helpful in trying to be responsive.  So I will

10     start, but I am ready to answer any questions as the Court

11     has them.

12          As to the first argument, again, I think the

13     pleadings make fairly clear our position that the plain

14     language of 1515(a)(1)(B), a proceeding before the Congress,

15     encompasses the certification of the electoral Congress vote

16     proceeding that happened on January 6th.

17          The case law that my friend on the other side

18     refers to is interpreting a different provision of

19     1515(a)(1)(c), in trying to determine whether law

20     enforcement investigations qualified as official proceedings

21     under a different definitional provision of official

22     proceeding.  And in some of those cases, the courts said it

23     did and some it didn't and looked to things like the

24     formality of the proceeding or whether something was

25     quasi-adjudicative or quasi-judicial.

1         All of that -- and I am happy to discuss that in

2    any length.  All of that, in our view, is beside the point

3    because of the plain language of proceeding before the

4    Congress would fully encompass and does fully encompass a

5    proceeding where you've got a joint session of both houses

6    gaveled in to carry out something that is both

7    constitutionally and as a matter of federal statutory law

8    scripted in, actually, quite considerable detail, down to

9    when it starts, the particular way in which the proceeding

10   must move forward.

11         That plain language argument, we think, is

12   dispositive.  I'm happy to address why even were the Court

13   to look to some of these quasi-adjudicative or formality

14   points, that the certification of the electoral college vote

15   would fit the bill as well, but I am equally happy to move

16   forward to the other arguments.

17         THE COURT:  I think I, like Judge Moss, think that

18   the more difficult questions relate to the scope of

19   1512(c)(2).  And, I mean, I certainly understand the

20   government's positions about that language, but what I'm

21   trying to understand, as I think Judge Moss was, is what

22   limits, if any, there would be under 1512(c)(2).

23         So, again, assuming it was a proceeding before

24   Congress, what would it mean to have attempted to influence

25   that proceeding?  Would it have been a violation of

1    1512(c) -- or at least would the act potentially have been a

2    violation of 1512(c) were someone to have called Vice

3    President Pence to seek to have him adjudge the

4    certifications in a particular way, assuming the person did

5    so with appropriate mens rea?

6              MR. PEARCE:  So I think everything sort of sits on

7    that very last qualification because I think otherwise, the

8    example the Court just gave sounds awfully like the example

9    from the D.C. Circuit's decision in *North*, which basically

10   says, Look, the kind of discussions in that particular case

11   -- or that example was sort of interbranch communications,

12   saying, Look, this investigation that is being carried out,

13   this is really just being done to embarrass the president or

14   the Senator.

15             I think in that hypothetical, if the individual is

16   calling up and is doing it in a way that suggests he or she

17   thinks there is a good faith argument to stop or to take

18   some action, then I don't see how that gets you past

19   corruptly.

20             If that person does it fully, knowingly, that it

21   is not an available argument, and it is, in essence, asking

22   the vice president to do something that the individual knows

23   is wrongful, I think that that would, actually, you know,

24   fall within some -- and there was much discussion of this

25   earlier, but one of the definitions of corruptly is trying

App.318

1    to get someone to violate a legal duty.  I think that could

2    potentially qualify there.

3          But a lot would then turn on that factually

4    specific question about whether there was adequate mens rea,

5    which I think really is the limitation -- one of the sort of

6    the two central limitations on 1512(c)(2).  It's not a

7    conduct-based limitation, I think.  It's a mens rea-based

8    limitation, and it's the nexus limitation.

9          THE COURT:  It seems to me that your answer really

10   is a whole lot of conduct could satisfy 1512(c)(2) because

11   there are a lot of ways in which we can all imagine that

12   someone would seek to influence or impede this particular

13   official proceeding, but the limiting principle is that the

14   person has to take those acts with corrupt intent or

15   corruptly.

16         MR. PEARCE:  That's correct.  That's our --

17         THE COURT:  Is there any limitation on the act?

18         MR. PEARCE:  I don't think the plain language

19   describes a type of conduct that isn't included as a matter

20   of what 1512(c)(2) says.  Right?  It says, Anyone who

21   obstructs, influences or impedes an official proceeding.

22   And, I mean, in its design that was established as

23   essentially a residual or a catch-all provision like the

24   omnibus clause in 1503.

25         So I do think it is comprehensive in that way;

App.319

1    that it is designed to capture conduct that influences,

2    impedes or obstructs an official proceeding.  And this was

3    not ultimately passed by Congress back in the early '80s

4    when considering a residual clause had some language to

5    suggest, look, this was designed to try to address the

6    inventive criminal mind in coming up with ways that have not

7    yet been imagined.

8         So I don't think there is a conduct-based

9    limitation.  We have fallback arguments, which I'm sure

10   Your Honor has seen, and if the Court says, you know, Look,

11   I'm not comfortable with this broad of a reading, I think

12   there are ways in which there could be a narrower

13   construction placed on it, but our top-line argument is

14   1312(c)(2)'s language does not include a conduct limitation,

15   that limits are found elsewhere.

16        THE COURT:  What seems anomalous to me is that at

17   least that incredibly broad interpretation or conduct-based

18   statute shows up in -- at least seems to me it shows up at a

19   time where we are post-*Enron* and Congress had a particular

20   set of concerns, and it then drops in what is a very,

21   very -- at least in the government's view -- or at least as

22   to conduct, prohibition that in addition to seeming

23   anomalous to me that Congress would do that without a lot of

24   fan fair, it also seems to capture within its terms much, if

25   not all, of the conduct that is prescribed by other

1    provisions whether under 1512 or otherwise.

2              And why isn't that significant redundancy

3    problematic?

4              MR. PEARCE:  I hear the Court asking two

5    questions:  One, the sort of redundancy or the surplusage

6    question; and the other, for lack of a better -- maybe sort

7    of a elephant-in-a-mousehole question, how did Congress do

8    that with this provision, and I want to answer them both,

9    but I will go in reverse order, if that's okay.

10             THE COURT:  Yes, please.

11             MR. PEARCE:  I wanted to push back a little bit on

12   this surplusage or redundancy question.  It's true that our

13   interpretation, the plain language interpretation of

14   1512(c)(2) will overlap with certain other provisions, but I

15   don't think it is quite as broad as perhaps the Court's

16   question suggested and, certainly, I've heard defendants

17   argue.

18             Starting with 1512 itself, it certainly wouldn't

19   cover 1512(a)(1)(c) or (a)(2)(c).  Those are provisions that

20   respectfully involve killing or using physical force

21   against -- or the threat of physical force against a witness

22   to hinder or prevent communications to law enforcement.

23   And, in fact, in another of the Capitol breach cases, *United*

24   *States versus Reffitt,* the government has charged the

25   violation of (c)(2) and (a)(1)(c).  There is no official

App.321

1    proceeding in (a)(1)(c) or (a)(2)(c).  That wouldn't fall

2    within the ambit of 1512 --

3            THE COURT:  But wouldn't (a)(1)(a) and (a)(1)(b)

4    fall within the ambit of 1512(c)?

5            MR. PEARCE:  It would.  I mean, in theory, it

6    could.  Again, the government is unlikely to charge if it's

7    got the more specific but, yes, as a matter of pure logic, I

8    think it would.  I just -- I think it's important to note,

9    yes, there is overlap, but the overlap is not sort of

10   throughout.

11           So, again, 1512(b)(3) for the same reason, and,

12   again, it is a similar kind of prohibition on sort of

13   hindering communication of information to law enforcement.

14           1512(d), which is a provision that came up in a

15   hearing the other day which involves harassing any person to

16   hinder or prevent, I think the relevant -- there would be

17   overlap for (d)(1), which is attending or testifying in an

18   official proceeding, but then it wouldn't cover (d)s (2)

19   through (4), which has nothing to do with an official

20   proceeding.

21           THE COURT:  Is there any provision in 1512 that

22   uses the term "official proceeding" that 1512(c)(2) would

23   not entirely overlap with on the government's reading?

24           MR. PEARCE:  So I think probably not with the

25   caveat -- and this, I think, also circles back to sort of

App.322

1    the legislative history question -- that what 1512(a) and

2    (b) in particular do -- and (d) to a certain extent -- is

3    target obstructive actions by defendant towards Person 1

4    that sort of down the line affects the official proceeding.

5    What 1512(c)'s innovation, both 1 and 2 -- and this, I

6    think, is borne out in the legislative history -- is

7    directly targeting the official proceeding itself.

8             And so I think, again, as a matter of logic, I

9    suppose you could say that by obstructing Person A, who then

10   goes and has some -- and that obstruction in some way

11   affects will the official proceeding, one could bring

12   1512(c)(2) -- you know, could fall within its ambit.

13            But that is not what it was designed to do.  And I

14   don't want to shift away, because I think there are other

15   responses to why 1512(c)(2) doesn't swallow other parts of

16   Chapter 73, but since we are on the point, I think -- I'm

17   sorry.  I've just -- I've lost the flow of it now thinking

18   back to the chapter -- oh, so I think what 1512(c)(2) does

19   is focuses on the direct firsthand obstructive activity.

20   1512(c)(1) is sort of the core *Enron*, Sarbanes-Oxley

21   concern; the document shredding, the document destruction.

22            1512(c)(2) then sits on top of that and is

23   concerned with the same result, the same idea of firsthand

24   obstruction of an official proceeding but in conduct that is

25   other than document destruction.  And I think that's the

1        work that otherwise does there.

2              I'd like to go back to the -- sort of the

3        redundancy issue, unless the Court wants to go a different

4        direction.  So, again, if you look at some of the other

5        provisions in Chapter 73, I think what defendants and to

6        some extent judges have raised are 1503 and 1505.

7              I grant that there is probably a good deal of

8        overlap between 1512(c)(2) and 1503, although I think

9        that's, in large part, a function of 1503's omnibus clause

10       trying to do something similar to what 1512(c)(2) does.

11       You've got two provisions that function as sort of residual

12       or catch-all provisions.  There is not a perfect overlap, so

13       there are cases that I think would fall outside of one and

14       inside of the other.

15             1503 targets the administration of justice.  It's

16       not clear to me that everything that qualifies as the

17       administration of justice is necessarily an official

18       proceeding and vice versa.

19             There is also a difference -- and this is as true

20       of 1505 as it is of 1503 -- in, kind of, how extensively the

21       provision reaches, and this is conduct-based, but it's sort

22       of not the conduct itself.  It's sort of a description of

23       the conduct, insofar as 1503 and 1505 reach endeavors.

24             And there is some case law to suggest that an

25       endeavor is even sort of earlier on in the process than an

App.324

1    attempt.  I think, you know, an attempt is a substantial

2    step towards the commission of a crime.  An endeavor can

3    capture conduct kind of earlier -- even earlier than that,

4    and so 1512(c)(2) would not reach as expansively in that

5    respect as 1503 and 1505.

6           1503, I believe, has language that specifically

7    involves retaliating against a jury or grand juror for an

8    indictment or for a verdict.  I don't see how our reading of

9    1512(c)(2) would capture that.  That's essentially

10   retroactive retaliatory conduct.  I don't think 1512(c)(2)

11   would allow the government to reach back.

12          1505 is sort of commonly referred to as the

13   Congressional obstruction provision, includes obstructing an

14   inquiry or an investigation being had by either a House

15   committee or subcommittee.

16          So there I think you could certainly imagine

17   conduct where -- you know, let's say shredding documents

18   after a phone call from an investigator with the House

19   Ethics Committee.  Right?  I think that would fall squarely

20   within the ambit of 1505.  There is a House Ethics Committee

21   investigation perhaps going on.  It's possible that that

22   investigation is not an official proceeding, sort of for the

23   same reasons that we see in the *Ermoian* case out of the

24   Ninth Circuit, the *Young* case, kind of the questions about

25   is an investigation adequately formalized to be an official

23

1    proceeding.

2         So that is conduct that would not fall within the

3    ambit of 1512(c)(2) and for similar reasons 1519, which,

4    of course, is not Congressionally specific but also involves

5    an investigation.  Right?  In cases where there was not an

6    official proceeding -- and by and large, the way courts are

7    moving, law enforcement investigations absent particular

8    marks of formality are not going to be official proceedings.

9    And so all of that conduct would not fall within the scope

10   of 1512(c)(2) but would be captured by, potentially, 1505

11   and 1519.

12        And then I won't go into detail, but there are

13   lots of other sort of smaller provisions in Chapter 73

14   obstructing -- I think 1502, like, extradition agents.  Or

15   1510(a), I think, involves sort of interfering or

16   obstructing with law enforcement not tied to official

17   proceedings.

18        And so there are others, but the point just being,

19   yes, the nature of a catch-all or a comprehensive provision

20   is that it will overlap.  That's not a problem.  The Supreme

21   Court has mentioned that in *Lawson*, the bank fraud case and

22   *Hubbard*, the false statements case.  I think that's a

23   feature of the system, not a bug, in that Congress is trying

24   to capture gaps and intricacies.  But it is -- that overlap

25   is not quite as extensive, I think, as defendants or some

App.326

1    argument has suggested.

2              THE COURT:  I don't want to keep you from the

3    elephants and mousehole question.  So why don't you do that,

4    and then I want to turn to the vagueness question.

5              MR. PEARCE:  Certainly.

6         So I think *Yates* is sort of the paradigmatic

7    example of the elephant and the mousehole example.  And one

8    of the things that the Court or -- the way in which the

9    Court described it, the Supreme Court described it is,

10   Listen, unlike -- and, in fact, compared 1512(c) in a way --

11   distinguished 1512(c) from 1519.

12            The Court said Congress in 1519 created this

13   relatively sort of narrow provision -- I don't want to

14   say -- they didn't call it narrow, but a provision towards

15   the end of obstruction chapter and sat it next to

16   obstructing audits rather than adding it into the broad

17   prescriptions in, for example, 1512.

18            And so sitting where it does in 1512, as a whole,

19   this is not a mousehole is essentially the argument.  It's

20   part of one of, kind of, the core obstruction statutes.

21   Right?  I think 1503 and 1512 are kind of the core

22   obstruction statutes.  I think we would have a much harder

23   argument, you know, one that we essentially -- that we lost

24   in *Yates* if this had been a sort of stand-alone, sitting

25   down towards the end of the obstruction chapter.

App.327

1      And then I think -- so that's the -- it's not

2  actually a mousehole argument.  And, frankly, I think it's

3  not an elephant argument.  It's more or less the one I just

4  was spinning out, which is, yes, it's broad, but it's not as

5  broad as advertised, that it covers some provisions but it's

6  not reaching so far widely and that there are plenty of

7  other provisions within Chapter 73 that it does not

8  encompass --

9      THE COURT:  An elephant.  It's not a mammal.

10      MR. PEARCE:  Sure.  Yeah.

11      THE COURT:  Some version of that.  It overlaps but

12  not so substantially that one would call it an elephant in

13  the government's view.

14      MR. PEARCE:  That's correct.

15      THE COURT:  So is the government's view, then --

16  going back to our conversation about breadth -- that where

17  you have at least capricious language as to conduct, limited

18  by, obviously, a mens rea requirement that does serve, in

19  the government's view, as a substantially limiting

20  provision, that there is no vagueness problem because the

21  statute is clear as to conduct and then there is a limiting

22  principle, which is the "corruptly" requirement?

23      MR. PEARCE:  I would say both of those things are

24  true.  I would add that the term here "corruptly" has also

25  been one that courts post-*Poindexter* -- and, frankly,

1    Congress amending the very provision that *Poindexter* was

2    interpreting after *Poindexter* -- have given content to --

3           And so I think if it was a term that itself was

4    not subject to interpretation, you know, judicial

5    interpretations or was not otherwise kind of something that

6    a jury could readily understand, then I acknowledge I think

7    that would pose a more challenging problem for us.

8           But here, you know, certainly there was the

9    D.C. Circuit's decision in *Poindexter*.  I made mention to

10   it, but just to make it explicit, of course Congress went

11   back a few years after that and defined the term so as to --

12   in fact, Senator Bryant, I think, says to overrule on

13   nonsensical interpretation, defining corruptly as with

14   improper purpose.  I don't have the term in front of me, but

15   through misleading or false statements or through document

16   destruction, basically.

17          And then you have the Supreme Court in 2005 in the

18   *Arthur Andersen* case basically saying that corruptly is

19   normally associated with wrong, evil, depraved, immoral.

20   That gives content to the term, and I think that allows a

21   jury to decide whether the conduct it is considering is

22   undertaken with the necessary mens rea.

23          And then, I think, to answer the question I heard

24   you pose to my friend on the other side, I'm sure it will be

25   no surprise to the Court that our view is this is not an

App.329

1    appropriate sort of question for dismissal.  It's an

2    appropriate question to hash out in the jury instructions.

3              You know, I think we have jury instruction

4    language that we'll propose to the Court.  The defendant

5    will perhaps want stricter language.  The Court may be

6    inclined to go -- I think we have language that the courts

7    have widely approved for 1512(c)(2).  Of course, we

8    acknowledge that these are not cases involving congressional

9    obstruction.  So perhaps a little bit more content would be

10   necessary to help guide and channel the jury's

11   consideration.

12             And that's not a vagueness problem.  That's a

13   problem that the jury instruction can enable the jury to

14   make its standard jury conclusion of whether the facts as

15   proved out by the government satisfy the mens rea that the

16   statute requires.

17             THE COURT:  Do you agree that I need to reach now,

18   though, the official proceeding question and the (c)(2)

19   conduct question?

20             MR. PEARCE:  So the official proceeding question,

21   I think, yes, you can.  I suppose that a jury could also be

22   asked to decide that, but I think courts have fairly

23   consistently held that that is something that is subject to

24   legal determination, and so that could be resolved and

25   should be resolved at this point.

App.330

 1             The conduct question, certainly in *Yates* itself

 2    that was not resolved until after the trial.  I think it

 3    does get complicated, particularly when you have a case like

 4    this where you don't have a speaking indictment, and so

 5    there isn't really conduct where the Court can sit and say,

 6    Okay, this conduct as alleged is clearly in or clearly out.

 7    I think you need that conduct in its full breadth to make

 8    that determination.  So I think really the better approach

 9    in a case like this is not to decide that at this point.

10             Again, I think there are ways this could even

11    potentially be done at a jury instruction level where a

12    court says, The government alleges that the defendant acted

13    corruptly by doing X, Y, Z, Z, Z.  You know, if you find

14    that those facts were proven beyond a reasonable doubt and

15    that that is acting corruptly beyond a reasonable doubt,

16    then that element is satisfied.  I mean, there are ways, I

17    think, that that is more appropriately decided down the line

18    rather than ex ante.

19             THE COURT:  The government's view is essentially

20    there is no conduct limitation here.  I mean, I would think

21    the government thinks that I could dismiss -- sorry -- I

22    could deny the Motion to Dismiss Count 3 on two grounds.

23             One is this is a proceeding before Congress; and,

24    two, either there is no limit to the conduct that can

25    satisfy (c)(2) or, in any event -- clearly have been

1    satisfied here by what is in the indictment, as limited as

2    it is.  But I take your point that an alternative would be

3    to decide the official proceeding question now and then wait

4    until trial to potentially define the conduct question under

5    (c)(2).

6           MR. PEARCE:  I think that is right.  And, again,

7    I'm sure it will not surprise the Court to say to the extent

8    the Court is leaning towards dismissing the conduct question

9    ex ante, I think, again, we would need or we would want the

10   opportunity to kind of put before a jury the full --

11   (inaudible) -- of that conduct.

12          And I think that even applies -- we sort of

13   alluded briefly to or we had -- sort of we were discussing

14   briefly, well, if there is a conduct limitation that is

15   conduct-based -- you know, let's say there's got to be a

16   nexus to tangible items or towards evidence, something like

17   that -- well, that's also got to be something that's --

18   there's got to be the conduct, and maybe that conduct is

19   there and the Court says, because that conduct was there,

20   even though I don't believe that the government's --

21   of course, we want the full comprehensive provision, but if

22   a Court would say, I adopt a more limited provision, there

23   would need to then be evidence one way or another to allow a

24   Court to decide whether there was sufficient evidence to get

25   past the post even on that more limited.

1          THE COURT:  I assume that at least as our colloquy

2     has indicated, as to conduct, some conduct that would be

3     prohibited by the statute -- putting mens rea aside.  I am

4     just talking about the thing that is done.  I get your

5     argument about corruptly -- could often include speech and

6     perhaps protected speech, at least before one gets to

7     mens rea.

8          So is there an overbreadth problem here or how do

9     I think through the speech -- the potential speech

10    implications of the government's position on this statute?

11         MR. PEARCE:  So there is not an overbreadth

12    problem.  I think the first-order question in overbreadth is

13    determining what the statute -- kind of the core conduct the

14    statute applies to, and I think that's conduct, right, that

15    is influencing or obstructing a proceeding.

16         Clearly, as the Court indicated, there are going

17    to be cases -- and perhaps this is one of them -- where

18    there will be some amount of speech that is part of that.

19         But as to overbreadth, the inquiry is, you know,

20    this is stiff medicine or something like that where you've

21    got to have a full -- basically got to capture a whole bunch

22    of otherwise innocent or unlawful conduct.  And I don't

23    think the defendant in this case or, frankly, in any of the

24    cases has made that argument and pointed to sort of

25    prosecution run amuck with 1512(c)(2) and this capturing all

App.333

1   sorts of First Amendment conduct, First Amendment protected

2   conduct.

3         Of course, it's always the case in criminal

4   proceedings that the government may look to a defendant's

5   words that are -- as a matter of just expression are

6   covered, and it's not in any way seen as a violation of the

7   First Amendment to say that expressing a certain view can be

8   adduced as evidence of intent or evidence -- I think intent

9   is usually where it falls in -- maybe -- or confirmation of

10   conduct that happened.

11         There is under, I think, *Texas versus Johnson* a

12   question about whether conduct is expressive conduct.  I

13   think that for much of the alleged facts in this case, that

14   would likely fall outside of that, and even if we do get

15   inside of that, I believe the *O'Brien* test basically puts --

16   sort of allows for incidental restrictions when there is a

17   compelling government interest, and I think protecting

18   official proceedings, as Judge Wilkinson said, I think, in

19   the *Sutherland* case, is an extremely compelling interest.

20         And, in fact, I believe there is a Supreme Court

21   case -- I think it is called Clark that upheld a provision

22   from First Amendment challenge of camping on the mall --

23   overnight camping on the mall with the stated government

24   interest of preserving park property, and I think our view

25   is if that's enough, then surely protecting the integrity of

App.334

1    official proceedings would be enough.

2             I am not saying that there's -- words are going to

3    be part of these prosecutions, but that's not a First

4    Amendment problem for those reasons.

5             THE COURT:  Thank you, Mr. Pearce.

6             Mr. Broden, is there anything you would like to

7    respond to briefly before we turn to the selective

8    prosecution motion?

9             MR. BRODEN:  The only -- I'd like to just come

10   back and -- maybe I misheard, but one of the Court's first

11   questions, I believe, to Mr. Pearce was, Well, if somebody

12   called up Vice President Pence and said, you know, This has

13   to be stopped, you can't do this, if that person didn't act

14   in good faith, that would be some sort of obstruction.

15            And that troubles me because if that's really the

16   government's position, then we are saying, Well, if former

17   President Trump, when he tried to convince Vice President

18   Pence not to certify the election, if there was evidence

19   that he really didn't believe that Vice President Pence had

20   that power, is that obstruction of justice under 1512(c),

21   and it seems the government is saying yes, and I think that

22   shows the rabbit trail we're going to go down with the

23   government's expansive reading of this statute.

24            THE COURT:  Thank you, Mr. Broden.

25            So as to your next motion, I would like to just

App.335

1    take that up now.  Actually, I think -- we've been going for

2    50, 5-0, minutes.  I think we should take a short recess

3    just to allow the court reporter to rest.  Because I suspect

4    that the next two motions will be probably a little bit

5    shorter discussion than this one was, but if we do the

6    entire selective prosecution motion, we might get to the

7    point where she is really needing a rest.

8          So why don't we do a very short recess.  Let's

9    take a five-minute recess.  I will put everybody on mute,

10   and I will stop my video.  A reminder that if you are not

11   muted, I can still hear you.  But, again, this should just

12   be a brief recess to allow the court reporter to take a

13   quick break.

14         And then, Mr. Broden, we will hear from you.

15   Then, I think, Mr. Lieberman, we will hear from you on

16   Mr. Broden's motion.  We will hear from you again,

17   Mr. Broden.  Then we will go under seal and take up the last

18   motion.  Okay?  Thank you.

19         (Break.)

20         COURTROOM DEPUTY:  We are now back on the record.

21         THE COURT:  So, Mr. Broden, let's now take up

22   Mr. Miller's motion to get selective prosecution discovery.

23         Again, as with the earlier motion, I've reviewed

24   all of the materials.  I have a good sense of the arguments

25   that have been presented.  There is no need to repeat your

1    points, but, obviously, anything particularly salient,

2    please note, and I will have some questions as we go.

3            And, Mr. Broden, you are muted.

4            MR. BRODEN:  I will try not to repeat what is in

5    the papers.  At this point, we are simply asking for an

6    evidentiary hearing.  So the question is have we made a

7    colorable claim.

8            You know, obviously, direct evidence doesn't exist

9    between the comparisons we are trying to make, but I did do

10   a fairly detailed recitation of how the -- some of the cases

11   or a large majority of the cases, a large number of cases

12   arising out of the Portland riots have been handled after

13   the change in administration.

14           So this is not a case where, you know, there is

15   just anecdotal evidence or personal conclusions.  We're able

16   to compare Mr. Miller entering the Capitol rotunda and

17   yelling -- I forget what the -- ew-wa-ew-wa-ouw-wow-wow.

18           And some of the Portland protesters who actually

19   assaulted federal officials were found with guns, body

20   armor, helmet, gas masks, and goggles and having their cases

21   dismissed after the change of the administration.

22           And the government's response really seems to

23   be -- well, the acting U.S. Attorney says, These aren't

24   political determinations, so the Court should just believe

25   us and they aren't political determinations vis-a-vis the

1    D.C. cases and the Portland cases.  And, in fact, they

2    suggested at one point that our list is underinclusive and

3    it mentions one case that -- the *Berteau-Pavy* case that

4    wound up being dismissed after the government filed its

5    response.

6            It also references in its supplements and remarks

7    sentencing hearings that had nothing to do with the

8    selective prosecution motion, and those judges didn't have

9    the Portland complaints in front of them and could compare

10   and contrast what was going on with the Portland riots

11   versus the D.C. riots.

12           There is never going to be a perfect comparison.

13   And there is never going to be a case where Mr. Lieberman is

14   going to come in and say, Yeah, we are doing this for

15   political reasons.  The government is never going to --

16   (audio breaking up) -- so we've got to do the best we can.

17           The way Mr. Miller's case is being treated,

18   vis-a-vis the Portland rioters, who engaged in a lot more

19   assaultive conduct than Mr. Miller is accused of engaging

20   in, we've certainly raised a colorable claim.

21           And we need to have an evidentiary hearing.  We

22   need to have an evidentiary hearing so we are not just

23   taking the government's word in an unsworn pleading that

24   this is not being done for political purposes.  That's the

25   purpose of an evidentiary hearing, not to just have the

App.338

1    government say, Believe us.

2            THE COURT:  What, in your view, would happen at

3    this evidentiary hearing?  Who is testifying and on the

4    basis of what documentary evidence?

5            MR. BRODEN:  Well, the documentary evidence could

6    probably be based on publicly available material on PACER,

7    the complaints and dismissals and what have you, and some of

8    that is before the Court as attachments.

9            But to determine whether the decisions that were

10   made were made for political purposes, I would think we

11   would need testimony from prosecutors, both before and after

12   the change of administrations in Portland, and the evidence

13   that the government seems to want to put before the Court in

14   an unsworn pleading regarding the assistant -- the acting

15   U.S. Attorney's representation, "Just trust us.  This isn't

16   for political reasons."  So I think those are the type of

17   things that would need to be explored at an evidentiary

18   hearing.

19           THE COURT:  As I interpreted it, you were also

20   moving for discovery, but it seems to me that you've

21   basically just said you don't need discovery because based

22   on --

23           MR. BRODEN:  Well -- (Audio breaking up)

24           THE COURT:  Wait.  That you would be relying on

25   what is available publicly?  What discovery --

```
 1              MR. BRODEN:  You broke up on me a little bit,

 2    Your Honor, but I think I've got the main point of the

 3    Court's question.

 4              No, I think there are probably internal documents

 5    within the U.S. Attorney's Office both in Portland and D.C.,

 6    especially Portland, as to why some of those cases were

 7    dismissed.  To the extent those existed, we would want to

 8    obtain them and do discovery.

 9              Obviously, I am not privy to the inner workings of

10    the U.S. Attorney's Offices in Portland or in D.C., so I

11    can't be for sure they exist, but it's something we would

12    like to explore in connection with an evidentiary hearing.

13              THE COURT:  Thank you, Mr. Broden.

14              Mr. Lieberman?  And why isn't it the case that the

15    dismissals of the various actions in Portland at least nudge

16    us over the line to warranting some discovery?

17              MR. LIEBERMAN:  Yes, Your Honor.  Good afternoon,

18    Your Honor.

19              Our primary point, and the one we flesh out in our

20    briefs, is that the government has a legitimate basis for

21    viewing Mr. Miller's conduct differently than the cases that

22    he cites.

23              Before I fully drill down a minute, I just want to

24    flag the government's concern that we raised in our

25    opposition, that we don't think that Mr. Miller's survey of
```

App.340

1    the Oregon cases is complete or entirely accurate.

2           And to give Your Honor an example, two of the

3    cases that we cited in our opposition at the end of *Horton*

4    and *Gaine*s involved felony-level charges against the

5    defendant for assaulting a federal officer, and those have

6    now proceeded to disposition with felony-level convictions.

7    And I think there are others, though I have not done a full

8    review of the District of Oregon docket, because I don't

9    think that's our burden at this point.

10          But accepting that there are -- out of the 79 --

11   he didn't tell us about the 29 that he examined.  Out of the

12   45 that he talked about -- that there are some comparators

13   there, the only question is, Does the government have a

14   legitimate basis for viewing them as different?  And if so,

15   then *Armstrong* tells us that the government can make a

16   different prosecutorial decision and defendant is not

17   entitled to discovery.

18          And the distinction, in our view, is something

19   that the D.C. Circuit, this Court and other judges in this

20   circuit have talked about, which is the serious and

21   sui generis nature of the conduct that Mr. Miller and others

22   engaged in.

23          And we cited to several of those examples in our

24   opposition.  If I could just supplement our presentation.

25   This was -- Your Honor sentenced a defendant several weeks

1    ago.  This is the Thomas Gallagher.  And Your Honor talked

2    about the events of January 6th being exceptionally serious,

3    as well as they threw our entire system of government into

4    disarray, undermined the stability of our society, which I

5    think is a legitimate distinguishing factor for the

6    government to consider in its prosecutorial decisions.

7              On top of that, in sentencing Mr. Gallagher,

8    Your Honor gave him a probationary sentence, but you talked

9    about how his conduct did not rise to the serious or

10   aggravated conduct that we saw that day.

11             And Your Honor -- this is from the transcript:

12   "Many of the rioters entered the Capitol for the express

13   purpose of interrupting the proceedings."

14             Your Honor continued, "Many of the rioters tried

15   to disrupt the transition of power through appalling and

16   irreprehensible acts of violence against law enforcement

17   officers and others."

18             Continuing, Your Honor stated, "Many of the

19   rioters engaged in planning efforts before January 6th,

20   suggesting that they intended to engage in violence on that

21   date."

22             And, finally, Your Honor stated that, "Many of the

23   rioters expressed glee and pride after the fact for having

24   actively participated in those events."

25             That list of the aggravated conduct that we saw

1   January 6th, it perfectly describes the conduct alleged of

2   Mr. Miller.  And I think also explains why the government

3   has treated his conduct more seriously than his cited cases.

4   Our federal interest here is at its apex.

5          Now, returning to, I think, the question that you

6   started with which is, What are some legitimate distinctions

7   that we have between this case and some of the other cases,

8   the cited cases in the original motion?  Those cases, in

9   reading the complaints in those cases, they generally

10  involved a smaller segment of an otherwise larger gathering

11  or protest, who vandalized federal property and assaulted an

12  officer.

13         That conduct was serious.  But the question for

14  this Court is, Does the record provide a reasonable basis

15  for the government to view Mr. Miller's conduct more

16  seriously and to bring these felony-level charges.

17         And the answer is yes.  Comparatively, the conduct

18  in the cited complaints occurred at night.  It was

19  individuals rather than collective conduct of a mob of

20  thousands.  Nobody breached the courthouse.  There were no

21  threats targeted at a judge or a court officer, unlike in

22  this case where there were threats on social media to a

23  Congresswoman and very specific threats to a U.S. Capitol

24  Police officer.  There was no effort by the defendants in

25  the cited cases to disrupt an ongoing judicial providing.

App.343

1        These are all factors that *Armstrong* tells us the

2    government can consider when trying to figure out what is an

3    appropriate charging package in a particular case.

4        And because Mr. Miller has not rebutted that

5    showing, he is not entitled to the very invasive discovery

6    that he seeks, which is basically to open up the charging

7    files of two different United States attorneys' offices and

8    to put two different United States attorneys as well as

9    their supervisor staffs on the stand to justify their

10   charging decisions before this court.

11       That discovery process is far broader than even

12   the discovery request that was at issue in *Armstrong*, and I

13   can't find a single case where a Court has ever entertained

14   that type of invasive discovery in looking through the

15   prosecutor's charging files.

16       Finally, it is -- Mr. Miller's counsel said the

17   government is -- (audio breaking up) -- relying on, Trust

18   us.  We didn't do this.  But it's his burden under

19   *Armstrong*.  He has to come forward first with a credible

20   showing, some actual evidence.

21       According to Judge Jackson's opinion in the *Stone*

22   case, it's not enough for a defendant to simply walk into

23   court and say, My prosecutor is biased.  There has to be

24   some showing, and we just don't have anything here.

25       For those reasons, as well as what we have

App.344

1    detailed in our position, we just don't think that

2    Mr. Miller has come close to the rigorous standard that

3    *Armstrong* imposes.

4              THE COURT:  It also seems to me that at least

5    where this case stands right now is, we have indictments.

6    The defendant has been charged.  He is relying on a set of

7    cases in which defendants were charged.

8              Obviously, there's a question of the ultimate

9    disposition and maybe the dismissal of some of those cases,

10   but at least at first blush, the fact that the pool of

11   people he is pointing to were charged, and that's

12   essentially where we are now, indicates maybe that there

13   isn't even any significant difference even if a difference

14   were warranted.

15             Let me ask you this question:  If it turned out,

16   hypothetically, that ultimate dispositions were apparently

17   quite different or maybe even that Mr. Miller satisfied his

18   burden to show that they were so different as to, you know,

19   potentially warrant some inference -- but we are talking,

20   you know, after dispositions -- how does a Court handle a

21   claim of selective prosecution at that point?

22             MR. LIEBERMAN:  Your Honor, I think the best way

23   to handle this -- this is an opinion that Judge McFadden

24   wrote, and I'm sorry.  I can't remember the case --

25   actually, I think it's the *Griffin* case, 21-CR-92.41.

App.345

1        Judge McFadden wrote, "We can reinvestigate all of

2    that at a sentencing hearing, and if you can convince me

3    between these two sets of cases that this has resulted in a

4    unwarranting [sic] sentencing disparity, the defense can

5    argue for Your Honor to take that into account and issue a

6    more lenient penalty.

7        That is certainly available under the factors of

8    3553(a).  I think that is how I would channel Your Honor's

9    question.  But the present question of, Should we dismiss

10   the charges?  The answer is no, because we are not even

11   anywhere close to the *Armstrong* standard.  And should

12   Your Honor grant discovery, the answer is no, because

13   *Armstrong* imposes a rigorous standard.

14       And one final point that -- I think Your Honor

15   made an insightful comment that we are still at charging.

16   We haven't gotten to disposition.  We don't know how the

17   evidence in this case shakes out.  We don't really know how

18   the evidence in all those cited cases out of Oregon shook

19   out.  But reading the complaints, it seems evident that

20   there is a vast difference in the evidentiary records in

21   this case versus those Oregon cases.

22       In this case -- and Your Honor may recall from the

23   detention hearing -- there is a ton of electronic and social

24   media evidence where Mr. Miller's admitting and celebrating

25   a lot of the conduct that he engaged in on January 6th, and

1    that evidence also catalogs the threats to the congresswoman

2    and to the U.S. Capitol Police officer.

3              Looking at the complaints that Mr. Miller appended

4    to his motion, in Oregon it appears that the government's

5    evidence in those cases implicated, really, officer

6    recollection.  They didn't involve the same level of

7    evidence, and you had officers at 2:00 a.m. in the morning

8    in full tactical gear, attempting to identify the person in

9    a larger crowd who assaulted the officer or vandalizing the

10   building.

11             And different evidentiary considerations.  Strong

12   case versus weak case is unquestionably a legitimate basis

13   for how the government either manages its charging package

14   or ultimately dispositions and plea deals.  It is yet

15   another reason why the showing here, this case versus the

16   cited cases out in Oregon just doesn't come close to what

17   *Armstrong* demands.

18             THE COURT:  Thank you, Mr. Lieberman.

19             Mr. Broden, would you like a brief rebuttal?

20             MR. BRODEN:  Your Honor, no.  I actually do not

21   have anything to add, I think, on the pleadings.  We rely on

22   the *Branch Ministries* case and what it takes to get us to a

23   colorable claim.  I think looking at those complaints and

24   looking how they were handled versus how Mr. Miller and some

25   other cases were handled, I think that should be a concern

```
 1        to the Court.  I think it is a concern to, a large degree,

 2        the public -- to a large segment of the public.

 3               I do find it ironic that the government says,

 4        Well, you know, there's not a single case like this where

 5        discovery has been granted, yet in our prior argument they

 6        argue for the application of a statute that has never been

 7        broadly interpreted like that.

 8               So I think these are unique circumstances, and I

 9        think we have made a colorable claim, and I think it is in

10        everybody's best interest that this be sorted out through an

11        evidentiary hearing.

12               THE COURT:  Thank you, Mr. Broden.

13               So I would now like to put this hearing under seal

14        so we can discuss the last motion that we have to discuss

15        today.

16               Ms. Lesley, could you please handle that?

17               COURTROOM DEPUTY:  Your Honor, the public line has

18        been disconnected.  However, do we still want to have

19        Ms. Miller on the line?

20               THE COURT:  What is the government's view about

21        whether Ms. Miller can participate?

22               MS. KELLEY:  Your Honor, we would ask for them to

23        be moved to the waiting room, given that this is being

24        placed under seal.

25               THE COURT:  Mr. Broden, do you have a contrary
```

1    view?

2              MR. BRODEN:  Your Honor, I really defer to the

3    Court, just like I deferred the sealing motion to the Court.

4    I really don't know why we are sealing this.  It seems that

5    the Millers have an interest in hearing what is going on

6    with their son, but as I said, I will defer to the Court on

7    that.

8              THE COURT:  Since I haven't decided the sealing

9    question yet, that is to say, since I am treating the

10   information as sealed for present purposes, I do think it is

11   appropriate, Ms. Miller, to place you in a waiting room.

12   It's because we're going to be talking about a government

13   document that is presently under seal, and I think that at

14   least for present purposes to have this discussion, it is

15   appropriate to do so with just the parties and counsel.

16             Obviously, if it turns out that I unseal this

17   portion of the hearing or the document at issue, you will be

18   able to see it.  But for present purposes, I think that is

19   the appropriate course.

20             So, Ms. Lesley, could you please put Ms. Miller

21   into a waiting room?

22             COURTROOM DEPUTY:  (Complied)

23        (Sealed discussion.)

24             THE COURT:  Okay.  It appears that the only

25   participants now are court staff, me, obviously, counsel,

1    the parties.  The public line has been disconnected.  So we

2    are under seal, which I think should allow us to speak

3    entirely freely about the motion to reopen the detention

4    hearing.

5         So, Mr. Broden, again, I've read all of the

6    papers.  I've read the documented issue.  You don't have to

7    repeat yourself, but -- and I think your argument is a

8    pretty straightforward one, which is to say -- but tell me

9    how you would add to it -- you didn't know in prior

10   proceedings around detention about this FBI memo.  The FBI

11   memo, in your view, is inconsistent with the notion that

12   Mr. Miller is a sufficient threat to the community, that he

13   couldn't be released without stringent conditions and,

14   therefore, he should be.  All fair?

15             MR. BRODEN:  All fair, Judge.

16             THE COURT:  Anything you would like to add to

17   that?

18             MR. BRODEN:  Well, you know, there is, I guess, a

19   preliminary question whether this is new evidence.  It's not

20   clear to me the position the government has taken.  I mean,

21   I think it's sort of a no-brainer -- (audio breaking up) --

22   evidence that was not available to us from before this

23   Court, the detention hearing being in front of the

24   magistrate in Texas.

25             So I don't know that the government's disagreeing

App.350

 1   with that.  And then it leads the question, does this tip

 2   the scale when you consider that we favor liberty, that the

 3   standard is very high for the government to detain a

 4   defendant.  And we have this memo that I've characterized as

 5   a threat assessment.  It certainly seemed like that to me,

 6   being written a day before Mr. Miller's arrested.  So,

 7   obviously, the government has the same information when this

 8   is written that they do when they prepare the criminal

 9   complaint in this case, and I think that is important

10   evidence.

11          Now, the government tries to downplay the memo,

12   and basically makes it sound like it's a -- I forget.  It's

13   described as a Post-it Note in the reply, but some sort of

14   transmittal memo.  And if that's the case, and the

15   government wants to maintain that position, I think the

16   appropriate course would be then to reopen the detention

17   hearing and let us call the gentleman that did the threat

18   assessment as a witness and try to figure out why he came to

19   a different conclusion one day before the government filed

20   its criminal complaint in this case.

21          That's all I have, Judge.

22          THE COURT:  Thank you, Mr. Broden.

23          Ms. Kelley, why don't we start with the

24   substantive question of what this January 18th, 2021

25   document stands for and what it doesn't in the government's

1  view, and then, obviously, we can take up the question of

2  whether any part of it can be made public.

3          MS. KELLEY:  So, Your Honor, I know defense

4  counsel has characterized this document as a threat

5  assessment, but that's not, in fact, what this letter is.

6          All this letter is is a duty to warn notification

7  that was alerting Capitol Police that there was a threat

8  made against one of its protectees, in this case, Senator

9  Schumer.  At the time that the letter was sent, the

10  defendant was under constant surveillance by the FBI.  They

11  were tracking his location.  They had conducted surveillance

12  at his house on the two days prior to the letter.  They knew

13  where he was.

14          They also knew that an arrest was imminent.

15  In fact, an arrest warrant was sent to the Court the very

16  next day.  So they knew that the defendant was in Dallas and

17  was not, at the time, on his way to Washington, D.C. to

18  carry out the threats that became very apparent in the

19  social media posts that the FBI had reviewed.

20          While I think their statement that Mr. Broden

21  points out isn't the best written statement I've ever seen,

22  what they were trying to say to the Capitol Police is that

23  they hadn't ruled out that the defendant was not a threat at

24  that time, and so that's why they were sending the

25  notification to the Capitol Police, because they couldn't

1    say for sure that he wasn't a threat.  They also knew he

2    wasn't an imminent threat, because they knew exactly where

3    he was at that time, and they knew that he was about to be

4    arrested.

5            We view this letter -- and the way that I even

6    initially reviewed this letter myself was as highly

7    inculpatory.  It's another example of the defendant

8    threatening a political figure whom he disagrees with, and

9    he threatened to take action against that political figure.

10   It's in keeping with him threatening to assassinate

11   Congresswoman Ocasio-Cortez, and it's in keeping with his

12   very articulated plans to track and kill a Capitol Police

13   officer.  And so this just further shows the steps that the

14   defendant is willing to take against people whom he

15   disagrees with.

16           And it shouldn't alter the Court's calculus here.

17   The Court has reviewed the evidence here.  The Court has

18   considered the strength of the case against Mr. Miller.  The

19   Court considered the defendant's ties to the community.  And

20   the Court ordered that the defendant should be detained.

21   And this duty to warn notification should not upend the

22   Court's determination that the defendant is, in fact, a

23   threat to the community; and that he should continue to be

24   detained through trial.

25           THE COURT:  So much of what you just said I either

App.353

1    understand or I find compelling, but part of the problem is

2    that this document, the duty to warn document, does say that

3    we -- our investigation has not provided a sufficient basis

4    to determine that the subject is an imminent threat to the

5    community, which is very similar to -- it's not the same, I

6    understand -- it's very similar to the inquiry I have to

7    undertake under the Bail Reform Act.

8            I am not assessing under the Bail Reform Act

9    whether the defendant is a threat to Senator Schumer only.

10   I'm making a broader judgment about the community, and this

11   document seems, at least in a sense, to take a position on

12   that question.  I get it uses different language.

13           But is, basically, your view that that is an

14   accurate statement here but it is dependent on a whole set

15   of facts that existed at the time, including the fact that

16   he was under surveillance, was about to be arrested and the

17   like, and that if I were to release him pretrial, even with

18   conditions, that those -- at least a lot of those facts and

19   circumstances would no longer be or would not be true?

20           MS. KELLEY:  That's exactly right, Your Honor.  At

21   the time that this -- well, for one, just to back up a

22   minute.  This letter is not a reflection of a thorough

23   investigation.  It was simply letting Capitol Police know

24   that there is this threat that was made against Senator

25   Schumer.  They need to let Senator Schumer know sort of the

 1    basics of that threat and, you know, be aware of this

 2    threat.  And so it is, by no means, a thorough assessment,

 3    as the defense as characterized it.

 4            But at the same time, the FBI had been monitoring

 5    the defendant's location because they were concerned about

 6    him and they had surveillanced his house and they knew that

 7    we were very close to getting an arrest warrant issued at

 8    that same time.  And so at that time it was reasonable to

 9    assume that the defendant was not a threat to the

10    D.C. community or Senator Schumer because everybody knew

11    that he was in Dallas.

12            If the Court were to release the defendant today,

13    for instance, there wouldn't be that level of surveillance.

14    We wouldn't have a warrant up on his phone.  The FBI is not

15    going to be surveillancing his house.  And so there just

16    wouldn't be that same level of oversight over the

17    defendant's activities and what he's planning to do as there

18    was back on January 18th.

19            THE COURT:  So thank you for that.

20            So as to sealing of the document, why should this

21    document not be released?

22            MS. KELLEY:  So the FBI has asked that we request

23    it remain under seal because the information that's

24    contained in the notification shows the manner and methods

25    it uses to protect high-level protectees.

1          There is one portion of the notification that

2    they've designated as releasable to the protectee himself.

3    I am not sure if they viewed that as sort of releasable to

4    the public, but arguably Senator Schumer could have released

5    it to the public, and so FBI has determined that that is

6    releasable information but has asked that the rest of that

7    document remain under seal given that it shows sort of their

8    law enforcement methods.

9          THE COURT:  What are those exactly?

10          MS. KELLEY:  Apparently, it's the fact that they

11    notify other agencies of threats against protectees via

12    these duty to warn letters.

13          THE COURT:  So it's not the underlying techniques,

14    it's actually the technique of notification to protectees.

15    That's what it is --

16          MS. KELLEY:  Exactly.

17          THE COURT:  -- to let them know?

18          MS. KELLEY:  Exactly.

19          THE COURT:  Okay.  Mr. Broden, what is your view

20    on that argument?

21          MR. BRODEN:  It seems farfetched to me, Judge, but

22    it's not really one that I have a dog in the fight.  I defer

23    to the Court on that.  I filed it under seal because the

24    government asked me to.  Whatever the Court wants to do.

25          THE COURT:  Thank you for that.

App.356

1           I think, Ms. Lesley, unless the parties have more

2    on this document -- I obviously understand it and the

3    arguments -- I think that it would be appropriate to go back

4    on the public record.

5           COURTROOM DEPUTY:  Yes, Your Honor.

6           MR. BRODEN:  Judge, I was going to respond to

7    Ms. Kelley's argument and, I guess, reference the document

8    somewhat.

9           THE COURT:  I'm sorry.  I short-circuited that.  I

10   apologize.

11          So, Ms. Lesley, let's stay under seal for the

12   moment.  I'll hear from Mr. Broden on the document itself

13   and how it relates to the detention question.  Once

14   Mr. Broden makes that argument, then we can go out from

15   under seal.

16          MR. BRODEN:  Well, with regard to the document

17   itself, the question is whether the evidentiary -- or the

18   detention hearing, and it is an evidentiary hearing, be

19   reopened.  And what I hear the government saying is, Well,

20   that memo wasn't after a thorough investigation and that's

21   not what they were trying to say.

22          How do we know that, Your Honor?  Had it been

23   disclosed to us at the detention hearing or at the time we

24   moved to revoke the detention order, we could have had a

25   hearing to see whether it's what they meant to say and to

1    see what investigation they conducted.

2              So this is, again, the government just saying,

3    Trust us.  And that's not appropriate.  And I actually think

4    Ms. Kelley, to some degree, makes my point.  She says, Well,

5    they weren't worried about the threat to the public because

6    they knew he was in Dallas.  They knew he was at home.

7              And that shows that there are conditions or

8    combinations of conditions the Court can set that will

9    protect the public, and we discussed them:  The home

10   monitoring, the third-party custodian.  Those are all

11   conditions that can be set to monitor Mr. Miller's location,

12   which is exactly why the government tries to downplay this

13   memo because his location was being monitored.

14             Now, obviously, the Court can't order surveillance

15   but, again, I do not think he was under 24-hour

16   surveillance, and that was my recollection from testimony at

17   the detention hearing.  So that is not the case.

18             The government took steps to assure that he was

19   going to be in Dallas and not in Washington, D.C., which I

20   guess is where they believe the threat to be.  The Court can

21   set conditions and combinations of conditions to satisfy

22   that.

23             And with regard to the threat against Mr. Schumer,

24   Senator Schumer, while I absolutely in no way condone that,

25   that also proves my point.  That threat was made months

56

 1    prior to January 6th, and no steps were taken by Mr. Miller

 2    to harm Senator Schumer in any way.  Mr. Miller's internet

 3    comments were reprehensible, but there is no indication that

 4    he was going to take actions on that.  And the Court can set

 5    conditions that would assure he would be in Dallas -- or

 6    reasonably assure.  And, again, that's not a guarantee.  The

 7    courts make that clear, "reasonably assure" -- him in Dallas

 8    and allow him to participate in his defense, which with the

 9    amount of discovery produced in this case, it is almost

10    impossible for him to participate in his defense in this

11    case.  And that's what I have to say in reply.

12            THE COURT:  Let me just ask this question, which

13    is not so much about the document but specifically about the

14    relief you are seeking here:  Do you want me to, based on

15    the new document, to reconsider my detention decision and

16    order him released with conditions or do you want me to, in

17    a technical sense, reopen the question for the submission of

18    additional information for you to try to figure out whatever

19    you could about this January 18th memo to present argument

20    on the questions that we've been discussing today or --

21            MR. BRODEN:  Go ahead, Judge.

22            THE COURT:  Please, please.  Or something else?

23            MR. BRODEN:  They are alternative arguments.  I

24    think based on the memo and what is set forth in the memo,

25    the Court could reconsider its order of detention,

App.359

57

1    especially in light of the government's argument that the

2    Court can really set conditions to guarantee.  The important

3    condition is that Mr. Miller be known to be in Dallas, and

4    those conditions can be set.

5           If the Court was not inclined to do that, then I

6    would ask it to be reopened and we can serve some subpoenas

7    and get -- and I forget the gentleman's name who authored

8    the memo, but get him subpoenaed and have a hearing and put

9    it to the test as to whether what he said isn't really what

10   he meant to say.

11          THE COURT:  Ms. Kelley, I assume the government is

12   opposed to both of those possible outcomes?

13          MS. KELLEY:  We are certainly opposed to both of

14   those, Your Honor.

15          I think I've stated why we are opposed to release

16   today.  Regarding sort of opening a hearing and putting this

17   agent on, I think Your Honor has the information that it

18   needs today.  Your Honor has seen all of the evidence.  You

19   know the strength of the case.  Whether -- you know, what

20   the FBI said in a notification to Senator Schumer on

21   January 18th just doesn't alter that calculus.

22          And so I think the facts haven't changed here and

23   whether or not the defendant is a danger to the community

24   hasn't changed.  If anything, what we've learned is that the

25   defendant made another threat.  This time it was to Senator

58

1    Schumer.

2              So we would ask that neither he be released nor

3    there be another sort of evidentiary hearing on the

4    question.

5              THE COURT:  Okay.  Thank you, Ms. Kelley.

6              I think what I was about to do earlier, it's the

7    time to do it.  Ms. Lesley, if we could go back on the

8    public line.

9              Again, that one document and references to it are

10   still sealed.  I have no intention of referring to them when

11   we go back publicly, but I would admonish everyone to treat

12   those materials as still sealed.

13             So if you could bring Ms. Miller back into the

14   Zoom, Ms. Lesley, and open the public line, I would

15   appreciate it.

16             COURTROOM DEPUTY:  Yes, Your Honor.

17             (Sealed discussion concluded.)

18             COURTROOM DEPUTY:  We are now back on the public

19   line.

20             THE COURT:  So, obviously, I've heard argument on

21   the various motions.  I am going to take each of them under

22   advisement.  I'm not going to issue an oral ruling on all or

23   even any of them today.

24             Why I wanted to go back on the public line is to

25   just have a brief discussion of where we are in the case

 1    more generally.  It seems to me that, obviously, I have a

 2    question of detention before me, which is about where

 3    Mr. Miller will be going forward, whether he will be at home

 4    or detained.  I have the question of whether to demiss one

 5    count, and I have a question whether to permit certain

 6    discovery on a few counts, but none of those affects the

 7    entire case and how we get from where we are now to a

 8    disposition.

 9            So, Ms. Kelley, can you walk me through where we

10    are on this case more generally, both with respect to

11    discovery, any discussions, discussions, if any, on

12    non-trial disposition or just the general arc of where

13    things stand?

14            MS. KELLEY:  Yes, Your Honor.

15            So regarding a disposition, we extended a global

16    plea to the defendant that would have required him to plead

17    guilty to two counts, the 1512 count and the 111(a)(1)

18    count.  In exchange for that, we would have dismissed all of

19    the remaining charges in the indictment.

20            We also agreed to not bring an additional charge

21    in the Northern District of Texas regarding a firearm that

22    was recovered during the search in this case.  And we agreed

23    that while we would seek the eight-point enhancement under

24    the sentencing guidelines related to the 1512 charge, that

25    the defense could argue against that enhancement and that

App.362

60

1    the Court would ultimately decide.

2              It's my understanding that the defendant is

3    rejecting that plea today, which I think Mr. Broden can

4    confirm for us.

5              THE COURT:  So before we go to Mr. Broden on that

6    question, assuming that that is where Mr. Miller is, where

7    does that leave us with respect to the government's

8    production of additional discovery and whether we can start

9    thinking about trial dates?

10             MS. KELLEY:  So my understanding is that we can

11   have, I think, the vast, vast majority of discovery out to

12   the defense by the middle of January.  It's my understanding

13   that there are some trials set at the very end of January.

14   In fact, I have one set for February 1st.  We understand

15   from the discovery team that we should, by then, have

16   provided the bulk of the discovery to defendants.

17             In this case, the defense has received the vast

18   majority of the defendant's FBI file already and the

19   case-related materials, along with thousands of hours of

20   video, body-worn camera videos, CCTV footage and, you know,

21   the global sort of riot discovery that has gone out to other

22   defendants.  And so there is quite a bit to work through.

23             The government would then ask -- I think the best

24   course of action would be to set a status hearing out in 30

25   to 60 days, toll time.  That gives the defense time to

1   review this voluminous discovery that we've disclosed over

2   the last two months or so, and also we can get out the

3   remaining discovery.  Then we would be in a position to set

4   a trial date for, I think at this point, the spring.

5           THE COURT:  Thank you, Ms. Kelley.

6           Mr. Broden, what are your reactions to or comments

7   on both the non-trial disposition plea offer summarized by

8   Ms. Kelley and then discovery and trial dates?

9           MR. BRODEN:  Regarding the plea offer -- I will

10  take that first, Judge -- just to add to the summary, we

11  would have -- Mr. Miller would have been required to waive

12  his argument regarding 1512, which, as the Court knows, is a

13  percolating issue, and I don't think that would have been a

14  wise decision.  And the government wanted to maintain its

15  right to appeal while forcing Mr. Miller to waive his right

16  to appeal.  So based on that, Mr. Miller did, in fact,

17  reject the plea offer.

18          With regard to the sort of the "Where we go from

19  here question," it in some ways comes back to what the Court

20  is going to do with the detention order, because we are in a

21  real catch-22 here.

22          Obviously, I'm cognizant that Mr. Miller is in

23  detention and wants to resolve this case and get out of

24  detention.  At the same point, he has a right and he has

25  indicated to me he would like to review most of this

1    discovery, and as Ms. Kelley says, it is thousands of hours'

2    worth of video.  How that's going to happen at the jail and

3    allow him to participate in his defense is -- I guess I

4    don't have words.  I guess I don't know how that is going to

5    be accomplished, quite frankly.

6         So we are not in a position to set a trial date.

7    I will agree with Ms. Kelley on that.  When we will be able

8    to do that, consistent with Mr. Miller's right to

9    participate in his own defense, would probably have to wait

10   until the Court rules on the detention, the motion to reopen

11   the detention.

12        THE COURT:  Thank you, Mr. Broden.

13        I've said this in other hearings, and I will say

14   it again here, that the speed or perhaps the lack thereof --

15   and let's not just cast dispersions -- the status of overall

16   discovery and the complications thereto are putting a lot of

17   pressure on the universe of defendants who are detained and

18   who are, seems to me, detained for good reason.  I am not

19   suggesting that's how I am going to come out with respect to

20   Mr. Miller's motion to reopen.

21        Certainly as to the defendants I have in front of

22   me who are presently detained, I, of course, made the right

23   decision about detention.  But the fact that we are not yet,

24   in many of those cases, in a position -- even to say that

25   discovery has been completed means that some defendants are

 1    continuing to face elongated pretrial detention, rather than
 2    detention followed by a trial.  And it's just putting and
 3    continuing to put a lot of pressure on the continued
 4    detention of that relatively small subset of January 6th
 5    defendants.
 6           For present purposes, I obviously will consider
 7    the motion to reopen the detention hearing.  I do agree,
 8    Mr. Broden, that where I come out on that could, in theory,
 9    alleviate some of that tension.  It's not clear that that is
10    an appropriate consideration at least -- or an
11    outcome-determinative one, but it would have that effect.
12           But because I have not yet reopened or granted
13    that motion and because Mr. Miller is presently detained, I
14    think we need to continue to move this case as quickly as
15    possible.  And by that, I have in mind not a 60-day
16    continuance but something substantially shorter, more like a
17    30-day continuance.
18           In other non-detained defendant cases, I have been
19    willing to entertain 60- to 90-day continuances because the
20    defendant was happy to have that happen and to continue
21    reviewing materials and the like, but I don't -- I just
22    don't think that's appropriate with respect to defendants
23    who are detained.
24           So in the most sort of basic way, I think -- or to
25    deal with the lowest hanging fruit, I suppose is a different

App.366

1    way to put it, I would like to have another status in this

2    matter on December 21st, which is just a little bit over

3    four weeks from today's date, so that we can check in, make

4    sure that discovery, hopefully, is progressing and to take

5    up the various issues that we've been discussing here.

6            I'm not certain that we're going to have

7    resolution as to what we have discussed just now, but at

8    least we may know more and we can perhaps make some

9    progress.

10           So are the parties available on December 21st at

11   2:00 p.m. for another status?

12           MS. KELLEY:  The government is available then,

13   Your Honor.

14           THE COURT:  Mr. Broden, does that work for you?

15           MR. BRODEN:  I'm sorry.  You broke up on me,

16   Judge.  I am available.

17           THE COURT:  So let's set this for another status

18   on December 21st at 2:00 p.m.  We will do it by video.  I

19   think that is the most appropriate method for convening this

20   group.

21           I will, as I said before, take under advisement

22   the various motions that are before me.  I have every

23   intention of resolving at least some and maybe all of them

24   relatively quickly ,and certainly I would hope before

25   December 21st, and that would give some further guidance to

App.367

1   the parties about our discussion on the 21st about next

2   steps.

3          My guess is that the fact that I still have

4   pending before me some pretrial motions probably has the

5   effect of excluding time under the Speedy Trial Act.  I

6   suppose I should ask Mr. Broden.  Does Mr. Miller agree that

7   at least as between today's date, November 22nd, and

8   December 21st, in that period, that it would be appropriate

9   to exclude time under the Speedy Trial Act?

10          MR. BRODEN:  He does, Your Honor.

11          THE COURT:  Okay.  So my view, for the various

12   reasons that we've discussed, including my consideration of

13   the pending motions, the government's continued provision of

14   discovery, Mr. Miller's review of that discovery, I believe

15   it is appropriate, if even necessary, to exclude time under

16   the Speedy Trial Act between today's date and the next

17   hearing.

18          Are there any other topics we should discuss

19   today?  Obviously, again, as I've said, I will take all

20   pending motions under advisement.

21          Ms. Kelley?

22          MS. KELLEY:  Nothing from the government.  Thank

23   you, Your Honor.

24          MR. BRODEN:  Your Honor, if you wouldn't mind

25   allowing me, since I have him on the line, to ask Mr. Miller

App.368

1    whether he is still in D.C.?  Because his parents got some

2    notice that he was being moved from the CTC.  So I think

3    that could even affect some of these issues.

4              THE DEFENDANT:  I am still in D.C.

5              MR. BRODEN:  Have you gotten any notice you are

6    going to be moved?

7              THE DEFENDANT:  No.  I haven't received any

8    notices of movement, no.

9              MR. BRODEN:  Thank you for indulging me,

10   Your Honor.  That is all I had.

11             THE COURT:  Thank you, Counsel.

12             As I said, we will take those motions under

13   advisement, and we will see everyone on the 21st at

14   2:00 p.m.  Thank you.

15             MR. PEARCE:  Thank you, Your Honor.

16             MR. BRODEN:  Thank you.

17             (Proceedings concluded at 2:15 p.m.)

18

19

20

21

22

23

24

25

App.369

1              **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman,** Official Court

4    Reporter, certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8              **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14   __March 26, 2022__          __/s/_____
                DATE                     Lorraine T. Herman

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIMINAL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | **1:21-CR-00119-CJN** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GARRET MILLER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>DEFENDANT OPPOSITION TO THE GOVERNMENT'S MOTION FOR
RECONSIDERATION OF THE COURT'S RULING DISMISSING COUNT THREE
OF THE INDICTMENT</u>**

App.371

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................................... 2

ARGUMENT ..................................................................................................... 3

    I.     Reconsideration standard in criminal cases ............................................ 3

    II.    Reconsideration is not warranted on account of the Court's application of the rule of lenity ...................................................................................................... 4

        A.   "The Court erred" is not a basis for reconsideration ................................. 5

        B.   The government reargues the same lenity theories .................................. 6

        C.   The government is wrong on the merits ................................................. 6

            1.    The government fails to address the principle that courts exercise restraint in addressing the reach of federal criminal statutes ......................................... 7

            2.    The Court did not err by using the word "serious" rather than "grievous" ........ 8

            3.    The government misunderstands *Miller*'s analysis of § 1512(c)'s text ........... 10

            4.    This Court's opinion was plainly correct on statutory context and history ...... 18

    III.   Pretrial dismissal was not "premature" ................................................. 22

CONCLUSION ................................................................................................. 24

CERTIFICATE OF SERVICE ............................................................................ 26

App.372

Defendant Garret Miller, through his counsel, submits this opposition to the government's Motion for Reconsideration of the Court's Ruling Dismissing Count Three of the Indictment. ECF No. 75. The government has not shown that the Court "patently misunderstood a party, made a decision outside the adversarial issues presented to the Court by the parties, [or] made an error not of reasoning but of apprehension," nor has it pointed to "a controlling or significant change in the law or facts since the submission of the issue to the Court." *United States v. Hassanshahi*, 145 F. Supp. 3d 75, 80 (D.D.C. 2015) (internal quotation and citation omitted). The reconsideration motion must therefore be denied.

But even if the government faced a less forbidding standard, overturning the settled law of the case would not be warranted. Repeating general arguments it made in opposition to Miller's motion to dismiss Count Three, the government fails to counter the Court's particular reasons for concluding that there are only two plausible constructions of 18 U.S.C. § 1512(c)(2), that the better one did not support Count Three, and that "at the very least" the Court was left with "serious ambiguity in a criminal statute."

## ARGUMENT

### I.    Reconsideration standard in criminal cases

Although the Federal Rules do not specifically provide for motions for reconsideration in criminal cases, "Courts in this District have . . .entertained motions for reconsideration in criminal cases by importing the standards of review applicable in motions for reconsideration in civil cases." *Hassanshahi*, 145 F. Supp. 3d at 80 (citing *United States v. Trabelsi*, 2015 U.S. Dist. LEXIS 1175272, 2015 WL 5175882, at *2 (D.D.C. 2010); *United States v. Slough*, 61 F. Supp. 3d 103, 107 (D.D.C. 2014); *United States v. Cabrera*, 699 F. Supp. 2d 35, 39 (D.D.C. 2010); *United*

App.373

*States v. Sunia*, 643 F. Supp. 2d 51, 60-61 (D.D.C. 2009); *United States v. Libby*, 429 F. Supp. 2d 46, 46-47 (D.D.C. 2006)).

With respect to interlocutory decisions, "courts in this district have . . . adopted the standard from civil cases that reconsideration of an interlocutory decision is available 'as justice requires.'" *Hassanshahi*, 145 F. Supp. 3d at 80 (citing *Trabelsi*, 2015 U.S. Dist. LEXIS 117572, at *2). To determine what "justice requires," the Court considers whether it "'patently misunderstood a party, made a decision outside the adversarial issues presented to the Court by the parties, [or] made an error not of reasoning but of apprehension,'" or whether there has been "'a controlling or significant change in the law or facts since the submission of the issue to the Court.'" *Id.* (quoting *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)).

Motions for reconsideration are committed to the sound discretion of the district court. *Hassanshahi*, 145 F. Supp. 3d at 80. The moving party bears the burden to show that reconsideration "is appropriate and that harm or injustice would result if reconsideration were denied." *Id.* (internal quotation and citation omitted). A motion for reconsideration is "'not simply an opportunity to reargue facts and theories upon which a court has already ruled.'" *Id.* (quoting *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995)).

## II.    Reconsideration is not warranted on account of the Court's application of the rule of lenity

The government argues that the Court should reconsider its decision as it "erred by applying the rule of lenity to Section 1512(c)(2) because, as many other judges have concluded after examining the statute's text, structure, and history, there is no genuine—let alone 'grievous' or 'serious'—ambiguity." ECF No. 75, p. 7. The government fails to carry its reconsideration burden for several reasons.

4

App.374

### A.  "The Court erred" is not a basis for reconsideration

In the first place, reconsideration is not warranted based on the government's argument that the "Court erroneously applied the rule of lenity in this case." ECF No. 75, p. 9.  Rather, its burden is to show either that the Court "patently misunderstood a party, made a decision outside the adversarial issues presented to the Court by the parties, [or] made an error *not of reasoning* but of apprehension,'" or that there has been "a controlling or significant change in the law or facts since the submission of the issue to the Court." *Hassanshahi*, 145 F. Supp. 3d at 80 (internal quotation and citation omitted) (emphasis added).  The government does not contend that the Court misunderstood the government's arguments, made a decision outside the adversarial issues presented to the Court, or made an error "not of reasoning but of apprehension." ECF No. 75, pp. 9-21.  To the contrary, the Court benefitted from multiple rounds of briefing on Miller's motion to dismiss Count Three, as well as oral argument.  ECF Nos, 34, 35, 47, 59, 60, 63.

Nor does the government show a controlling or significant change in the law or facts since the submission of Miller's motion to dismiss Count Three.  Instead, the government points to inconsistent decisions by judges in the same district court.  ECF No. 75, pp. 5-6.  But, of course, those decisions are not "controlling" with respect to this Court, in this and every other context. *E.g.*, *McAllister v. District of Columbia*, 53 F. Supp. 3d 55, 59 (D.D.C. 2014) (rejecting motion for reconsideration based on argument that new district court decisions constituted an "intervening change in controlling law" because those decisions were not controlling); *Young America's Foundation v. Gates*, 560 F. Supp. 2d 39, 49 n. 4 (D.D.C. 2008) (clarifying that other district court decisions are "only persuasive, and not binding, authority").

For those reasons alone, the government's reconsideration motion should not have been filed and must be denied.  *Hassanshahi*, 145 F. Supp. 3d at 80.

App.375

### B.  The government reargues the same lenity theories

The government "simply . . . reargue[s] facts and theories upon which [the] court has already ruled." *Hassanshahi*, 145 F. Supp. 3d at 80.  It contends that "[t]he rule of lenity . . . does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher. It continues that the rule of lenity 'only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended.'" ECF No. 75, p. 8 (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).  The government made exactly the same argument, with the same case citations, in multiple briefs, in opposing Miller's motion to dismiss Count Three.  ECF No. 35, p. 12 n. 2; ECF No. 63-1, pp. 38-39.  The reconsideration motion adds no new "theories" to the government's lenity arguments.  ECF No. 75, pp. 8-10.  The government simply contends that because the Court did not agree with the government's position, the Court did not apply the rule of lenity correctly.   *Id.* at 9 ("The Court erroneously applied the rule of lenity.").  The reconsideration motion must also be denied for this reason.  *Hassanshahi*, 145 F. Supp. 3d at 80.

### C.  The government is wrong on the merits

Even if the Court were to apply a *de novo* standard of review to its own decision—the standard advanced by the government in all but name—reconsideration would not be warranted. The government's lenity argument has two components.  The first is semantic and requires little attention.  The second amounts to an attempt to relitigate the Court's entire § 1512(c)(2) analysis— from text, to structure, to the development of the statute over time—through the lens of the rule of lenity.  Both fail.

App.376

**1. The government fails to address the principle that courts exercise restraint in addressing the reach of federal criminal statutes**

Before turning to the government's arguments, the Court should notice what its motion omits.  The Court's decision rested in part on the principle that "federal courts have 'traditionally exercised restraint in assessing the reach of a federal criminal statute.'" Mem. Op. at 9 (quoting *United States v. Aguilar*, 515 U.S. 593, 600 (1995)).  The Court added that this "'prudent rule of construction' continues with force today." *Id.* (quoting *Dowling v. United States*, 473 U.S. 207, 214 (1985)).

Though the restraint principle was a basis for the Court's decision, the government has nothing to say about it.  That is not surprising.  On this principle "[t]he Supreme Court's message is unmistakable: Courts should not assign federal criminal statutes a 'breathtaking' scope when a narrower reading is reasonable." *United States v. Dubin*, 27 F.4th 1021, 1041 (5th Cir. 2022) (Costa, J., dissenting) (quoting *Van Buren v. United States*, __ U.S. __, 141 S. Ct. 1648, 1661, 210 L. Ed. 2d 26 (2021)).

Interpretative restraint has played a vital role recently in the Supreme Court's criminal case docket.  *Van Buren*, 141 S. Ct. at 1661 (holding that the Computer Fraud and Abuse Act should not be read in a way that "would attach criminal penalties to a breathtaking amount of commonplace ... activity"); *Kelly v. United States*, __ U.S. __ , 140 S. Ct. 1565, 1568, 206 L. Ed. 2d 882 (2020) (refusing to expand federal fraud statutes to "criminalize all [ ] conduct" that involves "deception, corruption, [or] abuse of power"); *Marinello v. United States*, __ U.S. __, 138 S. Ct. 1101, 1107, 1110, 200 L. Ed. 2d 356 (2018) (rejecting expansive reading of tax obstruction law that would "transform every violation of the Tax Code into [a felony] obstruction charge"); *McDonnell v. United States*, 579 U.S. 550, 136 S. Ct. 2355, 2372–73, 195 L. Ed. 2d 639 (2016) (rejecting "expansive interpretation" of bribery law and refusing to construe it "on the

App.377

assumption that the Government will 'use it responsibly'"); *Yates*, 574 U.S. at 540 (rejecting an "across-the-board ban on the destruction of physical evidence of every kind"); *Bond v. United States*, 572 U.S. 844, 863, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014) (rejecting government's interpretation of chemical weapons ban when it would transform statute "into a massive federal anti-poisoning regime that reaches the simplest of assaults"); *Skilling v. United States*, 561 U.S. 358, 410–11, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) (adopting a "reasonable limiting construction" of honest-services wire fraud statute and "resist[ing] the Government's less constrained construction absent Congress' clear instruction otherwise"); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) (exercising "restraint" in interpreting obstruction statute to avoid criminalizing "innocuous" acts of persuasion).

The government's novel construction of § 1512(c)(2) would create felony liability on account of *any act* that "obstructs" or "influences" any proceeding of Congress, "corruptly." The government defines "corruptly" to mean "wrongfully" or "evilly." Taken together, then, the government contends that the statute reaches any act that influences Congress wrongfully. The Court appropriately applied the principle of interpretive restraint in rejecting this breathtakingly overbroad construction of § 1512(c)(2).

> **2.   The Court did not err by using the word "serious" rather than "grievous"**

The Court determined that, under current lenity doctrine, "the rule of lenity applies to instances of 'grievous' ambiguity, *see Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (collecting citations), a construction that is arguably in tension with the rule's historical origins." Mem. Op. at 9 (citing 1 William Blackstone, *Commentaries*, *88 ("Penal statutes must be construed strictly.")).   After considering the text, structure and

App.378

development of § 1512(c)(2) over time, the Court concluded that it was left with "serious ambiguity in a criminal statute." *Id.* at 28.  The government appears to contend that the Court erred by using the word "serious" instead of "grievous" in this portion of its opinion.  ECF No. 75, p. 9.

As "serious" is a synonym of "grievous," the government is mistaken. *Grievous*, def. 3, Merriam-Webster Online Dictionary (2022) (defining "grievous" to mean "serious, grave"), https://www.merriam-webster.com/dictionary/grievous.    But so far from prejudicing the government, the Court's decision may have turned against the government despite, not because of, its adjectival framing of current lenity doctrine.  Justice Kavanaugh's concurrence in *Shular* observed that the "Court has repeatedly explained that the rule of lenity applies only in cases of 'grievous' ambiguity. . ." 140 S. Ct. at 788.  But the Justice also allowed that "the Court has not always been perfectly consistent in its formulations." *Id.*  Indeed, the Justice's accompanying string citation was itself not perfectly consistent with the Court's recent lenity decisions, for it omitted *Yates v. United States*, 575 U.S. 528, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015).  *Shular*, 140 S. Ct. at 788 *Id.* n. 2.  In 2015, the Supreme Court applied the rule of lenity to § 1519 after finding some "doubt" about whether the statute reached the defendant's conduct—not "grievous" ambiguity.   *Yates*, 575 U.S. at 547-48 ("[I]f our recourse to traditional tools of statutory construction leaves *any doubt* about the meaning of 'tangible object,' as that term is used in § 1519, we would invoke the rule that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'") (quoting *Cleveland v. United States*, 531 U.S. 12, 25, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000) (emphasis added)).  The "any doubt" formulation traces to Justice Scalia's dissent in *Abramski v. United States*, where the Justice observed that "contrary to the miserly [grievous ambiguity] approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, a reasonable doubt persists regarding whether

App.379

Congress has made the defendant's conduct a federal crime." 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) (cleaned up).

The lack of "perfect consistency" is why this Court recently applied the rule of lenity in a case after finding plain "ambiguity" in the criminal statute, not "grievous" ambiguity. *United States v. Guertin*, 2022 U.S. Dist. LEXIS 12485, at *8 (D.D.C. Jan. 24, 2022) (citing *Yates*, 574 U.S. at 547-48) (McFadden, J.).  In sum, it is itself ambiguous at best whether "grievous" ambiguity, or the *Yates* "any doubt" formulation, is the current governing standard for the rule of lenity.

### 3.   The government misunderstands *Miller*'s analysis of § 1512(c)'s text

The Court observed that § 1512(c)(2) cannot be read alone.  On its own, subsection (c)(2) would criminalize "whoever corruptly. . . *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so. . ." (emphasis added).  Thus, it must be read together with subsection (c)(1), and the term "otherwise" is critical to determining how the subsections differ. Mem. Op. at 11.  That yielded three possible readings of (c)(2).

The Court noted that when § 1512(c)(2) became law, "otherwise" had three different plausible definitions in this context: "'in a different way or manner: differently'"; "'in different circumstances: under other conditions'"; and "'in other respects.'" Mem. Op. at 11 (quoting *Otherwise*, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002)). The Court determined that the government's argument made use of the first definition—"in a different way or manner"—to argue not only that subsection (c)(2) covered all acts of obstructing, influencing and impeding an official proceeding beyond those specifically enumerated in (c)(1), but also that (c)(2) encompassed the very acts in (c)(1) itself (and the rest of § 1512 into the bargain).  Thus, under the government's construction, the only question was whether Miller

App.380

"corruptly . . . obstruct[ed], influenc[ed], or imped[ed] any official proceeding, or attempt[ed] to do so." Mem. Op. at 12.  The Court called this the "clean break" reading of § 1512(c)(2).  *Id.*

The Court found inconsistency in the clean break construction.  Both parties agreed that § 1512(c)(2) cannot be read alone, given the term "otherwise."  Indeed, the contrary authority from this district on which the government most relies is in agreement.  *United States v. Sandlin*, 2021 U.S. Dist. LEXIS 237131, at \*14 (D.D.C. Dec. 10, 2021) ("Subsections (c)(1) and (c)(2) *are linked by the word 'otherwise.'*") (emphasis added); *see also United States v. Caldwell*, 2021 U.S. Dist. LEXIS 243756, at \*43 n. 6. (D.D.C. Dec. 20, 2021) ("[T]he subsections are separated by the word 'otherwise,' which connects the two provisions. . .").   But if, as the government would have it, the only question is whether Miller "corruptly . . . obstruct[ed], influenc[ed], or imped[ed] any official proceeding, or attempt[ed] to do so," the word "otherwise" not only does no work to "link" subsection (c)(2) to (c)(1)—it is "pure surplusage." Mem. Op. at 12.  "[U]nder this reading, subsection (c)(2) would have the same scope and effect as if Congress had instead omitted the word 'otherwise.'" *Id*.

To these points, the government rejoins that "overlap is not uncommon in criminal statutes." ECF No. 75, p. 12.  The government misunderstands.  The issue is not merely complete overlap between subsection (c)(2) and (c)(1), although that is a separate flaw in its interpretation.  Again, the problem is that if the only (c)(2) question is whether Miller "corruptly . . . obstruct[ed], influenc[ed], or imped[ed] any official proceeding. . ." the term "otherwise" does not "impl[y] a relationship [between (c)(2) and] something else": an element common to all the definitions of that word.  Mem. Op. at 12.[1]

---

[1] The government adds that interpreting § 1512(c)(2) in its favor "does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is

11

App.381

The Court also correctly held that the clean break interpretation was inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).  Mem. Op. at 12-16.  The government contends the Court's reading of *Begay* was "flawed in several respects." ECF No. 75, p. 13.

First, the government argues that the Armed Career Criminal Act statutory provision in *Begay* had "an entirely different structure than 1512(c)(2)." ECF No. 75, p. 13.   Unlike the "otherwise" clause in the ACCA, the "otherwise" clause in Section 1512(c)(2) is "set off by both a semicolon and a line break." *Id.*   For the Court's convenience, Miller displays both "otherwise" clauses here:

> (B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year. . . that—
>
> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is **burglary, arson, or extortion, involves use of explosives**, *or otherwise* involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B) (emphasis and emboldening added).

> (c) Whoever corruptly—
>
> (1) **alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so**, **with the intent to impair the object's integrity or availability for use in an official proceeding**; *or*
>
> (2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c) (emphasis and emboldening added).

---

prohibited and punishable only under Section 1512(c)(1)." ECF No. 75, p. 12.  That is a strange argument.  The validity of its interpretation does not turn on the extent to which it "forecloses a defendant from arguing" something.

App.382

The government's suggestion that the "semicolon and line break" separating the "or otherwise" phrase in § 1512(c)(2) is sufficient to distinguish *Begay* from this case is mistaken. The question of statutory meaning concerns grammar, not visual formatting. The sentence, "the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . that . . . or otherwise involves conduct that presents a serious potential risk of physical injury to another," cannot be correctly interpreted without the emboldened phrase in § 924(e)(2)(B)(ii) that immediately precedes "or otherwise." Identically, the sentence, "Whoever corruptly. . .or otherwise obstructs, influences or impedes any official proceeding, or attempts to do so. . .," cannot be correctly interpreted without the emboldened phrase in § 1512(c)(1) that immediately precedes "or otherwise." The semicolon and line break do not change the meaning of the sentence that is segmented by them. The statute in *Begay* shows the error of the government's "line break" argument. The government would presumably agree that Section 924(e)(2)(B)(ii) cannot be read without reference to § 924(e)(2)(B)—despite the "line break" between them.[2] The government's semicolon and line break argument was rejected in another decision on which it relies. *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *43 n. 6.

Second, the government contends that the "key feature in Section 924(e)(2)(B)(ii) at issue in *Begay*, namely, the four example crimes, is absent in Section 1512(c)(2)." ECF No. 75, p. 13 (internal citation omitted). That is wrong. The interpretive canon to which the government alludes is *ejusdem generis*, *i.e.*, "where general words follow specific words in a statutory enumeration,

---

[2] "Line break" is not even a legal term of statutory construction. It is a literary term denoting where one line of verse ends and another begins, a formatting decision dictated not by meaning but meter and rhyme. *Line break*, Literary Devices, https://literarydevices.com/line-break/#:~:text=A%20line%20break%20refers%20to,completes%20a%20sentence%20or%20cla use. The *Sandlin* court did not explain why it applied a verse term to its legal analysis of § 1512(c)(2). 2021 U.S. Dist. LEXIS 237131, at *14.

App.383

the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates*, 574 U.S. at 545 (internal quotation and citation omitted). Though the *ejusdem generis* canon was used in *Begay* to "limit the scope of the ['otherwise'] clause to crimes that are similar to the example[] [crimes] themselves," *Begay*, 553 U.S. at 143, the canon is not limited to lists of *crimes*. The question in all cases is whether "general words follow specific words in a statutory enumeration." Turning to § 1512(c), displayed above, the Court will notice that the emboldened portion of subsection (c)(1) contains these "specific words in a statutory enumeration": "alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so. . ." § 1512(c)(1). Those specific words are "follow[ed]" by "general words": the italicized words in subsection (c)(2), "or otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so. . ." Thus, the "key feature in Section 924(e)(2)(B)(ii) at issue in *Begay*" was not "absent in Section 1512(c)(2)" and the Court was correct to apply *Begay*.

The Court's contrary holding in *Caldwell*, which attempted to distinguish *Begay*, was erroneous. *Caldwell* held that "Section 1512(c)(1) contains a general prohibition on record spoliation; it is not a list of example crimes from which some common feature can be gleaned." *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *49. In the first place, subsection (c)(1) is nothing if not a "list of example crimes." Secondly, if the Court intended to suggest that "alters, destroys, mutilates . . . a record" refers to one crime only (spoliation), that would still not account for subsection (c)(1)'s "conceal[ing] a record," which is a crime different from "spoliation." *E.g.*, *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (defining "spoliation" to mean "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation"). Thirdly, a "common feature can

App.384

be gleaned" from the example crimes in subsection (c)(1), namely, the feature that the *Caldwell* defendants repeatedly put to the Court but which went unacknowledged in its decision: all the crimes feature action designed to interfere with the integrity or availability of evidence in an official proceeding.  Indeed, that "common feature" is spelled out explicitly in subsection (c)(1), since for all the listed crimes the defendant must intend "to impair the object's integrity or availability for use in an official proceeding." § 1512(c)(1).

Third, the government contends this Court's decision erred in finding that the "otherwise" clause in *Begay* was "crucial to that Court's decision" in *Begay*.  ECF No. 75, p. 14.  It was not the "otherwise" clause that did the work, the government argues; it was the "listed crime examples" and it was Section 924(e)(2)(B)(ii)'s history, "which showed that Congress . . . opted for the specific examples in lieu of a 'broad proposal' that would have covered offenses involving the substantial use of physical force. . ." *Id.*   After all, the government argues, the *Begay* "majority '[could] not agree' with the government's argument that 'otherwise' is '*sufficient* to demonstrate that the [crime] examples do not limit the scope of the clause' because 'the word otherwise *can* (we do not say *must*, cf. *post* at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others.'" ECF No. 75, p. 14 (quoting *Begay*, 553 U.S. at 144).  Declares the government: "A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of 'otherwise' cannot be described as 'crucial.'" *Id.*

The government's argument is mistaken.  If *Begay* was "remarkably agnostic" on the significance of the term "otherwise," *United States v. Montgomery*, 2021 WL 6134591, at *11 (D.D.C. Dec. 28, 2021), the Supreme Court likely would not have later focused on Section 924(e)(2)(B)(ii)'s "or otherwise" phrase when characterizing the holding in *Begay*.  Yet it did.

App.385

*Yates*, 574 U.S. at 546 (referring to *Begay*'s "'otherwise involves' provision"). Anyway, the government's "otherwise" arguments distract from *Begay*'s core holding: that the proximity of the listed crimes "burglary, arson, extortion, or crimes involving the use of explosives" to a general crime "otherwise involv[ing] conduct that presents a serious potential risk of physical injury to another" was sufficient to "indicate[] that [the 'otherwise' clause] covers only *similar* crimes, rather than *every* crime that "presents a serious potential risk of physical injury to another." *Begay*, 553 U.S. at 142 (emphasis original):

> If Congress meant the latter, i.e., if it meant the statute to be all-encompassing, it is hard to see why it would have needed to include the examples at all. Without them, [§ 924(e)(2)(B)(ii)] would cover *all* crimes that present a "serious potential risk of physical injury." *Ibid*. Additionally, if Congress meant [§ 924(e)(2)(B)(ii)] to include *all* risky crimes, why would it have included [§ 924(e)(2)(B)(i)]? A crime which has as an element the "use, attempted use, or threatened use of physical force" against the person (as [§ 924(e)(2)(B)(i)] specifies) is likely to create "a serious potential risk of physical injury" and would seem to fall within the scope of [§ 924(e)(2)(B)(ii)]. . . .

> These considerations taken together convince us that, "to give effect . . . to every clause and word" of this statute, we should read the examples as limiting the crimes that [§ 924(e)(2)(B)(ii)] covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves.

*Begay*, 553 U.S. at 143 (emphasis original).

It is no different here. If Congress meant § 1512(c)(2) to cover any act that obstructs, influences or impedes an official proceeding, "it is hard to see why it would have needed to include" subsection (c)(1) at all. Indeed, it is hard to see why it would have needed the rest of § 1512. *Begay* made an identical point about what would happen to § 924(e)(2)(B)(i) if the government's construction of § 924(e)(2)(B)(ii) were correct. 553 U.S. at 143.

The government contends that "in the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have adopted [*Miller*'s] interpretation, and for good reason." ECF No. 75, p. 15. It adds, "Every reported case—both in the courts of appeals and in district courts—

App.386

has interpreted Section 1512(c)(2)" in the manner the government proposes. *Id.* at 16. These points are quite misleading. In fact, no court has ever held that § 1512(c)(2) reaches acts that are not intended to affect the integrity or availability of evidence in an official proceeding. Every decision cited by the government concerns a defendant who took an action to impair evidence or make it unavailable in an official proceeding:

- *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (soliciting tips from corrupt law enforcement to evade surveillance constituted evidence sufficient for jury to find "efforts were out of a desire *to influence what evidence came before the grand jury*") (emphasis added);

- *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation evidence sufficient to find purpose was to "*thwart evidence from reaching the investigation*") (emphasis added);

- *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (attempting to obtain false statement *to be used in pending federal charges* sufficient to satisfy § 1512(c)(2));

- *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) (making false statements "*directly to the grand jury itself*" sufficient to satisfy § 1512(c)(2)) (emphasis original);

- *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (false responses to interrogatories *that were filed in the official proceeding* sufficient to satisfy § 1512(c)(2));

- *United States v. Ring*, 628 F. Supp. 2d 195, 223 (D.D.C. 2009) (making false statements to outside counsel "so that counsel *would provide misleading information to the grand jury*") (emphasis added).

The precedent "supporting" the government's argument is limited to the narrow point that some courts have construed § 1512(c)(2) to reach interference with non-object evidence such as testimony. The government has not cited any case where the statute, titled "Tampering with a witness, victim, or an informant," has been interpreted to reach conduct that has *no connection to the integrity or availability of any kind of evidence*. There is none. But that is what the government needs to sustain its charge.

App.387

Just as the Second Superseding Indictment fails to "allege, let alone imply, that Miller took some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote," Mem. Op. at 29, it similarly fails to allege that Miller took such action with respect to *any* kind of evidence, object or non-object. Second Superseding Indictment, ECF No. 61. Thus, even if § 1512(c)(2) reached acts that interfere with the integrity or availability of non-object evidence, reconsideration would not be warranted on account of the bare allegation that Miller "push[ed] past officers to gain entrance to the building." Mem. Op. at 3.

### 4. This Court's opinion was plainly correct on statutory context and history

This Court painstakingly and thoughtfully analyzed § 1512's structure, its historical development and its legislative history. Mem. Op. at 20-28. The government argues that the Court "erred in several respects" in applying those interpretative tools. ECF No. 75, p. 17. Those interpretive methods, it says, only "reinforce [the government's] straightforward interpretation of Section 1512(c)(2)'s scope." *Id.* Here, the government's arguments merit even less attention.

First, this Court aptly observed that the government's construction of § 1512(c)(2) presumes Congress would "hide [an] elephant in [a] mousehole." Mem. Op. at 21. The other subsections of the statute criminalize discrete conduct in narrow contexts; subsection (c)(1) continues that focus. If subsection (c)(2) covered *any* act that obstructs, influences, or impedes an official proceeding, it would be the "only provision in § 1512 not to have a narrow focus." *Id.* The Court might have added that it would also be the only provision in § 1512 that has no connection to the integrity or availability of evidence (object or non-object) in a proceeding. The government contends that this "reasoning is inconsistent with *Yates*" because the Court alluded in that case to "broad proscriptions" to be found generally in Chapter 73 sections other than § 1519. *Yates*, 574

App.388

at 541.  Of course, it is not clear what section, much less subsection, *Yates* was alluding to in this nonessential passage of a case not concerning § 1512.  The government adds that "Section 1512(c)(2) reaches more broadly precisely because other provisions in Section 1512 leave gaps that Section 1512(c)(2) fills." ECF No. 75, p. 18.  The Court will notice that the government does not explain where those "gaps" lie among Section 1512(a), (b), (c)(1), and (d).

Second, the Court held that the government's construction of § 1512(c)(2) would make surplusage of "at least eleven subsections" of § 1512.  Mem. Op. at 21-22.  The government rejoins that the Court should not "worry," as the government's construction of subsection (c)(2) would not "'entirely subsume numerous provisions within the chapter.'" *Id.* at 22 (quoting *Sandlin*, 2021 WL 5865006, at *8).  Here, Miller's counterarguments make themselves.  The canon against surplusage holds that "all words in a statute are to be assigned meaning, and that *nothing* therein is to be construed as surplusage.'" *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (quoting *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995)) (emphasis added).  "[T]he canon . . . is strongest when an interpretation would render superfluous *another part* of the same statutory scheme." *Marx v. General Rev. Corp.*, 568 U.S. 371, 386 (2013) (emphasis added).  Thus, that the government's construction of § 1512(c)(2) would not "entirely subsume numerous provisions within the chapter" does not relieve the Court of its surplusage "worry." The government does not attempt to show the Court was incorrect in concluding that at least eleven subsections of § 1512 would be rendered superfluous by the government's construction of subsection (c)(2).  By contrast, if § 1512(c)(2) is limited to acts that affect the

App.389

integrity or availability of evidence in a proceeding, none of those other subsections are rendered superfluous.[3]

Third, the Court determined that the legislative history of § 1512(c) in the Sarbanes-Oxley Act of 2002 is littered with legislators' statements and reports "regarding the focus of the proposed new subsection on documents and document-shredding." Mem. Op. at 27.  The government neither contests that characterization of the history, nor points to contrary suggestions in the history that support its construction of subsection (c)(2).   Indeed, it concedes that "the legislators who enacted Section 1512(c) . . . undoubtedly had document shredding foremost in mind. . ." ECF No. 75, p. 20.

Instead, the government focuses solely on the Court's "suggest[ion] that Congress would have had no reason to add Section 1512(a)(2)(B) three months after enacting Section 1512(c)(2) if the latter provision" were construed to cover any act that obstructs, impedes or interferes with an official proceeding.  ECF No. 75, p. 19.  The government hazards such a reason:

> Section 1512(a)(2)(B) prohibits the use or threatened use of physical force against "any person" with the intent to "cause or induce any person" to take one of four actions, including "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] an object with intent to impair the integrity or availability of the object for use in an official proceeding." 18 U.S.C. § 1512(a)(2)(B)(ii). But as the Court noted. . . unlike Section 1512(a)(2)(B), Section 1512(c) aimed generally to impose "direct" liability for obstructive conduct that was not directed at intimidating or influencing another person. Understood in that light, Section 1512(a)(2)(B) operates harmoniously with both subsections in Section 1512(c): Section 1512(a)(2)(B)(ii) reaches a defendant's use of force or threatened use of force at *another person* in order to cause that person to destroy documents in connection with an official proceeding; Section 1512(c)(1) reaches a defendant's direct destruction of documents in connection with an official proceeding; and Section 1512(c)(2) reaches a

---

[3] Not to be outdone in a surplusage contest, the government contends that *the Court's* construction creates surplusage. "More troubling, by interpreting Section 1512(c)(2) to require 'some action with respect to a document,' the Court risks rendering Section 1512(c)(2) itself superfluous in light of the broad ban on evidence spoliation in Section 1512(c)(1)." ECF No. 75, p. 18.  Because the Court held that subsection (c)(2) requires an act affecting the integrity or availability of evidence in a proceeding in a different manner than the acts in (c)(1), it is not clear what "risk" the government is vaguely alluding to.  In any case, even if the Court's construction created the "risk" of surplusage in one subsection that would be less than the eleven subsections rendered superfluous by the government's construction.

defendant's non-document-related conduct that obstructs or impedes an official proceeding.

ECF No. 75, pp. 19-20.

It is not hard to see that the government has failed to show why Congress would add Section 1512(a)(2)(B) three months after enacting Section 1512(c)(2) if the government's construction of the latter were correct. In the government's example, if "Section 1512(c)(2) reaches a defendant's non-document-related conduct that obstructs or impedes an official proceeding," then it would also necessarily encompass "a defendant's use of force or threatened use of force at *another person* in order to cause that person to destroy documents in connection with an official proceeding." ECF No. 75, p. 19. Thus, if § 1512(c)(2) covers any act that obstructs, influences or impedes an official proceeding, there was no need for Congress to enact Section 1512(a)(2)(B)(ii) three months later.

Fourth, the government contends that the Court's construction of § 1512(c)(2) would "lead to absurd results." ECF No. 75, p. 20. The Court's interpretation "would appear, for example, not to encompass an individual who seeks to 'obstruct[], influence[], or impede[]' a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify Electoral College vote results by 'dragging lawmakers out of the Capitol by their heels with their heads hitting every step . . .'" *Id.* at 20-21 (citing *United States v. Reffitt*, 21-cr-32-DLF). This is quite a misleading argument. To begin with, that subsection (c)(2) specifically would not "encompass [such] an individual" does not make that result "absurd" because at least one other subsection of § 1512 would apply to the posited scenario. § 1512(d)(1) (criminalizing "harass[ing] another person and thereby hinder[ing], delay[ing], prevent[ing], or dissuad[ing] any person from . . . attending or testifying in an official proceeding"). Indeed, the Court in *Reffitt*, on which the government's misleading hypothetical is based, beseeched the government to substitute a § 1512(d)(1) charge for its § 1512(c)(2) charge. Yet the

App.391

government refused, almost certainly because subsection (d)(1) has a three-year statutory sentencing maximum, unlike the 20-year maximum in subsection (c)(2), which the government insists on securing.  In addition, it would not be an "absurd" outcome for an obstruction of justice charge not to apply to a person on the basis that he "explicitly state[ed] that he intends to stop [] legislators" from doing something, because, in the absence of additional facts, that would be to prosecute the person for protected speech.  *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

### III.   Pretrial dismissal was not "premature"

The government's indictment must contain a "definite written statement of *the essential facts* constituting the offense charged. . ." Fed. R. Crim. P. 7(c)(1) (emphasis added).  Therefore, a "valid indictment must: (1) allege the essential facts constituting the offense, (2) allege each element of the offense, so that fair notice is provided, and (3) be sufficiently distinctive that a verdict will bar a second prosecution for the same offense." *United States v. Sunia*, 643 F. Supp. 2d 51, 77 (D.D.C. 2009).  "[I]n order to satisfy [the Fifth Amendment's] purpose of giving the defendant notice of the charge against him the indictment must allege the essential elements of the offense." *United States v. Haldeman*, 559 F.2d 31, 123 (D.C. Cir. 1976).

Another function of Rule 7 is "serv[ing] the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).  When the evidence on which a defendant is tried broadens the possible bases for conviction beyond the indictment voted on by the grand jury, a constructive amendment occurs.  *Stirone v. United States*, 361 U.S. 212, 217 (1960).

This Court held that "[n]othing in Count Three (or the Indictment more generally) alleges, let alone implies, that Miller took some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence Congress's certification of the electoral vote."

App.392

Mem. Op. at 29.  The government now contends that even if its interpretation of § 1512(c)(2) is erroneous, the Second Superseding Indictment is still valid under Rule 7 and may not be dismissed. ECF No. 75, pp. 21-24.  That makes no sense.

The Indictment does not allege facts that the Court has deemed "essential facts constituting the offense." Thus, it does not comport with Rule 7.  *Sunia*, 643 F. Supp. 2d at 77.  It does not put Miller on notice of the facts on which he will be tried and exposes him to a second prosecution for the same offense.  In addition, if the government did not present the essential facts to the grand jury, Miller's presentment right has been violated, which is a "fatal error."  *Stirone*, 361 U.S. at 217.  On many occasions Courts in this district have found indictments insufficient under Rule 7 for not alleging essential facts such as these. *E.g.*, *United States v. Bazezew*, 783 F. Supp. 2d 160, 168 (D.D.C. 2011) (indictment fails to allege all overt acts in which any defendant participated so that each defendant may understand the government's view of his alleged role in the conspiracy); *United States v. Ramirez*, 54 F Supp. 2d 25, 90 (D.D.C. 1999) (same); *United States v. Brown*, 2007 U.S. Dist. LEXIS 49169, *45 (D.D.C. July 9, 2007) (indictment failed to allege "specific alleged actions and specifically worded false statements on which the government shall rely in proving its case"); *United States v. Palfrey*, 499 F. Supp. 2d 34, 51-52 (D.D.C. 2007) (indictment failed to identify proceeds allegedly used in support of criminal enterprise); *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) (indictment failed to allege "which [false] statements [defendant] has to defend against . . ."); *United States v. Espy*, 989 F. Supp. 17, 34 (D.D.C. 1997) (indictment failed to allege what defendant solicited and received because of official acts performed and to be performed by defendant).

The government asserts that the Court's "conclusion that only the narrower theory is a viable basis for conviction should not result in dismissal of Count Three; instead, the Court would

App.393

properly enforce that limitation by permitting conviction on that basis alone." ECF No. 75, p. 22.

It adds that, at trial, the government "could" prove that the Certification proceeding "operates

through a deliberate and legally prescribed assessment of ballots, lists, certificates, and potentially,

written objections." ECF No. 75, p. 23.  Other evidence "could" establish that Miller's conduct

had the "'natural and probable effect,' *Aguilar*, 515 U.S. at 599" of "destroying or imperiling the

ballots and other paraphernalia from the Certification proceeding." *Id.* at 24.  The government does

not understand.  It must present the essential facts constituting the offense to the grand jury and

those facts must be *alleged in the Indictment* to put Miller on notice of the charge and to prevent

double jeopardy.  The Indictment does not allege any action Miller took with respect to a

document, record or other object in order to corruptly obstruct, impede, or influence the joint

session of Congress.

Even if the government were correct that its Indictment were somehow valid under Rule 7

despite the *Miller* decision, reconsideration would not be warranted because "harm or injustice"

does not result to the government from dismissal.  *Hassanshahi*, 145 F. Supp. 3d at 80.  If the

government is correct that it can proceed to trial in this case despite the Court's decision, it could

obtain a new indictment that pleads the essential facts required by *Miller*.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the government's motion for reconsideration should be

denied.

App.394

Respectfully submitted,


/s/ F. Clinton Broden
F. Clinton Broden
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
(214) 720-9552
(214) 720-9594 (facsimile)
clint@texascrimlaw.com

Attorney for Defendant
Garret Miller

App.395

## <u>CERTIFICATE OF SERVICE</u>

I, F. Clinton Broden, certify that, on April 28, 2022, I caused a copy of the above document

to be served by electronic means on:

Elizabeth C. Kelley
United States Attorney's Office
555 4th Street, N.W.
Washington, DC 20350

<u>/s/ F. Clinton Broden</u>
F. Clinton Broden

App.396

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

      v.

GARRET MILLER,

        *Defendant*.

Criminal Action No. 1:21-cr-00119 (CJN)

<u>**MEMORANDUM OPINION**</u>

In Count Three of a twelve-count Second Superseding Indictment, the United States charged Garret Miller with violating 18 U.S.C. § 1512(c)(2).  *See* Second Superseding Indictment ("Indictment"), ECF No. 61 at 2–3.  On March 7, 2022, the Court granted Miller's Motion to Dismiss, rejecting the government's broad interpretation of that statute.  *United States v. Miller*, ___ F. Supp. 3d ___, 2022 WL 823070 (D.D.C. Mar. 7, 2022).

The government has since moved for reconsideration, arguing that the Court's prior interpretation regarding the scope of § 1512(c)(2) was incorrect.  *See generally* Mot. for Reconsideration ("Mot."), ECF No. 75.  In the alternative, the government contends for the first time that, even if the Court's statutory interpretation is correct, dismissal was not warranted because the Indictment provides Miller with sufficient notice of how he allegedly violated the statute under the Court's interpretation.  *See generally id.*  The Court disagrees on both scores.

**I.  RECONSIDERATION OF THE COURT'S PRIOR DECISION ON THE SCOPE OF**
**§ 1512(C)(2) IS NOT WARRANTED**

The government argues that the Court should reconsider its prior decision because the government did not present the issue of "the degree of ambiguity required to trigger the rule of lenity" in its briefs opposing Miller's motion to dismiss.  *See* Mot. at 8.  But the parties did join

App.397

issue on this specific question, *see* Opp. to Mot. to Dismiss, ECF No. 35, at 12 n.2 (discussing the degree of ambiguity required to trigger the rule of lenity); *see also* Supp. Br. in Resp. to Def.'s Second Supp., ECF No. 63-1 at 38 (same), and the Court was well aware of and considered the appropriate standard for the application of lenity, *see Miller*, 2022 WL 823070, at *5.  The government has pointed to no intervening change in law.  Because a reconsideration motion is "not simply an opportunity to reargue facts and theories upon which a court has already ruled," the Court concludes that the government's lenity argument is not a basis for reconsideration.  *United States v. Hassanshahi*, 145 F. Supp. 3d 75, 80–81 (D.D.C. 2015) (internal quotation marks omitted).

The government also contends that reconsideration is warranted because the Court erred in its interpretation of § 1512(c)(2) and because its decision conflicts with the decisions of other Judges in the District.  *See generally* Reply, ECF No. 84.  The Court has again carefully considered the government's arguments—presented here and in other cases pending before the Court—as to why the government's broad reading of § 1512(c)(2) is the correct one.  The Court has also carefully considered the opinions from other Judges in the District on the issue.[1]  The Court is not

---

[1] The Court notes that those decisions reach the same conclusion but for different reasons.  For example, some opinions do not consider the relevance of the word "otherwise" in the statute at all, *see United States v. McHugh*, ("*McHugh I*"), 2022 WL 296304, at *12 (D.D.C. Feb. 1, 2022) (omitting "otherwise" even from its quotation of the statute); others mention the word but essentially omit any serious discussion of it, *see United States v. Nordean*, 2021 WL 6134595, at *6-7 (D.D.C. Dec. 28, 2021); and others suggest that it presents the key interpretive question, *United States v. McHugh*, ("*McHugh II*"), 2022 WL 1302880, at *4 (D.D.C. May 2, 2022) (concluding "the meaning of 'otherwise' is central to the meaning of § 1512(c)(2)").  Other decisions appear to have concluded that § 1512(c)(1) acts as something of a carveout from § 1512(c)(2)'s otherwise broad terms, *see United States v. Reffit*, 2022 WL 1404247, at *8 (D.D.C. May 4, 2022), *see also United States v. Sandlin*, 2021 WL 5865006, at *5 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 2021 WL 6062718, at *12 (D.D.C. Dec. 20, 2021), *reconsideration denied*, 2022 WL 203456 (D.D.C. Jan. 24, 2022); *United States v. Mostofsky*, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021); *United States v. Bingert*, 2022 WL 1659163, at *8–*9 (D.D.C. May 25, 2022), while others interpret "otherwise" to require a link between the subsections that is

persuaded, either by the government's arguments or those other decisions, that the statute is so clear that the rule of lenity is inapplicable.  The Court therefore stands on its previous decision concerning the scope of § 1512(c)(2).

## II. DISMISSAL OF THE INDICTMENT IS NOT PREMATURE

The government argues in the alternative that, even under the Court's interpretation of § 1512(c)(2), dismissal was premature because the Indictment satisfies Federal Rule of Criminal Procedure 7(c)(1) and is otherwise constitutional.  *See* Mot. at 21–24.  The government did not make this argument in its initial opposition to Miller's Motion to Dismiss.  *See generally* Mem. in Opp., ECF No. 63-1.  But even if the argument has not been forfeited—Miller, for his part, has not argued that the government forfeited this argument—it falls short.

Count Three of the Second Superseding Indictment states:

### <u>COUNT THREE</u>

On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET MILLER**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

Indictment at 2–3 (emphasis original).  Count Three contains no other allegations, is not preceded by a general facts section, and does not cross-reference any other Counts.

The government contends that the Indictment is nonetheless sufficient, as it "echo[es] the operative statutory text while also specifying the time and place of the offense."  Mot. at 21

---

provided through the requirement that the illegal conduct be targeted at an "official proceeding," *see United States v. Montgomery*, 2021 WL 6134591, at \*12 (D.D.C. Dec. 28, 2021); *United States v. Grider*, 2022 WL 392307, at \*5–6 (D.D.C. Feb. 9, 2022).

App.399

(quoting *United States v. Williamson*, 903 F.3d 124, 140 (D.C. Cir. 2018)).  The government argues that Count Three should be construed as encompassing both the government's interpretation of the statute and the Court's.  Put differently, the government argues that because Count Three echoes the statutory text, it is wholly consistent with the Court's interpretation of the statute (and, presumably, would be consistent with essentially any interpretation).[2]

Miller disagrees.  He argues that an indictment must contain a "definite written statement of the essential facts constituting the offense charged."  Def.'s Resp., ECF No. 80 at 22 (quoting Fed. R. Crim. P. 7(c)(1)) (emphasis omitted).  Miller contends that nothing in Count Three (or in the Indictment more generally) alleges or even implies that he took some action with respect to a document, record, or other object, which is required under the Court's interpretation.  *See id.* at 22–24; *Miller*, 2022 WL 823070, at *15.  Miller also notes that the Indictment does not include the facts essential to the charge, thus robbing him of his opportunity to prepare a proper defense. *See* Def.'s Resp. at 23.

The Court agrees with Miller.

An indictment must contain the essential facts constituting the charged offense.  Chief Justice John Marshall explained long ago (albeit in the context of an admiralty proceeding to enforce a forfeiture judgment against a schooner and her cargo) that:

> It is not controverted that in all proceedings in the Courts of common law, either against the person or the thing for penalties or forfeitures, the allegation that the act charged was committed in violation of law, or of the provisions of a particular statute will not justify condemnation, unless, independent of this allegation, a case be stated which shows that the law has been violated.  The reference to the statute may direct the attention of the Court, and of the accused, to the particular statute by which the prosecution is to be sustained, but forms no part of the description of the offence.  The importance of this principle to a fair administration of justice, to that

---

[2] If the government's argument were correct, it is not apparent why any Judge needed to address what conduct § 1512(c)(2) covers at the motion-to-dismiss stage.

App.400

> certainty introduced and demanded by the free genius of our institutions in
> all prosecutions for offences against the laws, is too apparent to require
> elucidation, and the principle itself is too familiar not to suggest itself to
> every gentleman of the profession.

*The Hoppet*, 11 U.S. (7 Cranch) 389, 393 (1813); *see also* Joseph Story, *Commentaries on the Constitution of the United States* § 1779 (1833) ("[T]he indictment must charge the time, and place, and nature, and circumstances, of the offense, with clearness and certainty; so that the party may have full notice of the charge, and be able to make his defense with all reasonable knowledge and ability.").

Courts soon applied this principle in criminal proceedings. *See* Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 YALE L.J. 2446, 2500–01 (2016) (citing *The Hoppet* and noting that the "analogy between penal actions and criminal prosecutions may also have led judges to require more specificity in pleadings than standard civil practice would have demanded"); Note, *Indictment Sufficiency*, 70 COLUM. L. REV. 876, 884 (1970) (describing *The Hoppet* as the origin of the rule that a valid criminal indictment must include a "sufficient description of [the essential elements] to inform [a] defendant as to the nature and cause of his accusation"). As the Supreme Court stated in 1895, "the true test is, not whether [the criminal indictment] might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet." *Cochran v. United States*, 157 U.S. 286, 290 (1895); *see also United States v. Cruikshank*, 92 U.S. 542, 558 (1875) ("A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances."); *id.* at 559 ("[T]he indictment should state the particulars, to inform the court as well as the accused. It must be made to appear—that is to say, appear from the indictment, without going further—that the acts charged will, if proved, support a conviction for the offence alleged.").

5

App.401

This standard is still applicable today.  As then-District Court Judge Jackson recently explained:

> It is axiomatic that "[a] crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances" if the charging document is to comport with the Constitution.  *United States v. Cruikshank*, 92 U.S. 542, 558 (1875); *see also* U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation [against him.]").  To satisfy the protections that the Sixth Amendment guarantees, "*facts* are to be stated, not conclusions of law alone." *Cruikshank*, 92 U.S. at 558 (emphasis added).  In other words, "[t]he accusation must be legally sufficient, i.e., it must assert facts which in law amount to an offense and which, if proved, would establish prima facie the accused's commission of that offense."  *United States v. Silverman*, 745 F.2d 1386, 1392 (11th Cir. 1984) (citation omitted).
>
> "The requirement that an indictment contain a few basic factual allegations accords defendants adequate notice of the charges against them and assures them that their prosecution will proceed on the basis of facts presented to the grand jury."  *United States v. Cecil*, 608 F.2d 1294, 1297 (9th Cir. 1979).  "The . . . generally applicable rule is that the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged." [*United States v.*] *Conlon*, 628 F.2d [150,] 155 [(D.C. Cir. 1980)].  Furthermore, and importantly for present purposes, "[i]t is an elementary principle of criminal pleading[ ] that where the definition of an offen[s]e . . . includes generic terms, it is not sufficient that the indictment shall charge the offen[s]e in the same generic terms as in the definition; but it must state the species[ ]—it must descend to particulars."  *United States v. Thomas*, 444 F.2d 919, 921 (D.C. Cir. 1971) (first alteration in original) (quoting *Cruikshank*, 92 U.S. at 558).  Thus, an indictment that mirrors the exact language of a criminal statute may nevertheless be dismissed as constitutionally deficient if it is "not framed to apprise the defendant 'with reasonable certainty[ ] of the nature of the accusation against him[.]'" [*United States v.*] *Nance*, 533 F.2d [699,] 701 [(D.C. Cir. 1976)] (quoting [*United States v.*] *Simmons*, 96 U.S. [360,] 362 [(1877)]).

*United States v. Hillie*, 227 F. Supp. 3d 57, 71–72 (D.D.C. 2017) (Jackson, K.B., J.) (noncitation alterations in original).

To be sure, in certain circumstances, an indictment that "echoes the operative statutory text while also specifying the time and place of the offense" can be sufficient.  *Williamson*, 903 F.3d

App.402

at 130; *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007); *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014). But those cases involve criminal statutes that are sufficiently precise such that merely echoing the statutory language in the indictment provides enough specificity to apprise a reasonable defendant of his allegedly unlawful conduct. *See, e.g.*, *Williamson*, 903 F.3d at 130–31 ("[B]y parroting the statutory language and specifying the time and place of the offense and the identity of the threatened officer, the indictment adequately informed Williamson about the charge against him [under 18 U.S.C. § 115(a)(1)] so that he could prepare his defense and protect his double-jeopardy rights."); *Resendiz-Ponce*, 549 U.S. at 107–08 ("[I]t was enough for the indictment in this case to point to the relevant criminal statute [8 U.S.C. § 1326(a)] and allege that '[o]n or about June 1, 2003,' respondent 'attempted to enter the United States of America at or near San Luis in the District of Arizona.'"); *see also Verrusio*, 762 F.3d at 13–14 (approving a much more detailed indictment than mere parroting).

In some circumstances, then, merely echoing the words of a statute and adding the time and location of the alleged offense may be enough. But when a statute is so broad and general that its terms, without more, fail to inform a reasonable person of the essential conduct at issue, merely echoing that language is *not* enough. As the Supreme Court has stated, "[i]*t is an elementary principle of criminal pleading*, *that where the definition of an offence . . . includes generic terms*, *it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition*; *but it must state the species—it must descend to particulars*." *Cruikshank*, 92 U.S. at 558 (emphasis added). In such cases, "it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Carll*, 105 U.S. 611, 612 (1881); *see also Hess*, 124 U.S. at 487

App.403

("Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."); *Williamson*, 903 F.3d at 131 ("It is true that, while parroting the statutory language is 'often sufficient,' that is not invariably so."). The government seems to realize that parroting the statute will not always suffice. Indeed, the Indictment includes allegations laying out the "official proceeding" at issue here. *See* Indictment at 2–3 (alleging that Miller disrupted "an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18").

To be sure, "neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every *means* by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (emphasis added). And the Federal Rules "were designed to eliminate technicalities in criminal pleading and are to be construed to secure simplicity in procedure." *United States v. Debrow*, 346 U.S. 374, 376 (1953). But an indictment still must include allegations of fact sufficient to make a prima facie case of criminal conduct. That rule "retain[s its] full vitality under modern concepts of pleading, and specifically under Rule 7(c) of the Federal Rules of Criminal Procedure." *Russell*, 369 U.S. at 763.

In the specific context of this statute, under the government's interpretation, just about any *actus reus* could satisfy the statute. *See, e.g.*, Mot. at 10–11; *see also Caldwell*, 2021 WL 6062718, at *13 (noting that "a person outside the Capitol building protesting legislation while it is under consideration by a congressional committee," or a "citizen who emails her congresswoman to urge

App.404

her to vote against a judicial nominee" could fall under a broad reading of the statute, but stating without explanation that "no one would seriously contend that such [ ] act[s] violate[ ] section 1512(c)(2)").  Indeed, absent any limiting context, the words "obstruct, influence, and impede" provide essentially no limit on what criminal conduct might be at issue.  *See Miller*, 2022 WL 823070, at *9; *Sandlin*, 2021 WL 5865006, at *5; *see also Caldwell*, 2021 WL 6062718, at *13 (explaining that "[t]he terms 'obstruct,' 'impede,' and especially 'influence,' unless meaningfully limited, sweep in wholly innocent and protected First Amendment conduct.").  This is true in part because those verbs refer to the *effect* that an action has, not to the *act* itself.  *See Sandlin*, 2021 WL 5865006, at *5.  Because many actions (including some constitutionally protected ones) could have the natural and probable effect of at least influencing an official proceeding, those words, without more, provide a defendant little to no guidance as to what conduct is being charged.[3]

---

[3] Other Judges in the District have concluded that the word "corruptly" limits the scope of § 1512(c)(2).  *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *13; Final Jury Instructions, *United States v. Reffitt*, No. 21-cr-32, ECF No. 119, at 25 ("To act 'corruptly,' the defendant must use unlawful means or act with an unlawful purpose, or both."); *Montgomery*, 2021 WL 6134591, at *21 ("The predominant view among the courts of appeals is that the 'corruptly' standard requires at least an 'improper purpose' and an 'intent to obstruct.'").  But this limitation goes to the *mens rea* required by the statute; it does not limit the types of conduct that are made criminal.  *But see* 18 U.S.C. § 1515(b) (defining "corruptly" in § 1505 as "acting with an improper purpose" but specifically "including" only acts with an evidentiary nexus); *United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (interpreting "corruptly" in a transitive sense, requiring acts directed towards others). And much like the different opinions on the scope of the statute, *see supra note* 1, while all Judges to have considered the issue have concluded that the statute's use of the term "corruptly" does not render it unconstitutionally vague, those decisions have not landed on a consistent approach.  For example, some have suggested that "corruptly" means acting "voluntarily and intentionally to bring about an unlawful result or a lawful result by some unlawful method, with hope or expectation of . . . [a] benefit to oneself or a benefit to another person," *Montgomery*, 2021 WL 6134591 at *22 n.5 (quoting *Aguilar*, 515 U.S. at 616–17 (Scalia, J., concurring in part and dissenting in part)), while others have suggested it means, at least, acting with "consciousness of wrongdoing."  *Bingert*, 2022 WL 1659163, at *6 (quoting *Arthur Anderson LLP v. United States*, 544 U.S. 696, 706 (2005)).

In any event, the government has not argued that "corruptly" meaningfully clarifies or limits the conduct charged in the Indictment here.  Although the Court does not now interpret "corruptly" as

9

App.405

As for the Indictment here, it states that Miller "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding."  Indictment at 2.  The charge provides no further detail as to what conduct by Miller the government (or the grand jury, for that matter) considers the *actus reus*.  But that act is an essential element of the crime.[4]

The government responds that Count Three is sufficient because it necessarily encompasses the Court's interpretation of § 1512(c)(2).  *See* Mot. at 21–24.  The Court disagrees. Absent any additional context or specificity, nothing in Count Three informs Miller of what actions he is alleged to have taken with respect to some document, record, or other object.  *See Miller*, 2022 WL 823070, at *15.  And looking to the rest of the Indictment, and assuming that Count Three implicitly incorporates its other charges, the government has pointed to no action alleged in the Indictment's four corners that has a reasonable nexus with a document, record, or other object. The Court cannot presume that the grand jury passed judgment on this essential element of the offense.  *See United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 109–10 (D.D.C. 2016).

The government offers a fallback argument, contending that the Indictment's reference to a specific official proceeding, which itself involved documents, cures the insufficiency.  *See* Reply

---

used in § 1512(c), the Court concludes that the common meanings of "corruptly" are sufficiently capacious so as not to limit or clarify the *actus reus* charged in the Indictment.

[4] Note that the Indictment would be insufficient even under the government's reading of the statute. Indeed, it is perhaps *more* problematic because an even broader set of conduct can be criminal under § 1512(c)(2) on the government's view, thereby providing even less notice to the defendant through language that merely summarizes the statute.

Indictments may cross-reference other counts.  Such cross-references could provide detail that mere parroting of general words of a statute do not.  For example, under the government's interpretation of § 1512(c)(2), a charge of an indictment under that count could incorporate the factual details provided by other charges.  But here there is no such explicit cross-reference, and the Court need not determine whether a charge lacking specificity implicitly cross-references other conduct in the indictment because nothing in this Indictment provides a document nexus.

App.406

at 10–11.  Again, the Court disagrees.  The Indictment's reference to the certification of the

Electoral College vote is only a reference to the official proceeding in question.  It sheds no light

on the *actus reus* that Miller is alleged to have taken.

The government also contends that the preferred remedy to a vague indictment is a bill of

particulars, not dismissal.  *See* Reply at 11–12; Transcript of Hearing of May 4, 2022 in *United*

*States v. Lang*, No. 21-cr-53; *see also* Minute Order of November 19, 2021, *United States v. Reffitt*,

No. 21-cr-32 (D.D.C.) (ordering a bill of particulars instead of granting a motion to dismiss when

the government advanced multiple theories about how the Defendant violated § 1512(c)(2), none

of which were described in the Indictment).  But "courts have long held that, while a valid

indictment can be clarified through a bill of particulars, *an invalid indictment cannot be saved by*

*one.*"  *Hillie*, 227 F. Supp. 3d at 81 (emphasis modified); *see also Conlon*, 628 F.2d at 156 ("[I]t

is settled that a bill of particulars and a fortiori oral argument cannot cure a defective indictment.");

*Nance*, 533 F.2d at 701–02 (same); *Thomas*, 444 F.2d at 922–23 (same).  As then-District Judge

Jackson explained:

> A subsequent statement by the government in the form of a bill of
> particulars does not guarantee that the formal charges brought against the
> defendant adhere to the facts that the grand jury considered.  *See Nance*,
> 533 F.2d at 701 (finding that a bill of particulars did not remedy an
> indictment that lacked "any allegation whatsoever" on a key element of the
> offense, because merely reciting the words of the statute gave the
> government "a free hand to insert the vital part of the indictment without
> reference to the grand jury").  And "to permit the omission [of a material
> fact] to be cured by a bill of particulars would be to allow the grand jury to
> indict with one crime in mind and to allow the U.S. Attorney to prosecute
> by producing evidence of a different crime"; which would, in essence,
> "usurp the function of the grand jury . . . and, in many cases, would violate
> due process by failing to give the accused fair notice of the charge he must
> meet."  *Thomas*, 444 F.2d at 922–23.  Therefore, even if the government's
> subsequent statement might reduce the future risk of double jeopardy, *see,*
> *e.g.*, [*United States v.*] *Sanford, Ltd.*, 859 F.Supp.2d [102,] 124 [(D.D.C.
> 2012)], it cannot "cure" an indictment that fails to provide Defendant with
> present notice of the charges against him or that potentially thwarts the role

App.407

of the grand jury in bringing those charges in the first place, *see Russell*, 369 U.S. at 770 (finding that a bill of particulars cannot cure an imprecise and fatally defective indictment); *see also Gaither*[ *v. United States*], 413 F.2d [1061,] 1067 [(D.C. Cir. 1969)] ("The bill of particulars fully serves the functions of apprising the accused of the charges and protecting him against future jeopardy, but it does not preserve his right to be tried on a charge found by a grand jury.").

*Hillie*, 227 F. Supp. 3d at 81 (Jackson, K.B., J.) (noncitation alterations in original).

In sum, Count Three of the Second Superseding Indictment is far too sparse under any proposed reading of the statute. Miller has a constitutional "right . . . to be informed of the nature and cause of the accusation" against him. U.S. Const. Amend. VI.; *see also* Fed. R. Crim. P. 7(c) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"). And allowing the government to correct that violation with a bill of particulars would simply spawn another constitutional problem, because "[n]o person shall be held to answer for a [felony], unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V.[5]

\*        \*        \*

For the forgoing reasons, the Court **DENIES** the government's Motion to Reconsider.

DATE:  May 27, 2022

CARL J. NICHOLS
United States District Judge

---

[5] The Court observes that some of the January 6 indictments include lengthy fact sections that may even include allegations that provide both an *actus reus* and an adequate nexus to a document, record, or other object. *See, e.g.*, *Caldwell I*, 2021 WL 6062718, at \*13 (D.D.C. Dec. 20, 2021) (listing detailed factual allegations in the Indictment). And others specify the alleged *actus reus* conduct in the count charging a violation of § 1512(c)(2). *See, e.g.*, *United States v. Robertson*, 2022 WL 969546, at \*3 (D.D.C. Feb. 25, 2022) (alleging that the defendants obstructed, influenced, and impeded an official proceeding "by entering and remaining in the United States Capitol without authority and participating in disruptive behavior"). The Court does not, of course, opine on the sufficiency of such indictments, but does note that the government has declined to pursue, or has failed to secure, such an indictment in this case.

App.408

# United States District Court for the District of Columbia

UNITED STATES OF AMERICA )
                          )
          vs.           )    Criminal No.   21-cr-119 (CJN)
                          )
Garret Miller                )

## NOTICE OF APPEAL

Name and address of appellant:       United States of America

Name and address of appellant's attorney:       Elizabeth H. Danello, Assistant US Attorney
Office of the US Attorney for DC
601 D Street, NW Room 6.232
Washington, DC  20253

Offense:    18 USC sec. 231(a)(3), 1512(c)(2),2, 111(a)(1), 875(c), 1752(a)(1),(2),(3), 40 USC secs. 5104(e)(2)(D),(E),(G)

Concise statement of judgment or order, giving date, and any sentence:

Order, entered on March 7, 2022, dismissing Count Three; Order, entered May 27, 2022, denying motion for reconsideration

Name and institution where now confined, if not on bail:    DC Jail (CTF Unit)

      I, the above named appellant, hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the above-stated judgment.

June 22, 2022
_____
DATE

United States of America
_____
APPELLANT
Elizabeth H. Danello
_____
ATTORNEY FOR APPELLANT

GOVT. APPEAL, NO FEE [✓]
CJA, NO FEE [ ]
PAID USDC FEE [ ]
PAID USCA FEE [ ]
Does counsel wish to appear on appeal?            YES [ ]    NO [ ]
Has counsel ordered transcripts?                YES [ ]    NO [✓]
Is this appeal pursuant to the 1984 Sentencing Reform Act?   YES [ ]    NO [✓]

# 1:21cr234, USA v. FISCHER

US District Court Criminal Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 08/02/2022**

## Header

**Date Filed:** 03/19/2021
**Other Docket:** Magistratejudgecasenumber: 1:21mj00237

**Class Code:** Open
**Closed:**

## Participants

## Defendant

**Name**
JOSEPH W. FISCHER
Appeals court case number: 22-3038

**Attorneys**
Eugene Jeen-Young Kim Ohm
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF
COLUMBIA
625 Indiana Avenue, NW Suite 550
Washington, DC 20004
USA
eugene_ohm@fd.org
(202) 208-7500
Fax: (202) 208-7515
Designation: Public Defender or Community Defender
Appointment

Amanda Rachel Gaynor
ATTORNEY TO BE NOTICED
OFFICE OF THE FEDERAL PUBLIC DEFENDER
330 Pine Street Suite 302
Williamsport, PA 17701
USA
amanda_gaynor@fd.org
570-323-9314
Designation: Public Defender or Community Defender
Appointment

Lori J. Ulrich
ATTORNEY TO BE NOTICED
OFFICE OF THE FEDERAL PUBLIC DEFENDER
Middle District of Pennsylvania 100 Chestnut Street Suite
306
Harrisburg, PA 17101
USA
lori_ulrich@fd.org
(717) 782-2237  Fax: (7107) 782-3881  Designation: Public
Defender or Community Defender Appointment

App.410

1:21cr234, USA v. FISCHER

| Charges | Disposition |
|---|---|

**Complaints:** COMPLAINT in Violation of 18:231(a)(3), 18:1752(a)(1) and (a)(2), 40:5104(e)(2)(D) and (G) and 18:1512(c)(2)

**Pending:** 18:231(a)(3); CIVIL DISORDER; Civil Disorder(1)

18:231(a)(3); CIVIL DISORDER; Civil Disorder.(1s)

18:111(a)(1) and 2; ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting(2)

18:111(a)(1) and 2; ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting.(2s)

18:1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting(3)

18:1752(a)(1); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds(4)

18:1752(a)(1); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds.(4s)

18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds(5)

18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT;  Disorderly and Disruptive Conduct in a Restricted Building or Grounds.(5s)

40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building(6)

40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building.(6s)

40:5104(e)(2)(G); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Parading, Demonstrating, or Picketing in a Capitol Building(7)

40:5104(e)(2)(G); IOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Parading, Demonstrating, or Picketing in a Capitol Building.(7s)

**Offense Level (Opening):** Felony

**Terminated:** 18:1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting.(3s)

Dismissed on Order of the Court.

**Offense Level (Terminated):** Felony

**Case Assigned To:** Judge Carl J. Nichols

## U.S. Attorneys

Alexis Jane Loeb

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

U.S. ATTORNEY'S OFFICE FOR THE NORTHERN DISTRICT OF CAL

App.411

450 Golden Gate Ave. 11th Fl.

San Francisco, CA 94102

USA

alexis.loeb@usdoj.gov

(415) 436-7168
Fax: (415) 436-7234
Designation: Assistant U.S. Attorney

Elizabeth Harper Danello

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA

Appellate Division 555 4th Street, NW

Washington, DC 20530

USA

elizabeth.danello@usdoj.gov

(202) 252-6768
Designation: Assistant U.S. Attorney

James Pearce

ATTORNEY TO BE NOTICED

U.S. DEPARTMENT OF JUSTICE CRIMINAL DIVISION APPELLATE SECTION

Department of Justice, Criminal Division 950 Pennsylvania Ave NW Suite 1250

Washington, DC 20530

USA

james.pearce@usdoj.gov

(202) 532-4991
Fax: (202) 305-2121
Designation: Assistant U.S. Attorney

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 02/17/2021 | SEALED COMPLAINT as to JOSEPH W. FISCHER (1). (Attachments: # 1 Statement of Facts) (zstd) [1:21-mj-00237-GMH] (Entered: 02/17/2021) | |
| 3 | 02/17/2021 | MOTION to Seal Case by USA as to JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21-mj-00237-GMH] (Entered: 02/17/2021) | |
| 4 | 02/17/2021 | ORDER granting 3 Motion to Seal Case as to JOSEPH W. FISCHER (1). Signed by Magistrate Judge G. Michael Harvey on 02/17/2021. (zstd) [1:21-mj-00237-GMH] (Entered: 02/17/2021) | |
| | 02/19/2021 | Case unsealed as to JOSEPH W. FISCHER (bb) [1:21-mj-00237-GMH] (Entered: 02/19/2021) | |
| | 02/19/2021 | Arrest of JOSEPH W. FISCHER in U.S. District Court for the Middle District of Pennsylvania (Harrisburg). (zltp) [1:21-mj-00237-GMH] (Entered: 02/25/2021) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 5 | 02/23/2021 | NOTICE OF SUBSTITUTION OF COUNSEL as to USA. Attorney McClain, Nicole E. added. Substituting for attorney Amy E. Larson (McClain, Nicole) [1:21-mj-00237-GMH] (Entered: 02/23/2021) | |
| 6 | 02/23/2021 | Rule 5(c)(3) Documents Received as to JOSEPH W. FISCHER from U.S. District Court for the Middle District of Pennsylvania (Harrisburg) Case Number 1:21-mj-00023-SES (zltp) Modified on 2/25/2021 (zltp). [1:21-mj-00237-GMH] (Entered: 02/25/2021) | |
| 10 | 02/25/2021 | ORDER Setting Conditions of Release : Defendant JOSEPH W. FISCHER placed on Personal Recognizance Bond, signed by Magistrate Judge Robin M. Meriweather on 2/25/2021. (kk)[1:21-mj-00237-GMH] (Additional attachment(s) added on 4/23/2021: # 1 Appearance Bond) (zkk). (Entered: 03/01/2021) | |
| 14 | 02/25/2021 | Arrest Warrant, dated 2/17/2021, returned executed in the U.S. District Court for the District of Columbia on 2/25/2021 as to Defendant JOSEPH W. FISCHER. (zstd)[1:21-mj-00237-GMH] Modified on 3/26/2021 (kk). (Entered: 03/22/2021) | |
| | 02/25/2021 | ORAL MOTION by Defendant JOSEPH W. FISCHER to Appoint Counsel. (kk) (Entered: 03/26/2021) | |
| | 02/25/2021 | ORAL MOTION by USA to Exclude Time Under the Speedy Trial Act from 2/25/2021 to 3/15/2021 as to Defendant JOSEPH W. FISCHER. (kk) (Entered: 03/26/2021) | |
| | 02/25/2021 | Minute Entry for Initial Appearance as to JOSEPH W. FISCHER held by video before Magistrate Judge Robin M. Meriweather on 2/25/2021 : The Court advised the Government of its due process obligations under Rule 5(f). Oral Motion by Defendant to Appoint Counsel, heard and granted. Assistant Federal Public Defender Eugene Ohm appointed to represent JOSEPH W. FISCHER. The defendant agreed to appear by Zoom for this hearing. A preliminary hearing was held in Pennsylvania for the defendant. Status Hearing set before Magistrate Judge Zia M. Faruqui on 3/15/2021 at 1:00 pm by telephonic/VTC. Oral Motion by USA to Exclude Time Under the Speedy Trial Act from 2/25/2021 to 3/15/2021, with no opposition by the defense, heard and granted in the interest of justice. Bond Status of Defendant: Defendant placed on Personal Recognizance Bond. Court Reporter: FTR Gold - Ctrm. 7; FTR Time Frames: 1:32:31 - 1:43:19 and 2:48:22 - 3:55:29. Defense Attorney: Eugene Ohm; U.S. Attorneys: Jacob Steiner and Nicole McClain; Pretrial Officer: Andre Sidbury. (kk) (Entered: 03/26/2021) | |
| 11 | 03/03/2021 | NOTICE OF ATTORNEY APPEARANCE Alexis Jane Loeb appearing for USA.  (Loeb, Alexis) [1:21-mj-00237-GMH] (Entered: 03/03/2021) | |
| 12 | 03/11/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, Alexis) [1:21-mj-00237-GMH] (Entered: 03/11/2021) | |
| | 03/15/2021 | Minute Entry for proceedings held before Magistrate Judge Zia M. Faruqui: Status Hearing as to JOSEPH W. FISCHER held on 3/15/2021. Defendant present by video. Government seeking to Indict the defendant. Status Hearing set for 3/29/2021 at 1:00 PM by Telephonic/VTC before Magistrate Judge Zia M. Faruqui. Bond Status of Defendant: Defendant Remain on Personal Recognizance; Court Reporter: FTR-Gold; FTR Time Frame: Ctrm 4 [2:51:28-2:56:25];Defense Attorney: Eugene Ohm; US Attorney: Alexis Loeb; Pretrial Officer: Andre Sidbury. (ztl) (Entered: 03/25/2021) | |
| 15 | 03/19/2021 | INDICTMENT as to JOSEPH W. FISCHER (1) count(s) 1, 2, 3, 4, 5, 6, 7. (zstd) (Entered: 03/22/2021) | |
| | 03/19/2021 | MINUTE ORDER: The status hearing currently scheduled for 3/29/2021 is hereby VACATED, as the government has formally | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | charged JOSEPH W. FISCHER and there are no additional matters necessitating action by a magistrate judge. If a hearing has not been scheduled before the assigned district judge, the parties are directed to contact the chambers of the assigned district judge to schedule a hearing. Signed by Magistrate Judge Zia M. Faruqui on 3/19/2021. (ztl) (Entered: 03/25/2021) | |
| 17 | 03/24/2021 | MOTION to Continue and Exclude Time by USA as to JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order to Continue and Exclude Time)(Loeb, Alexis) (Entered: 03/24/2021) | |
| 18 | 03/24/2021 | Unopposed MOTION for Protective Order  by USA as to JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order Protective Order)(Loeb, Alexis) (Entered: 03/24/2021) | |
| 22 | 03/24/2021 | MOTION to Exclude Time by USA as to JOSEPH W. FISCHER. (See docket entry 17 to view document.) (zstd) (Entered: 03/31/2021) | |
| | 03/25/2021 | Terminate Deadlines and Hearings as to JOSEPH W. FISCHER: Status Hearing set for 3/29/2021 at 1:00 PM by Telephonic/VTC before Magistrate Judge Zia M. Faruqui is VACATED. (ztl) (Entered: 03/25/2021) | |
| 19 | 03/26/2021 | MOTION for Disclosure of Discovery by USA as to JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(Loeb, Alexis) (Entered: 03/26/2021) | |
| 20 | 03/26/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, Alexis) (Entered: 03/26/2021) | |
| 21 | 03/30/2021 | NOTICE OF ATTORNEY APPEARANCE: Lori J. Ulrich appearing for JOSEPH W. FISCHER  (Ulrich, Lori) (Entered: 03/30/2021) | |
| | 03/30/2021 | Set/Reset Hearings as to JOSEPH W. FISCHER: Arraignment/Status Conference set for 4/6/2021 at 03:00 PM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 03/30/2021) | |
| | 04/06/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference/Arraignment as to JOSEPH W. FISCHER (1): Count 1,2,3,4,5,6,7 held on 4/6/2021. Not Guilty Plea as to all counts. Speedy Trial as to JOSEPH W. FISCHER is Excluded from 4/6/2021 to 5/6/2021, in the Interest of Justice, XT. Further Order to be issued by the Court. Status Conference set for 5/6/2021 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: Eugene Ohm and Lori Ulrich; US Attorney: Alexis Loeb. (zcal) (Entered: 04/06/2021) | |
| 23 | 04/06/2021 | Unopposed MOTION for Protective Order (Revised) by USA as to JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order Revised Proposed Protective Order)(Loeb, Alexis) (Entered: 04/06/2021) | |
| 24 | 04/12/2021 | PROTECTIVE ORDER. Signed by Judge Carl J. Nichols on April 12, 2021. (lccjn2) (Entered: 04/12/2021) | |
| 25 | 04/12/2021 | ORDER granting in part and denying in part 22 Motion to Exclude as to JOSEPH W. FISCHER; granting in part and denying in part 17 Motion to Continue as to JOSEPH W. FISCHER. Signed by Judge Carl J. Nichols on April 12, 2021. (lccjn2) (Entered: 04/12/2021) | |
| 27 | 04/13/2021 | Unopposed MOTION for Disclosure of Grand Jury and Sealed Materials and Proposed Order by USA as to JOSEPH W. FISCHER. (Loeb, Alexis) (Entered: 04/13/2021) | |
| 28 | 04/19/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, | |

1:21cr234, USA v. FISCHER

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Alexis) (Entered: 04/19/2021) | |
| 29 | 04/22/2021 | ORDER granting 27 Motion for Disclosure as to JOSEPH W. FISCHER. Signed by Judge Carl J. Nichols on April 22, 2021. (lccjn2) (Entered: 04/22/2021) | |
| 30 | 04/26/2021 | ENTERED IN ERROR.....NOTICE PROTECTIVE ORDER GOVERNING DISCOVERY by JOSEPH W. FISCHER (Ulrich, Lori) Modified on 4/28/2021 (zstd). (Entered: 04/26/2021) | |
| | 04/26/2021 | NOTICE OF CORRECTED DOCKET ENTRY: as to JOSEPH W. FISCHER re 30 Notice (Other) was entered in error and counsel was instructed to refile said pleading and include the motion for protective order (zstd) (Entered: 04/28/2021) | |
| 31 | 04/27/2021 | ENTERED IN ERROR.....MOTION for Bill of Particulars  by JOSEPH W. FISCHER. (Attachments: # 1 NOTICE OF FILING)(Ulrich, Lori) Modified on 4/28/2021 (zltp). (Entered: 04/27/2021) | |
| | 04/27/2021 | NOTICE OF CORRECTED DOCKET ENTRY: as to JOSEPH W. FISCHER re 31 MOTION for Bill of Particulars  was entered in error and counsel was instructed to refile said pleading. Counsel will refile as notice of filing. (zltp) (Entered: 04/28/2021) | |
| 32 | 04/28/2021 | NOTICE Bill of Particulars by JOSEPH W. FISCHER (Attachments: # 1 Bill of Particulars)(Ulrich, Lori) (Entered: 04/28/2021) | |
| 33 | 05/03/2021 | NOTICE of Filing Letter Response to Defendant's Letter Requesting Bill of Particulars by USA as to JOSEPH W. FISCHER re 32 Notice of Filing (Attachments: # 1 Exhibit Letter)(Loeb, Alexis) Modified text on 5/4/2021 (zstd). (Entered: 05/03/2021) | |
| | 05/06/2021 | MINUTE ORDER. Pursuant to the Due Process Protections Act, the Court ORDERS that all government counsel shall review their disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, as set forth in Local Criminal Rule 5.1, and comply with those provisions. The failure to comply could result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, continuances, Bar discipline, or any other remedy that is just under the circumstances. Signed by Judge Carl J. Nichols on May 6, 2021. (lccjn2) (Entered: 05/06/2021) | |
| | 05/06/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to JOSEPH W. FISCHER held on 5/6/2021. Speedy Trial as to JOSEPH W. FISCHER is Excluded from 5/6/2021 to 6/17/2021, in the Interest of Justice, XT. Status Conference set for 6/17/2021 at 01:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: Eugene Ohm and Lori Ulrich; US Attorney: Alexis Loeb. (zcal) (Entered: 05/06/2021) | |
| 35 | 05/24/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, Alexis) (Entered: 05/24/2021) | |
| 36 | 06/14/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, Alexis) (Entered: 06/14/2021) | |
| | 06/17/2021 | MINUTE ORDER. Upon consideration of Defendant's Oral Motion to Modify the 10 Order Setting Conditions of Release, it is hereby ORDERED that the Motion is GRANTED. Defendant may travel to the Eastern District of Pennsylvania and to Maryland without advance permission from Pretrial Services. The current condition requiring Defendant to stay away from the District of Columbia except for Court, pretrial business, or to meet with counsel remains in effect. Signed by Judge Carl J. Nichols on June 17, | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 2021. (lccjn2) (Entered: 06/17/2021) | |
| | 06/17/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to JOSEPH W. FISCHER held on 6/17/2021. Speedy Trial as to JOSEPH W. FISCHER is Excluded from 6/17/2021 to 8/19/2021, in the Interest of Justice, XT. Defense request to Modify Release Conditions; heard and Granted. Further Order to be issued by the Court. Status Conference set for 8/19/2021 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lisa Moreira; Defense Attorney: Lori Ulrich; US Attorney: Alexis Loeb; Pretrial Officer: Dashanta Valentine-Lewis. (zcal) (Entered: 06/17/2021) | |
| 38 | 07/13/2021 | MEMORANDUM REGARDING STATUS OF DISCOVERY by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit A)(Loeb, Alexis) Modified text on 7/14/2021 (zstd). (Entered: 07/13/2021) | |
| 39 | 08/16/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, Alexis) (Entered: 08/16/2021) | |
| | 08/19/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to JOSEPH W. FISCHER held on 8/19/2021. Speedy Trial as to JOSEPH W. FISCHER is Excluded from 8/19/2021 to 10/26/2021, in the Interest of Justice, XT. Status Conference set for 10/26/2021 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: Lori Ulrich and Eugene Ohm; US Attorney: Alexis Loeb. (zcal) (Entered: 08/19/2021) | |
| 41 | 08/30/2021 | STATUS REPORT Discovery Status Report by USA as to JOSEPH W. FISCHER (Loeb, Alexis) (Entered: 08/30/2021) | |
| 42 | 09/13/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, Alexis) (Entered: 09/13/2021) | |
| 43 | 09/17/2021 | STATUS REPORT Status of Discovery as of September 14, 2021 by USA as to JOSEPH W. FISCHER (Loeb, Alexis) (Entered: 09/17/2021) | |
| 44 | 09/27/2021 | NOTICE of Discovery Correspondence by USA as to JOSEPH W. FISCHER (Attachments: # 1 Exhibit Discovery Letter)(Loeb, Alexis) (Entered: 09/27/2021) | |
| 45 | 10/22/2021 | STATUS REPORT Status of Discovery as of October 21, 2021 by USA as to JOSEPH W. FISCHER (Loeb, Alexis) (Entered: 10/22/2021) | |
| | 10/26/2021 | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to JOSEPH W. FISCHER held on 10/26/2021. Motions due by 1/12/2022. Speedy Trial as to JOSEPH W. FISCHER is Excluded from 10/26/2021 to 1/12/2022, in the Interest of Justice, XT. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: Eugene Ohm and Lori Ulrich; US Attorney: Alexis Loeb. (zcal) (Entered: 10/26/2021) | |
| 47 | 11/02/2021 | MOTION to Modify Conditions of Release by JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(Ulrich, Lori) (Entered: 11/02/2021) | |
| 48 | 11/02/2021 | MOTION to Clarify by JOSEPH W. FISCHER. (See docket entry 47 to view document). (zstd) (Entered: 11/03/2021) | |
| 49 | 11/05/2021 | Memorandum in Opposition by USA as to JOSEPH W. FISCHER | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | re 48 MOTION to Clarify, 47 MOTION to Modify Conditions of Release   (Loeb, Alexis) (Entered: 11/05/2021) | |
| 50 | 11/08/2021 | STATUS REPORT Status of Discovery as of November 5, 2021 by USA as to JOSEPH W. FISCHER (Loeb, Alexis) (Entered: 11/08/2021) | |
| 51 | 11/08/2021 | REPLY TO OPPOSITION to Motion by JOSEPH W. FISCHER re 48 MOTION to Clarify, 47 MOTION to Modify Conditions of Release   (Ulrich, Lori) (Entered: 11/08/2021) | |
| | 11/08/2021 | MINUTE ORDER. Upon review of the Defendant's 47 Motion to Modify the Conditions of Release and the 48 Motion to Clarify the Conditions of Release, it is ORDERED that the Defendant is permitted to attend his family hunting camp from November 26 to December 12, 2021. It is further ORDERED that the Defendant may use a muzzleloader and/or a bow during that time period to hunt and only to hunt.Signed by Judge Carl J. Nichols on November 8, 2021. (lccjn2) (Entered: 11/08/2021) | |
| 52 | 11/10/2021 | SUPERSEDING INDICTMENT as to JOSEPH W. FISCHER (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s. (zhsj) (Entered: 11/16/2021) | |
| 54 | 01/12/2022 | MOTION to Dismiss Count (s) 1, 3, 4, and 5 of Superseding Indictment by JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(Ulrich, Lori) (Entered: 01/12/2022) | |
| 55 | 01/12/2022 | MOTION to Change Venue and Memorandum of Law in Support Thereof by JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(Ulrich, Lori) (Entered: 01/12/2022) | |
| | 01/14/2022 | MINUTE ORDER. Upon review of the 54 Defendant's Motion to Dismiss Counts 1, 3, 4, and 5 as well as 55 Defendant's Motion to Change Venue, it is ORDERED that the Government shall respond to both motions on or before February 4, 2022. Signed by Judge Carl J. Nichols on January 14, 2022. (lccjn2) (Entered: 01/14/2022) | |
| | 01/14/2022 | Set/Reset Deadlines as to JOSEPH W. FISCHER: Government Responses due by 2/4/2022. (zcal) (Entered: 01/14/2022) | |
| 56 | 01/27/2022 | Joint MOTION to Hold in Abeyance re 55 MOTION to Change Venue and Memorandum of Law in Support Thereof  by USA as to JOSEPH W. FISCHER. (Loeb, Alexis) (Entered: 01/27/2022) | |
| | 02/02/2022 | MINUTE ORDER. Upon consideration of 56 the Parties' Joint Request to hold JOSEPH W. FISCHER's 55 Motion to Transfer Venue in Abeyance, it is ORDERED that the Motion is GRANTED. It is further ORDERED that JOSEPH W. FISCHER's Motion to Transfer Venue shall be held in abeyance and that the deadlines for the Governments opposition and JOSEPH W. FISCHER's reply to the Motion are hereby vacated. JOSEPH W. FISCHER may renew his motion or file an amended motion at a later date. Signed by Judge Carl J. Nichols on February 2, 2022. (lccjn2) (Entered: 02/02/2022) | |
| | 02/02/2022 | Terminate Deadlines and Hearings as to JOSEPH W. FISCHER: Response TERMINATED pursuant to Minute Order filed 2/2/2022. (zcal) (Entered: 02/03/2022) | |
| 57 | 02/04/2022 | Memorandum in Opposition by USA as to JOSEPH W. FISCHER re 54 MOTION to Dismiss Count (s) 1, 3, 4, and 5 of Superseding Indictment  (Loeb, Alexis) (Entered: 02/04/2022) | |
| 58 | 02/07/2022 | MOTION for Leave to File Reply by JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(Ulrich, Lori) Modified text on 2/7/2022 (zstd). (Entered: 02/07/2022) | |
| | 02/08/2022 | MINUTE ORDER. Upon review of the 54 Defendant's Motion to Dismiss Counts 1, 3, 4, and 5 of the Superseding Indictment, it is ORDERED that the Parties shall appear for in-person argument on Wednesday, February 23 at 1:00pm. Signed by Judge Carl J. | |

1:21cr234, USA v. FISCHER

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Nichols on February 8, 2022. (lccjn2) (Entered: 02/08/2022) | |
| | 02/08/2022 | MINUTE ORDER. Upon review of 58 JOSEPH W. FISCHER's Motion for Leave to File a Reply, it is ORDERED that the Motion is GRANTED. JOSEPH W. FISCHER shall file the Reply on or before February 23, 2022. Signed by Judge Carl J. Nichols on February 8, 2022. (lccjn2) (Entered: 02/08/2022) | |
| | 02/08/2022 | Set/Reset Deadlines as to JOSEPH W. FISCHER: Reply due by 2/23/2022. (zcal) (Entered: 02/08/2022) | |
| | 02/08/2022 | Set/Reset Hearings as to JOSEPH W. FISCHER: Motion Hearing set for 2/23/2022 at 01:00 PM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 02/08/2022) | |
| 59 | 02/08/2022 | Unopposed MOTION to Continue Hearing on Motion to Dismiss by USA as to JOSEPH W. FISCHER. (Loeb, Alexis) (Entered: 02/08/2022) | |
| 60 | 02/09/2022 | NOTICE of Recent Authority by USA as to JOSEPH W. FISCHER re 54 MOTION to Dismiss Count (s) 1, 3, 4, and 5 of Superseding Indictment, 57 Memorandum in Opposition (Attachments: # 1 Exhibit U.S. v. Grider Memorandum Opinion)(Loeb, Alexis) (Entered: 02/09/2022) | |
| | 02/10/2022 | MINUTE ORDER. Upon review of the 59 Unopposed Motion to Continue the Hearing on the Motion to Dismiss, it is ORDERED that the Motion is GRANTED. It is further ORDERED that the Parties shall appear for in-person argument on Monday, February 28 at 1:00pm.Signed by Judge Carl J. Nichols on February 10, 2022. (lccjn2) (Entered: 02/10/2022) | |
| | 02/10/2022 | Set/Reset Hearings as to JOSEPH W. FISCHER: Motion Hearing RESET for 2/28/2022 at 01:00 PM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 02/10/2022) | |
| 61 | 02/11/2022 | STATUS REPORT Regarding Status of Discovery as of 2-9-22 by USA as to JOSEPH W. FISCHER (Loeb, Alexis) (Entered: 02/11/2022) | |
| 62 | 02/22/2022 | NOTICE  by JOSEPH W. FISCHER re 54 MOTION to Dismiss Count (s) 1, 3, 4, and 5 of Superseding Indictment (Ulrich, Lori) Modified text on 2/22/2022 (zstd). (Entered: 02/22/2022) | |
| | 02/28/2022 | Minute Order and Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing/Arraignment as to JOSEPH W. FISCHER (1): Count 1s,2s,3s,4s,5s,6s,7s held on 2/28/2022; Not Guilty Plea as to all counts. Motion 54 ; Taken Under Advisement. Further Opinion and Order to be issued by the Court. Motion 55 ; found as moot. Renewed Venue Motion due by 3/23/2022. Government Response due by 4/25/2022. Motion Hearing / Status Conference set for 5/3/2022 at 01:30 PM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lisa Bankins; Defense Attorney: Lori Ulrich and Eugene Ohm; US Attorney: Alexis Loeb and James Pierce. (zcal) (Entered: 02/28/2022) | |
| 64 | 03/15/2022 | MEMORANDUM OPINIONSigned by Judge Carl J. Nichols on March 15, 2022. (lccjn2) (Entered: 03/15/2022) | |
| 65 | 03/15/2022 | ORDER.Signed by Judge Carl J. Nichols on March 15, 2022. (lccjn2) (Entered: 03/15/2022) | |
| 66 | 03/22/2022 | SUPPLEMENT by JOSEPH W. FISCHER re 55 MOTION to Change Venue and Memorandum of Law in Support Thereof (Attachments: # 1 Exhibit 1)(Ulrich, Lori) (Entered: 03/22/2022) | |
| | 03/28/2022 | MINUTE ORDER. Upon review of the 66 Motion to Change Venue, it is ORDERED that the Government shall file a response on or before April 25, 2022. Signed by Judge Carl J. Nichols on March 28, 2022. (lccjn2) Modified on 3/28/2022 to correct date of | |

1:21cr234, USA v. FISCHER

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | deadline (zcal). (Entered: 03/28/2022) | |
| | 03/28/2022 | Set/Reset Deadlines as to JOSEPH W. FISCHER: Government Response due by 4/5/2022. (zcal) (Entered: 03/28/2022) | |
| | 03/28/2022 | NOTICE OF CORRECTED DOCKET ENTRY: Deadline in Minute Order filed 3/28/2022 as to JOSEPH W. FISCHER was corrected. Government Response due 4/25/2022. (zcal) (Entered: 03/28/2022) | |
| 67 | 03/29/2022 | RESPONSE TO ORDER OF THE COURT by USA as to JOSEPH W. FISCHER re 65 Order Regarding Counts Four and Five of the Superseding Indictment (Loeb, Alexis) (Entered: 03/29/2022) | |
| 68 | 03/29/2022 | SUPPLEMENT by USA as to JOSEPH W. FISCHER re 67 Response to Order of the Court Exhibit A (Secret Service Head of State Worksheet) (Loeb, Alexis) (Entered: 03/29/2022) | |
| 69 | 03/31/2022 | Unopposed MOTION for Leave to File Reply by JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(Ulrich, Lori) (Entered: 03/31/2022) | |
| | 04/01/2022 | MINUTE ORDER. Upon review of the 69 Unopposed Motion to File a Reply, it is ORDERED that the Motion is GRANTED. JOSEPH W. FISCHER may file a reply on or before April 8, 2022. Signed by Judge Carl J. Nichols on April 1, 2022. (lccjn2) (Entered: 04/01/2022) | |
| | 04/01/2022 | Set/Reset Deadlines as to JOSEPH W. FISCHER: Reply due by 4/8/2022. (zcal). (Entered: 04/04/2022) | |
| 70 | 04/06/2022 | REPLY by JOSEPH W. FISCHER re 65 Order Regarding Counts Four and Five of the Superseding Indictment (Ulrich, Lori) (Entered: 04/06/2022) | |
| 71 | 04/07/2022 | Unopposed MOTION for Leave to File Reply Brief by USA as to JOSEPH W. FISCHER. (Loeb, Alexis) (Entered: 04/07/2022) | |
| 72 | 04/08/2022 | MOTION for Reconsideration re 64 Memorandum Opinion, 65 Order Dismissing Count Three by USA as to JOSEPH W. FISCHER. (Attachments: # 1 Exhibit A (Reffitt trial transcript), # 2 Exhibit B (Reffitt trial transcript))(Loeb, Alexis) (Entered: 04/08/2022) | |
| 73 | 04/08/2022 | REPLY by USA as to JOSEPH W. FISCHER re 70 Reply to document Regarding Counts Four and Five of the Superseding Indictment (Loeb, Alexis) (Entered: 04/08/2022) | |
| | 04/11/2022 | MINUTE ORDER. Upon review of the 71 Unopposed Motion to File a Reply Brief, it is ORDERED that the Motion is GRANTED. The Government may file a reply brief on or before April 12, 2022. Signed by Judge Carl J. Nichols on April 11, 2022. (lccjn2) (Entered: 04/11/2022) | |
| | 04/11/2022 | Set/Reset Deadlines as to JOSEPH W. FISCHER: Reply due by 4/12/2022. (zcal). (Entered: 04/11/2022) | |
| 74 | 04/13/2022 | TRANSCRIPT OF PROCEEDINGS in case as to JOSEPH W. FISCHER before Judge Carl J. Nichols held on 02/28/2022; Page Numbers: 61. Date of Issuance:04/13/2022. Court Reporter/Transcriber L. Bankins, Telephone number 202-354-3243, Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court repor ter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 5/4/2022. Redacted Transcript Deadline set for 5/14/2022. Release of Transcript Restriction set for 7/12/2022.(Bankins, Lisa) (Entered: 04/13/2022) | |
| 75 | 04/19/2022 | Unopposed MOTION for Extension of Time to File Brief in Opposition by JOSEPH W. FISCHER. (Attachments: # 1 Text of Proposed Order)(Ulrich, Lori) (Entered: 04/19/2022) | |
| 76 | 04/19/2022 | Memorandum in Opposition by USA as to JOSEPH W. FISCHER re 55 MOTION to Change Venue and Memorandum of Law in Support Thereof  (Loeb, Alexis) (Entered: 04/19/2022) | |
| | 04/21/2022 | MINUTE ORDER. Upon consideration of 75 Defendant's Motion for Extension of Time to File Brief in Opposition, it is ORDERED that the Motion is GRANTED. Defendant shall file a Brief in Opposition on or before April 29, 2022.Signed by Judge Carl J. Nichols on April 21, 2022. (lccjn2) (Entered: 04/21/2022) | |
| | 04/21/2022 | Set/Reset Deadlines as to JOSEPH W. FISCHER: Response due by 4/29/2022 (zcal) (Entered: 04/21/2022) | |
| 77 | 04/29/2022 | Memorandum in Opposition by JOSEPH W. FISCHER re 72 MOTION for Reconsideration re 64 Memorandum Opinion, 65 Order Dismissing Count Three  (Ulrich, Lori) (Entered: 04/29/2022) | |
| 78 | 05/02/2022 | NOTICE OF ATTORNEY APPEARANCE: Amanda Rachel Gaynor appearing for JOSEPH W. FISCHER  (Gaynor, Amanda) (Entered: 05/02/2022) | |
| 79 | 05/02/2022 | NOTICE OF ATTORNEY APPEARANCE James Pearce appearing for USA.  (Pearce, James) (Entered: 05/02/2022) | |
| 80 | 05/02/2022 | SUPPLEMENT by USA as to JOSEPH W. FISCHER re 72 MOTION for Reconsideration re 64 Memorandum Opinion, 65 Order Dismissing Count Three Notice of Recent Authority Relevant to 18 U.S.C. 1512(c)(2) (Attachments: # 1 Exhibit 1 (Memorandum Opinion in United States v. McHugh))(Loeb, Alexis) (Entered: 05/02/2022) | |
| | 05/03/2022 | Minute Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing as to JOSEPH W. FISCHER held on 5/3/2022 re 54 and 72 . 54 Motion to Dismiss Count(s); Granted in Part and Denied in Part. 72 Motion for Reconsideration ; Taken Under Advisement. Further Order to be issued by the Court. Speedy Trial as to JOSEPH W. FISCHER is Excluded from 5/3/2022 to 7/6/2022, in the Interest of Justice, XT. Status Conference set for 7/6/2022 at 02:00 PM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: Amanda Gaynor and Eugene Ohm; US Attorney: Alexis Loeb and James Pearce. (zcal) (Entered: 05/03/2022) | |
| 81 | 05/05/2022 | SUPPLEMENT by USA as to JOSEPH W. FISCHER re 72 MOTION for Reconsideration re 64 Memorandum Opinion, 65 Order Dismissing Count Three Notice of Recent Authority (Attachments: # 1 Exhibit 1 (U.S. v. Reffitt Opinion))(Loeb, Alexis) (Entered: 05/05/2022) | |
| 82 | 05/12/2022 | SUPPLEMENT by USA as to JOSEPH W. FISCHER re 72 MOTION for Reconsideration re 64 Memorandum Opinion, 65 Order Dismissing Count Three Notice of Recent Authority (Attachments: # 1 Exhibit 1 (Reply Brief Filed in United States v. Miller))(Loeb, Alexis) (Entered: 05/12/2022) | |
| 83 | 05/25/2022 | SUPPLEMENT by USA as to JOSEPH W. FISCHER re 72 MOTION for Reconsideration re 64 Memorandum Opinion, 65 | |

1:21cr234, USA v. FISCHER

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Order Dismissing Count Three Notice of Recent Authority (Attachments: # 1 Exhibit 1 (Memorandum Opinion in U.S. v. Bingert))(Loeb, Alexis) (Entered: 05/25/2022) | |
| | 05/30/2022 | MINUTE ORDER. Upon review of the 72 Government's Motion for Reconsideration, and for the reasons discussed in the Court's recent 86 Memorandum Opinion in USA v. Miller (21-cr-119), it is ORDERED that the Motion is DENIED. Signed by Judge Carl J. Nichols on May 30, 2022. (lccjn2) (Entered: 05/30/2022) | |
| 84 | 06/22/2022 | NOTICE OF APPEAL (Interlocutory) by USA as to JOSEPH W. FISCHER re 65 Order. Fee Status: No Fee Paid. Parties have been notified. (Danello, Elizabeth) (Entered: 06/22/2022) | |
| 85 | 06/22/2022 | NOTICE OF ATTORNEY APPEARANCE Elizabeth Harper Danello appearing for USA. (Danello, Elizabeth) (Entered: 06/22/2022) | |
| 86 | 06/22/2022 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government as to JOSEPH W. FISCHER re 84 Notice of Appeal - Interlocutory. (zstd) (Entered: 06/22/2022) | |
| | 06/27/2022 | USCA Case Number as to JOSEPH W. FISCHER 22-3038 for 84 Notice of Appeal - Interlocutory filed by USA. (zstd) (Entered: 06/27/2022) | |
| | 06/30/2022 | MINUTE ORDER. In light of 84 the Notice of Appeal, it is ORDERED that the status conference scheduled for July 6, 2022 at 2:00pm is CANCELLED. Signed by Judge Carl J. Nichols on June 30, 2022. (lccjn2) (Entered: 06/30/2022) | |
| | 06/30/2022 | Terminate Deadlines and Hearings as to JOSEPH W. FISCHER: Status Conference scheduled for July 6, 2022 at 2:00pm is Terminated pursuant to Minute Order filed 6/30/2022. (zcal) (Entered: 06/30/2022) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| United States of America<br><br>v.<br><br>Joseph W. Fischer<br>DOB: XXXXXX<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:21-mj-00237<br>Assigned to: Judge Harvey, G. Michael<br>Assign Date: 2/17/2021<br>Description: COMPLAINT W/ARREST WARRANT |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 6, 2021_____ in the county of _____ in the _____ in the District of ___Columbia___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder, | |
| 18 U.S.C. § 1752(a)(1) and (a)(2) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, | |
| 40 U.S.C. § 5104(e)(2)(D) and (G) - Violent Entry and Disorderly Conduct on Capitol Grounds, | |
| 18 U.S.C. § 1512(c)(2) - Obstruction of Justice/Congress. | |

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Mustafa Kutlu, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by telephone.

Date: _____02/17/2021_____

Digitally signed
by G. Michael
Harvey
_____
*Judge's signature*

City and state: _____Washington, D.C._____     G. Michael Harvey, U.S. Magistrate Judge
_____
*Printed name and title*

App.422

Case 1:21-cr-00234-CJN   Document 1-1   File

USCA Case #22-3039     Document #1958171      Filed 08/08/2022    Page 426 of 515

Case: 1:21-mj-00237
Assigned to: Judge Harvey, G. Michael
Assign Date: 2/17/2021
Description: COMPLAINT W/ARREST WARRANT

# STATEMENT OF FACTS

Your affiant, Mustafa Kutlu, is a Special Agent with the Federal Bureau of Investigation (FBI). I have been in this position since September 2018. Currently, I am tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of violations of Federal criminal laws.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification were allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

App.423

On January 10, 2021, the FBI received information that the Facebook user with the vanity name SV Spindrift (Subject-1) bragged about breaking into the United States Capitol Building and posted a video showing Subject-1 in the front of the pack pushing against the police. The information stated that the video was later removed from Facebook. The information included the following link to Subject-1's Facebook account.

https://www.facebook.com/profile.php?id=100004195239438.

Your affiant determined from the provided link that the account identifier associated with Subject-1's Facebook account was 100004195239438. Publicly available information on Subject-1's Facebook page did not list any identifying information. However, it contained the following picture.



On January 14, 2021, your affiant served Facebook a subpoena, requesting all customer or subscriber account information for any and all accounts associated with Subject-1's Facebook account from January 6, 2021 8:00 PM (EST) to January 10, 2021 6:00 AM (EST). Upon analyzing the results of the subpoena that Facebook provided, your affiant determined that the email address jfischer@XXXXXX.org and phone number ending in -6390 were listed under account details.[1] Open source research indicated that the email address jfischer@XXXXXX.org was associated with Joseph Fisher, a Patrolman at North Cornwall Township Police Department in Pennsylvania. Searches conducted in law enforcement databases indicated that the phone number ending in -6390 was associated with Joseph W Fischer, date of birth (DOB) XX/XX/1966 and an address in Jonestown, Pennsylvania.

---

[1] The full email address and phone number were provided in the records; however, because this is being publicly filed, that information is partially redacted here.

App.424

On January 18, 2021, cellular telephone number analysis conducted for the cell phone number ending in -6390 indicated that the cell phone was active on Verizon towers servicing the U.S. Capitol on January 6, 2021, from about 3:19 P.M. until about 3:28 PM.

On February 8, 2021, your affiant obtained records from Facebook for Fischer's Facebook account pursuant to a search warrant. Your affiant analyzed the results and identified the following.

On January 7, 2021, Fischer posted a 2 minute and 43 second video on Facebook which showed the recorder of the video walking amongst crowds of people towards an entrance to a building, eventually entering the building. The video was accompanied with the text "Made it inside ... received pepper balls and pepper sprayed. Police line was 4 deep.. I made it to level two..." At about the 50 second mark of the video, it appears that the recorder begins yelling "Charge!" Towards the end of the video, the recorder started charging towards a line of police officers while appearing to shout "Hold the Line" and "Motherfuckers". The recorder had a physical encounter with at least one police officer. The recording device seemed to fall to the ground, possibly as a result of the physical encounter with the police. At least one individual could be seen on the ground. Before the end of the video, an individual could be heard shouting "Let him up…Let him up". Still images from the video recording are included below.





App.425









App.426

On January 7, 2021, Fischer provided the following comment to a Facebook post:

"there was some minor destruction and a few things were stolen ... but 98% peaceful.. I was there..we pushed police back about 25 feet. Got pepper balled and OC sprayed , but entry into the Capital was needed to send a message that we the people hold the real power"

On January 6, 2021, Fischer provided the following comment to another Facebook post:

"it was mostly peaceful... a few became destructive. Not near as bad as media was making it out...hell I was inside the capital talking to police"

On January 7, 2021, Fischer exchanged the following messages with another Facebook user (Facebook User -1).

**SV Spindrift (Fischer):** Well I may need a job ...
**SV Spindrift (Fischer):** Word got out that I was at the rally..lol
**Facebook User-1:** Are you serious?
**Facebook User-1:** Who the hell told your work? One of your friends?
**Facebook User-1:** That's bullshit
**SV Spindrift (Fischer):** Yeah .. and the FBI may arrest me ..lol
**SV Spindrift (Fischer):** >>>>Bail<<<<<<
**Facebook User-1:** Are you shitting me? This is a joke right?
**Facebook User-1:** You're fucking around
**Facebook User-1:** I seen a lot of people online getting arrested but slapped with a trespassing charge
**SV Spindrift (Fischer):** No.. havnt seen FBI yet .. but I know they are targeting police who went
**Facebook User-1:** Did your job say something to you?
**SV Spindrift (Fischer):** Yep.... chief did
**SV Spindrift (Fischer):** I told him if that is the price I have to pay to voice my freedom and liberties which I was born with and thusly taken away then then must be the price...
**SV Spindrift (Fischer):** .. I told him I have no regrets and give zero shits
**SV Spindrift (Fischer):** Sometimes doing the right thing no matter how small is more important than ones own security.

On January 7, 2021, Fischer posted the following photos of himself to Facebook which appear to have been taken at the "Stop the Steal" rally. In the photos, Fischer can be seen wearing black framed glasses with a navy blue sweater underneath a red coat. Fischer also appears to be carrying a large bag.

App.427





Further investigation revealed that Fischer was captured on video footage from a law enforcement database of pictures and videos from the Capitol riot on January 6, 2021. The source of the video was a body camera worn by a Washington Metropolitan Police Department (MPD) officer responding to the Capitol on January 6. The total length of the video is 22 minutes and 48 seconds. Based on the date and time stamp on the body camera, the recording started on January

App.428

6, 2021, at or around 3:07 PM, and ended at or around 3:29 PM. The footage showed MPD officers trying to control and push out individuals inside the Capitol building who were not authorized to be there. At or around 15:25:00 a minor scuffle erupted between the MPD officers and some of the trespassers. At or around 15:25:17 an individual at or immediately around the area of the scuffle could be seen wearing the same clothing worn by Joseph Fischer, as described above. This individual can be seen wearing a navy blue sweater with black framed glasses folded into the front collar of the sweater. The red coat is not visible. Your affiant infers that the over coat had been removed.

This individual could be seen a few more times up until about 15:25:20. Based on the individual's body movements, he seemed to be getting up from the ground. Other individuals seemed to be assisting him. At least one police officer could be seen on the ground. Another individual could be seen and heard shouting "Let him up…Let him up". Immediately after the end of the scuffle, at or around 15:25:31, an individual could be heard saying "I am a cop. I am a cop, too." Based on the tone and speed of the shout "Let him up…let him up", your affiant reasonably believes that this footage is from the same scuffle that the above-mentioned Facebook footage captured. Still images from the video recording are below.



App.429



App.430





Based on the foregoing, your affiant submits that there is probable cause to believe that Joseph Wayne Fischer violated 18 U.S.C. § 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement

App.431

officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For purposes of 18 U.S.C. § 231, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

Your affiant submits there is also probable cause to believe that Joseph Wayne Fischer violated 18 U.S.C. § 1752(a)(1) and (2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions.  For purposes of 18 U.S.C. § 1752, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your affiant submits there is also probable cause to believe that Joseph Wayne Fischer violated 40 U.S.C. § 5104(e)(2)(D) and (G), which makes it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

Finally, your affiant submits there is probable cause to believe that Joseph Wayne Fischer violated 18 U.S.C. § 1512(c)(2), which makes it a crime to obstruct, influence, or impede any official proceeding, or attempt to do so. Under 18 U.S.C. § 1515, congressional proceedings are official proceedings.

_____
MUSTAFA KUTLU
SPECIAL AGENT FBI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 17th day of February 2021.

Digitally signed by G.
Michael Harvey
Date: 2021.02.17
13:13:19 -05'00'
_____
G. MICHAEL HARVEY
U.S. MAGISTRATE JUDGE

10

App.432

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-234-CJN** |
| | : | |
| **JOSEPH W. FISCHER,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO CLARIFY AND MODIFY CONDITIONS OF RELEASE

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to defendant Joseph Fischer's Motion to Clarify and Modify Conditions of Release.   ECF Nos. 47-48.

Defendant's request to modify or clarify his release conditions goes a bit too far. Defendant, a police officer who ran at a police line inside the U.S. Capitol on January 6, 2021 during the riot, is charged with multiple felonies.   His conduct before, during, and after January 6 raises concerns that he poses a danger to the community—concerns that originally led the government to seek his detention.   Defendant is already released on relatively lenient conditions. At a minimum, to ensure the safety of the community, he needs to stay away from weapons, whether they be firearms, bows, or muzzleloaders.

When defense counsel asked, the government could not bless his participation in the hunting trip as described.   Pretrial Services agrees.   Using a bow or muzzleloader would be a clear violation of defendant's release conditions, and the Court should not grant an exception here, where defendant's request is not based on necessity, but on his desire to participate in recreation. Setting aside the issue of the weapons defendant has admitted he would like to use, the government is further concerned about the likelihood that defendant will possess firearms or other weapons,

1

App.433

either actually or constructively, should he participate in the trip, where he will be surrounded by family members using them—it seems altogether too inviting under the circumstances.

The Court should deny Fischer's motion.

## FACTUAL BACKGROUND

### I.   Fischer's Communications Before January 6

Over text message, defendant discussed plans for January 6 in Washington, D.C., sometimes in violent terms.   On December 16, 2020, he sent a text message to another individual, stating "If Trump don't get in we better get to war or we will lose our country."   On January 3, defendant said (via text), "Are you going to D.C on January 6th.....!!!!! Its going to be historic !!!!!"   A little more than twenty minutes later, defendant wrote, "Take democratic congress to the gallows," followed by "Can't vote if they can't breathe..lol."

That same day, defendant, an eighteen-year veteran of the North Cornwall Township Police, texted his police chief, "I might need you to post my bail."   He wrote, "It might get violent.... they should storm the capital and drag all the democrates [sic] into the street and have a mob trial."

### II.   Fischer's Participation in the Capitol Riot

At approximately 3:24 p.m. on January 6, Fischer stood just outside the East Rotunda Doors, an entrance to the U.S. Capitol Building.   He began recording a video on his cell phone. "Charge!" he yelled.   "Charge!" he yelled again, and again.   He pushed forward through the crowd to the doorway, holding his phone in the air.   Then, on the heels of another rioter wielding a Marine Corps flag, he galloped forward, toward a group of police, yelling "Motherfuckers!" Inside the building, Fischer and the flagpole-wielding rioter made contact with police and fell to the ground.   After being helped back on his feet, Fischer did not leave, but began to talk to officers

2

App.434

stationed near the door. "I'm a cop too," he said, "sometimes the country is worth more than your job."

As the police attempted to clear rioters from the area, Fischer pressed up against one officer's riot shield.   He eventually ended up behind the police line before being pushed back behind the line and out the door, approximately four minutes after he had entered.   He later texted his police chief, "Got pepper sprayed to hell."

III.    **Statements After January 6**

The next day, Fischer posted the video of his charge into the Capitol on Facebook, accompanied by the following text: "Made it inside ... received pepper balls and pepper sprayed. Police line was 4 deep.. I made it to level two."   He also posted the following:

> There was some minor destruction and a few things were stolen but 98 percent peaceful. I was there. We pushed police – we pushed police back about 25 feet, got pepper balled and OC sprayed, but entry into the Capitol was needed to send a message that we, the people, hold the real power.

Describing a conversation with his police chief, Fischer posted: "I told him if that is the price I have to pay to voice my freedom and liberties which I was born with and thus taken away, then then (sic) must be the price," "I told him I have no regrets and give zero shits," and "Sometimes doing the right thing no matter how small is more important than one's own security."

Also on January 7, defendant posted photographs to Facebook that appear to depict him in Washington, D.C.   Defendant was wearing a ballistic vest underneath a red coat.   When he charged into the Capitol, he was not wearing the red coat or the ballistic vest.

On January 21, Fischer sent a message, "Yet the want peace ......fuck peace...I want an uprising.  Resistance.. too many have fought for this country and too many have died for our libertiies only to have these blind sheep try to take it all away."

App.435

## IV.  Arrest

Defendant was initially charged by complaint on February 17, 2021 with civil disorder (in violation of 18 U.S.C. § 231(a)(3)), obstruction of an official proceeding (in violation of 18 U.S.C § 1512(c)(2)) and two misdemeanors.   ECF No. 1.   The morning of February 19, the chief of the North Cornwall Township police and FBI agents went to the defendant's home to take him into custody after defendant did not answer multiple phone calls from his chief.   The police chief knocked on Fischer's door.   Fischer did not answer right away, but, when he did come outside, and was immediately confrontational, shouting obscenities.   He got within inches of the police chief's face and yelled that he had no regrets about his actions.   He continued to yell obscenities at the rest of the arrest team and assumed what one of the arresting agents described as an aggressive posture, with a puffed-up chest and his nose up against an agent's nose, before ultimately complying with orders.

Agents also asked Fischer for his cell phone.   He provided a phone, which the FBI later learned had not been in use since well before January 6.   The FBI later found the phone which Fischer had brought with him to the Capitol hidden under a bed.   The FBI also found six rifles and two pistols in Fischer's house.

As the FBI transported Fischer to the jail, he made a statement about nothing mattering after that day.   Agents asked him if he planned to harm himself, and he said no, but then said that his children were older, and it didn't matter if he was gone.   He also referred to his wife, suggesting that, even if he did harm himself, she would benefit financially.

## V.  Procedural History

On February 23, 2021, in the Middle District of Pennsylvania, Magistrate Judge Susan E. Schwab held a combined preliminary and detention hearing.   At the hearing, defendant's wife

App.436

testified that all firearms had been removed from their house, and that he did not use bows and arrows.   Defense counsel followed up, "if the court imposed the condition that there be absolutely no weapons that could, you know, injure somebody, to get out of the house, you would have no problem making sure they were out of the house and that Mr. Fischer would have no access to them. Right?"   Defendant's wife agreed.

Weighing the 3142(g) factors, Magistrate Judge Schwab noted that defendant was charged with serious crimes (at the time, two felonies and two misdemeanors), including a felony with a twenty-year statutory maximum.   She found that the weight of the evidence was strong.   She observed that defendant's history and circumstances, including a stable family, career as a police officer, and lack of criminal history or substance abuse issues, favored release, despite his behavior the day of arrest.   She ultimately found that defendant's wife was a suitable custodian and that release on conditions could secure the safety of the community.   Those conditions included home detention with location monitoring and a prohibition on firearms and access to social media.

At defendant's initial appearance in this district on February 25, 2021, the government requested home detention and GPS monitoring, but Magistrate Judge Meriwether imposed the standard conditions that have been ordered in many Capitol riot cases, except that she prohibited the possession of <u>all</u> firearms, destructive devices, or weapons.[1]   ECF No. 10 at 2 (Condition 7(k), stating "The defendant must (k) not possess a firearm, destructive device, or other weapon").   At the time, the standard release being imposed in many Capitol riot cases conditions prohibited only the illegal possession of weapons; in this case, the court imposed a more restrictive condition.   On March 19, 2021, the grand jury returned a seven-count indictment against defendant, adding a

---

[1] At the time, many defendants were being prohibited only from possessing *illegal* firearms or weapons.

App.437

felony charge under 18 U.S.C. § 111(a) for assaulting, resisting, or impeding certain officers (and aiding and abetting), in addition to the two felonies charged in the complaint.

On October 27, 2021, defense counsel contacted the government to ask its position on defendant's request to take the hunting trip and possess a bow and muzzleloader. Defense counsel represented that Pretrial Services had advised defendant that he could not go on the hunting trip if others were possessing and using firearms. Pretrial Services further noted its opposition, observing that defendant's compliance while on the hunting trip could not be monitored and that condition 7(k) applied equally to a bow or a muzzleloader.

Defendant has complied with his release conditions to date.

## ARGUMENT

### I.    Applicable Authority

Pursuant to 18 U.S.C. § 3142(c), if a judicial officer determines that the release described in 18 U.S.C. § 3142(b) (release on personal recognizance, or with an unsecured appearance bond) will *not* reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, the judicial officer must order the pretrial release of the person subject to "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The conditions "may include . . . [any of the thirteen possible conditions listed] or any other condition that is reasonably necessary." *Id.* One of the thirteen conditions listed is: "refrain from possessing a firearm, destructive device, or other dangerous weapon." *Id.* § 3142(c)(1)(B)(viii). Thus, the Bail Reform Act permits a weapons restriction where the court finds that it (in combination with other conditions imposed) is "reasonably necessary to protect the community."

App.438

In determining appropriate conditions of release, the judicial officer considers factors including: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence," (3) "the history and characteristics" of the defendant, and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(1)-(4) (the "Section 3142(g) factors"). The judicial officer may amend a release order "at any time." 18 U.S.C. § 3142(c)(3).

## II.     The Section 3142(g) Factors Support Restricting Defendant's Access to Weapons

The Magistrate Judge in defendant's home district and the Magistrate Judge in this district both determined that a firearms or weapons restriction was reasonably necessary in this case.   For good reason: defendant aggressively charged into the Capitol, running straight at a police line.   Defendant made physical contact with officers and did not back off or leave even after falling to the floor; he got up and began to argue that the officers should abandon their duty during a violent riot and pressed himself against one officer's riot shield.   The incident was captured on Capitol security footage, body-worn camera, and in video from defendant's own cell phone and social media.

The government recognizes that the defendant has no criminal history, and credits him for his good conduct on release since he stormed the Capitol earlier this year.   While community safety may no longer require custody or home detention in this case, the risk defendant poses has not abated so entirely that he should be allowed to possess weapons.   In addition to the seriousness of the offense and the weight of the evidence, aspects of defendant's conduct suggest that his characteristics support pretrial restrictions.   Defendant's text messages before January 6 suggest that he contemplated violence on January 6 and was eager to join the fight.   He brought a ballistic vest with him to Washington.   His messages after the riot show that he was defiant, increasing the

App.439

possibility that, having not recognized his grave error, he continues to pose a danger.   When the FBI came to arrest him, he was aggressive and belligerent toward law enforcement officers again. Defendant's own history of service as a law enforcement officer makes his confrontations with law enforcement, both on January 6 and after, all the more alarming, suggesting a level of anger that indicates potential danger and supports restricting defendant's access to weapons pre-trial.   In addition, defendant's post-arrest statements, where he indicated that his family would be well taken care of should something happen to him, suggest that one factor that persuades many individuals to comply with the law – namely, not wanting to be separated from their loved ones – no longer held much sway over defendant.   While defendant denied that he was interested in harming himself, his statements, respectfully, raise reasonable concerns about such a possibility.

The proposed hunting trip raises several issues.   First, defendant has asked for permission to actually possess bows and muzzleloaders, which obviously qualify as weapons.   That would clearly violate condition 7(k) of defendant's release.   Second, even if defendant agrees not to possess bows and muzzleloaders (or any other weapon), the government is concerned about his participation in the hunting trip.   There will be firearms all around him, being handled by friendly family members, and defendant will be unmonitored.   The temptation to possess weapons, either actively or constructively, may simply be too great.   Any time someone puts a weapon down near the defendant, there could be a potential violation.   And, for the reasons described above, the defendant could pose some threat to the safety of himself and others if he comes into possession of a weapon.

It may theoretically be possible for defendant to go on the hunting trip without violating his pretrial release conditions, but the government has not been presented with a workable plan to ensure compliance.   Particularly given the difficulty of monitoring defendant on the trip,

App.440

moreover, a workable plan is not readily apparent.   The current proposal requires placing an enormous amount of trust in the defendant to restrain himself, and defendant's conduct earlier this year casts serious doubts on his ability to do so.

Recently, Judge Amy Berman Jackson denied a misdemeanor defendant's motion to modify his conditions of release to allow him to pursue his firearm hobby.   The court noted that the firearms restriction was already "the least restrictive means available," explaining that the "burden was minimal" because defendant had been denied access to firearms only during the pendency of the case.   Order, *United States v. Jared Adams*, No. 21-cr-212 (ABJ), ECF No. 28, at 6 (D.D.C. July 15, 2021).   Judge Jackson continued, "the temporary interference with his ability to pursue his hobby of hunting is justified and outweighed by the substantial risk to public safety." *Id.*

So too here.   While the government certainly appreciates the importance of time with family, and of family traditions, Fischer has not requested access to weapons out of necessity, but to pursue a recreational activity while awaiting trial on serious charges relating to his decision to participate in the Capitol riot.   And, unlike Jared Adams, who has been accused only of nonviolent misdemeanors in connection with the Capitol riot, Fischer is facing multiple felony charges, discussed the possibility of violence before January 6, and physically confronted officers inside the U.S. Capitol that day, despite being active law enforcement himself.   The government had sufficient concerns here about potential danger to initially seek detention and then GPS monitoring and home detention.   The court did not order those conditions, and the result is that defendant's current release conditions are relatively forgiving.   The Section 3142(g) factors at least justify taking reasonable steps to limit defendant's access to weapons.   That is the minimum restriction required to ensure the safety of the community.

9

App.441

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion, that is, his request to possess weapons, or in the alternative, to engage in a recreational trip without supervision involving the use and/or possession of weapons.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____/s/_____
ALEXIS J. LOEB
Assistant United States Attorney
Detailee
California Bar No. 269895
450 Golden Gate Ave, 11th Floor
San Francisco, CA 94102
Alexis.loeb@usdoj.gov
(415) 436-7168

App.442

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on January 8, 2021**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO. 21-CR-234-CJN** |
| | : | |
| **JOSEPH W. FISCHER,** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. § 231(a)(3)** |
| **Defendant.** | : | **(Civil Disorder)** |
| | : | **18 U.S.C. § 111(a)(1), 2** |
| | : | **(Assaulting, Resisting, or Impeding** |
| | : | **Certain Officers)** |
| | : | **18 U.S.C. §§ 1512(c)(2), 2** |
| | : | **(Obstruction of an Official Proceeding)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| | : | **(Disorderly Conduct in** |
| | : | **a Capitol Building)** |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | **(Parading, Demonstrating, or Picketing in** |
| | : | **a Capitol Building)** |

## I N D I C T M E N T

The Grand Jury charges that:

### COUNT ONE

On or about January 6, 2021, within the District of Columbia, **JOSEPH W. FISCHER**, committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer, lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed,

and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

(**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

## COUNT TWO

On or about January 6, 2021, within the District of Columbia, **JOSEPH W. FISCHER,** did forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee that is, officers from the United States Capitol Police and Metropolitan Police Department while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

(**Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting**, in violation of Title 18, United States Code, Section 111(a)(1) and 2)

## COUNT THREE

On or about January 6, 2021, within the District of Columbia and elsewhere, **JOSEPH W. FISCHER**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

## COUNT FOUR

On or about January 6, 2021, within the District of Columbia, **JOSEPH W. FISCHER,** did unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its

2

App.444

grounds, where the Vice President was temporarily visiting, without lawful authority to do so.

**(Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(1))

## COUNT FIVE

On or about January 6, 2021, within the District of Columbia, **JOSEPH W. FISCHER**, did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

**(Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(2))

## COUNT SIX

On or about January 6, 2021, within the District of Columbia, **JOSEPH W. FISCHER**, willfully and knowingly engaged in disorderly and disruptive conduct in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct in that building of a hearing before or any deliberation of, a committee of Congress or either House of Congress.

**(Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(D))

3

App.445

## COUNT SEVEN

On or about January 6, 2021, within the District of Columbia, **JOSEPH W. FISCHER,**

willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol

Building.

(**Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(G))

A TRUE BILL:

FOREPERSON.

Matthew M. Graves

Attorney of the United States in
and for the District of Columbia.

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-234-CJN** |
| | : | |
| **JOSEPH W. FISCHER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS**
<u>**ONE, THREE, FOUR, AND FIVE OF THE SUPERSEDING INDICTMENT**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

**INTRODUCTION** ................................................................................................ 1

**FACTUAL BACKGROUND** .............................................................................. 1

**PROCEDURAL HISTORY** ................................................................................ 2

**ARGUMENT** ....................................................................................................... 2

I.   Legal Standard ............................................................................................. 3

II.  Fischer's Motion to Dismiss Count One, Alleging a Violation of 18 U.S.C. § 231, Fails.. 3

   A.   Vagueness and overbreadth doctrines .......................................... 4

   B.   Section 231 is not void for vagueness .......................................... 6

   C.   Section 231(a)(3) is not unconstitutionally overbroad ............... 11

III. The Court Should Deny Fischer's Motion to Dismiss Count Three (Obstruction of an Official Proceeding, in Violation of 18 U.S.C. § 1512) ....................................... 15

   A.   The certification of the Electoral College vote is an official proceeding ................ 15

      1.   Background ........................................................................... 15

      2.   Certification of the Electoral College vote is a proceeding before the Congress ... 16

      3.   The proceeding before the Congress is not limited to proceedings "affecting the administration of justice" ............................................................. 20

      4.   *Yates v. United States* and legislative history do not limit the meaning of Section 1512(c)(2) to proceedings involving document destruction or "the administration of justice" ................................................................. 23

      5.   Defendant's violation of multiple statutes does not bar a prosecution under Section 1512(c)(2) ............................................................................. 27

   B.   18 U.S.C. § 1512(c)(2) is not unconstitutionally vague and the defendant had fair notice that his actions are punishable under 18 U.S.C. § 1512(c)(2)................... 28

      1.   The "otherwise" catch-all clause is not unconstitutionally vague as applied here. 28

      2.   The word "corruptly" is not unconstitutionally vague as applied here.................. 30

      3.   The word "official proceeding" is not unconstitutionally vague as applied here... 32

4.   The exercise of prosecutorial discretion does not render a statute vague ............... 33

IV.  The Court Should Deny Fischer's Motion to Dismiss Counts Four and Five, Alleging Violations of 18 U.S.C. § 1752 .................................................................................... 35

A.   The Vice President can "temporarily visit" the U.S. Capitol ..................................... 35

B.   18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction ...................................................... 39

V.   The Indictment Satisfies the Notice and Presentment Requirements ............................... 42

App.449

## TABLE OF AUTHORITIES

**Cases**

*Arthur Andersen v. United States,*
    544 U.S. 696 (2005) .................................................................................. 31, 33

*Babb v. Wilkie,*
    140 S. Ct. 1168, 1177 (2020) ................................................................... 23, 40

*Blair v. City of Evansville, Ind.,*
    361 F. Supp.2d 846 (S.D. Ind. 2005) .............................................................. 39

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ........................................................................................... 6

*City of Houston v. Hill,*
    482 U.S. 451 (1987) ........................................................................................... 6

*Coates v. Cincinnati,*
    402 U.S. 611 (1971) ...................................................................................... 5, 8

*Collazos v. United States,*
    368 F.3d 190 (2d Cir. 2004) ........................................................................... 29

*Elonis v. United States,*
    135 S. Ct. 2001 (2015) ................................................................................... 10

*Genus Med. Techs. LLC v. United States Food & Drug Admin.,*
    994 F.3d 631 (D.C. Cir. 2021) ....................................................................... 38

*Hamling v. United States,*
    418 U.S. 87 (1974) .......................................................................................... 43

*Hubbard v. United States,*
    514 U.S. 695 (1995) ................................................................................. 23, 27

*Johnson v. United States,*
    576 U.S. 591 (2015) ................................................................................ passim

*Levin v. United States,*
    568 U.S. 503 (2013) ......................................................................... 23, 35, 40

*Loughrin v. United States,*
    573 U.S. 351 (2014) ....................................................................................... 27

*Lovitky v. Trump,*
    949 F.3d 753 (D.C. Cir. 2020) ....................................................................... 38

App.450

*Marks v. United States*,
    430 U.S. 188 (1977) ............................................................ 26

*Members of the City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ...................................................... 6, 15

*Parker v. Levy*,
    417 U.S. 733 (1974) ............................................................ 34

*Pub. Investors Arbitration Bar Ass'n v. S.E.C.*,
    930 F. Supp. 2d 55 (D.D.C. 2013) ................................ 40

*Russello v. United States*,
    464 U.S. 16 (1983) ............................................................ 21

*Smith v. Goguen*,
    415 U.S. 566 (1974) .......................................................... 5

*Skilling v. United States*,
    561 U.S. 358 (2010) .......................................................... 5

*State v. Illig-Renn*,
    341 Or. 228 (2006) ............................................................ 8

*State v. Steen*,
    164 Wash. App. 789 (2011) .............................................. 8

*United States v. Aguilar*,
    515 U.S. 593 (1995) .......................................................... 30

*United States v. Ballestas*,
    795 F. 3d 138 (D.C. Cir. 2015) ...................................... 3

*United States v. Batchelder*,
    442 U.S. 114 (1979) .......................................................... 28

*United States v. Berger*,
    473 F.3d 1080 (9th Cir. 2007) ........................................ 43

*United States v. Bowdoin*,
    770 F. Supp. 2d 142 (D.D.C. 2011) .............................. 3

*United States v.*
    *Bowser*, 964 F.3d 26 (D.C. Cir. 2020) ........................ 21

*United States v. Brenson*,
    104 F.3d 1267 (11th Cir. 1997) ...................................... 31

App.451

*United States v. Brice,*
    926 F.2d 925 (9th Cir. 1991) ............................................................. 8

*United States v. Bronstein,*
    849 F.3d 1101 (D.C. Cir. 2017) .......................................................... 5

*United States v. Burge,*
    711 F.3d 803 (7th Cir. 2013) ............................................................ 29

*United States v. Bursey,*
    416 F.3d 301 (4th Cir. 2005) ............................................................ 39

*United States v. Caldwell,*
    21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021) ..................... passim

*United States v. Caputo,*
    201 F. Supp. 3d 65 (D.D.C. 2016) ..................................................... 38

*United States v. Carson,*
    560 F.3d 566, 584 (6th Cir. 2009) ..................................................... 26

*United States v. Cassel,*
    408 F.3d 622 (9th Cir. 2005) ............................................................ 10

*United States v. Cervantes,*
    No. 16-10508, 2021 WL 2666684 (9th Cir. June 29, 2021) ...................... 26

*United States v. Cisneros,*
    26 F. Supp. 2d 24 (D.D.C. 1998) ...................................................... 43

*United States v. Du Bo,*
    186 F.3d 1177 (9th Cir. 1999) .......................................................... 43

*United States v. Dunn,*
    434 F. Supp. 2d 1203 (M.D. Ala. 2006) ......................................... 18, 19

*United States v. Edwards,*
    869 F.3d 490 (7th Cir. 2017) .................................................. 31, 32, 34

*United States v. Ermoian,*
    752 F.3d 1165 (9th Cir. 2013) ................................................ 17, 18, 19

*United States v. Featherston,*
    461 F.2d 1119 (5th Cir. 1972) ........................................................... 7

*United States v. Friske,*
    640 F.3d 1288 (11th Cir. 2011) ........................................................ 32

v

App.452

*United States v. Gilbert*,
   813 F.2d 1523 (9th Cir. 1987) ............................................................. 10

*United States v. Gonzalez*,
   No. 20-cr-40 (BAH), 2020 WL 6342948 (D.D.C. Oct. 29, 2020)............................................. 5

*United States v. Gordon*,
   710 F.3d 1124 (10th Cir. 2013) ............................................................. 32

*United States v. Griffin*,
   No. 21-cr-92 (TNM), 2021 WL 2778557 (D.D.C. July 2, 2021) ................................... passim

*United States v. Haldeman*,
   559 F.2d 31, 124 (D.C. Cir. 1976) (*en banc*)............................................................ 34

*United States v. Harmon*,
   No. 19-cr-395 (BAH), 2021 WL 1518344, at *4 (D.D.C. Apr. 16, 2021) ................................ 5

*United States v. Howard*,
   569 F.2d 1331, 1333 (5th Cir. 1978) ............................................................. 29

*United States v. Howard*,
   No. 21-cr-28-pp, 2021 WL 3856290 (E.D. Wis. Aug. 30, 2021)................................... passim

*United States v. Huff*,
   630 F. App'x 471, 489 (6th Cir. 2015) (unpublished)............................................... 9

*United States v. Junot*,
   1990 WL 66533 (9th Cir. May 18, 1990) ............................................................. 39

*United States v. Kelley*,
   36 F.3d 1118, 1127 (D.C. Cir. 1994)............................................................. 18

*United States v. Kelly*,
   147 F.3d 172 (2d Cir. 1998) ............................................................. 31

*United States v. Matthews*,
   505 F.3d 698 (7th Cir. 2007) ............................................................. 32

*United States v. McHugh*,
   21-cr-453 (JDB), ECF No. 51 (D.D.C. Feb. 1, 2022)................................... passim

*United States v. Mechanic*,
   454 F.2d 849 (8th Cir. 1971) ............................................................. passim

*United States v. Montgomery*,
   21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021) ......................... passim

vi

App.453

*United States v. Morrison*,
   529 U.S. 598 (2000) ........................................................................................ 6

*United States v. Morrison*,
   98 F.3d 619 (D.C. Cir. 1996) ....................................................................... 31

*United States v. Mostofsky*,
   21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021) ............... passim

*United States v. Nat'l Dairy Products Corp.*,
   372 U.S. 29 (1963) ......................................................................................... 5

*United States v. Nordean*,
   21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021) ............... passim

*United States v. Perez*,
   575 F.3d 164 (2d Cir. 2009) *cert. denied*, 140 S. Ct. 1106 (2020) ............. 18, 19

*United States v. Petruk*,
   781 F.3d 438 (8th Cir. 2015) ........................................................ 25, 28, 29, 30

*United States v. Phillips*,
   583 F.3d 1261 (10th Cir. 2009) ................................................................... 26

*United States v. Phomma*,
   No. 20-465, 2021 WL 4199961 (D. Or. Sept. 15, 2021) ........................ 3, 11, 12

*United States v. Poindexter*,
   951 F.2d 369 (D.C. Cir. 1991) ............................................................... 30, 31

*United States v. Ramos*,
   537 F.3d 439 (5th Cir. 2008) ................................................................. 18, 19

*United States v. Resendiz-Ponce*,
   549 U.S. 102 (2007) ..................................................................................... 43

*United States v. Ring*,
   628 F. Supp. 2d 195 (D.D.C. 2009) ....................................................... 25, 29

*United States v. Rundo*,
   990 F.3d 709 (9th Cir. 2021) ......................................................................... 6

*United States v. Sandlin*,
   21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021) ................. passim

*United States v. Shotts*,
   145 F.3d 1289 (11th Cir. 1998) ................................................................... 31

App.454

*United States v. Stringer*,
   730 F.3d 120 (2d Cir. 2013) ................................................................ 43

*United States v. Sutherland*,
   921 F.3d 421 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1106 (2020) ........................................ 18

*United States v. Verrusio*,
   762 F.3d 1 (D.C. Cir. 2014) ................................................................ 43

*United States v. Volpendesto*,
   746 F.3d 273 (7th Cir. 2014) ............................................................... 26

*United States v. Williams*,
   553 U.S. 285 (2008) .................................................................... passim

*United States v. Williamson*,
   903 F.3d 124 (D.C. Cir. 2018) ............................................................. 43

*United States v. Wood*,
   No. 20-cr-56 MN, 2021 WL 3048448 (D. Del. July 20, 2021) ......................... passim

*United States v. Young*,
   916 F.3d 368 (4th Cir.), *cert. denied*, 140 S. Ct. 113 (2019) ........................ 32

*Virginia v. American Booksellers Ass'n*,
   484 U.S. 383 (1988) ..................................................................... 6

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ................................................................. 6, 12

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008) ..................................................................... 5

*White House Vigil for ERA Comm. v. Clark*,
   746 F.2d 1518 (D.C. Cir. 1984) .......................................................... 38

*Wilson v. DNC Servs. Corp.*,
   417 F. Supp. 3d 86 (D.D.C. 2019), *aff'd* 831 F. App'x 513 (D.C. Cir. 2021) ......................... 40

*Yates v. United States*,
   574 U.S. 528 (2015) ............................................................. 22, 25, 26

## Statutes and Constitutional Provisions

U.S. Const. art. II, § 1, cl. 3 ................................................................ 16

U.S. Const amend. XII. ..................................................................... 16

3 U.S.C. § 15 ......................................................................... 16, 19

App.455

3 U.S.C. § 16 ................................................................................................ 16, 20

3 U.S.C. § 17 ........................................................................................................ 16

3 U.S.C. § 18 ........................................................................................................ 16

18 U.S.C. § 231(a)(3) .................................................................................... passim

18 U.S.C. § 232(1) ............................................................................................... 4, 9

18 U.S.C. § 1505 ............................................................................................ 21, 30

18 U.S.C. § 1512(c)(2) .................................................................................. passim

18 U.S.C. § 1515 .................................................................................................. 17

18 U.S.C. § 1515(a)(1) ........................................................................................ 22

18 U.S.C. § 1515(a)(1)(B) ............................................................................ 16, 20

18 U.S.C. § 1515(b) ............................................................................................. 31

18 U.S.C. § 1752 ............................................................................................ passim

18 U.S.C. § 3056(a)(1) ........................................................................................ 41

26 U.S.C. § 7212(a) ........................................................................................... 8, 9

Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006) ............................ 42

Victim and Witness Protection Act of 1982, Pub. L. No. 97-291, 96 Stat. 1248 ...................... 21

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807 .......................... 21

Cal. Penal Code § 148 ............................................................................................. 8

**Other Authorities**

148 Cong. Rec. S6550 (daily ed. July 10, 2002) ........................................... 24

S. Rep. No. 107-146, at 2 (2002) .................................................................. 24

S. Rep. 91-1252 (1970) .................................................................................. 41

S. Rep. No. 97-532, at 17 (1982) .................................................................. 17

Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668–69 (2006) ................ 41

App.456

**Rules**

Fed. R. Crim. P. 7(c)(1) ..................................................................................................... 3

App.457

## INTRODUCTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Joseph Fischer's Motion to Dismiss Counts One, Three, Four, and Five of the Superseding Indictment (ECF No. 54) ("Mot."). Several courts in this district have recently written opinions rejecting many, if not all, of the challenges defendant raises here. *See United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery,* 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean,* 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. McHugh,* 21-cr-453 (JDB), ECF No. 51 (D.D.C. Feb. 1, 2022); *United States v. Griffin*, No. 21-cr-92 (TNM), 2021 WL 2778557 (D.D.C. July 2, 2021). There is no reason for this Court to differ. The Court should deny the motion in its entirety.

## FACTUAL BACKGROUND

Fischer's role in the January 6, 2021, attack on the U.S. Capitol is described in the statement of facts supporting the criminal complaint (ECF No. 1) and in the government's opposition to Fischer's Motion to Modify Release Conditio1ns (ECF No. 49). In summary, after sending messages such as "Take democratic congress to the gallows," and "they should storm the capital and drag all the democrates into the street and have a mob trial," Fischer traveled from Pennsylvania to Washington, D.C. to participate in the events of January 6, 2021. On that day, Fischer went to the Capitol. Standing outside the Rotunda Doors, he yelled "Charge!" and then "Motherfuckers!" as he rushed forward through the doors on the heels of a flagpole-wielding rioter, straight at a line of police officers who were trying to clear the area. Fischer, the other rioter, and multiple officers fell to the ground. After being helped back to his feet, Fischer spoke heatedly to

1

App.458

officers in the area, saying that he was also a police officer, and that "sometimes the country is worth more than your job." He then pressed himself against an officer's riot shield and then ended up behind the police line before being pushed out the door. He later commented, "We pushed police back about 25 feet, got pepper balled and OC sprayed, but entry into the Capitol was needed to send a message that we the people hold the real power."

## PROCEDURAL HISTORY

On March 19, 2021, the grand jury returned an indictment charging Fischer with civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Three); entering or remaining on restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Four); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Five); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Seven). ECF No. 15. On November 10, the grand jury returned a superseding indictment with the same counts. ECF No. 52. Fischer filed the instant motion on January 12, 2022, seeking dismissal of Counts One, Three, Four, and Five of the superseding indictment.

## ARGUMENT

Fischer's challenges to Count One (civil disorder, in violation of 18 U.S.C. § 231(a)(3)), Count Three (obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2)) and Counts Four and Five (unlawful entry and disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) and (2)) all lack merit.

2

App.459

## I.    Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An "indictment's main purpose is to inform the defendant of the nature of the accusation against him." *United States v. Ballestas*, 795 F. 3d 138, 148–49 (D.C. Cir. 2015) (citation omitted). Because dismissal of an indictment "directly encroaches upon the fundamental role of the grand jury," however, "dismissal is granted only in unusual circumstances." *Ballestas*, 795 F. 3d at 148 (internal quotation marks omitted). "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*

## II.    Fischer's Motion to Dismiss Count One, Alleging a Violation of 18 U.S.C. § 231, Fails

Improperly isolating various statutory terms, Fischer argues that Section 231(a)(3), the civil disorder statute, is either unconstitutionally vague or overbroad. Three judges in this district have recently rejected nearly identical challenges to Section 231. *See Mostofsky*, 2021 WL 6049891, at *8–*9 (rejecting overbreadth challenges); *Nordean,* 2021 WL 6134595, at *16–*17 (rejecting vagueness and overbreadth challenges); *McHugh,* 21-cr-453 (JDB), ECF No. 51, at 28–37.[1] This Court should too.

---

[1] A number of courts outside this circuit have also recently rejected similar challenges to Section 231. *See United States v. Phomma*, No. 20-465, 2021 WL 4199961, at *5 (D. Or. Sept. 15, 2021); *United States v. Rupert*, No. 20-cr-104 (NEB/TNL), 2021 WL 1341632, at *16–*20 (D. Minn. Jan. 6, 2021) (Report & Recommendation), *adopted*, 2021 WL 942101 (D. Minn. Mar. 12, 2021); *United States v. Pugh*, No. 1:20-cr-73-TFM, slip op. (S.D. Ala. May 13, 2021); *United States v. Wood*, No. 20-cr-56 MN, 2021 WL 3048448 (D. Del. July 20, 2021); and *United States v. Howard*, No. 21-cr-28-pp, 2021 WL 3856290 (E.D. Wis. Aug. 30, 2021).

App.460

Section 231(a)(3) (the civil disorder statute) criminalizes any "act" (or attempted act) to "obstruct, impede, or interfere" with a law enforcement officer "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder." 18 U.S.C. § 231(a)(3). For the statute to apply, the civil disorder must "in any way or degree obstruct[], delay[], or adversely affect[] commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function." *Id.* The statute defines civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

Reading the statute as a whole, it passes muster; Fischer cannot meet the high bar required to invalidate a statute as vague or overbroad. The statute sufficiently provides notice of the conduct it prohibits. Nor are there a substantial number of unconstitutional applications, particularly compared with the statute's plainly legitimate conduct restrictions. Vagueness and overbreadth are not judged according to whether a litigant might identify a hypothetical edge case where application of a law might be questionable, yet Fischer erroneously urges the Court to do so.

### A.     Vagueness and overbreadth doctrines

An outgrowth of the Due Process Clause of the Fifth and Fourteenth Amendments, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation omitted).

A statute is not unconstitutionally vague simply because its applicability is unclear at the

4

margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because reasonable jurists might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). A statutory provision is "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). A statute is instead vague where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). A law is not vague because it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603–04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

There is a strong presumption that a statute is not vague. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Other courts in this district have recognized that high bar. *See United States v. Gonzalez*, No. 20-cr-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020); *see also United States v. Harmon*, No. 19-cr-395 (BAH), 2021 WL 1518344, at *4 (D.D.C. Apr. 16, 2021) (finding that the defendant did not meet the "stringent standard" to prevail on a Rule 12 vagueness motion).

Facial overbreadth challenges—in which a defendant asserts that a statute, constitutionally applied to him, is nevertheless invalid because it would be unconstitutional in a "substantial number" of *other* cases, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)—are even more exceptional. Overbreadth can invalidate a criminal law

5

App.462

only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep,'" and no limiting construction is available. *Id.* (quoting *New York v. Ferber*, 458 U.S. 747, 769–771 (1982)); *see also City of Houston v. Hill*, 482 U.S. 451, 458 (1987). The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.

 "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ." *Id.* at 801. "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

Invalidating a statute for overbreadth is "strong medicine" to be applied "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). If the statute is "readily susceptible" to a narrowing construction that would make it constitutional, it must be upheld. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988); *accord Broadrick*, 413 U.S. at 613; *United States v. Rundo*, 990 F.3d 709, 714 (9th Cir. 2021) ("we construe [the riot statute, 18 U.S.C. §§ 2101–2102] as constitutional if we can reasonably do so").

### B.      Section 231 is not void for vagueness

Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison,* 529 U.S. 598, 607 (2000). Fischer cannot overcome this presumption.

App.463

Section 231(a)(3) is not constitutionally vague. *See McHugh,* 21-cr-453, ECF No. 51, at 23*; Nordean,* 2021 WL 6134595, at *17. It provides sufficient notice of the conduct it prohibits. The terms Fischer attacks, such as "any act to obstruct, impede, or interfere" and "civil disorder," Mot. at 6–7, do not carry the potential for misunderstanding or make the statute "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also Nordean*, 2021 WL 6134596*,* at *16 (observing that "there are specific fact-based ways to determine whether a 'defendant's conduct interferes with or impedes others,' or if a law enforcement officer is performing his official duties 'incident to and during' a civil disorder."). Like the challenge recently rejected by Judge Bates, Fischer's motion "misunderstand[s]" vagueness: "There is a crucial difference between reasonable people differing over the meaning of a word and reasonable people differing over its application to a given situation—the latter is perfectly normal, while the former is indicative of constitutional difficulty." *McHugh,* 21-cr-453, ECF No. 51, at 23.

Section 231(a)(3) does not prohibit mere presence at a civil disorder, but rather, "an act committed during the course of such disorder." *United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971). And not just any act: it prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement carrying out their official duties during a civil disorder. It punishes intentional conduct, not "mere inadvertent conduct." *United States v. Featherston,* 461 F.2d 1119, 1122 (5th Cir. 1972).

Contrary to defendant's arguments, the statute's terms are thus quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether a defendant's conduct was "annoying" or "indecent," or those that depend on the victim's state of mind, as in the cases defendant cites. *See Nordean,* 2021 WL 6134595, at

App.464

*16*; see also Williams*, 553 U.S. at 306; Mot. at 8 (citing *Coates*, 402 U.S. at 614, *United States v. Kozminski,* 487 U.S. 931, 949–50 (1988)).[2] "An ordinary person would have an intuitive understanding of what is proscribed by a ban on obstructing, impeding, or interfering with law enforcement." *McHugh,* 21-cr-453, ECF No. 51, at 33. In addition, Section 231(a)(3) is not unique; many state and federal statutes likewise criminalize "obstructing" the government's efforts to enforce the law and maintain public order, and they have been upheld. *See, e.g.,* 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation); *United States v. Brice,* 926 F.2d 925, 930–31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-20.305, regulation prohibiting impeding or disrupting government duties); *see also* Cal. Penal Code § 148 (prohibiting resisting, delaying, or obstructing any peace officer or emergency medical technician); *State v. Illig-Renn,* 341 Or. 228 (2006) (rejecting constitutional attacks leveled against O.R.S. 162.247(1)(b), which prohibits interference with a police officer); *State v. Steen,* 164 Wash. App. 789, 808 (2011) (rejecting as-applied constitutional challenge to RCW 9A.76.020(1), which criminalizes obstructing police officers).

Fischer also claims that the phrase "incident to and during the commission of a civil disorder" is vague because he cannot tell whether the statute requires an individual to have

---

[2] Fischer also cites *McCoy v. City of Columbia*, 929 F. Supp. 2d 541 (D.S.C. 2013) (Mot. at 11); he states that *McCoy* invalidated the law at issue as overbroad, but *McCoy* in fact found it unconstitutionally vague. Id. at 554. In any event, *McCoy* is distinguishable. *See McHugh,* 21-cr-453, ECF No. 51, at 33. *McCoy* invalidated an ordinance making it unlawful "for any person to interfere with or molest a police officer in the lawful discharge of his duties." *Id.* at 546. As Judge Bates observed, unlike Section 231(a)(3), "the ordinance at issue in *McCoy* did not include a scienter requirement, and its use of only two operative verbs ('interfere and molest') prevented interpreters from . . . giving those words 'more precise content by the neighboring words with which it is associated.'" *McHugh*, at 33 n.24 (citing *McCoy*, 929 F. Supp. 2d at 553) ((quoting *United States v. Stevens*, 559 U.S. 460, 474 (2010)).

App.465

participated in the civil disorder or if it is sufficient that he be in the general vicinity of the event. Mot. at 7. This argument, too, is meritless. "The crime set forth by the statute is not mere presence at a civil disorder . . . but an act committed during the course of such a disorder, so 'civil disorder' simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a) (3)." *Mechanic*, 454 F.2d at 852; *see also Howard*, 2021 WL 3856290, at *14 ("[T]he statute does not require the government to prove that the defendant created the civil disorder, or that he was participating in the civil disorder."). Contrary to Fischer's argument that any "tumultuous public gathering" could qualify (Mot. at 7), "it is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Mechanic*, 454 F.2d at 853; *see* 18 U.S.C. § 232(1); *cf. United States v. Huff*, 630 F. App'x 471, 489 (6th Cir. 2015) (unpublished) (rejecting vagueness challenge to "civil disorder" term in 18 U.S.C. § 231(a)(2) and citing definition in 18 U.S.C. § 231(1)). *See McHugh*, 21-cr-453, ECF No. 51, at 32, 32 n.22.

And even if a broad range of public gatherings could be deemed "civil disorders," Section 231(a)(3) criminalizes only particular conduct, not mere participation in such a disorder. The "civil disorder" language operates to <u>narrow</u> the situation where the statute may apply—unlike other statutes, which criminalize acts of obstruction, wherever they may take place. *See* 26 U.S.C. § 7212(a) (criminalizing obstruction of tax laws). The requirement that the *actus reus* take place in the context of a civil disorder does not make Section 231 vague; to the contrary, it limits its application.

Fischer's argument that the statute is vague because it lacks an express scienter requirement or *mens rea* (Mot. at 7–8) is also incorrect. Fischer ignores the fact that Section 231(a)(3) requires

9

App.466

*intent*, which narrows its scope. *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad); *McHugh*, 21-cr-453, ECF No. 51, at 29–31 (finding that Section 231(a)(3) includes an intent requirement). The requirement that a defendant who violates Section 231(a)(3) act with the intent to obstruct, interfere or impede is critical to the First Amendment analysis. *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of statute to protected speech). The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a firefighter or police officer, *i.e.,* the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement). And even if the statute lacked an express scienter requirement, courts "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a *mens rea* element even when none appears on the face of the statute.").

Fischer's vagueness claim also fails because his conduct clearly falls within the ambit of Section 231. The Court must consider vagueness "as applied to the particular facts at issue, for a [defendant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applies to the conduct of others." *Nordean,* 2021 WL6134595, at *17 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (cleaned up)); *see generally Wood*, 2021 WL 3048448, at *9 ("Defendant does not have standing to bring a facial vagueness challenge" to § 231(a)(3) because he failed to "demonstrate that [the statute]is vague as applied to his conduct"). The January 6, 2021 attack on the United States Capitol was clearly a "civil

App.467

disorder," not just some "tumultuous public gathering" to which the police were called. And there

is no question that Fischer participated in the disorder. Tracking the statutory language, the

superseding indictment alleges that he "commit[ted] an act to obstruct, impede, and interfere with

a law enforcement officer." ECF No. 52. Fischer crossed into the restricted area and charged inside

the Capitol, straight into a police line. He was not some bystander yelling at police to desist. No

one could credibly claim to believe that he could lawfully enter the Capitol during the riot, and

then physically block, push, and press against law enforcement who were attempting to protect

and clear the mob from the Capitol. The statute is "sufficiently clear that a normally intelligent

person could ascertain its meaning and would be given fair notice of whether or not his conduct is

forbidden." *Mechanic*, 454 F.2d at 854.

### C.      Section 231(a)(3) is not unconstitutionally overbroad

Fischer's remaining claims are most appropriately cast as an overbreadth argument—he

contends that Section 231 criminalizes too wide an array of activity, including protected speech.

"[T]his exact argument has been heard and rejected by at least five different federal judges all within

the last year." *McHugh*, ECF No. 51, at 35 (citing *Mostofsky*, 2021 WL 6049891, at *8–9; *Nordean*,

2021 WL 6134595, at *17; *Howard*, 2021 WL 3856290, at *11–12; *Phomma*, 2021 WL 4199961, at

*4–5; *Wood*, 2021 WL 3048448, at *7–8, and adding, "This Court joins them.").

Section 231(a)(3) is not overbroad because "the statute's potentially unconstitutional

applications are few compared to its legitimate ones." *Mostofsky,* 2021 WL 6049891, at *8. The

statute's scope is primarily, if not exclusively, conduct or unprotected speech, such as threats. The

plain text supports this reading. *See Nordean*, 2021 WL 6134595, at *17. An overbreadth challenge

faces a steep uphill climb when the statute focuses mainly on conduct, as Section 231(a)(3) does.

*See Hicks*, 539 U.S. at 119, 124 (noting the "substantial social costs created by the overbreadth

doctrine when it blocks application of a law to . . . constitutionally unprotected conduct" and

App.468

observing that laws "not specifically addressed to speech or to conduct necessarily associated with speech" are far less likely to be overbroad).

In *Mechanic*, the Eighth Circuit rejected a similar overbreadth challenge to § 231(a)(3). "The section applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute." 454 F.2d at 852. The Eighth Circuit held that the "conduct involved here [the massing of a mob that threw stones at an R.O.T.C. building on a college campus to protest the Viet Nam war, followed by rock and bottle-throwing at firemen who arrived to quell the disturbance] is not entitled to constitutional protection." *Id.* As the Court explained, "[t]he First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence." *Id.* (citation omitted).

Fischer argues that Section 231(a)(3) could prohibit conduct "undertaken merely to convey a message or symbolic content" (and protected by the First Amendment) because it applies to "any act to obstruct, impede, or interfere." Mot. at 6. Even if there could be "limited instances in which speaking constitutes the 'act' of interfering with a law-enforcement officer," *Mostofsky,* 2021 WL 6049891, at *8, those instances are just that: limited. *McHugh*, 21-cr-453, ECF No. 51, at 36. As *Mostofsky* found, Section 231's "plain text, however, indicates that it is 'targeted primarily if not exclusively at conduct rather than speech.'" *Id.* (citing *Phomma*, 2021 WL 4199961, at *5); *see also Nordean,* 2021 WL 6134595, at *17 ("Section 231(a)(3) does not even mention speech, and it simply does not prohibit peaceful expression or association."); *Mechanic*, 454 F.2d at 852 (Section 231 "does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officers and firemen"), *see also Wood*, 2021 WL 3048448, at *7 ("This Court agrees with *Mechanic* that § 231(a)(3) applies to conduct, not speech."). As such, it is unlikely to present a "realistic danger" that it will "significantly compromise recognized First

12

App.469

Amendment protections." *Mostofsky,* 2021 WL 6049891, at *17 (quoting *Vincent,* 466 at 800).

Fischer relatedly contends that Section 231 "casts far too wide a net" because it is not limited to "violent acts or acts that result in bodily injury or that otherwise put persons or property in imminent danger," and could therefore reach "acts with protected expressive content or those that occur in a traditional public forum." *See* Mot. at 9.[3]  Like Mostofsky, Fischer offers examples (in fact, identical examples) of potential unlawful applications of Section 231(a)(3), such as a bystander "who flips off officers to distract or to encourage resistance, or one who records police activity with a cell phone." Mot. at 10; *cf. Mostofsky,* 2021 WL 6049891 at *8.

Judge Boasberg held that Mostofsky was wrong; Fischer is wrong too. *Mostofsky,* 2021 WL 6049891, at *8–*9. Fischer's hypotheticals do not undermine the conclusion that "[m]any more potential applications would fall within the statute's plainly legitimate sweep." *Id.* at *8 (citation omitted). As noted above, the statute prohibits both violent acts (which are not protected by the First Amendment), and non-violent conduct that is not expressive, such as "creating a barricade to prevent officers' movement." *See id.* Again, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Mostofsky,* 2021 WL 6049891, at *8 (quoting *Vincent*, 466 U.S. at 800); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim while noting that "because the statute does not require a violent act or an assaultive act, the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an 'act' that 'attempted to obstruct' an officer performing her lawful duties"). Courts have denied similar challenges to Section 231(a)(3) while recognizing that the statute is not limited

---

[3]     Fischer's reference to "acts…that occur in a traditional public forum" is misguided. While there is a greater right to speak in a public forum, there is no right to engage in non-protected (indeed, criminal) conduct there.

13

App.470

to "violent" acts for the simple reason that the statute is not overbroad, as explained above, and so no limiting construction is required. *See, e.g., Mostofsky,* 2021 WL 6049891 at \*9 (finding that "the Court need not adopt a limiting construction such that § 231(a)(3) reaches only violent conduct" to uphold the statute and collecting cases); *see also McHugh,* 21-cr-453, ECF No. 51, at 36 n.26, *Wood*, 2021 WL 3048448, at \*7 (rejecting overbreadth challenge to § 231(a)(3) while recognizing that it is possible for nonviolent acts to also fall within the statute's prohibition.").[4]

Moreover, Fischer's hypotheticals, like Mostofsky's, may not even be criminal under the statute because they "would not necessarily rise to the level of 'obstruct[ing], imped[ing], or interfer[ing]' with a law-enforcement officer," as the statute requires. *Mostofsky,* 2021 WL 6049891, at \*8. Indeed, as noted above, Section 231 contains numerous guardrails ensuring that not all "acts" qualify: they must obstruct, interfere with, or impede; and they must occur during a civil disorder, which is defined, in part, as a public disturbance "involving acts of violence." *Mostofsky,* 2021WL 6049891, at \*8; *Wood,* 2021 WL 3048448, at \*7. Even if "some expressive conduct may fall within its remit," however, Section 231(a)(3) still would not "make unlawful a substantial amount of constitutionally protected conduct." *Mostofsky,* 2021 WL 6049891, at \*8 (citation omitted). Fischer has failed to show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Vincent*, 466 U.S. at 801.   His overbreadth and vagueness challenges fail.

---

[4]      While *Mechanic* states that Section 231(a)(3) "applies only to violent physical acts," courts do not take this to mean that it imposed such a limitation on the statute; rather, "it appears that the Eighth Circuit was considering the specific 'acts' committed by the defendants in that case—throwing cherry bombs at police officers and firemen—when it referenced "violent acts." *Howard,* 2021 WL 3856290, at \*11; *Nordean,* 2021 WL 6134595 at \*17 n.14.

App.471

III.   **The Court Should Deny Fischer's Motion to Dismiss Count Three (Obstruction of an Official Proceeding, in Violation of 18 U.S.C. § 1512)**

Fischer argues that Count Three, charging a violation of 18 U.S.C. § 1512(c)(2), should be dismissed because Congress's certification of the Electoral College vote is not an "official proceeding," and because the statute is unconstitutionally vague as applied. As set forth below, and as other judges in his district have unanimously held, these arguments lack merit.

A.   **The certification of the Electoral College vote is an official proceeding**

Section 1512(c)(2) of Title 18 of the U.S. Code provides that "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." The defendant argues that Congress's certification of the Electoral College vote on January 6, 2021, does not qualify as an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2) because it does not concern the "administration of justice." ECF No. 54, 14–19. His argument is contrary to the plain text of the statute and every recent decision in this district considering the issue.  *See Sandlin,* 2021 WL 5865006, at *3–*10; *Caldwell*, 2021 WL 6062718, at *4–*7; *Mostofsky*, 2021 WL 6049891, at *9–*10; *Montgomery*, 2021 WL 6134591, at *4–*10; *Nordean,* 2021 WL 6134595, at *4–*6; *McHugh,* 21-cr-453, ECF No. 51, at 7–18.

1.   **Background**

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock

App.472

in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House (who are required to read them "in the presence and the hearing of the two Houses"), ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The obstruction statute with which the defendant is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. 18 U.S.C. § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined, in relevant part, as "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B) (emphasis added).

### 2.    Certification of the Electoral College vote is a proceeding before the Congress

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. *See Caldwell*, 2021 WL 6062718 at * 4 ("A straightforward reading of that definition easily reaches the Certification of the Electoral College vote."). Skipping past the text, the defendant argues that Congress's intent and other language and

16

App.473

structural features of the obstruction statute import a requirement that the proceeding be "adversarial" in nature and related to the administration of justice. Mot. at 14–19. That argument is incorrect.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding." *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com). The defendant does not meaningfully contend that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—under that broad definition. And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly. While subsection (B) refers only to proceedings "before the Congress," other subsections encompass judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance." 18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "proceeding" (11th ed. 2019). Taken with its modifier

App.474

"official," the term proceeding thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512"). For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the cases relied upon by the defendant—courts analyze the degree of formality involved in an investigation. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (holding that FBI investigation was not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170–72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (holding that internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (holding that internal investigation conducted by Customs and Border Patrol was not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (holding that investigation conducted by Bureau of Alcohol, Tobacco, and Firearms was not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added); *Montgomery*, 2021 WL 6134591, at *9 (concluding that "the most sensible reading of Section 1515 is that the term 'official proceeding' refers to "the business conducted by an official body that has formally convened for the purpose of conducting that business") (citation omitted).

Fischer cites *Ermoian, Ramos,* and *Dunn*, but claims that what these cases actually require

18

App.475

is that the conduct interfere with the "administration of justice" (Mot. at 16). Fischer misinterprets his own citations, which hold that ongoing law-enforcement or internal agency investigations are not "official proceedings" not because they do not involve the "administration of justice," but because "[t]hey are not formal hearings conducted before official bodies." *Sandlin*, 2021 WL 5865006, at *3. Moreover, none of these cases involved "a proceeding before the Congress," and they do not undermine the government's position because "an ongoing law enforcement investigation of a criminal enterprise bears no resemblance, as a matter of form or content, to the official process mandated by the Twelfth Amendment and the Electoral Count Act for certifying the electoral vote for President and Vice President." *Montgomery*, 2021 WL 6134591, at *6.

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true of the certification of the Electoral College vote, which is expressly mandated by the Constitution and federal statute.

Required by law to begin at 1 p.m. on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (describing where various officials must sit). The certification, moreover,

App.476

must terminate with a decision: no recess is permitted until the "the count of electoral votes" is

"completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote

is a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).[5] Judges in this district have

accordingly concurred. *See, e.g., Montgomery,* 2021 WL 6134591, at *10; *Sandlin,* 2021 WL

5865006, at *3–*4; *Mostofsky*, 2021 WL 6049891, at *10 (concluding that the certification of the

Electoral College is an official proceeding within the meaning of 18 U.S.C. §§ 1515, 1512(c)(2));

*Caldwell*, 2021 WL 6062718 at * 4 ("The Certification of the Electoral College vote thus meets

the definition of an 'official proceeding.'"); *Nordean,* 2021 WL 6134595 at *5 ("the certification

is therefore a 'series of actions' that requires 'some formal convocation,' making it a 'proceeding

before the Congress,' 18 U.S.C. §1515(a)(1)(B), and thus an 'official proceeding.'")

### 3. The proceeding before the Congress is not limited to proceedings "affecting the administration of justice"

The defendant improperly asks this Court to add a limitation to the definition and interpret

"official proceeding" to mean only proceedings related "to a hearing before a tribunal affecting

the administrative of justice." Mot. at 16–17. As an initial matter, it is difficult to imagine a

proceeding more "official" than a constitutionally and statutorily prescribed Joint Session of

Congress.

---

[5]      In a footnote, Fischer contends that the certification is "merely ceremonial," an argument
that should come as a surprise to the thousands of rioters who descended on the Capitol believing
otherwise. Mot. at 14 n.2. Chief Judge Howell recently rejected this claim in an oral ruling denying
a January 6 defendant's motion to dismiss. *United States v. DeCarlo*, 1/21/22 Tr. at 35–36. So did
Judge Bates. *McHugh,* 21-cr-453, ECF No. 51, at 17–18. Contrary to Fischer's argument, "it is
inaccurate to characterize the Certification that occurred on January 6 as a purely ministerial,
legislative vote-counting event." *Caldwell*, 2021 WL 6062718*,* at *7 (citation omitted). That is
because, as explained above, Congress convenes to render judgment on the votes cast by electors;
parties may lodge objections, and each House must consider the objection and make a decision
whether to overrule or sustain it.

App.477

Fischer claims that the statute's title, "Tampering with a victim, witness, or informant" (Mot. at 16), supports his position, but that title pre-dates the passage of Section 1512(c)(2) by almost 20 years. *See* Victim and Witness Protection Act of 1982 (VWPA), Pub. L. No. 97-291, § 4(a), 96 Stat. 1248, 1249–50. "When Congress enacted Section 1512(c)(2), that title was already included in the codification." *Montgomery*, 2021 WL 6134591, at *15 (citing 18 U.S.C. § 1512 (2000)). "The title of the section of the legislation that added Section 1512(c), in contrast, was 'Tampering with a record *or otherwise impeding an official proceeding*.'" *Id.* (citing Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807 (emphasis added)). As Judge Moss found, "Section 1512(c)(2)'s title in the U.S. Code is unenlightening, and the title under which it was enacted arguably supports a broader reading of the statute." *Id.*

Defendant's argument finds no textual support when applied to Section 1515(a)(1)(B), moreover, which speaks broadly of a proceeding "before the Congress." Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency. Further, Section 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress wished to limit the obstruction prohibition under Section 1505 to congressional investigations, it could have done so in the text of Section 1515(a)(1)(B). *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.") But "Congress did not select this narrow construct when

App.478

it enacted section 1512(c)." *Caldwell*, 2021 WL 6062718, at *5. Instead, Congress enacted broader language— "a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies] and investigation[s]" envisioned in Section 1505. "That Congress decided to incorporate into section 1512(c) an existing definition of 'official proceeding' that broadly includes 'a proceeding before Congress,' as opposed to one limited to its 'power of inquiry,' is therefore consequential." *Id.*

Fischer argues that other provisions in Chapter 73 relate to the administration of justice, such as 18 U.S.C. § 1503 (influencing or injuring a juror), and that Section 1512(c)(2) should be similarly limited. Mot. at 19. This only proves the government's point: Congress knows how to draft statutes that relate to the administration of justice, and it did not do so here. Even *Yates v. United States,* 574 U.S. 528 (2015), upon which defendant relies, contradicts his argument: the *Yates* plurality observed that Section 1512(c)'s placement within chapter 73 was consistent with its role as a "broad proscription" on obstructive acts, not a narrowed reading. *Yates,* 574 U.S. at 541 (plurality opinion).

Fischer's arguments cannot overcome the plain and unambiguous meaning of the statute. The broader reference to a "proceeding before the Congress" in Section 1515 includes the Electoral College vote certification. All the courts in this district who have recently considered the issue have so held. *See, e.g., Caldwell*, 2021 WL 6062718 at *5 ("Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions. And the court will not add a requirement to the statute that Congress did not see fit to include."); *Sandlin*, 2021 WL 5865006, at *4 ("[T]he Court will not read an "administration of justice" requirement into "official proceeding.").[6]

_____

[6] Moreover, "even if there were a quasi-adjudicative or quasi-judicial requirement, the

App.479

**4.** ***Yates v. United States*** **and legislative history do not limit the meaning of Section 1512(c)(2) to proceedings involving document destruction or "the administration of justice"**

The defendant relies on flawed legislative history and misreads *Yates v. United States* to argue that the Electoral College vote is not an "official proceeding" under the misguided belief that Section 1512(c), in its entirety, is aimed at "preventing corporations from destroying records relevant to a federal hearing related to the administration of justice." Mot. at 17–19. Defendant again errs by avoiding Section 1515's text. To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). And because construing Section 1512(c)(2) to reach defendant's conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted). The defendant offers no rationale for looking past the statute's plain text to reach for other interpretive tools. *See McHugh,* 21-cr-453, ECF No. 51, at 16 (declining to use "vague notions of a statute's basic purpose" or Congress's "expectations" to impose an "extra-textual limitation" on the actual text of Section 1515 and 1512(c)(2)).

One of those tools is legislative history, which should be given little weight here, and which defendant mischaracterizes, in any event. Fischer quotes from the Senate Judiciary Committee's

---

certification would 'pass the test.'" *Nordean,* 2021 WL 6134595, at *12. The certification is "one of the very few congressional proceedings that actually is adjudicative." *McHugh,* 21-cr-453, ECF No. 51, at 17.

App.480

description of the "Act's purpose," as punishing persons "who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations," Mot. at 17 (quoting S. Rep. No. 107-146, at 2 (2002)), but fails to mention that the version of the legislation the committee was discussing did not include Section 1512(c)(2) (which was added two months after the act was reported out of committee, as a floor amendment). *Montgomery,* 2021 WL 6134591, at *15–*16 (citing 148 Cong. Rec. S6542 (daily ed. July 10, 2002)). Relatedly, Fischer argues that "nothing in the legislative history" supports that Section 1512(c)(2) applies to "the disruption of a ceremony before Congress by persons engaged in a political rally," Mot. at 17, but he fails to mention that the legislative history regarding Section 1512(c)(2), regarding *any of its applications,* is scant in general and of little value here, given that Section 1512(c)(2) was not added until after the bill was reported out of committee. *See Montgomery,* 2021 WL 6134591, at *15 (observing that "[b]ecause Section 1512(c)(2) did not originate in a committee, there is little legislative history that sheds light on the purposes of that particular provision. And what little history exists should not be given much weight").[7] After Senator Lott offered the floor amendment that included Section 1512(c), Senator Hatch observed that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who acts alone in destroying evidence." 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). This passing reference is not a basis to limit the statute.

Relying on the Supreme Court's decision in *Yates*, Fischer also contends that Section 1512(c)(2) targets only "corporate malfeasance" and is "aimed at preventing corporations from destroying records relevant to a federal hearing related to the administration of justice." Mot. at

---

[7] The only discussion of Section 1512 in the Senate Judiciary Committee Report, for example, relates to limitations under the pre-existing prohibition in Section 1512(b), which made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally." S. Rep. No. 107-146, at 6–7.

24

App.481

17–18. As Judge Moss recently found, *Yates* is "inapt." *Montgomery,* 2021 WL 6134591, at *13–

*15 (distinguishing *Yates*). The statute at issue in *Yates* was 18 U.S.C. § 1519, which prohibits

altering, destroying, and concealing records, documents, and tangible objects. *See Yates*, 574 U.S.

at 532 (plurality opinion). *Yates* held that the term "tangible object" as used in Section 1519

included only an object "used to record or preserve information," and thus did not encompass the

undersize red grouper that the defendant in *Yates* had discarded. *Id.* In reaching that conclusion,

the plurality compared Section 1519 with Section 1512(c)(1), which similarly prohibits altering,

destroying, or concealing evidence in connection with an official proceeding. Congress enacted

both Sections 1519 and 1512(c) as part of the Sarbanes-Oxley Act of 2002, 116 Stat. 745, but

drafted Section 1512(c)(1) to reach more broadly than Section 1519. *See Yates*, 574 at 543–45; *see

also id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep

with it."); *Caldwell*, 2021 WL 6062718 at *15–*18 (rejecting defendants' arguments that *Yates*

narrows the reach of Section 1512(c) based, in part, on the statute's legislative history, title, and

placement within Chapter 73 of Title 18)).

The statute with which the defendant is charged, Section 1512(c)(2), expands the

obstruction prohibition beyond the focus on document destruction in Sections 1519 and Section

1512(c)(1). *See United States v. Ring*, 628 F. Supp. 2d 195, 225 (D.D.C. 2009) ("[Section]

1512(c)(2)'s application is not limited to the destruction of documents."). Its application to a

defendant who "corruptly . . . otherwise obstructs, influences, or impedes any official proceeding,"

§ 1512(c)(2), "operates as a catch-all to cover otherwise obstructive behavior that might not

constitute a more specific offense like document destruction, which is listed in (c)(1)." *United

States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (affirming conviction under Section 1512(c)(2)

for false statements) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)).

App.482

Courts have repeatedly upheld its application to obstructive acts that reach beyond the impairment

of financial records. *See id.* (collecting cases concerning violations of Section § 1512(c)(2) by

virtue of the use of false statements); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir.

2009) (upholding conviction under Section 1512(c)(2) for disclosing the identity of an undercover

federal agent to thwart a grand jury investigation); *United States v. Carson*, 560 F.3d 566, 584 (6th

Cir. 2009) (upholding conviction under Section 1512(c)(2) for providing false testimony to a grand

jury); *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021)

(upholding conviction under Section 1512(c)(2) for the burning of building to conceal two bodies

of murder victims).

Moreover, to the extent that Fischer suggests that the outcome in *Yates* was dictated by the

general purpose of the Sarbanes-Oxley Act (to stem "corporate and accounting deception and

cover-ups"), Mot. at 18, that is incorrect: the plurality used a range of tools of construction to

narrow the statute at issue, of which legislative history was only one, and Justice Alito, the decisive

fifth vote, did not refer to Sarbanes-Oxley's purpose at all.[8] As Judges Mehta and Moss have

recently explained, the contextual features, including legislative history, that influenced the *Yates*

plurality to narrow Section 1519, are absent in Section 1512(c)(2). *See Caldwell,* 2021 WL

6062718, at *15–*18; *Montgomery,* 2021 WL 6134591, at *13–*18.

Furthermore, while Section 1512(c) may have been enacted due to concerns over document

destruction and corporate malfeasance, "[s]tatutes often reach beyond the principal evil that

---

[8] Under the rule announced in *Marks v. United States*, 430 U.S. 188 (1977), Justice Alito's
narrower concurrence represents the binding holding as the narrowest opinion among those
concurring in the judgment. *See id.* at 193. In *Yates,* Judge Alito relied on "the statute's list of
nouns, its list of verbs, and its title," but did not discuss the purpose of the Sarbanes-Oxley Act.
*See* 574 U.S. at 549. Fischer thus errs by suggesting that the plurality's reasoning in *Yates*, such
as its reference to the purpose of the Sarbanes-Oxley Act, is binding. *See* ECF No. 54, at 18
(citing plurality opinion).

App.483

animated them." *Sandlin,* 2021 WL 5865006, at *9 (finding that Section 1512(c)(2) may apply to defendants who attempted to stop the certification of the Electoral College on January 6, 2021); *see also Mostofsky*, 2021 WL 6049891 at *11 (rejecting defendant's argument that Section 1512 only applies to conduct similar to document destruction and explaining that the defendant's position "would have the Court ignore the plain meaning of the words contained in (c)(2)—to wit, 'obstructs, influences, or impedes'—which cannot be read so narrowly. The use of 'otherwise' is better understood as 'clarif[ying] that the latter prohibits obstruction by means *other than* document destruction.'") (emphasis in original); *Caldwell*, 2021 WL 6062718 at * 14 ("The natural reading of the two sections is that section 1512(c)(2) 'operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction'").

### 5.   **Defendant's violation of multiple statutes does not bar a prosecution under Section 1512(c)(2)**

The defendant suggests (Mot. at 20) that, to the extent his role in interfering with the Electoral College vote certification warranted prosecution, he should only have been charged with violations of 18 U.S.C. § 231 and 40 U.S.C. § 5104 because his actions interfered with a "federally protected function" and "official business of Congress," not an "official proceeding." In his view, charging him under 18 U.S.C. §1512 as well is "overkill." Mot. at 20. This claim is meritless. First, each of the offenses that he cites contains different elements that the Government must prove beyond a reasonable doubt. Moreover, the mere fact that multiple criminal statutes apply to an individual's conduct does not render prosecution under one (or more) of those statute suspect; indeed, "overlap" is "not uncommon in [federal] criminal statutes." *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014); *accord Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995) (opinion of Stevens, J.) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct."); *see also United States v. Batchelder*, 442 U.S. 114,

123 (1979) ("So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.").

> **B.**     **18 U.S.C. § 1512(c)(2) is not unconstitutionally vague and the defendant had fair notice that his actions are punishable under 18 U.S.C. § 1512(c)(2)**

The defendant argues (Mot. at 21–27) that Section 1512(c) is unconstitutionally vague because of the terms "otherwise," "corruptly," and "official proceeding." Again, several other judges in this district have recently rejected this same argument. *Sandlin,* 2021 WL 5865006, *Caldwell,* 2021 WL 6062718, *Mostofsky*, 2021 WL 6049891; *Montgomery,* 2021 WL 6134591; *Nordean,* 2021 WL 6134595; *McHugh,* 21-cr-453, ECF No. 51, at 19–28. The void for vagueness doctrine, described above in Section I(A), *supra*, is narrow, and does not apply here, where the statute gives Fischer fair notice and is not "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595.

> **1.**     **The "otherwise" catch-all clause is not unconstitutionally vague as applied here.**

The defendant argues that the "otherwise" in Section 1512(c)(2) ("otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so") makes the statute unconstitutionally vague. Mot. at 21. It does not. "Section 1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different ("otherwise") manner compared to § 1512(c)(1) if the defendant 'obstructs, influences, or impedes any official proceeding' without regard to whether the action relates to documents or records." *Sandlin,* 2021 WL 5865006, at *5 (quoting *United States v. Petruk*, 781 F.3d 438, 446–47 (8th Cir. 2015) (emphasis added)).

Section 1512(c) consists of two provisions, which both require the defendant to act "corruptly" and are separated by both a semicolon and line break. First, Section 1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official

App.485

proceeding." Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an official proceeding. The term "otherwise," consistent with its ordinary meaning, conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013); *Petruk*, 781 F.3d at 446–47 (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition in that statute applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *see also Ring*, 628 F. Supp. 2d at 224 n.17 (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512 (c)(1)'s separate and independent prohibition on evidence-tampering"); *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com (defining otherwise as "in another way" or "in any other way"); *see also Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466 (1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court").

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different *means, i.e.*, by conduct other than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503, which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catch-all clause designed to capture other means). Section 1512(c)(2) "operates as a catch-all to cover otherwise obstructive behavior that might not

App.486

constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014); *cf. United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute").

Defendant's citation to *Johnson* does not demonstrate that "otherwise" is vague here. Mot. at 21–22 (quoting *Johnson,* 576 U.S. at 591). *Johnson* invalidated the residual clause of the Armed Career Criminal Act (ACCA) (which enhanced a sentence if a defendant's conduct "otherwise involved conduct that presented a serious potential risk of physical injury to another"), but not because it included the term "otherwise." Rather, the Court decided that applying the categorical approach to determine whether a hypothetical crime "involves conduct" that at some point created a "risk of injury," as the residual clause required, was too indeterminate. 576 U.S. at 596–97. Concerns about the application of the categorical approach are inapposite here.

### 2.    The word "corruptly" is not unconstitutionally vague as applied here.

Section 1512(c)(2) applies only where an individual "corruptly" performs one of the enumerated acts. Fischer argues that the term "corruptly" is unconstitutionally vague. ECF No. 55 at 22–25. As judges on this Court have recognized, that argument is without merit. *See Caldwell,* 2021 WL 6062718, at *8–*13; *Sandlin*, 2021 WL 5865006 at *10–14; *Mostofsky*, 2021 WL 604891 at *11; *Montgomery,* 2021 WL 6134591 at *18–*22; *Nordean,* 2021 WL 9134595, at *9.[9]

The defendant relies on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which addressed a separate statute, 18 U.S.C. § 1505, that prohibited "corruptly" obstructing a congressional inquiry. *Poindexter* is inapposite, and does not show that Section 1512(c)(2) is vague

---

[9] While each of the cited opinions provides persuasive analysis, *Montgomery* is notable because the indictment at issue, like the one here, was not a speaking indictment. *Montgomery,* 2021 WL 6134591, at *18–*22.

App.487

as applied here, as Judge Mehta explained in depth in *Caldwell.*[10] *See Caldwell*, 2021 WL 60626718, at *8–*11. First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629–30. Moreover, "[i]n the 30 years it has been on the books, courts have not applied *Poindexter* widely to render impotent the many obstruction statues that use the word 'corruptly.' Rather . . . courts have recognized 'the narrow reasoning used in *Poindexter*' and 'cabined that vagueness holding to its unusual circumstances.'" *Nordean,* 2021 WL 6134595, at *10 (quoting *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017)); *see also, e.g*., *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). They have not "read *Poindexter* to mean, as Defendants seem to urge, that the term 'corruptly' in any obstruction statute is fatally vague." *Caldwell*, 2021 WL 6062718, at *9.

*Poindexter* also predated the Supreme Court's decision in *Arthur Andersen v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705 (citation omitted). In

---

[10] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, *personally or by influencing another*, including making a false or misleading statement." (Emphasis added.)

App.488

doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502.

Courts have encountered little difficulty when addressing Section 1512(c)'s elements following *Arthur Andersen. See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing"); *United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007) (upholding instruction defining "corruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512 ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice."); *see also Mostofsky, supra,* at 23 ("corruptly" requires that a defendant act "'unlawfully, and with the intent to obstruct[,]' impede, or influence an official proceeding") (citing *Sandlin, supra,* at 26); *Caldwell, supra,* at 23 (noting that, "at the very least," corruptly "requires Defendants to have acted with consciousness of wrongdoing"). The reach of the term "corruptly" in Section 1512(c)(2) is also limited by the "nexus" requirement, namely, that the "the obstructive conduct be connected to a specific official proceeding." *United States v. Young*, 916 F.3d 368, 386 (4th Cir.), *cert. denied*, 140 S. Ct. 113 (2019) (citation omitted). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

### 3.    The word "official proceeding" is not unconstitutionally vague as applied here.

The defendant further contends (Mot. at 21–23) that the Court must speculate as to the meaning of the term "official proceeding" in Section 1512(c). As explained above, no indeterminacy exists. The Joint Session of Congress qualifies as an "official proceeding" under both the "lay" and "legal" definitions of the term. *See* Section (I)(C)(1)(ii), *supra*. It also contains

App.489

the necessary "adjudicatory" features to satisfy the defendant's extra-textual construction. For that reason, Section 1512(c) provided him with more than "a fair warning … of what the law intends to do if a certain line [was] passed" on January 6, 2021. *Arthur Andersen*, 544 U.S. at 703 (citation omitted); *see also Caldwell*, 2021 WL 6062718 at *7 (rejecting vagueness challenge to the term "official proceeding"). "It is difficult to fathom that a reasonable person would not believe the Electoral College certification was an official proceeding . . . ; indeed, this is precisely the reason why the January 6 rioters wished to stop it." *Mostofsky*, 2021 WL 6049891, at *11.

###      4.      The exercise of prosecutorial discretion does not render a statute vague

Fischer singles out five January 6 defendants charged with violations of Section 1512 (out of hundreds) and argues that their cases "illustrate[] how vague and arbitrary the enforcement of the statute can be." Mot. at 24. Defendant's effort is flawed, and several courts in this district have recently rebuffed similar invitations to compare charging decisions as part of the vagueness inquiry. *See Montgomery,* 2021 WL 6134591, at *22; *Caldwell*, 2021 WL 6062718, at *8; *Nordean,* 2021 WL 6134595 at *12. "Discretionary prosecutorial decisions cannot render vague as applied a statute that by its plain terms provides fair notice." *Caldwell*, 2021 WL 6062718 at *8; see also *Montgomery,* 2021 WL 6134591, at *22 ("the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague") (quoting *Kincaid v. District of Columbia*, 854 F.3d 721, 729 (D.C. Cir. 2017) (Kavanaugh, J.)). The vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304 (emphasis added). The defendant cites no authority, and the government has found none, showing that charging decisions postdating the offense have any bearing on this inquiry.

While the Court need not delve into the specifics of defendant's five citations, they do not suggest that 1512(c)(2) is arbitrary. There is no indication that any of the defendants lacked the

App.490

intent to "corruptly"—through wrongdoing, whether by violence, force, or other means—obstruct, interfere with, and impede the certification of the Electoral College vote count. Their obstructive methods varied: some defendants assaulted officers outside the Capitol while others entered the Senate Chamber and rifled through Senators' paperwork. But such factual distinctions lack salience under the statute. Each type of conduct "corruptly" "obstruct[ed], influence[d], or impede[d]" a proceeding before Congress, and accordingly, comes within the statute's scope. 18 U.S.C. § 1512(c). The fact that a criminal statute could encompass varied fact patterns is hardly unusual: take the wire and mail fraud statutes, for example.

Fischer further states, "the government does not specify what 'influence' these defendants had or how exactly they 'impeded.'" Mot. at 26. But the government does not have to describe in the charging instrument how it will prove the elements at trial. *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (*en banc*) ("[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed."). The question here is whether Section 1512(c)'s text provided the defendant with adequate notice.

Finally, the Court should reject Fischer's contention that the indictment is vague as applied to him because, whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c)'s "corruptly" element provided ample notice to Fischer that *this conduct* was criminal. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). Fischer is accused of multiple felonies for his conduct during the January 6 Capitol riot. His "conduct on January 6th was just as independently unlawful and thus just as obviously covered by § 1512(c)(2)." *McHugh*, 21-cr-453, ECF No. 51, at 26.[11]

---

[11] The indictment at issue in *McHugh*, like the superseding indictment here, was not a speaking

IV.    **The Court Should Deny Fischer's Motion to Dismiss Counts Four and Five, Alleging Violations of 18 U.S.C. § 1752**

Counts Four and Five allege violations of Section 1752 of Title 18, which prohibits the unlawful entry into and disruptive or disorderly conduct in a "restricted buildings or grounds." A "restricted building or grounds" is a "posted, cordoned off, or otherwise restricted area…where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). At the time the defendant entered the U.S. Capitol on January 6, 2021, the Vice President was present. The defendant's conduct accordingly falls within the Section 1752's plain sweep because he unlawfully entered a restricted building while the Vice President was "temporarily visiting," as alleged in the superseding indictment.

A.    **The Vice President can "temporarily visit" the U.S. Capitol**

Contrary to Section 1752's plain terms, purpose, and structure, defendant argues that Vice President Pence cannot "temporarily visit" the U.S. Capitol because he has an office there. Mot. at 29–40. He claims that his is the commonsense reading of the statute, but he is wrong, as Judge Bates recently held. *McHugh,* 21-cr-453, ECF No. 51, at 42–47 (reaching "a commonsense conclusion: the Vice President was 'temporarily visiting' the Capitol").

As noted above, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[12]

---

indictment. Judge Bates nevertheless concluded that McHugh's conduct was "squarely within the core coverage of 'corruptly' as used in 18 U.S.C. § 1512(c)(2)." *McHugh,* 21-cr-453, ECF No. 51, at 26 (citation omitted).

[12] https://www.merriam-webster.com/dictionary/visit

App.492

Either definition describes the Secret Service protectee's activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings. Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

The defendant emphasizes Section 1752's use of the term "temporarily" and cites cases where either the President or Vice President were "traveling *outside* of the District of Columbia 'visiting' that area for a 'temporary' purpose." Mot. at 30. Section 1752, however, does not impose a requirement that the location being temporarily visited be outside of the District of Columbia. Second, the visit to the U.S. Capitol *was* temporary: Vice President Pence (and his family) had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress—a proceeding of limited duration. At the close of the proceeding, they left—confirming the "temporary" nature of their visit. *See McHugh,* 21-cr-453, ECF No. 51, at 43 (citing various dictionary definitions of "temporary" as "for a limited time" and finding that the Vice President can "temporarily visit" the U.S. Capitol).

The defendant offers two further observations—both irrelevant. First, he notes that Vice President Pence "lived and worked" in the District of Columbia. Mot. at 29. But Section 1752(c)(1)(B) defines the restricted area by reference to "buildings or grounds," not municipal borders. That Vice President Pence lived and worked in Washington, D.C. does not detract from

36

App.493

the fact that he "temporarily visit[ed]" the U.S. Capitol on January 6. "Simply being in the visitor's hometown does not mean a place cannot be 'visited.'" *McHugh,* 21-cr-453, ECF No. 51, at 44. Second, the defendant stresses that Vice President Pence had a permanent U.S. Capitol office. *Id.* Section 1752(c)(1)(B), however, defines the restricted area by reference to the location of the protectee—not his office. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]." Moreover, the U.S. Capitol is not the Vice President's regular workplace; even if "there is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to Vice President Pence's trip to the Capitol on January 6, 2021." *McHugh*, 21-cr-453, ECF No. 51, at 46.

Such a "carveout," taken to its logical end, would undermine the government's ability to protect the President and Vice President by deterring and punishing individuals who seek unauthorized access to the President's or Vice President's location. It would restrict Section 1752(c)(1)(B)'s application to only locations outside the District of Columbia—on the view that any visit by the President or Vice President to a location within municipal limits cannot be "temporary" because they reside in the District of Columbia. Second, under the defendant's construction, Section 1752(c)(1)(B) would not apply where the President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting." Nor would it apply to Camp David, where there is a presidential cabin and office. In another strange scenario, a restricted area could exist when, as here, the Vice President's family visits the Capitol (because they are Secret Service protectees without an office there), but not when the Vice President does, affording a higher level of protection for the family of the elected official than to the elected official himself (or herself). No

App.494

support exists for the defendant's effort to insert such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (noting that courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it") (citation omitted).

The defendant's position also defies Section 1752's clear purpose. *Cf. Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021) ("[I]f the text alone is insufficient to end the inquiry, we may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.") (internal quotation marks and citation omitted). In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they (or other protectees) happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B). Reading Sections 1752(c)(1)(A) and 1752(c)(1)(B) together protects the President and Vice President in their official homes and wherever else they go. Interpreting the statute as the defendant suggests would create a gap in Section 1752's coverage by removing areas, such as the U.S. Capitol, from protection. It could expose the leaders of the Executive Branch even as they perform their official duties. That gap is both illogical and contrary to the statutory history of Section 1752, where, "at every turn,"

App.495

Congress has "*broadened* the scope of the statute and the potential for liability." *Griffin,* 2021 WL 2778557, at *5 (D.D.C. July 2, 2021).

All the relevant metrics—plain language, statutory structure, and congressional purpose—foreclose the defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it. The defendant's cited cases—involving either an arrest or conviction under Section 1752—do not discuss the "temporarily visiting" language. Mot. at 29–30 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990) (unpublished); *Blair v. City of Evansville, Ind.,* 361 F. Supp.2d 846 (S.D. Ind. 2005)). They lack relevance to the present dispute.

### B.     18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction

The defendant argues that because the Capitol Police, not the Secret Service, barricaded the area around the Capitol, he should not be charged with violating 18 U.S.C. § 1752(a)(1) and (2). Mot. at 30–31. Courts in this district have rightly rejected this contention. *See Griffin*, 2021 WL 2778557; *Mostofsky*, 2021 WL 6049891, at *12–*13, *Nordean,* 2021 WL 6134595, at *18; *McHugh,* 21-cr-453, ECF No. 51, at 38–40.

In relevant part, 18 U.S.C. § 1752 ("Restricted building or grounds") criminalizes:

(a) Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(c) In this section—

App.496

      (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

          (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

          (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

          (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

      (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752. In short, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off area where "a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F. App'x 513 (D.C. Cir. 2021). Section 1752 therefore "focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting." *Griffin*, 2021 WL 2778557, at *6.

    As previously mentioned, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal*, 498 U.S. at 108); *see also Pub. Investors Arbitration Bar Ass'n v. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C. 2013) (Howell, J.). Here, the plain text of the statute is "unambiguous," so the "judicial inquiry is complete." *Babb*, 140 S. Ct. at 1177. Section 1752's text is clear. It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and the defendant does not appear to dispute—that "person[s] protected by the Secret Service" includes the Vice President. §

40

1752(c)(2); *see* § 3056(a)(1).

That straightforward analysis has a straightforward application to the facts alleged in the defendant's case. The superseding indictment alleges that a protected person (the Vice President) was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted—making it a "restricted building or grounds" under § 1752(c)(1). In short, the allegations closely track the statutory language.

The defendant urges the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area. Mot. at 30–31. That is so, the defendant claims, because it is the Secret Service who protects the President and others, so it is the Secret Service who must make the designation of a restricted area. Section 1752 is directed not at the Secret Service, however, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668–69 (2006). "Indeed, the only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." *Griffin*, 2021 WL 2778557, at *7; *see also Mostofsky*, 2021 WL 6049891 at *13 ("The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area."). "If Congress intended a statute designed to safeguard the President and other Secret Service protectees to hinge on who outlined the safety perimeter around the principal, surely it would have said so." *Griffin*, 2021 WL 2778557, at *6. Fischer's reading would have the Court create a "potentially massive procedural loophole" from the statute's "silence." *McHugh*, 21-cr-453, ECF No. 51, at 40. The Court should not do so.

Statutory history also undercuts the defendant's argument. *See id.*, at *4–*5 (explaining

App.498

how Congress has consistently "*broadened* the scope of the statute and the potential for liability").

While the earlier version of Section 1752 also did not say who must restrict a building or grounds,

it did incorporate regulations promulgated by the Department of the Treasury (which at the time

housed the Secret Service) governing restricted areas. *Id*. Fischer falsely conflates the Treasury's

Department's authority to promulgate certain regulations with a requirement that the Secret

Service cordon off areas; but, even so, Congress subsequently struck subsection (d) and did not

replace it with language limiting the law enforcement agencies allowed to designate a restricted

area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). Its decision in 2006 to

eliminate reference to the Treasury Department (without replacing it with the Department of

Homeland Security, which currently houses the Secret Service) indicates that the statute no longer

depends (if it ever did) on whether the Secret Service has defined an area as "restricted."[13]

Moreover, Fischer's reading of the statute, which would require the Secret Service to "cordon off"

a private residence, "no matter how secure the location or how imposing the preexisting walls,"

leads to "pressing absurdities." *Griffin*, 2021 WL 2778557 at *6. Counts Four and Five are sound.

**V.    The Indictment Satisfies the Notice and Presentment Requirements**

Finally, Fischer asserts the indictment is deficient because it "lacks *any* specifics regarding

the alleged acts or circumstances and contains only conclusory allegations." Mot. at 32–33. Once

again, Fischer's claim is without merit. An indictment is sufficient if it contains the elements of

the charged offense and enough detail to allow a defendant to prepare a defense and invoke the

---

[13] Defendant claims that "legislative history" supports his reading of Section 1752, but never explains what that legislative history is. Mot. at 30. *Griffin* rejected an argument that references to the Secret Service in the legislative history suggested that it must do the restricting because Section 1752 is not a "regulatory statute" directed to the agency. *Griffin*, 2021 WL 2778557, at *4. In any event, because Section's statutory text is clear, "there is no reason to resort to legislative history." *Id.* (quoting *United States v. Gonzales*, 520 U.S. 1, 6 (1997)).

App.499

Double Jeopardy Clause if necessary. *Hamling v. United States*, 418 U.S. 87, 117–19 (1974); *United States v. Resendiz-Ponce*, 549 U.S. 102, 108–10 (2007)*; United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("the validity of an indictment is not a question of whether it could have been more definite and certain. Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.") (cleaned up).

"[B]y using the statutory language and specifying the time and place of the offense," an indictment provides both "fair notice" and protection against future prosecution. *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (internal quotation omitted). "[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendant on notice as to every detail considered by the grand jury. Further, indictments 'must be read to include facts which are necessarily implied by the specific allegations made.'" *United States v. Cisneros*, 26 F. Supp. 2d 24, 46 (D.D.C. 1998) (quoting *United States v. Silverman*, 430 F.2d 106, 111–12 (2d Cir. 1970)); *see also United States v. Berger,* 473 F.3d 1080, 1103 (9th Cir. 2007) (explaining that an indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied.").

Following his citations to general Fifth Amendment and due process principles, Fischer's only authority for his attack on the format of the indictment is *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). But *Du Bo* is inapposite because its indictment failed to allege all elements of the offense. *Id.* at 1179–80 (concluding Hobbs Act charge was fatally flawed where it

App.500

failed to "properly allege an offense"). That omission explains the Ninth Circuit's concern for whether the defendant was convicted on the basis of facts "perhaps not even presented to [] the grand jury that indicted him." *Id.* at 1179 (internal quotations omitted). There is no reason to examine what facts the grand jury received in this case, or what facts could have been added to the indictment, because the indictment properly alleges all elements of the charges. Moreover, the charging instruments and disclosures in this case—which Fischer acknowledges in a footnote— make clear what Fischer is charged with doing, which is likely why he did not seek a bill of particulars. Nothing further need be included. Fischer criticizes the January 6 indictments as "assembly-line," but those commonalities result from the tragic fact that the District suffered an unprecedented number of similar crimes during the unlawful assault on the Capitol. It is no sign of insufficiency. Fischer's motion to dismiss fails.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to dismiss.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:    _____/s/ *Alexis J. Loeb*_____
ALEXIS J. LOEB
Assistant United States Attorney
Detailee
California Bar No. 269895
450 Golden Gate Ave, 11th Floor
San Francisco, CA 94102
Alexis.loeb@usdoj.gov
(415) 436-7168

44

App.501

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

      v.

JOSEPH W. FISCHER,

         *Defendant*.

Criminal Action No. 1:21-cr-00234 (CJN)

**<u>MEMORANDUM OPINION</u>**

The government alleges that Defendant Joseph Fischer was an active participant in the notorious events that took place at the U.S. Capitol on January 6, 2021.  On November 10, 2021, a grand jury returned a Superseding Indictment that charges Fischer with seven different criminal offenses, several of which are felonies.  *See* Superseding Indictment, ECF No. 53.  Fischer has moved to dismiss Counts One, Three, Four, and Five.  *See* Fischer's Motion to Dismiss, ("Def.'s Mot") ECF No. 54.  For the reasons stated below, the Court grants in part and denies in part Fischer's motion.

**I.      Legal Standard**

Before trial, a defendant may move to dismiss an indictment on the basis that a "defect in the indictment or information" exists.  Fed. R. Crim P. 12(b)(3)(B)(v).  "The operative question is whether the allegations, if proven, would be sufficient to permit a jury to" conclude that the defendant committed the criminal offense as charged.  *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  Courts must assume as true the

App.502

allegations contained in the indictment—but may rely only on those allegations. *United States v. Akinyoyenu*, 199 F. Supp. 3d. 106, 109–10 (D.D.C. 2016) (citing *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015)). Strict "[a]dherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001).

## <u>COUNT ONE</u>

Count One of the Superseding Indictment charges Fischer with civil disorder in violation of 18 U.S.C. § 231(a)(3).

> On or about January 6, 2021, within the District of Columbia, **JOSEPH W. FISCHER**, committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

18 U.S.C. § 231(a)(3) provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function shall be fined under this title or imprisoned not more than five years or both.

Fischer argues that portions of § 231(a)(3) are unconstitutionally vague because the provision's "imprecise and subjective standards fail to provide fair notice and creates significant risk of arbitrary enforcement." Def.'s Mot. at 4–5. Fischer further contends that § 231(a)(3) is unconstitutionally overbroad because "several of the statute's terms are so broad and indefinite as

App.503

to impose unqualified burdens on a range of protected expression." *Id.* at 5.  In particular, Fischer

points to "*any act to obstruct, impede, or interfere with*" as well as "*incident to and during the*

*commission of a civil disorder*" as the problematic components of the civil disorder statute.  *Id.* at

4 (emphasis added).  The Court, joining the company of other judges in this district, rejects these

arguments.  *See United States v. Mostofsky*, No. CR 21-138 (JEB), 2021 WL 6049891, at *8

(D.D.C. Dec. 21, 2021) (rejecting an overbreadth challenge to § 231(a)(3)); *United States v.*

*Nordean*, No. CR 21-175 (TJK), 2021 WL 6134595, at *16 (D.D.C. Dec. 28, 2021) (holding that

§ 231(a)(3) is neither vague nor overbroad); *United States v. McHugh*, No. CR 21-453 (JDB), 2022

WL 296304, at *13 (D.D.C. Feb. 1, 2022) (same).

## A.  18 U.S.C. § 231(a)(3) is not Void for Vagueness

The void-for-vagueness doctrine as currently understood[1] arises from both "ordinary

notions of fair play and the settled rules of law."  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018)

(quotation omitted).  The doctrine "guarantees that ordinary people have fair notice of the conduct

a statute proscribes" and "guards against arbitrary or discriminatory law enforcement by insisting

that a statute provide standards to govern the actions of police officers, prosecutors, juries, and

judges."  *Id.* (quotations omitted).   A court will therefore decline to enforce a statute as

impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable

opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages

arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

---

[1] Some have questioned whether the void-for-vagueness doctrine is consistent with the Due
Process Clause, *see Sessions*, 138 S. Ct. at 1242 (Thomas, J., dissenting) ("I continue to doubt that
our practice of striking down statutes as unconstitutionally vague is consistent with the original
meaning of the Due Process Clause."), but this Court is of course bound to apply the doctrine in
its current form.

App.504

Section 231(a)(3) criminalizes any "act" or "attempt[ed]" act to "obstruct, impede, or interfere" with a law enforcement officer "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder." 18 U.S.C. § 231(a)(3). The alleged civil disorder must "in any way or degree obstruct[], delay[], or adversely affect[] commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function." *Id.* The statute defines civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

The Court concludes that the statute, taken as a whole, is not unconstitutionally vague. Section 231(a)(3) provides sufficient notice of the conduct it prohibits. It prohibits any "act" done "to obstruct, impede, or interfere" with law enforcement responding to a "civil disorder." 18 U.S.C. 231(a)(3). As Judge Kelly has persuasively concluded, "these terms are not dependent on the subjective reaction of others," but are rather subject to "specific fact-based ways to determine whether a defendant's conduct interferes with or impedes others, or if a law enforcement officer is performing his official duties incident to and during a civil disorder." *Nordean*, 2021 WL 6134595 at *16.

Fischer argues that "by penalizing any act to obstruct, impede, or interfere, § 231(a)(3) reaches the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content." Def.'s Mot at 6. But the terms Fischer attacks do not carry the potential for misunderstanding or make the statute "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). As Judge Bates has convincingly concluded: "There is a crucial difference between

4

App.505

reasonable people differing over the <u>meaning</u> of a word and reasonable people differing over its <u>application</u> to a given situation—the latter is perfectly normal, while the former is indicative of constitutional difficulty." *McHugh*, 2022 WL 296304 at *16.

Fischer further contends that the term "civil disorder, as defined under § 232(1), is extremely far-reaching, applying to any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the property," and that this "definition of civil disorder offers no limitation to solve the vagueness problem because it could apply to virtually any tumultuous public gathering to which police might be called, not just largescale protests or riots." Def.'s Mot. at 7. But civil disorder's "fulsome statutory definition" makes plain that to constitute a "civil disorder," the "gathering" must "involve acts of violence" and either cause or "immediate[ly]" threaten bodily injury or property damage." *McHugh*, 2022 WL 296304 at *15 n.22. The definition, in other words, "limits the application of "civil disorder" to a small (obviously unlawful) subset of "public gatherings." *Id.*

Fischer also claims that "because § 231(a)(3) contains no scienter requirement, . . . it is left to police, prosecutors, and judges to decide whether the statute requires knowledge or specific intent or neither." Def.'s Mot. at 8. But the contrary is true: "§ 231(a)(3) is a specific intent statute, criminalizing only acts performed with the intent to obstruct, impede, or interfere with a law enforcement officer." *McHugh*, 2022 WL 296304 at *14. Even the government acknowledges that the defendant must have acted with intent to violate § 231(a)(3). *See* Gov.'s Br. in Opp'n ("Gov.'s Br."), ECF No. 57 at 9.

All in all, § 231(a)(3) survives Fischer's void-for-vagueness challenge because it provides Fischer with sufficient notice of the conduct it prohibits.

App.506

## B.  18 U.S.C. § 231(a)(3) is not Unconstitutionally Overbroad[2]

In the typical case, a litigant bringing a facial constitutional challenge "must establish that no set of circumstances exists under which the [law] would be valid," or the litigant must "show that the law lacks a plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quotation omitted).  Courts treat facial challenges differently in the First Amendment context.  In that context, a litigant will succeed on an overbreadth challenge "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quotation omitted).  Refusing to enforce a statute because of overbreadth concerns is "strong medicine," and courts will refuse to enforce the statute on such grounds "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1583 (2020) (Thomas, J., concurring) (noting that it "appears that the overbreadth doctrine lacks any basis in the Constitution's text, violates the usual standard for facial challenges, and contravenes traditional standing principles").

Despite Fischer's argument to the contrary, § 231(a)(3) is not unconstitutionally overbroad because "the statute's potentially unconstitutional applications are few compared to its legitimate ones." *Mostofsky*, 2021 WL 6049891 at *8.  The text shows that § 231(a)(3) covers "primarily, if not exclusively, conduct or unprotected speech, such as threats."  Gov.'s Mot at 22.  Section 231(a)(3), in other words, "applies to persons who commit or attempt to commit 'any act to obstruct, impede, or interfere' with law enforcement or firefighters.  The words 'any act' imply that the statute is directed towards conduct, not speech." *United States v. Phomma*, No. 3:20-CR-

---

[2] The vagueness doctrine differs from the overbreadth doctrine in that "[a] vague law denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions; in contrast, a law that is overbroad may be perfectly clear but impermissibly purport to penalize protected First Amendment activity." *Hastings v. Jud. Conf. of the U.S.*, 829 F.2d 91, 105 (D.C. Cir. 1987).

App.507

00465-JO, 2021 WL 4199961, at *5 (D. Or. Sept. 15, 2021).  It should come as no surprise then

that numerous "federal judges all within the last year" have rejected overbreadth challenges lodged

against § 231(a)(3).  *See McHugh*, 2022 WL 296304 at *17; *Nordean*, 2021 WL 6134595 at *17;

*Mostofsky*, 2021 WL 6049891 at *8; *United States v. Howard*, No. 21-cr-28 (PP), 2021 WL

3856290, at *11–12 (E.D. Wis. Aug. 30, 2021); *United States v. Wood*, No. 20-cv-56 (MN), 2021

WL 3048448, at *8 (D. Del. July 20, 2021).  This Court joins the ranks.

<u>**COUNT THREE**</u>

Count Three of the Superseding Indictment charges Fischer with obstruction of an official

proceeding in violation of 18 U.S.C. § 1512(c)(2).

> On or about January 6, 2021, within the District of Columbia and elsewhere,
> **JOSEPH W. FISCHER**, attempted to, and did, corruptly obstruct,
> influence, and impede an official proceeding, that is, a proceeding before
> Congress, specifically, Congress's certification of the Electoral College
> vote as set out in the Twelfth Amendment of the Constitution of the United
> States and 3 U.S.C. §§ 15-18.

18 U.S.C. § 1512(c) provides:

> Whoever corruptly –
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other
> object, or attempts to do so, with the intent to impair the object's integrity
> or availability for use in an official proceeding; or
>
> (2) Otherwise obstructs, influences, or impedes any official proceeding, or
> attempts to do so, . . . shall be fined . . . or imprisoned.

The Court recently concluded that the word "otherwise" links subsection (c)(1) with

subsection (c)(2) in that subsection (c)(2) is best read as a catchall for the prohibitions delineated

in subsection (c)(1).  *United States v. Miller*, No. 21-cr-00119, Dkt. No. 72, slip op. at 28 (D.D.C.

Mar. 7, 2022).  As a result, for a defendant's conduct to fall within the ambit of subsection (c)(2),

App.508

the defendant must "have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id.*

The Superseding Indictment does not allege that Fischer has taken any such action.  Count Three of the Superseding Indictment alleges only that Fischer "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18."  Nothing in Count Three (or the Superseding Indictment generally) alleges, let alone implies, that Fischer took some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence Congress's certification of the electoral vote.  The Court will therefore grant Fischer's Motion to Dismiss Count Three.

## **COUNTS FOUR & FIVE**

Count Four of the Superseding Indictment charges Fischer with entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1).

> On or about January 6, 2021, within the District of Columbia and elsewhere, **JOSEPH W. FISCHER**, did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so.

18 U.S.C. § 1752(a)(1) provides:

> (a)  Whoever—
>
> (1)  knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
>
>  . . . shall be punished as provided in subsection (b).

Count Five of the Superseding Indictment charges Fischer with disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2).

App.509

On or about January 6, 2021, within the District of Columbia and elsewhere, **JOSEPH W. FISCHER**, did knowingly and with intent to impede and disrupt the orderly conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

18 U.S.C. § 1752(a)(2) provides:

> (a) Whoever—
>
> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;
>
> . . . shall be punished as provided in subsection (b).

For the purposes of both § 1752(a)(1) and § 1752(a)(2), 18 U.S.C. § 1752(c)(1)(B) defines "restricted building or grounds:"

> as a "posted, cordoned off, or otherwise restricted area . . . where the President or other person protected by the Secret Service *is or will be temporarily visiting*."

From the government's perspective, the Capitol qualified as "restricted building and grounds" on January 6 because it was a "building or grounds where the President or other person protected by the Secret Service is or will temporarily be visiting." 18 U.S.C. § 1752(c)(1)(B). *See* Gov.'s Br. at 48. According to the Superseding Indictment, then-Vice President Michael Pence counts as the "other person." But as Fischer sees it, then-Vice President Pence could not have been "temporarily visiting" the Capitol on January 6 because (1) he had a permanent office, in his capacity as President of the Senate, "within the United States Capitol and its grounds," and because (2) he presided over the Senate Chamber on January 6 to count the electoral votes in accordance

9

App.510

with the Electoral Count Act.  *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors.  The Senate and House of Representatives shall meet in the hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the *President of the Senate shall be their presiding officer*.") (emphasis added).

The Court held argument on Fischer's motion on February 28, 2022.  At the argument, the government suggested a willingness to amend the Superseding Indictment to allege that one of then Vice President Pence's family members—who were not present at the Capitol in the capacities that then Vice President Pence was—attended the certification of the electoral vote at the Capitol on January 6.  Indeed, the government stated the following in its brief in opposition to Fischer's motion to dismiss:  "While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings."  Gov.'s Br. at 47.   And Fischer's counsel essentially conceded during the argument that the motion to dismiss Counts Four and Five would be meritless if the government added the names of additional Secret Service protectees to the Superseding Indictment.  As a result, the Court grants the government 14 days to either amend the Superseding Indictment or to explain to the Court why it will not do so.

\*    \*    \*

For the foregoing reasons, the Court will grant in part and deny in part Fischer's Motion to Dismiss, ECF No. 54.  An appropriate order will follow.

DATE:  March 15, 2022

_____
CARL J. NICHOLS
United States District Judge

App.511

# United States District Court for the District of Columbia

UNITED STATES OF AMERICA )
)
vs. )      Criminal No.  21-cr-234 (CJN)
)
Joseph W. Fischer )

## NOTICE OF APPEAL

Name and address of appellant:          United States of America

Name and address of appellant's attorney:     Elizabeth H. Danello, Assistant US Attorney
Office of the US Attorney for DC
601 D Street, NW Room 6.232
Washington, DC  20253

Offense:   18 USC secs. 231(a)(3), 111(a)(1),2, 1512(c)(2),2, 1752(a)(1), 1752(a)(2), 40 USC secs 5104(e)(2)(D), (e)(2)(G)

Concise statement of judgment or order, giving date, and any sentence:

Order, entered on March 15, 2022, dismissing Count Three; Order, entered on May 30, 2022, denying motion for reconsideration

Name and institution where now confined, if not on bail:   N/A

        I, the above named appellant, hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the above-stated judgment.

June 22, 2022                               United States of America
DATE                                        APPELLANT
                                            Elizabeth H. Danello
                                            ATTORNEY FOR APPELLANT

GOVT. APPEAL, NO FEE  ☑
CJA, NO FEE           ☐
PAID USDC FEE         ☐
PAID USCA FEE         ☐
Does counsel wish to appear on appeal?                     YES ☐   NO ☐
Has counsel ordered transcripts?                           YES ☐   NO ☑
Is this appeal pursuant to the 1984 Sentencing Reform Act? YES ☐   NO ☑

App.512