ORAL ARGUMENT NOT YET SCHEDULED

## SUPPLEMENTAL APPENDIX

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

NO'S. 22-3038, 22-3039 & 22-3041

—————

UNITED STATES OF AMERICA,
*Appellant*
v.
JOSEPH W. FISCHER, EDWARD LANG, and GARRET MILLER,
*Appellees,*

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NO'S. 1:21-CR-234, 1:21-CR-119, 1:21-CR-53 (NICHOLS, J.)

—————

HEIDI R. FREESE, ESQ.
Federal Public Defender
Middle District of Pennsylvania

FREDERICK W. ULRICH, ESQ.
Asst. Federal Public Defender
AMANDA R. GAYNOR, ESQ.
Staff Attorney

100 Chestnut Street, Suite 306
Harrisburg, PA 17101
717-782-2237

F. CLINTON BRODEN, ESQ.
Broden & Mickelsen
2600 State Street
Dallas, TX 75204
214-720-9552

NICHOLAS D. SMITH, ESQ.
David B. Smith, PLLC
1123 Broadway, Ste. 909
New York, NY 10010

STEVEN A. METCALF, II, ESQ.
Metcalf & Metcalf, P.C.
99 Park Avenue
New York, NY 10016

*Attorneys for Appellees*

# TABLE OF CONTENTS

1.    Transcript, In-Person Oral Argument/Status Conference,
      May 3, 2022 ....................................................................... 1

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              CR Action
                                       No. 1:21-234

        vs.                            Washington, DC
                                       May 3, 2022
JOSEPH W. FISCHER,
                                       1:40 p.m.
             Defendant.
```

```
   TRANSCRIPT OF IN-PERSON ORAL ARGUMENT/STATUS CONFERENCE
          BEFORE THE HONORABLE CARL J. NICHOLS
               UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

**For the Plaintiff:**    **ALEXIS LOEB**
  US ATTNYS OFC N.D. OF CA
  450 Golden Gate Ave., 11th Fl.
  San Francisco, CA 94102
  415-436-7168
  **JAMES PEARCE**
  U.S. DEPARTMENT OF JUSTICE
  950 Pennsylvania Ave NW, Ste 1250
  Washington, DC 20530
  202-532-4991

**For the Defendant:**    **AMANDA GAYNOR**
  **LORI ULRICH** (by phone)
  OFFICE OF THE FED. PUBLIC DEFENDER
  330 Pine Street, Suite 302
  Williamsport, PA 17701
  570-323-9314
  **EUGENE OHM**
  FEDERAL PUBLIC DEFENDER FOR D.C.
  625 Indiana Avenue, NW, Suite 550
  Washington, DC 20004
  202-208-7500

**Reported By:**    **LORRAINE T. HERMAN, RPR, CRC**
  Official Court Reporter
  U.S. District & Bankruptcy Courts
  333 Constitution Avenue, NW
  Room 6720
  Washington, DC 20001
  202-354-3196

2

# **P R O C E E D I N G S**

1

2          **DEPUTY CLERK:**  Your Honor, this is criminal case

3     year 2021-234, *United States of America versus Joseph W.*

4     *Fischer.*

5          Counsel, please come forward and introduce

6     yourselves for the record, beginning with the government.

7          **THE COURT:**  And as I said in the earlier hearing,

8     my current practice is -- obviously I'm not masked --

9     whoever is at the podium, take off your mask, if you are

10    comfortable with that, opposing counsel, court reporter,

11    deputy and put your mask back on at counsel table.

12          **MS. LOEB:**  Your Honor, Alexis Loeb for the United

13    States.  With me is my colleague James Pearce.

14          **THE COURT:**  Counsel.

15          **MS. GAYNOR:**  Good afternoon, Your Honor, Amanda

16    Gaynor from the Federal Public Defenders Office in the

17    Middle District of Pennsylvania.

18          I am here with my colleague Gene Ohm, from the

19    Washington, D.C. office.  I believe also on the phone is my

20    co-counsel, Lori Ulrich, who can't be here today.  She is on

21    a COVID quarantine.

22          **THE COURT:**  Yes, we heard.  I hope she is feeling

23    better soon.

24          **MS. GAYNOR:**  Thank you.

25          **THE COURT:**  Thank you, Counsel.

1          So there are a few motions still pending as to

2     which additional things have been filed.

3          As I indicated in communication through Ms. Lesley

4     with counsel, I am interested in really hearing argument on

5     two questions.  The first is on the 1512(c)(2) count.

6     Assuming I don't reconsider my substantive holding, whether

7     the indictment as currently framed is adequate.  I want to

8     hear argument on that question.  And then the other

9     question, which was presented in the hearing that just

10    concluded as well, whether the venue motion should be

11    granted.

12          So I think I'd like to start with the government,

13    hear from you on -- I don't know if you are going to split

14    those issues and if you are, I am happy to hear from you in

15    either order.  Then I will hear from defense counsel, give

16    the government a very short time for rebuttal.  I am happy

17    to hear from either of you in whatever order you would like.

18          **MS. LOEB:**  Your Honor, I am going to address the

19    venue change issue.

20          **THE COURT:**  Very well.  Yes.

21          **MS. LOEB:**  Your Honor, Defendant's Motion to

22    Change Venue should be denied; and that's because this isn't

23    a question of trying to find some plutonic ideal of a

24    district where no one has heard anything about the events of

25    January 6th, and that's true for two reasons.  First of all,

1    the standard from the *Skilling* case is that the defendant

2    has to demonstrate extraordinary prejudice, which is a

3    standard the defendant has not met.

4            Second of all, the Court isn't looking for jurors

5    who haven't heard anything about the news; that's not the

6    question.  People who follow the news who are well-informed

7    can be perfectly suitable jurors.  The question is whether

8    those people can put aside what they know and decide the

9    case on the facts before them.

10    **THE COURT:**  So, as I explored with counsel earlier

11    today, four January 6th cases have gone to trial in front of

12    juries.  I believe it is four.  There have been bench

13    trials, but I think it is irrelevant for present purposes.

14    Each of those judges, based on the individualized

15    circumstances of the defendant, the questions that were

16    asked, the potential jurors, ultimately was able to seat a

17    jury, so to speak.

18            So my question is really a question I also asked

19    the government earlier which is, Do you agree that if we got

20    to jury selection, and that if I had a different experience,

21    and that we found a pool that was very difficult to qualify

22    enough jurors to get to peremptories, that at that point it

23    might be appropriate to consider a change of venue?

24    **MS. LOEB:**  Yes.  Yes.  I agree with that.  We

25    could talk about what "very difficult" means.

1      **THE COURT:**  It's at least hypothetically possible,

2  in your view, that even if the venue motion isn't granted

3  now, either because I hold it or because I deny it without

4  prejudice to refiling later, that it's theoretically

5  possible that as a result of jury selection we wouldn't have

6  to just keep trying and trying; that maybe I could conclude

7  that a change in venue was appropriate at that time.

8      I recognize the government's view is that would be

9  probably be very difficult to satisfy, the standards are

10  incredibly high, but it's at least theoretically possible in

11  your view.

12      **MS. LOEB:**  It is, Your Honor.  I would also like

13  to talk about what we've seen in some of those recent

14  trials --

15      **THE COURT:**  Yes, please; that would be very

16  helpful.

17      **MS. LOEB:**  -- in terms of what the experience has

18  been.

19      **THE COURT:**  Yes.

20      **MS. LOEB:**  I think what we've seen is that voir

21  dire has been very successful in identifying unbiased

22  jurors; and that it's done so without requiring undue time

23  or effort by the District Court.

24      So to take the most recent example, the *Thomas*

25  *Webster* case, the Court questioned 53 jurors.  The Court was

1  able to qualify 35, after striking 18 jurors for cause.

2         **THE COURT:**  For whatever cause, obviously.

3         **MS. LOEB:**  Right.  Right.

4         So as Judge Mehta explained, of the 18 who were

5  struck for cause, only half of them were struck either

6  because they expressed an inability to be impartial or

7  because they had some connection to the event.

8         So in the Webster trial, we are looking at 9

9  jurors out of 53 who were questioned; so that's just about

10  17 percent.  That is also in line with what we saw in the

11  Reffitt trial and the Robertson trial.

12         In Reffitt, the percentage is about 14 percent.

13  So 8 of the 56 prospective jurors, again claim to have such

14  strong feelings that they could not set aside, they could

15  not be fair and impartial, and they were struck for cause.

16  And in the Robertson trial, only about 9 out of 49 jurors

17  were struck for cause on this basis.  So we are looking at

18  under 20 percent for each of those three trials so far.

19         And in none of those cases -- I believe in all of

20  those, jury selection was finished in about a day, maybe a

21  little spillover but pretty much a little more than a day.

22  So I don't think we are not seeing signs of extreme

23  prejudice in the jury pool here.

24         **THE COURT:**  And --

25         **MS. LOEB:**  And voir dire also offered an

1  opportunity to pose the kinds of questions -- the parties,

2  of course, both had opportunities to suggest questions and

3  the Court was involved.  During the voir dire process, they

4  were able to ask questions to try to ferret out a bias that

5  couldn't be set aside.

6      **THE COURT:**  It seems to me that there either are

7  or theoretically should be some cases in which the courts

8  have concluded that they need not wait for jury selection.

9  Am I right about that?  It seems to me that there must have

10  been venue motions, change of venue motions, granted on

11  these questions where the Court said, Hey, we don't want to

12  wait for voir dire.  Otherwise, that would always be the

13  answer.

14      So what distinguishes the cases where the motions

15  have been granted from those where the courts have said,

16  Well, we can just deal with this at voir dire?

17      **MS. LOEB:**  I can think of a couple of situations

18  where that's happened.  So that could happen if there was a

19  -- if the Court found that there was a presumption of

20  prejudice, which is the standard that is outlined in

21  *Skilling*, using the various *Skilling* factors.  So it is

22  theoretically possible that if that the defendant makes a

23  showing of extraordinary prejudice before trial, the Court

24  can grant the motion.

25      Now, the Supreme Court has not found a case that

1    meets that standard in 50 years.  And in cases such as

2    *Rideau* -- and not even in *Skilling* did the Supreme Court

3    find that there was that presumption before trial.  The

4    cases -- the Supreme Court cases *Rideau* and *Irvin* are

5    readily distinguishable from the case here.  They both

6    involved small communities, which were saturated with

7    extremely prejudicial news, specifically news in both cases

8    that the defendants had confessed.  And not just confessed

9    to any crime but confessed to the crime of murder, which I

10   think has an extreme, acute effects on the local community.

11   And there was also a showing there that the news reached

12   very high percentage of houses in the small community.

13            Our briefing discusses *Rideau* in depth.

14            **THE COURT:**  Yes.

15            **MS. LOEB:**  So I won't describe it any further.

16            **THE COURT:**  So just to play that out a little bit,

17   so essentially what implicitly maybe the Courts must have

18   concluded is in those circumstances the concerns can't be

19   obviated through voir dire.  Even if you could

20   hypothetically find 35 people who haven't heard about the

21   issue or didn't read the news, it's so permeating, the

22   venire, that we are not even going to try.  That must be

23   sort of implicit in that.

24            Does any Court discuss that?  Essentially say, It

25   has been suggested we can go to voir dire and see if there

1    is a problem here, but we know there is a presumption of

2    prejudice so we are not even going to bother.

3            **MS. LOEB:**  Aside from *Irvin* and *Rideau*, there are

4    cases that are coming to mind.  I do want to mention

5    *McVeigh*, because there the Court did transfer the venue

6    without going through voir dire.  But there the government

7    agreed that the trial could not take place in Oklahoma City.

8    So the question was, What will the alternative venue be?

9    The government wanted the trial to be in Oklahoma and the

10   district judge instead settled on Colorado.

11           *McVeigh*, I think, is also readily distinguishable

12   from this case.  The pretrial publicity gave a lot of

13   attention specifically to Timothy McVeigh, who was splashed

14   across the media, in a way that Mr. Fischer has not been.

15           **THE COURT:**  Is that, from your perspective,

16   essentially a requirement for such a motion that the

17   defendant specifically is well-known to the venire or is

18   that not necessarily a requirement?

19           **MS. LOEB:**  It's hard to say that -- I suppose

20   there could theoretically be a case where that is not there.

21   But I think it is, just as a matter of human experience, if

22   people aren't familiar with an individual in front of them,

23   it is going to be easier for them to set aside their views.

24   And I think their views may not be as fixed, if they haven't

25   seen coverage relating to that specific person.

1          But I think *McVeigh* is also distinguishable

2    because just the horrendous crime which so acutely affected

3    Oklahoma City.  Here I they think we are dealing with a

4    crime that has a more nationwide harm.  I don't want to

5    minimize the importance of what happened here, but over 100

6    people dying in a bombing, including victims who were

7    children, is a really extraordinary crime in terms of the

8    affect on the local community.

9          **THE COURT:**  So imagine or assume that I don't

10   think I should grant the motion at this time, and that I

11   either deny it without prejudice or hold it in abeyance or

12   whatever and say, Look, other judges have had this

13   experience with the voir dire.  So let's table the question

14   until we can see whether we can pick a jury here.  I think

15   the defendant says, Well, I want a jury questionnaire as a

16   precondition or precautionary bias.  What is the

17   government's view on that?

18         **MS. LOEB:**  Our view is a jury questionnaire is not

19   necessary, especially since we have now seen voir dire in

20   four trials function in a time-efficient manner.  The judges

21   have allowed the parties to ask follow-up questions.

22         I will say one drawback of a questionnaire is you

23   can't gauge the demeanor of the person as they are giving

24   the response.  So we certainly don't think a questionnaire

25   is a substitute for voir dire, and we think voir dire is

1    adequate here.

2            **THE COURT:**  Would there be any harm, in the

3    government's view -- again, assuming I don't grant the venue

4    motion now -- in allowing the defendant to propose what he

5    has in mind by way of a questionnaire, and then the

6    government can respond to it, including by telling me I

7    shouldn't use one?

8            **MS. LOEB:**  Just my time, Your Honor.  So, no.

9            **THE COURT:**  It's important.  My time too.

10           **MS. LOEB:**  No, I mean, I think -- I suspect our

11    position will be that we don't think the questionnaire is

12    necessary, but we are certainly happy to look at proposed

13    questions.  And if there is something that we haven't

14    thought of that should be expressed in writing we could

15    consider it.

16           **THE COURT:**  Okay.  Thank you.

17           Anything else on this question?

18           **MS. LOEB:**  If Your Honor doesn't have any further

19    questions, no.  Thank you.

20           **THE COURT:**  Thank you.  Thank you, Counsel.

21           Mr. Pearce, why don't I hear from you, and then I

22    will hear from defense counsel on these two issues.

23           Obviously I recognize the government disagrees

24    with my decision in this case and *Miller* and the like on

25    1512(c)(2).  I don't want to hear argument on that.  I

1   understand the issues very well.  I've read Judge Bates'

2   opinion from yesterday.  So on that question, obviously, I

3   understand the issues.

4          What I want to explore with you is whether and to

5   what extent, assuming I don't reconsider my position or my

6   decision, whether the indictment here is adequate; and

7   that's really what I would like to hear from you on.

8          **MR. PEARCE:**  Certainly.

9          Of course we would like you to reconsider but

10  understand the focus of today --

11         **THE COURT:**  I understood that.  I understood that

12  from your papers.  The position is clearly preserved, no

13  doubt.

14         **MR. PEARCE:**  Sure.

15         **THE COURT:**  But I do want to hear you on this

16  question.

17         **MR. PEARCE:**  So in our view -- and it's in our

18  reconsideration motion and other cases like *Miller* that  are

19  before you -- the statutory language in 1512(c)(2) and the

20  specification of the official proceeding here is one -- the

21  certification proceeding on January 6th, as sort of set out

22  in the 12th Amendment of the Constitution and in the

23  Electoral Count Act in 3 United States Code, 15 to 18 -- in

24  our view establishes a proceeding in which -- and perhaps I

25  should back up and say, there is some question from the

1    government's perspective about precisely what it is that the

2    Court requires or envisions requiring the government to

3    prove.  In other words, what does it mean for a defendant to

4    "take action with respect to a document?"

5         We make the argument here in our brief here and

6    elsewhere that we think -- essentially that's the

7    instruction to the jury, that we can get up and we can say

8    to the jury, Defendant Fischer, in this case, he took

9    actions directed at this proceeding.  The proceeding

10   involves the consideration of certificates that come in from

11   the electors that are considered by Congress.  We can put on

12   more specific evidence that shows how on January 6th itself,

13   I think it was the General Counsel to the Secretary of the

14   Senate, who comes in with some of his additional colleagues

15   and removes those ballots and other documents from the

16   proceeding that, in this case, Mr. Fischer's conduct is

17   taking action with respect to a document.

18        So that -- I think that's perhaps addressing two

19   different things at once.  One is that the indictment

20   adequately alleged a proceeding that involves documents,

21   records, et cetera, by invoking the constitutional and

22   statutory provisions.  And the broad statutory language

23   about obstructing, impeding, influencing an official

24   proceeding captures and does what it needs to do.  It

25   certainly alerts the defendant as to the conduct against

1    which he must defend himself.

2            **THE COURT:**  So one of the things you argue in your

3    brief is that it is sufficient for constitutional or other

4    requirements for the indictment to essentially use the

5    language of the relevant statute, I think, so long as the

6    statute itself contains all of the elements of the crime.

7            Here the statute -- we all know what 1512(c) and

8    (c)(1) and (c)(2) say.  There is nothing in there about the

9    certification of the electoral college and the like.  Is the

10   government's view that if the indictment had merely quoted

11   from the statute said, On January 6th, Fischer violated 18

12   U.S. Code, 1512(c)(2), maybe even quoted it, but didn't

13   identify the official proceeding, that that would or would

14   not have been adequate?

15           **MR. PEARCE:**  Clearly it's a much harder case.  So

16   the *Murphy* case out of the First Circuit, an older case,

17   suggests where an indictment fails entirely to identify an

18   official proceeding, that not only fails the constitutional

19   but also the Rule VII requirement to set out a concise

20   statement.

21           **THE COURT:**  What is that?  What is it about not

22   identifying the official proceeding at issue that is the

23   problem?

24           **MR. PEARCE:**  So as I understand that case and sort

25   of the principle underlying it, it's that a defendant

1    doesn't know what he or she must defend against.  In that

2    particular case, back to *Murphy*, there was both, I think, a

3    grand jury proceeding and potentially some other proceeding.

4    And it's escaping me now what it was.  In fact, I think in

5    the government's opening brief it suggested it was going

6    with potentially one or the other.  I think the Court said,

7    you know, Listen, the defendant has to know what it is he

8    must defend himself against.  Right?

9         And so mapping that on to here -- and I recognize

10   I am getting a little bit away from the hypothetical, but I

11   think the indictment in this case clearly identifies the

12   certification proceeding, as I mentioned before, invokes the

13   constitutional and statutory --

14        **THE COURT:**  Yeah, but -- I think "all" would

15   acknowledge.  It doesn't say anything in the -- I'm talking

16   about the indictment itself, not that there aren't facts

17   that couldn't be put in the indictment.  The indictment

18   itself doesn't say anything about -- and I get the

19   government's view, We don't know exactly what you mean.  It

20   doesn't say anything about how Mr. Fischer may have acted or

21   taken action with respect to a document of record.  There is

22   nothing in the indictment about that.

23        **MR. PEARCE:**  So I agree that explicitly there is

24   not.  Implicitly, our view is because -- and I will repeat

25   myself, but I will make it quick --

1      **THE COURT:**  Because the particular proceeding is

2  the kind -- I'm paraphrasing you but just so I have it.

3  Because the particular proceeding is of the kind at which

4  records exist or documents are relevant or something like

5  that.  It necessarily includes within it this gloss that

6  you, Judge Nichols, have imposed on the statute.

7      **MR. PEARCE:**  Basically that's right.  And now to

8  get back and try to squarely answer your hypothetical, if an

9  indictment said "any official proceeding" and there was some

10  legitimate question as to what that proceeding was, I think

11  that there is a strong argument for a defendant to say,

12  Look, it's not even clear that this proceeding even involves

13  documents, records or other objects, you know.  Therefore,

14  it's defective under probably, at least Rule VII or maybe

15  not constitutionally, and therefore, you know, it should be

16  dismissed potentially for the government to go back and put

17  in the facts, if those exist, to allege that.

18      Again, I think here we don't need to do that

19  because of the argument I think you just accurately

20  paraphrased.

21      **THE COURT:**  I do have one question which is just

22  about practice here.  Indictments in some of these January

23  6th matters have had some sort of lead-in facts description

24  before getting to the counts.  So the judges who are

25  considering whether the indictment, you know, adequately

1    states whatever - I guess whatever the argument is -- is

2    able to rely on almost, like, an introductory statement of

3    facts.

4            Do you have a sense for why that is true in

5    certain indictments in these January 6th cases and not true

6    in others like this one?  The thing about this one is, it is

7    pretty sparse, certainly as it relates to other indictments,

8    even in January 6th cases.  Is that just a function of

9    different cases being brought by different prosecutors or is

10   there something else going on?

11           **MR. PEARCE:**  So this indictment is closer to the

12   majority of the indictments in the January 6th cases.  It is

13   true that there are a non-trivial number of speaking

14   indictments, indictments that include often some sort of

15   background and then more specific factual recitation.

16           Just as an example, in *United States versus*

17   *Rhodes*, a case that charges seditious conspiracy, that

18   indictment is, I think, 30-some-odd pages -- or at least

19   Count 1 is -- and 134 paragraphs.  That is obviously very

20   different in content than the indictments here.

21           That's not a function of just, you know, what one

22   prosecutor does versus another.  Some of it has to do with

23   the nature of the allegations at issue.  So in that

24   particular case, it's a conspiracy charge.  It's a number of

25   defendants, you know, that are charged together.

18

1          None of that, in our view or to my knowledge, is

2    legally required in one way or the other.  I mean, again,

3    there are obviously federal rules and constitutional limits

4    at some point.

5          **THE COURT:**  Right.  And I wasn't suggesting it

6    was.  It was really just --

7          **MR. PEARCE:**  Why some and not others.

8          **THE COURT:**  -- why some and not others.  Yeah.

9          **MR. PEARCE:**  Right.

10         So as I said, the indictment in this case is much

11   more reflective of the majority of the indictments in

12   January 6th cases.  It tends to do with, in some respects,

13   the number of defendants or the type of charges that are at

14   issue.

15         **THE COURT:**  I hesitate to ask this because I asked

16   it once already with respect to other counts in this case,

17   which we'll address at the end of the hearing, I think,

18   about Vice President Pence as the temporary visitor.  And,

19   hey, if he may not have been, there were concededly members

20   of his family that were.  That seems to be a conceded point.

21   Are you interested in going back to getting that added to

22   the indictment?  The government said, No, no.  We are good.

23         Do you have a view about whether -- if I were to

24   conclude -- not saying I'm there -- that the indictment

25   needs to have something more about a record or some

1    additional information in it, about whether the government

2    would be willing to go back to the grand jury to include

3    that information or if it would, basically, stand on the

4    indictment as-is?

5           **MR. PEARCE:**  I will give the entirely satisfactory

6    answer of "it depends."  I think a lot would turn on what

7    this Court would say -- again, what it means for defendant

8    to take some action with respect to a document, record or

9    other object.

10          I mean, I think if it were simply to spell out the

11   provisions that are encoded in the Twelfth Amendment and the

12   Electoral Count Act.  Certainly that wouldn't be

13   particularly hard to do.  Again, in our view, it would be

14   unnecessary but would not be complicated.

15          If there was a requirement that it have more

16   specifically to do with the defendant's actions with respect

17   to a document, you know, I think that might be more

18   challenging.  You know, I think speaking candidly about this

19   case and others, there are probably not a whole lot of

20   defendants who, if the view is they needed to have

21   physically laid hands on a document or other object, grab --

22   you know -- nobody touched an electoral ballot, to the

23   government's knowledge, those allegations just don't exist

24   in a case like that.

25          **THE COURT:**  I mean, it seems to me that we are --

1    I take very seriously the notion that we are at the Motion

2    to Dismiss the Indictment stage, which is a very low

3    threshold.

4              **MR. PEARCE:**  A low bar.

5              **THE COURT:**  Or a high one.

6              **MR. PEARCE:**  Judge Hogan called it a low bar

7    recently.

8              **THE COURT:**  Right.  Exactly.  Depending --

9              **MR. PEARCE:**  Who's --

10             **THE COURT:**  If it's defendant's motion, it's very

11   high.

12             **MR. PEARCE:**  -- it --

13             **THE COURT:**  Exactly.

14             So I don't think that -- I'm not thinking that the

15   requirement would be to -- well, I guess I'm not sure.

16             I understand your view.  I understand that -- I

17   guess a different way to put it is, in your brief you argue,

18   Of course the indictment is satisfactory because we have a

19   different view of 1512(c)(2).  But even if your view, Judge

20   Nichols, continues to be your view, we can satisfy it

21   because -- and then there is essentially a statement in your

22   brief, sort of an encapsulation of what you could prove.

23             And what I was really thinking is, if something

24   like that -- which is really, like, almost a one-sentence

25   thing about Fischer's actions generally or in the

1    indictment.  My question for defense counsel, of course,

2    will be, Would that be sufficient?  Assuming my opinion on

3    1512(c)(2) stands.

4           And the question is, since you've essentially

5    written it and you think you could prove that, the statement

6    in your brief, would you be prepared to go to the grand jury

7    to get that and the indictment?  That's really, I think, the

8    question.

9           **MR. PEARCE:**  Yeah.  And I'm hesitant to give an

10   answer because I think, as I'm sure the Court understands,

11   this has system-wide consequences.  And we don't want to be

12   in a position where what we need to prove to establish a

13   violation of 1512(c)(2) is different in this courtroom than

14   it is down the hall.

15          So I agree that I think it would be relatively

16   easy to go back and insert those allegations; and that,

17   potentially, could get us past the low bar at the Motion to

18   Dismiss stage.  As I said, for those sort of systemic

19   consequences, I don't think I can commit at this point to

20   say, That's what we would do.

21          **THE COURT:**  Fair enough.  Thank you, Counsel.

22          **MR. PEARCE:**  Thank you very much.

23          **THE COURT:**  Ms Gaynor.

24          **MS. GAYNOR:**  Good afternoon, Your Honor.

25          **THE COURT:**  Good afternoon.

22

1          **MS. GAYNOR:**  What would you like me to address

2    first?

3          **THE COURT:**  I'm happy to have you take them in

4    whatever order you like.

5          **MS. GAYNOR:**  I think since we were just talking

6    about 1512, it makes sense to sort of stay with that topic.

7          **THE COURT:**  Please.

8          **MS. GAYNOR:**  Since it's fresh for both of us.

9          So I kind of want to go to the point you were

10   really just talking about with Mr. Pearce about the

11   government's -- essentially their alternate theory that they

12   presented in that sentence that you were discussing in the

13   brief.

14         I really think that based on the way my reading of

15   *Miller*, and subsequently *Fischer*, your holding is that

16   Mr. Fischer must have done something himself concrete,

17   tangible -- maybe tangible is not the right word -- but

18   concrete toward a document, record or other object.

19         And I think we can all agree, based on what we

20   know about this case, that's not what happened.  He didn't

21   lay hands on the ballots.  And I don't think that your

22   ruling in *Miller* and *Fischer*, and your construction of the

23   statute, permits this theory of his conduct, by entering the

24   Capitol that day, had this natural and probable effect --

25   those are the words in the government's brief -- of

1    destroying or impeding or imparling the ballots.

2         I just think that's a bridge too far.  And I

3    think, truly, I mean, that is why they filed -- the

4    government's filed their reconsideration motion.  Because

5    they can't -- well, there is a variety of reasons why they

6    filed their motion.  But they can't fit the facts of this

7    case into your construction of 1512(c)(2).

8         **THE COURT:**  I of course understand that is your

9    view, but why isn't that a question for trial?  When we are

10   talking about just what the indictment needs to allege, why

11   isn't it sufficient, as it is now, or why wouldn't it be

12   sufficient for the government to have a theory that, you

13   know, if they even had to add something more to the

14   indictment that it would at least provide notice as to what

15   their theory was, and then we would have a trial about

16   whether, based on my jury instructions, the evidence gets

17   them there.  Why isn't that a trial question rather than a

18   dismiss-the-indictment question?

19        **MS. GAYNOR:**  Right.

20        Backing up then one step, I think looking at Rule

21   VII, requires the indictment to contain the essential facts

22   that constitute the offense.  And here, based on the

23   construction of the statute that's been set forth by the

24   Court, an essential fact is the action that was taken

25   towards the record, evidence, object.

1          Now, I understand the government's now arguing

2     that the existence of the electoral college proceeding

3     implies that there were ballots.  It implies that there were

4     documents --

5               **THE COURT:**  Let me just pause you there for a

6     second.

7               **MS. GAYNOR:**  Sure.

8               **THE COURT:**  Look at Count 2.  What facts does

9     Count 2 have it in?

10          **MS. GAYNOR:**  Well, I mean, to be perfectly frank,

11     there is a lot of sparsity in this indictment.  That's been

12     our complaint, not only in this case and other cases that

13     we've had.  They really are just, essentially, citing

14     statutes.  They are not giving a lot of facts.

15               **THE COURT:**  The government says that's adequate.

16          **MS. GAYNOR:**  And perhaps for some charges it is.

17     For example, Count 2 -- so Count 2 -- okay.  So a forceable

18     assault, resist, oppose, impede; those are actions that a

19     person takes with respect to the law enforcement officer;

20     that's the object of the action.  And here they haven't

21     identified what the object of the action is.

22               **THE COURT:**  In Count 3?

23          **MS. GAYNOR:**  Aside from saying the it was the

24     ballots and the electoral college.

25               **THE COURT:**  Right.  I mean, Mr. Pearce, basically

1    says, Look -- I'm going to paraphrase, of course -- we cite

2    the statute, we cite the date, we have identified the

3    relevant proceeding.  And because we identify the relevant

4    constitutional provisions and statutory provisions, which

5    necessarily require a document or records to exist and be

6    around, that provides your client with as much notice and/or

7    the grand jury passed on as much specificity in Count 3 as

8    it did in Count 2.  What is wrong with that argument?

9         **MS. GAYNOR:**  Well, it doesn't fit into the

10   construction of 1512(c)(2) that Your Honor set forth in his

11   opinions.  Because, as you noted in your opinion, there are

12   no facts that imply -- suggest or imply or state with any

13   precision that our client took any action with respect -- he

14   himself took any direct action with respect to a document,

15   record, piece of evidence.

16        **THE COURT:**  But does the indictment have to say

17   that?  That's my question.

18        **MS. GAYNOR:**  I think it does.  I think, if we

19   construed the statute in a way that is perhaps -- I mean, so

20   one of the big issues in this case is whether or not there

21   was clarity in the statute.  Everyone disagreed about that.

22   Now we have a ruling that says, Yes, there is a lack of

23   clarity, but this is what it means.

24        So if we've narrowed the clarity down or if we've

25   put a finer point on things, I think then to allow the

1   government just to have a simple recitation of the statute,

2   just gets them back to where they were before we went even

3   went through this exercise of arguing these motions, truly.

4        **THE COURT:**  Well, but what it means, I suppose is,

5   in the government's view, Count 3 would survive --

6        **MS. GAYNOR:**  Uh-huh.

7        **THE COURT:**  -- either as it's currently pleaded,

8   so to speak, or perhaps with, you know, as you haven't

9   exactly invited, but you've suggested the government could

10  go back to the grand jury and get a superseding indictment

11  that could include a little bit more information.

12       What we would then have, though, is we would have

13  a case where everyone knows that going to trial, the

14  government's proof is going to be -- is going to have to be

15  directed at a particular construction of the statute.

16       In other words, it's not as if just because the

17  indictment might survive on this theory that the case isn't

18  otherwise a different case than it would have been absent

19  their filing.

20       **MS. GAYNOR:**  Right.

21       **THE COURT:**  They would still have to prove the

22  case based on my instructions to the jury about what it

23  requires to have violated 1512(c)(2).

24       **MS. GAYNOR:**  Yes.  And I understand that

25  completely and I understand that point, but I still believe

1    that the indictment should contain an essential fact, which

2    would be the conduct -- and it doesn't have to be overly

3    descriptive, but I think the indictment still needs more

4    here about what the action was that was taken, and what the

5    object of that action was.

6           **THE COURT:**  One of the things I'm struggling with

7    is, at least as you look at just this indictment, some of

8    the other counts don't really seem to have --

9           **MS. GAYNOR:**  Sure.

10          **THE COURT:**  -- the kind of specificity you are

11   talking about.

12          Count 6 basically says, Fischer engaged in

13   disorderly and disruptive conduct with the intent to impede

14   disrupt, disturb.  It doesn't say what he did.

15          **MS. GAYNOR:**  What he did.  Right.

16          **THE COURT:**  It just says he did it.  He did this

17   thing that is the language in the statute.  Why isn't that

18   inadequate, in your view, if Count 3 is?

19          **MS. GAYNOR:**  Right.  So I think -- to be perfectly

20   frank, I think -- you know, Count 3 has presented a lot of

21   issues with, What does it mean, in context of January 6th

22   prosecutions.  Disruptive, disorderly conduct, I mean, that

23   is something laypeople understand and lawyers understand

24   sort of on a -- it's just sort of a simple level we get.

25          **THE COURT:**  One line that one might draw from the

1    case is that it's okay to essentially parrot the language of

2    the statute, so long as the language of the statute is

3    commonly understood to have a particular meaning by most

4    people.  But it's not enough to parrot the language of the

5    statute, in the event there is, you know, the language of

6    the statute isn't clear to most people or there is a

7    substantial limitation that you can't find within the

8    language of the statute.  Is that, maybe, the way in which

9    you would distinguish Counts 3 and 6?

10              **MS. GAYNOR:**  Yes.  Absolutely.

11              **THE COURT:**  Okay.

12              **MS. GAYNOR:**  Thank you for that.

13              **THE COURT:**  Sure.  So I have a procedural

14    question.

15              **MS. GAYNOR:**  Sure.

16              **THE COURT:**  There have been a couple cases which

17    I've had the 1512(c) question in front of me.  I believe, in

18    this one -- so Mr. Fischer moved to dismiss Count 3 of the

19    indictment.

20              **MS. GAYNOR:**  Right.

21              **THE COURT:**  The government responded.  And of

22    course the government's main argument is 1512(c)(2) is not,

23    as you have now interpreted it, Judge Nichols, but as to

24    most of the rest of the bench has interpreted it, so you

25    can't dismiss the indictment on that grounds.

1          I think there is a question whether the government

2     made, at that time, the alternative argument as fully as its

3     making now, about whether the indictment was nevertheless

4     adequate, even if you took the narrowed interpretation that

5     you proposed and I adopted.  We are now at the Motion for

6     Reconsideration stage.  The government is clearly making the

7     argument that I got 1512(c) wrong -- and in any event, even

8     if I didn't, the indictment is inadequate.

9          You've responded to those arguments, but have not

10    argued that the government somehow forfeited the fallback

11    argument.  Do you agree that I absolutely can reach that

12    fallback argument now, at a minimum either because there is

13    a Motion for Reconsideration or you forfeited your

14    forfeiture argument?

15         **MS. GAYNOR:**  Well, I don't want to forfeit my

16    forfeiture argument, but I also want the issues in this case

17    to be handled correctly and we want the record to be clear.

18         I think really at the end of the day we -- the way

19    -- the posture of the case right now is that Count 3 has

20    been dismissed without prejudice.  I know that we have this

21    pending reconsideration motion.  But I really think if the

22    government wants to persist -- assuming you deny the

23    reconsideration motion as it relates to your interpretation

24    of 1512(c), if the government wants to persist on a 1512

25    charge against my client, I really believe the ball is in

1    their court to go back to the grand jury.

2              THE COURT:  They have two alternatives.  One is

3    they could, of course, appeal.

4              MS. GAYNOR:  True.

5              THE COURT:  Seek to appeal.  Or they could go back

6    to the grand jury.  There would be a superseding indictment.

7    Again, I am not saying they have to, of course.  I am just

8    exploring these questions.  But if they went back to the

9    grand jury and got a superseding indictment, the original

10   Motion to Dismiss Count 3 is essentially mooted out.

11             MS. GAYNOR:  Right.

12             THE COURT:  And I would have to consider a new --

13   assuming you renewed your motion -- whether to grant it at

14   that point.  So these issues would be right back in front of

15   me.

16             MS. GAYNOR:  Right.

17             THE COURT:  Fair enough.

18             THE COURT:  So let's talk venue.

19             MS. GAYNOR:  Sure.

20             THE COURT:  Okay.

21             MS. GAYNOR:  Okay.

22             THE COURT:  Why should I not just wait?

23   Especially given the experience of three or four of my

24   colleagues?  I know Judge Walton's trial was unique.  And my

25   understanding is there was some agreement among the parties

1    to have a slightly different, than typical, jury selection.

2    But as to three of them, as Ms. Loeb articulated, of the

3    venire, something less than 20 percent were excluded for

4    cause because of the issues or the types of issues that you

5    argue require --

6              **MS. GAYNOR:**  Transfer.

7              **THE COURT:**  -- on a very high standard transfer.

8              **MS. GAYNOR:**  Sure.

9              **THE COURT:**  So we have three cases, 80 percent or

10   more in each case, 3 different judges here have concluded

11   can sit on a jury.  Why isn't that enough, at least for me

12   to conclude that I should wait to see how voir dire happens

13   here?

14             **MS. GAYNOR:**  So I obviously agree that Your Honor

15   can wait or that the motion can be renewed or whatever sort

16   of procedural posture we put it in and that it could be

17   renewed.

18             What I'm really interested to see is what happens

19   as these trials keep going.  Because we are at the very

20   beginning of this now.  Right?  So there's been four trials.

21   I know there have been, you know, quite a handful of

22   defendants that have pled and have been sentenced.  You

23   know, I think there is still something like 500 cases -- I

24   could be a little bit wrong on that number -- that are

25   outstanding.

1          So as these keep coming through the mill, I'm

2     really interested to see what would happen and how the

3     percentages are going to change.  And one of the arguments

4     that I was going to make about sort of the publicity and the

5     kind of baked-in prejudices that are happening, really right

6     as we stand here, in this D.C. venire, has to do with the

7     fact that this January 6th news cycle is just going to keep

8     repeating every time we have a new trial and every time we

9     have a new verdict.

10          I mean, we just saw it yesterday -- yesterday or

11     the day before, the Webster verdict came out.  It splashed

12     on the newspapers again.  So I think it's inevitable that

13     Mr. Fischer, when he goes to trial, he will be going to

14     trial on the heels of someone else.

15          I think that to -- I don't think the -- I think

16     the baked-in prejudices that are already there, which we've

17     established in the survey, I think they have the clear

18     potential to only get worse as time goes on as more trials

19     happen.

20          So we could wait but that could also -- I mean, it

21     could help us in our motion, because we might have a much

22     more different jury pool in the fall, early part of next

23     year, than we do right now.

24          **THE COURT:**  Remind me -- not to skip ahead too

25     much -- but we have not yet set a trial date yet.  Correct?

1      **MS. GAYNOR:** We haven't, no. I think we were all

2  expecting that once these few pretrial issues --

3          **THE COURT:** The of the issues are resolved.

4          **MS. GAYNOR:** -- we can start talking about that

5  seriously, yes.

6          **THE COURT:** Okay. What's your response to my

7  question about whether most, if not all of the cases in

8  which there really has been a change in venue motion that's

9  been granted, there's really something known about the

10  particular defendant --

11          **MS. GAYNOR:** Right.

12          **THE COURT:** -- within the jury pool?

13          **MS. GAYNOR:** Sure. It's interesting when you read

14  this kind of body of case law -- although it's not

15  necessarily -- well, it is. The *Timothy McVeigh* case. The

16  names of the defendants attached to these cases are names we

17  all know. Right? Because they are really notorious

18  criminal defendants in the federal system. I totally just

19  lost my train of thought. I'm sorry.

20          Can you repeat what you just asked me? I

21  apologize.

22          **THE COURT:** Well, it seems to me what you just

23  said cuts against your client pretty significantly.

24          **MS. GAYNOR:** Oh, yes. I knew where I was going.

25          **THE COURT:** Because -- well, go ahead.

1      **MS. GAYNOR:**  Okay.  Thank you.

2      So January 6th is such a different event than

3  these discrete crimes that happened, like the Oklahoma City

4  bombing, for example, or the murder in *Rideau*.

5      It sort of goes back to what I was just

6  discussing.  It's a crime that happened on a particular

7  date, but it keeps resurfacing in the news for a variety of

8  reasons.  I mean, it's not just the trials I was mentioning.

9  We got the Congressional investigations, we've got how it

10  plays into mid-term elections.  It's constantly, at this

11  point, being brought back to the floor.  It's not something

12  that happened in a moment in time.  The population of D.C.

13  the potential jurors are constantly reminded of it.

14      This motion really isn't about Mr. Fischer and his

15  notoriety, it's about the impact of that day and what

16  happened on that day.

17      **THE COURT:**  Right.  I mean it seems to me that the

18  implications of this motion -- and your argument is that

19  literally every single January 6th case should be

20  transferred somewhere else.

21      **MS. GAYNOR:**  Well, I'm only here to speak to

22  Mr. Fischer.

23      **THE COURT:**  I understand.  But I can thing about

24  what the implications of the argument would be.  And that

25  would mean notwithstanding the constitutional provision that

1    generally requires trials to happen at the location of the

2    crime, and the fact that the allegations are these

3    defendants all came here --

4         **MS. GAYNOR:**  Right.

5         **THE COURT:**  -- engaged in the conduct they engaged

6    in; that they are nevertheless all -- entitled is the wrong

7    word, but I am just going to use it -- they all have valid

8    motions to transfer venue somewhere else.  So D.C. is the

9    one place that no January 6th trial should occur, is the

10   implication of your argument.

11        **MS. GAYNOR:**  Right.

12        It is and we -- again, we understand that this is

13   an extremely difficult motion for defendants to win.  But I

14   do think that January 6th was such a unique event that

15   involved so many defendants and also impacted so many people

16   that we are confronted with just a very unique situation.

17        **THE COURT:**  So imagine that I defer the motion or

18   deny it without prejudice for leave to refile at trial or

19   whatever, the questionnaire proposition, do you agree that

20   if I were inclined to at least consider a questionnaire,

21   that the right procedural course is to have the defendant

22   propose the questionnaire or at least to negotiate with the

23   government over one whether there might be one that both

24   sides could live with.  If not, propose it to me.  The

25   government gets a chance to object to it, tell me why I

1    shouldn't do it, and then I do all of that well in advance

2    of all jury selection efforts?

3         **MS. GAYNOR:**  Correct.  That would be the plan.

4         I mean, I think we could work with Ms. Loeb and

5    her co-counsel to come up with the questionnaire that would

6    be suitable.  And if there are areas we object, we would

7    bring it to Your Honor.

8         It's not going to be, you know, a 500-question

9    questionnaire.  But I do think there are some pointed

10   questions that could be asked in advance that would help

11   ferret out some of the -- so that Your Honor would have a

12   better chance at actual voir dire.

13        **THE COURT:**  Right.

14        And just procedurally we'd -- again, assuming

15   assuming -- we would fold that step of a proposed

16   questionnaire and the like into the "to be agreed upon" or

17   "to be set by me" pretrial schedule.

18        **MS. GAYNOR:**  Sure.  Yeah.

19        I think if you were to deny or defer, really, the

20   motion, I think that would probably be the next thing that

21   we should start at least preparing so that we can have that

22   to you well in advance of any trial scheduling.

23        **THE COURT:**  Okay.

24        **MS. GAYNOR:**  And I don't think that's something

25   that needs to happen -- we could work on that now, you know.

1   It doesn't have to happen too close to trial.

2           **THE COURT:**  Okay.  Thank you, Counsel.

3           **MS. GAYNOR:**   Thank you.

4           **THE COURT:**  I'm happy to hear from either of you

5   or both of you, Ms. Loeb or Mr. Pearce.  I don't have any

6   particular questions, but I'm happy to hear from you on

7   anything you would like to say.

8           **MS. LOEB:**  Thank you, Your Honor.

9           On the venue point, I just wanted to point out

10  that the example of *Enron*, I think, is similar to January

11  6th.  It is something that continued to be in the news.  It

12  involved many different defendants.  In fact, it was in the

13  decision in *Skilling* that the Court found that the passage

14  of time was one of the factors that actually weakened the

15  argument for a change of venue.  And I think there's good

16  reason for that, which is the effects in the immediate

17  aftermath of a crime diminish over time.  Defendant talks

18  about some of those effects in the motion, such as curfews

19  or closures.

20          **THE COURT:**  Right.

21          **MS. LOEB:**  We argue those aren't of the kind that

22  would require venue transfer.  But in any event, the effects

23  of those would diminish over time.

24          **THE COURT:**  Thank you.

25          **MS. LOEB:**  Thank you.

1          **THE COURT:**  Mr. Pearce, anything?  You don't have

2     to.

3          **MR. PEARCE:**  I'll make just one very brief point.

4     The potential rule about there being a -- the language of

5     the indictment is generally enough, unless there is --

6     parroting is enough, unless there is substantial limitation

7     that's not apparent from the face of the statute.  I think,

8     actually, it is already the rule under the Supreme Court's

9     *Russell* case.  And I would just say that -- I think that

10    that's a 1960s case.

11         **THE COURT:**  Yes.

12         **MR. PEARCE:**  And I think the Supreme Court, the

13    D.C. Circuit, other judges on this court have pretty

14    infrequently found *Russell* to apply.  The *Resendiz-Ponce* case

15    from the Supreme Court doesn't apply it.  The *Williamson*

16    case from the D.C. Circuit.  I think Chief Judge Howell in

17    *Apodaca* doesn't apply it.  And I don't think it would apply

18    here either.

19         **THE COURT:**  For the reasons you argued, yes.

20         **MR. PEARCE:**  Yes.

21         **THE COURT:**  Okay.  Thank you.

22         So as to the two motions that were argued today, I

23    am going to take both of them under advisement.  The motion

24    for reconsideration, I'm still very much contemplating,

25    especially the question of whether the indictment is

1    adequate, even if I don't reconsider the 1512(c)(2) decision

2    in *Miller* and here; so that I'm taking under advisement.

3          I'm also taking venue under advisement.  I will

4    say that my very strong inclination is hold effectively hold

5    it/deny it without prejudice, to be renewed at trial,

6    depending on how the voir dire goes.  But I'm not holding

7    that today.  I just wanted to give you a preview of my

8    thinking.  As I can imagine you likely inferred from my

9    questions today and, frankly, from the questions I asked

10   earlier in the McKellop hearing.

11         So there is still the question of the counts about

12   temporary visiting the Capitol, and I'm prepared to decide

13   that question today.  As everyone knows, in my previous

14   order, I instructed the government to either amend the

15   superseding indictment allege that one then-Vice President

16   Pence's family members attended the certification of the

17   electoral vote of the Capitol on January 6th or to explain

18   to the Court why it will not do so.

19         The government responded contending that no

20   further amendment is necessary because the Vice President

21   was temporarily victim the Capitol on January 6th within a

22   meaning of the relative statute stated cite.

23         On the government's reading of the statute, or at

24   least the government's sort of starkest reading of the

25   statute, someone can temporarily visit even their only work

1   office or their primary work office.  And, in any event, the

2   government argued in the various papers that just because

3   Vice President Pence had an office, the so-called ceremonial

4   office in the Capitol, doesn't mean he couldn't temporarily

5   visit that office or the rest of the Capitol for that

6   matter.

7   Fischer posits that this position produces

8   awkwardness, because anyone who leaves his or her home to go

9   to their permanent place of work is, according to the

10  government, merely temporarily visiting that place.

11  I agree with Fischer that that stark reading of

12  the statute does seem like a stretch, but the indictment

13  here doesn't relate to Vice President Pence's visit to his

14  only or even his primary office.

15  Instead, at most he would have visited his

16  ceremonial office at the Capitol on January 6th, 2021.  And

17  the government is free to prove at trial that he rarely

18  visited that office.  Moreover, Vice President Pence, as the

19  President of the Senate, provided over joint session of

20  Congress during the certification of the electoral vote;

21  that certification proceeding took place, at least in part,

22  in the Chamber of the House of Representatives, and not in

23  the Senate Chamber.  Again, Vice President Pence

24  constitutionally only has a role as it relates to the

25  Senate.

1      So after reading over the papers, the opinions

2  that have addressed the same arguments, I agree with the

3  government that no further amendment is necessary at this

4  time.  It is certainly possible the government can prove at

5  trial that Vice President Pence was temporarily visiting

6  parts of the Capitol within the meaning of the statute on

7  January 6th, 2021.  I therefore deny defendant's Motions to

8  Dismiss Counts 4 and 5 of the Superseding Indictment.

9      So that's my holding on that motion -- or in light

10  of my prior order and the government's briefing, the

11  defendant's motion is denied.

12      Having already indicated I am going to take those

13  other motions under advisement, are there any other topics

14  we should discuss today from the government's perspective?

15  Is it worth talking about any scheduling issues recognizing

16  that I still have to decide the Count 3 Motion for

17  Reconsideration in particular?

18      **MS. LOEB:**  Yes, Your Honor.

19      Just the exclusion of time.  I know the pending

20  motions now we have 30 days of tolling.  But any tolling

21  beyond that or the next status.

22      **THE COURT:**  Well, I suppose then, should we at a

23  minimum just schedule another status in this matter and then

24  assuming that there is no objection from the defendant or

25  agreement exclude time between today's date and that next

1    status?

2              **MS. LOEB:**  Yes, Your Honor.

3              **THE COURT:**  And do you believe that 60 days is

4    appropriate or -- cause obviously I need to decide the

5    Motion for Reconsideration but I don't have a great sense of

6    what else is going on discovery wise or otherwise, frankly.

7    Is 60 days an appropriate period of time from the

8    government's perspective?

9              **MS. LOEB:**  Yes, Your Honor, it is.

10             **THE COURT:**  How about from Mr. Fischer's

11   perspective.

12             **MS. GAYNOR:**  We would agree with that too, Your

13   Honor.  Sixty days is appropriate.

14             **THE COURT:**  I apologize I'm just looking at my

15   calendar.  Are the parties available for a status on July

16   6th at 2 p.m.?  I think it need not be in person.  This can

17   be on the phone or video.

18             **MS. LOEB:**  That works for the government, Your

19   Honor.

20             **MS. GAYNOR:**  And that's fine with us too.

21             **THE COURT:**  Um, and just so the record is clear,

22   Ms Gaynor, Mr. Fischer agrees it is appropriate to exclude

23   time under the Speedy Trial Act to the extent it's not

24   already being excluded?

25             **MS. GAYNOR:**  Yes, Your Honor, we do.

1    **THE COURT:**  All right.  So we will do another

2    status in this matter July 6th at 2 p.m.  We will do it by

3    phone.  And I believe that it's in the interest of justice

4    to exclude time between today's date for the various reasons

5    discussed, my consideration -- the motions and the like --

6        **MS. LOEB:**  And Your Honor, we are also continuing

7    to produce discovery, specifically the voluminous discovery

8    that applies across the Capitol riot cases.

9        **THE COURT:**  And for that reason as well, that it

10   makes sense to exclude time under the Speedy Trial Act

11   between today's date and that next status of July 6th.

12        Anything else from the government's perspective,

13   Ms. Loeb?

14        **MS. LOEB:**  No, I believe defense counsel has a

15   request but nothing from the government.

16        **THE COURT:**  Mr. Ohm.

17        **MR. OHM:**  I do but if I could ask for the Court's

18   indulgence really quick.

19        Thank you, Your Honor.

20        If -- is it possible to do that next hearing in

21   person?  I know that it's burdensome to the government but I

22   believe --

23        **THE COURT:**  Do you object to doing it in person

24   and on the phone?  If the government would like to

25   participate other than --

1    **MR. OHM:**  I don't have any grounds I think to

2    object to Ms. Loeb being on the phone.

3        **THE COURT:**  My recollection is Ms. Loeb lives

4    quite farred burdensome to require her to come to a status

5    conference for 15 minutes.

6        **MR. OHM:**  As a taxpayer I am with Your Honor on

7    this we don't take a --

8        **THE COURT:**  You would like to be in person?

9    **MR. OHM:**  Yes.

10       **THE COURT:**  That seems just fine with me as long

11   as Ms. Loeb you don't have a problem -- I guess I would say

12   I would leave it to you to decide how you would like to

13   appear.

14       I certainly as a general matter want to

15   accommodate defendants' requests to do in-court proceedings.

16   I am happy to do that here.  You are free on the defense

17   side to appear in person.  The government is free to appear

18   how it would like to.

19       I guess what I would say is, I am anticipating

20   this will largely be a traditional status conference.  Not a

21   particularly substantive discussion.  So you are, of course,

22   welcome to appear by phone if you would like.

23       If that changes for whatever reason, then you are

24   free to appear in person as well.  So I sort of leave it to

25   you.  I know it's very burdensome to come here for a

1      15-minute hearing.

2                **MS. LOEB:**  Thank you, Your Honor.

3                **MR. OHM:**  One other question, Your Honor.

4                Mr. Fischer he's here with his wife.  His pretrial

5      conditions allow him to come to Washington, D.C. for the

6      purposes of court.  We have -- we would like permission for

7      Mr. Fischer to go to some museums before he goes back home.

8      The government does not oppose our request we just wanted to

9      --

10               **THE COURT:**  I want to make sure, Ms. Loeb, you

11     don't oppose that.

12               **MS. LOEB:**  I don't, Your Honor.

13               **THE COURT:**  Would that, Mr. Ohm would that be

14     today?  Today and tomorrow?

15               **MS. GAYNOR:**  Today, Your Honor.

16               **THE COURT:**  Today?

17               **MS. GAYNOR:**  Yes.

18               **THE COURT:**  The request is granted.  The

19     government doesn't oppose.  It's just today to visit some

20     museums I don't have a problem with that.

21               **MR. OHM:**  Great.  Thank you, Your Honor.

22               **THE COURT:**  Thank you, Counsel.

23               **MS. GAYNOR:**  Thank you, Your Honor.

24               **DEPUTY CLERK:**  Court is adjourned.

25               (Proceedings concluded at 2:42 p.m.)

1                    **C E R T I F I C A T E**

2

3            I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9    _____July 15, 2022_____        _/s/_____
                **DATE**                    **Lorraine T. Herman**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF SERVICE

Counsel for the Appellees certify that we served on this date a

copy of the attached supplemental appendix by Electronic Case Filing,

or by placing a copy in the United States mail, first class in Harrisburg,

Pennsylvania, addressed to the following:

JAMES I. PEARCE, ESQUIRE
U.S. Department of Justice
*james.pearce@usdoj.gov*

/s/ *Frederick W. Ulrich*
FREDERICK W. ULRICH, ESQ.
Asst. Federal Public Defender

Date:  September 14, 2022